# United States Court of Appeals
## for the First Circuit

---

No. 17-1714

UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND, on behalf of themselves and others similarly situated; LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated; AFSCME HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated; MINNESOTA LABORERS HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated; PENNSYLVANIA EMPLOYEES BENEFIT TRUST FUND, on behalf of themselves and others similarly situated; LOUISIANA HEALTH SERVICE AND INDEMNITY COMPANY, d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA, on behalf of themselves and others similarly situated,

Plaintiffs, Appellants,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION; NOVARTIS AG,

Defendants, Appellees

---

No. 17-1776

RXDN, INC., on behalf of themselves and others similarly situated,

Plaintiff, Appellant,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION; NOVARTIS AG,

Defendants, Appellees.

---

On Appeal from the United States District Court for the District of Massachusetts
Civil Action Nos. 15-12732-ADB, 15-13461-ADB, 15-13724-ADB, 15-13725-ADB, 15-13726-ADB, 16-12399-ADB

---

## BRIEF OF PLAINTIFFS-APPELLANTS

---

Thomas M. Sobol
Hannah W. Brennan
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700

*Counsel for End Payer Purchaser Appellants*

John D. Radice
RADICE LAW FIRM, P.C.
34 Sunset Blvd
Long Beach, NJ 08008
Tel.: (646) 245-8502

Noah Rosmarin
ADKINS, KELSTON & ZAVEZ, P.C.
90 Canal Street, Suite 500
Boston, MA 02114
Tel.: (617) 367-1040

*Counsel for Direct Purchaser Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Plaintiffs-Appellants state as follows:

Plaintiff-Appellant Laborers Health and Welfare Trust Fund for Northern California has no parent corporations, and no publicly held company owns 10% or more of its stock.

Plaintiff-Appellant Louisiana Health Service and Indemnity Company d/b/a/ Blue Cross and Blue Shield of Louisiana has no parent corporations, and no publicly held company owns 10% or more of its stock.[1]

Plaintiff-Appellant RXDN, Inc. has no parent corporations, and no publicly held company owns 10% or more of its stock.

---

[1] Before the Court are two endpayer purchasers and one direct purchaser who press damages claims. Previous parties' injunctive relief claims have been mooted.

# TABLE OF CONTENTS

I.      JURISDICTIONAL STATEMENT ................................................................1

II.     STATEMENT OF THE ISSUES ................................................................3

III.    STATEMENT OF THE CASE ......................................................................5

        A.      Overview ...............................................................................................5

        B.      The Development of Imatinib Mesylate ...............................................6

        C.      The First Gleevec Patent ....................................................................11

        D.      The Second Gleevec Patent.................................................................12

        E.      Prosecution of the Second Patent before the PTO .............................15

                1.      Examiner's Initial Rejection ......................................................15

                2.      Patent Trial and Appeal Board Reversal....................................15

                3.      Novartis's Opportune Prior Art Disclosures..............................17

        F.      Novartis's Sham Lawsuits Against Generic Competitors...................19

        G.      Procedural History...............................................................................23

IV.     SUMMARY OF THE ARGUMENT ............................................................24

V.      ARGUMENT.................................................................................................25

        A.      Legal Standard for Motions to Dismiss ..............................................25

        B.      The district court wrongly dismissed the purchasers' sham
                litigation claim....................................................................................26

                1.      Legal Standard for Sham Litigation...........................................26

                2.      Legal Standard for Patent Obviousness .....................................27

                3.      The complaints adequately allege there was no realistic
                        likelihood the second Gleevec patent would be upheld as
                        non-obvious.................................................................................32

4.    The district court erred in dismissing the purchasers' sham litigation claim. ...............................................38

    i.    The district court did not accept the purchasers' well-pleaded facts as true. .............................38

    ii.   The purchasers' allegations were not conclusory...........42

    iii.  The district court misinterpreted the presumption of patent validity as requiring a heightened pleading requirement in sham litigation cases. ..............45

        (1)  The district court's tarnishment or invalidity rule undermines the purpose of sham litigation.................................48

        (2)  The presumption of validity is not evidence of validity. ............................54

    iv.   The district court incorrectly relied on the PTO's issuance of the second Gleevec patent to discard the purchasers' sham allegations. ...................58

    v.    The district court misunderstood the patent prosecution history. ........................61

5.    The district court should have applied *California Motor* instead of *PRE* to the purchasers' sham claim.........................62

C.    The district court wrongly dismissed the purchasers' *Walker Process* claim. ...................................67

1.    The complaints allege Novartis misled the PTO regarding its production of the β-crystalline form of imatinib mesylate. ...................................69

    i.    Novartis's claim that its β-crystalline form of imatinib mesylate was surprising was a material misstatement. ...................................69

    ii.   Novartis's claim that imatinib mesylate had not previously been prepared was a blatant falsehood. ........74

2.    Novartis acted with intent to deceive........................................77

VI.    CONCLUSION.................................................................................82

TABLE OF GENERIC INFRINGEMENT LAWSUITS........................................84

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Allergan, Inc. v. Apotex Inc.*,
   754 F.3d 952 (Fed. Cir. 2014) .........................................................29

*In re AndroGel Antitrust Litig. (No. II)*,
   888 F. Supp. 2d 1336 (N.D. Ga. 2012)..................................46, 47, 61

*Asahi Glass Co., Ltd. v. Pentech Pharm., Inc.*,
   289 F. Supp. 2d 986 (N.D. Ill. 2003)................................................52

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................25

*Beckman Instruments, Inc. v. Chemtronics, Inc.*,
   439 F.2d 1369 (5th Cir. 1970) ...................................................67, 73

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................25, 26

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,
   326 F.3d 1226 (Fed. Cir. 2003) .................................................67, 77

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
   157 F.3d 1340, 1364 (Fed. Cir. 1998) ..............................................68

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972).......................................................62, 63, 65, 66

*Cardigan Mountain Sch. v. N.H. Ins. Co.*,
   787 F.3d 82 (1st Cir. 2015)............................................26, 44, 45, 74

*In re Cardizem CD Antitrust Litig.*,
   105 F. Supp. 2d 618. (E.D. Mich. 2000) ..........................................47

*Connell v. Sears, Roebuck & Co.*,
   722 F.2d 1542 (Fed. Cir. 1983) .......................................................54

*Cuno Eng'g Corp. v. Automatic Devices Corp.*,
   314 U.S. 84 (1942)............................................................................28

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677, 690 (2d Cir. 2009) ................................................50, 51

*Dippin' Dots, Inc. v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007) .................................................68, 78

*Douglas v. City of Springfield*,
No. 14-30210-MAP, 2017 WL 123422 (D. Mass. Jan. 12, 2017) ....................53

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006) ...........................................................37

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)................................................................26, 27

*In re Effexor XR Antitrust Litig.*,
No. 11-cv-5479, 2014 WL 4988410 (D.N.J. Oct. 6, 2014)................................47

*Futorian Mfg. Corp. v. Dual Mfg. & Eng'g, Inc.*,
528 F.2d 941 (1st Cir. 1976)...........................................................55

*García-Catalán v. United States*,
734 F.3d 100 (1st Cir. 2013).........................................................44, 45

*Graham v. John Deere Co. of Kansas City*,
383 U.S. 1 (1966)........................................................................31

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015) .........................................................63, 64

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)......................................................................78

*In re Huai-Hung Kao*,
639 F.3d 1057 (Fed. Cir. 2011) .........................................................62

*Hydril Co. LP v. Grant Prideco LP*,
474 F.3d 1344 (Fed. Cir. 2007) .........................................................78

*Intellect Wireless, Inc. v. HTC Corp.*,
732 F.3d 1339 (Fed. Cir. 2013) ...............................................*passim*

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*,
    552 F.3d 1033 (9th Cir. 2009) ......................................................79, 80, 81, 82

*KangaROOS U.S.A., Inc. v. Caldor, Inc.*,
    778 F.2d 1571 (Fed. Cir. 1985) ........................................................81

*United States* ex rel. *Karvelas v. Melrose-Wakefield Hosp.*,
    360 F.3d 220 (1st Cir. 2004)............................................................69

*Koppers Co. v. Foster Grant Co.*,
    396 F.2d 370 (1st Cir. 1968).............................................................32

*KSR Int'l Co. v. Teleflex*,
    550 U.S. 398 (2007).................................................................*passim*

*In re Kubin*,
    561 F.3d 1351 (Fed. Cir. 2009) .................................................32, 39

*In re Lantus Direct Purchaser Antitrust Litig.*,
    No. 16-cv-12652 (D. Mass. July 31, 2017), ECF No. 26..................46

*Lincoln v. French*,
    105 U.S. 614 (1881).........................................................................55

*In re Lipitor Antitrust Litig.*,
    868 F.3d 231 (3d Cir. 2017) ......................................................40, 41

*In re Loestrin 24 Fe Antitrust Litig.*,
    No. 1:13-MD-2472-S-PAS, 2017 WL 3600938 (D.R.I. Aug. 8,
    2017) .............................................................................................47

*Lorenz v. F.W. Woolworth Co.*,
    305 F.2d 102 (2d Cir. 1962) ............................................................56

*Microsoft Corp. v. i4i Ltd. P'ship*,
    564 U.S. 91 (2011)....................................................................55, 56

*Molins PLC v. Textron, Inc.*,
    48 F.3d 1172 (Fed. Cir. 1995) .........................................................68

*Morales-Cruz v. Univ. of P.R.*,
    676 F.3d 220 (1st Cir. 2012).............................................................44

*Morton Grove Pharm., Inc. v. Par Pharm. Co.*,
No. 04 C 7007, 2006 WL 850873 (N.D. Ill. March 28, 2006) .................... 46, 54

*In re Neurontin Antitrust Litig.*,
MDL No. 1479, No. 02-1390, 2009 WL 2751029 (D.N.J. Aug. 28,
2009) ........................................................................................................ 48

*Nobelpharma AB v. Implant Innovations, Inc.*,
141 F.3d 1059 (Fed. Cir. 1998) ................................................... 68, 78

*Otter Tail Power Co. v. United States*,
410 U.S. 366 (1973) .................................................................... 65

*P.R. Tel. Co., Inc. v. San Juan Cable Co. LLC*,
196 F. Supp. 3d 207 (D.P.R. 2016) ............................................ 64

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) .......................................... *passim*

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007) ................................................. 29

*In re Piasecki*,
745 F.2d 1468 (Fed. Cir. 1984) ................................................. 55

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*,
219 F.3d 92 (2d Cir. 2000) ......................................................... 63

*Prof'l Real Estate Inv'rs, Inc. v. Colombia Pictures Indus., Inc.*
(*PRE*),
508 U.S. 49 (1993) ............................................................. *passim*

*Purdue Pharma L.P. v. Endo Pharm. Inc.*,
438 F.3d 1123 (Fed. Cir. 2006) ............................................ 71, 72

*Regence Grp. v. TIG Specialty Ins. Co.*,
903 F. Supp. 2d 1152 (D. Or. 2012) ......................................... 53

*Ritz Camera & Image, LLC v. SanDisk Corp.*,
700 F.3d 503 (Fed. Cir. 2012) ................................................... 51

*Sanofi-Synthelabo v. Apotex, Inc.*,
550 F.3d 1075 (Fed. Cir. 2008) ................................................. 33

*Sciele Pharma Inc. v. Lupin Ltd.*,
   684 F.3d 1253 (Fed. Cir. 2012) ...................................................60, 61

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993)...................................................................69

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
   537 F.3d 1357 (Fed. Cir. 2008) ........................................................78

*Stratoflex, Inc. v. Aeroquip Corp.*,
   713 F.2d 1530 (Fed. Cir. 1983) ........................................................56

*Tellab, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................................81

*In re Thalomid and Revlimid Antitrust Litig.*,
   No. 14-6997, 2015 WL 9589217 (D.N.J. Oct. 29, 2015)...................................47

*United Mine Workers of Am. v. Pennington*,
   381 U.S. 657 (1965)...................................................................26

*United States v. Ross*,
   92 U.S. 281 (1875)....................................................................55

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
   375 F.3d 1341 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S.
   394 (2006)...........................................................................81

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades
   Council, AFL-CIO*,
   31 F.3d 800 (9th Cir. 1994) ..........................................................64

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
   382 U.S. 172 (1965)..........................................................4, 50, 67, 68

*Waugh Chapel S., LLC v. United Food & Commercial Workers Union
   Local 27*,
   728 F.3d 354 (4th Cir. 2013) .........................................................63

**Statutes**

15 U.S.C. § 15 .........................................................................1

21 U.S.C. § 355(j) .......................................................................20, 21, 23

28 U.S.C. § 1291 ..................................................................................1, 2

28 U.S.C. § 1331 .......................................................................................1

28 U.S.C. § 1332(d) ..................................................................................1

28 U.S.C. § 1337 .......................................................................................1

35 U.S.C. § 102 .......................................................................................32

35 U.S.C. § 103 ...................................................................27, 28, 33, 69

35 U.S.C. § 282 .................................................................................55, 56

**Other Authorities**

37 C.F.R. § 1.56 (2017) ....................................................................14, 67

Andrx Mem. of Law in Opp'n to Mot. of "Direct" and "Indirect"
   Purchaser Pls. for Partial Summ. J., *In re Cardizem Antitrust Litig.*,
   No. 99-md-1278 (E.D. Mich. Jan. 10, 2000), ECF No. 55 ................47

Br. of Novartis in Supp. of Mot. to Dismiss, *United Food &
   Commercial Workers Unions & Emp'rs Midwest Health Benefits
   Fund v. Novartis Pharm. Corp.*, No. 15-cv-12732, 2017 WL
   2837002 (D. Mass. May 10, 2016), ECF No. 112............................34

Carolina Pavlovsky, Hagop Kantarjian, & Jorge E. Cortes, *First-line
   Therapy for Chronic Myeloid Leukemia: Past, Present, and
   Future*, Am. J. Hematology 287 (2009) ............................................6

Fed. R. Civ. P. 9(b) .........................................................................68, 69

FTC, *Generic Drug Entry Prior to Patent Expiration* (July 2002),
   http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf.......................57

John R. Allison, Mark A. Lemley & David L. Schwartz,
   *Understanding the Realities of Modern Patent Litigation*, 92 Tex.
   L. Rev. 1769 (2014) ..........................................................................57

Joshua D. Sarnoff, *Bilcare, KSR, Presumptions of Validity, Preliminary Relief, and Obviousness in Patent Law*, 25 Cardozo Arts & Ent. L.J. 995 (2008) ........................................................55, 56

Kristen Dietly, *Lightening the Load: Whether the Burden of Proof for Overcoming a Patent's Presumption of Validity Should Be Lowered*, 78 Fordham L. Rev. 2615 (2010) ......................................................55

Leslie A. Pray, *Gleevec: The Breakthrough in Cancer Treatment*, 1 Nature Ed. 37 (2008) ........................................................................6

Mark A. Lemley, *Rational Ignorance at the Patent Office*, 95 Nw. U. L. Rev. 1495 (2001)....................................................................57, 59

# I. JURISDICTIONAL STATEMENT

The district court has jurisdiction over the complaint of United Food and Commercial Workers Union and Employers Midwest Health Benefits Fund, Laborers Health and Welfare Trust Fund for Northern California, AFSCME Health and Welfare Fund, Minnesota Laborers Health and Welfare Fund, Pennsylvania Employees Benefit Trust Fund, and Louisiana Health Service & Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana (the endpayer purchasers) under 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the proposed putative class is a citizen of a different state than at least one of the defendants.

On June 30, 2017, the district court dismissed the endpayer purchasers' claims for relief.[2] On July 18, 2017, the court entered final judgment to that effect.[3] The endpayers filed a timely notice of appeal on July 20, 2017.[4] This Court has jurisdiction over that appeal under 28 U.S.C. § 1291.

The district court also has jurisdiction over the complaint of RxDN, Inc. (the direct purchasers) under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337 because the direct purchasers bring claims under Section 4 of the Clayton Act, 15 U.S.C.

---

[2] ADD-004 (all citations to "ADD" refer to the appellants' addendum).

[3] ADD-035.

[4] ADD-048.

§ 15, for violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

The direct purchasers' factual allegations mirror those of the endpayers. On July 25, 2017, the district court entered an order granting the direct purchasers' motion for final entry of judgment under Federal Rule of Civil Procedure 54(b).[5] The direct purchasers filed a timely notice of appeal on July 31, 2017.[6] This Court has jurisdiction over that appeal under 28 U.S.C. § 1291.

---

[5] ADD-036.

[6] ADD-062.

## II.    STATEMENT OF THE ISSUES

1. *Sham patent litigation.* Under antitrust law, purchasers may recover damages for anticompetitive harm caused when a patent holder brings an infringement suit no reasonable litigant would realistically expect to succeed on the merits.[7] Purchasers of the leukemia medication, Gleevec, allege that Novartis sued generic competitors for infringement of a follow-on patent that claimed a non-needle, crystalline form of imatinib mesylate *despite* knowing a court would, ultimately, find this patent obvious: a prior Novartis patent disclosed imatinib mesylate and the claimed crystal was either an inherent product of imatinib mesylate or else derived through rudimentary techniques. Did the district court err in dismissing, under Federal Rule of Civil Procedure 12(b)(6), the purchasers' sham litigation theory?

   a. Under Rule 12(b)(6), a district court must accept as true the factual allegations undergirding obviousness. In their complaints, the purchasers allege the following facts: any pharmaceutical chemist would seek the non-needle form of imatinib mesylate as a matter of course (needle crystals do not flow well, absorb more water, and are often unstable), and any pharmaceutical chemist would have known how to make the non-

---

[7] *Prof'l Real Estate Investors, Inc. v. Colombia Pictures Indus., Inc.* (*PRE*), 508 U.S. 49, 60 (1993).

needle form through routine procedures (heated polar solvent or crystal

seeding). Did the district court err in rejecting, under Rule 12(b)(6), these

alleged facts?

b. Patent law teaches that the "presumption of patent validity" allocates the

*burden* of proof and the *standard* of proof needed at trial; it is not

evidence of a patent's validity. In dismissing the purchasers' detailed

allegations of obviousness, the district court relied on the presumption –

in and of itself – as evidence of the patent's validity, labeling facts

supporting obviousness implausible in light of the presumption. Did the

district court err in doing so?

2. *Fraudulent patent procurement.* Antitrust law prohibits patent holders from

enforcing fraudulently obtained patents and permits purchasers to recover for

such anticompetitive actions.[8] The purchasers allege that Novartis intentionally

duped the PTO into issuing its follow-on patent by materially misrepresenting

that imatinib mesylate had not previously been prepared (it had, years earlier)

and that the non-needle crystal was surprising (it was not, it is either inherent or

the result of simple laboratory reactions). Did the district court err in dismissing

the purchasers' *Walker Process* theory under Rule 12(b)(6)?

---

[8] *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172,
177 (1965).

### III.   STATEMENT OF THE CASE

#### A. Overview

The two plaintiff groups – direct and endpayer purchasers – respectively bring federal and state antitrust claims alleging the same wrongful conduct. Both allege that Novartis denied drug purchasers access to more affordable versions of the life-saving medication, Gleevec (imatinib mesylate), through a three-part anticompetitive scheme.

First, Novartis fraudulently procured a follow-on patent for the non-needle version of imatinib mesylate, making misrepresentations about both its mesylate salt form and non-needle crystal form.

Second, Novartis listed the fraudulently procured patent in the FDA's Orange Book, triggering regulatory hurdles for its generic competitors that ought not have been triggered.

Third, Novartis wrongfully enforced the follow-on patent against its would-be competitors: no litigant would realistically expect success on the merits of a suit asserting this patent because, as discovery would bear out, the non-needle crystal was an inherent characteristic of imatinib mesylate or else entirely obvious.

The purchasers allege that these actions enabled Novartis to pursue settlement agreements with its competitors that it otherwise would have been unable to realize. These settlements kept more affordable versions of Gleevec off

the market for an additional seven months, costing purchasers roughly *$2.2 billion.*[9]

## B. The Development of Imatinib Mesylate

Chronic myeloid leukemia is a cancer of the blood and bone marrow. For most of the twentieth century, the disease was fatal.[10] But a series of discoveries in the 1980s led to the development of a new medication to treat the disease, imatinib mesylate. Described as a "miracle drug" and branded as Gleevec, this medication targeted the specific cellular enzyme responsible for the cancer.[11] The estimated overall survival rate for patients treated with 60 months of imatinib mesylate therapy is now 89 percent.[12] Yet this therapy comes at a high price: prior to generic entry, Gleevec cost $540,000 for a course of treatment.[13]

Development of this drug began with a team of chemists at Ciba-Geigy (the predecessor to Novartis).[14] In the early 1990s, the team manufactured a class of

---

[9] JA-000121 (¶ 379) (all citations to "JA" refer to the appellants and appellees' joint appendix).

[10] Carolina Pavlovsky, Hagop Kantarjian, & Jorge E. Cortes, *First-line Therapy for Chronic Myeloid Leukemia: Past, Present, and Future*, Am. J. Hematology 287, 287, 291 (2009).

[11] Leslie A. Pray, *Gleevec: The Breakthrough in Cancer Treatment*, 1 Nature Ed. 37, 37 (2008).

[12] *Id.*

[13] JA-000112 (¶ 338).

[14] JA-000066-68 (¶¶ 121-33) (detailing the discovery and development of imatinib mesylate starting in 1984).

compounds, N-phenyl-2-pyrimidine-amine derivatives, that had potential for leukemia treatment. One such compound – imatinib – showed particular promise. As is typical in pharmaceutical formulation, imatinib was first produced in its purified form (also known as the free-base form).[15] Compounds in their free-base forms are usually unsuitable for drug development.[16] Therefore, pharmaceutical chemists routinely modify compounds from free-base to "salt" form.[17]

There are many different types of salts and, as a result, salt forms, each with distinct "solubilities, dissolution rates, melting points, [and] chemical stability," among other things.[18] As the purchasers' complaints allege, salt selection is one of the most important decisions chemists make during drug development: the "goal" is to identify a salt that best allows researchers to study and manufacture the compound at issue.[19]

Chemists sometimes convert compounds from free-base to salt form by adding acid. Such salts are appropriately known as "acid addition salts."[20] A salt compound formed through the addition of methanesulfonic acid is called a

---

[15] JA-000068 (¶¶ 131-33).

[16] JA-000042 (¶ 26).

[17] JA-000042 (¶¶ 26-29). Salt forms are ionic versions of free-base compounds. Unlike free-base compounds, the salt forms are electrically neutral.

[18] JA-000042 (¶ 28).

[19] JA-000042 (¶ 29); *see also* JA-000042-44 (¶¶ 26-34) (detailing the salt-selection process).

[20] JA-000043 (¶ 30).

"mesylate."[21] As the complaints allege, "[m]esylates are commonly used in the pharmaceutical industry" due to their "enhanced water solubility" and more "stable crystalline forms."[22] These characteristics are critical in large-scale pharmaceutical production and enable researchers to study compounds with greater ease.[23]

In addition to the salt question, pharmaceutical chemists often change a compound's polymorphic form. "Polymorphism is the ability of a solid material to exist in more than one form or crystal structure."[24] Crystals, like snowflakes, can take a number of shapes depending on the temperature, solvent, and degree of supersaturation in which they are formed.[25] For example, graphite and diamond are two different polymorphic forms of carbon.

Unsurprisingly, some crystalline structures are superior to others for pharmaceutical use.[26] "Needle-shaped crystals, which are long and very thin," are often the first crystals to form during a given chemical reaction.[27] But, as the purchasers allege, pharmaceutical chemists have long known to avoid needle-

---

[21] JA-000043 (¶ 33).

[22] JA-000043-44 (¶ 33).

[23] JA-000043-44 (¶ 33).

[24] JA-000044 (¶ 35).

[25] JA-000044-45 (¶¶ 36-39) (providing greater detail on polymorphisms and crystallization).

[26] JA-000045 (¶¶ 39-40).

[27] JA-000045 (¶ 41).

shaped crystals: they behave like "glass wool insulation," sticking together and making them difficult to handle in the lab and during commercial production.[28] Chemists routinely modify crystal structure "by varying temperature and degree of supersaturation, solvent, nucleation, and mechanical means."[29] If presented with a needle-shaped crystal, "[a]ny trained pharmaceutical formulation chemist . . . in the 1990s would have . . . sought a non-needle form by standard laboratory procedures."[30]

Led by chemist Jürg Zimmermann, the Ciba-Geigy team "synthesized a number of different salt forms"[31] of imatinib and eventually found that the mesylate salt form – imatinib mesylate – was superior to others. With respect to the crystalline structure of this particular salt, the purchasers allege that imatinib mesylate naturally converts to a non-needle crystal upon production.[32] A 2012 article in the Journal of Pharmaceutical Sciences supports this allegation: the article explains that the non-needle form of imatinib mesylate is the *more* stable form and that the amorphous (i.e., non-crystal) form of imatinib mesylate will

---

[28] JA-000045-46 (¶ 41).

[29] JA-000046 (¶ 43).

[30] JA-000046 (¶ 42).

[31] JA-000068 (¶ 132)

[32] JA-000069-70 (¶¶ 135-38); JA-000078 (¶ 181).

*naturally* convert to the non-needle form with time.[33]

Even if imatinib mesylate does not inherently convert to a non-needle crystal structure, the purchasers allege that a person of ordinary skill in the art would have known *how* to transfigure the crystal with minimal experimentation.[34] As the purchasers explain in their complaints, "[c]hemists routinely modify crystal habits."[35] Therefore, "no unusual skill or undue degree of experimentation [was] required to discover the non-needle form of" imatinib mesylate.[36] And any reasonable litigant would have known this.

The purchasers' complaints further allege that the characteristics of imatinib mesylate in its non-needle form – "better flow, less hygroscopic, and potentially increased stability" – were "the desired and expected features of such a polymorphic form."[37] In sum, Ciba-Geigy's development of imatinib mesylate in its non-needle form "involved routine steps, employed with a known goal," to arrive at "an expected result."[38]

With this discovery in hand, Ciba-Geigy began to test the compound,

---

[33] JA-000698, 705-07.

[34] JA-000069-70 (¶¶ 135-38).

[35] JA-000046 (¶ 43).

[36] JA-000070 (¶ 138).

[37] JA-000070 (¶ 138).

[38] JA-000070 (¶ 138); *see also* JA-000045-46 (¶¶ 39-45).

running live experiments.[39] The purchasers allege that the non-needle form of imatinib mesylate was used in *all* of these experiments.[40] When these trials confirmed that imatinib mesylate inhibits tumor growth, the Ciba-Geigy team published articles and gave presentations describing this result.[41] These articles and presentations, published in the mid-1990s, publicly disclosed that imatinib mesylate could be a powerful cancer treatment.

## C. The First Gleevec Patent

On April 28, 1994, Ciba-Geigy applied for a U.S. patent covering the class of compounds to which imatinib belongs (N-phenyl-2-pyrimidine-amine derivatives) as well as use of these compounds for "treatment" of tumors in "warm blooded animals," i.e., cancer treatment (U.S. Patent Application No. 08/234,889).[42] On May 28, 1996, the application issued as U.S. Patent No. 5,521,184 (the Zimmermann patent or first Gleevec patent), listing Jürg Zimmermann as the inventor.[43] It expired on July 4, 2015.[44]

The Zimmermann patent claimed the class of compounds in their free-base

---

[39] JA-000071 (¶¶ 145-47).

[40] JA-000080 (¶¶ 189-90).

[41] JA-000073-77 (¶¶ 155-80).

[42] JA-000282. Ciba-Geigy's first patent application pre-dated the published articles.

[43] JA-000282.

[44] JA-000366-67; JA-000096 (¶ 261) (January 4, 2015 expiration date plus six months of pediatric exclusivity).

and salt forms.[45] It *specifically* claimed imatinib in its salt forms.[46] The patent's

specification further disclosed that "[c]ompounds having at least one basic group

[such as imatinib] . . . may form acid addition salts, for example with . . . *aliphatic*

*sulfonic acids, such as methane-*, ethane- or 2-hydroxyethane-sulfonic acid."[47] In

plain English: the Zimmermann patent claimed imatinib and its salt forms and

disclosed that this compound can be formulated as a mesylate salt, i.e., imatinib

mesylate.

The patent application did not discuss or describe the particular crystalline

structure of imatinib mesylate. But as the purchasers allege in their complaints,

imatinib mesylate inherently converts to the non-needle form, and, if not, would

have been an easy and obvious next step for a pharmaceutical chemist.[48]

**D. The Second Gleevec Patent**

In 1996, Ciba-Geigy merged with Sandoz to form Novartis,[49] and under the

new regime, Novartis reviewed its patent portfolios to identify possible

opportunities for expanded protection. As a breakthrough cancer therapy, Gleevec

was poised to become an extremely lucrative drug, and Novartis knew that

---

[45] JA-000297-99 (patent claims).

[46] JA-000295, JA-000299 (Example 21 & Claim 23).

[47] JA-000284 (col. 3, ll. 23-40).

[48] JA-000045-46 (¶¶ 39-45); JA-000068-70 (¶¶ 134-38).

[49] JA-000076 (¶ 168).

extension of this drug's patent term would be highly valuable. Accordingly, Novartis searched for a way to file a second, later-expiring patent on Gleevec.

On January 18, 2000 – six years after Ciba-Geigy filed the application that led to the first patent and four years after that patent issued – Novartis filed U.S. Patent Application No. 09/463,097 claiming the *non-needle crystal form* of imatinib mesylate.[50] Naming Jürg Zimmermann as an inventor once again, Novartis's follow-on application described the non-needle form of imatinib mesylate as "new"[51] and dubbed it the "β-crystal form."[52] Novartis then contrasted it with the needle-shaped form, which the application called the "α-crystal form": "The α-crystal form of [imatinib mesylate] is characterised by needle-shaped crystals and is hygroscopic. In this form, the crystals are not particularly well-suited to pharmaceutical formulation as solid dosage forms, because their physical properties, for example their flow characteristics, are unfavourable."[53] But, as the purchasers allege, these characteristics were "the desired and expected features of such a polymorphic form."[54]

The purchasers allege that imatinib mesylate in the β-crystal form was the

---

[50] JA-000369.

[51] JA-000369.

[52] JA-000372 (col. 1, l. 30).

[53] JA-000372 (col. 2, ll. 19-26).

[54] JA-000070 (¶ 138).

*exact same compound* Ciba-Geigy had formulated in the early 1990s, patented, tested, and then described in published articles.[55] In other words, to extend Gleevec's term of patent protection, Novartis put a new name – the "β-crystal form" – on an old characteristic – a non-needle crystal.

Nonetheless, Novartis's 2000 patent application claimed that it had just discovered the non-needle form: "*It has now been surprisingly found* that a crystal form may under certain conditions be found in the methanesulfonate salt of [imatinib], . . . which has very advantageous properties."[56] The second application also represented that the first patent had only disclosed imatinib "in free form (not as a salt),"[57] ignoring the fact that this earlier patent expressly claimed imatinib and its "*corresponding salts.*"[58]

Furthermore, when it filed its follow-on application, Novartis failed to disclose many of the articles Zimmerman had published in the mid-1990s about imatinib mesylate, *the very compound it was trying to patent*.[59] Patent applicants have a duty to disclose *all* relevant prior art references with their applications.[60] Novartis had no excuse not to submit these articles: the named inventors wrote

---

[55] JA-000080 (¶¶ 189-190).

[56] JA-000372 (col. 1, ll. 27-30) (emphasis added).

[57] JA-000372 (col. 1, ll. 25-26).

[58] JA-000299 (Claim 23) (emphasis added).

[59] *See infra* Section III.E.3.

[60] 37 C.F.R. § 1.56 (2017).

most of them.

### E. Prosecution of the Second Patent before the PTO

#### 1. Examiner's Initial Rejection

The PTO examiner assigned to the second Gleevec patent initially rejected all twelve of the application's claims out-of-hand. As she explained in her rejection, the first Gleevec patent disclosed imatinib mesylate.[61] And although she recognized that the first patent did not describe the specific crystal form of imatinib mesylate, she concluded that it was *Novartis's* responsibility to show that this crystal form was not an inherent component of the earlier invention (i.e., a natural product of the manufacture of imatinib mesylate).[62] Put simply, the examiner held that Novartis must prove its second application actually described something new.

#### 2. Patent Trial and Appeal Board Reversal

Novartis appealed this decision to the Patent Trial and Appeal Board (the Board).[63] The Board reversed, but not on the merits of the application. Rather, the Board found the examiner had taken incorrect shortcuts in her anticipation and obviousness analyses.

As to anticipation, the Board noted Novartis that had represented "[i]t has

---

[61] JA-000423.

[62] JA-000423.

[63] At the time Novartis appealed this decision, the Board was called the Board of Patent Appeals and Interferences. The America Invents Act changed its name, effective 2012.

now been surprisingly found that a [β] crystal form may under certain conditions be found in the methanesulfonate salt of [imatinib]."[64] Given this representation, the Board concluded that the examiner could not impose *on Novartis* a burden to further establish that the particular β-crystal was not inherently produced. Instead, the Board held that *the examiner* was required to "provide some evidence or scientific reasoning" for her conclusion that the β-crystal was "an inherent characteristic."[65] Because her rejection had not done so, the Board reversed.

As to obviousness, the Board observed that the examiner had taken another shortcut and invoked a "*per se* rule of obviousness."[66] The Board held that this shortcut constituted reversible error, and instructed the examiner that she needed to provide a "fact-specific analysis" comparing the claims and prior art.[67] In so holding, the Board assumed, without deciding, that the first Gleevec patent disclosed the mesylate salt version of imatinib.[68]

But five weeks after the Board's decision, on New Year's Eve, the examiner issued a notice of allowance to Novartis without opinion.[69] The examiner declined to undertake the anticipation and obviousness analyses the Board had instructed

---

[64] ADD-043 (quoting the second Gleevec patent).

[65] ADD-044 (quotation marks omitted).

[66] ADD-044.

[67] ADD-045 (quotation marks omitted).

[68] ADD-042.

[69] JA-000506.

her to complete. As result, the record is devoid of any explanation for her complete about-face. Allowing the patent without opinion, the examiner effectively rubber-stamped Novartis's application.

### 3. Novartis's Opportune Prior Art Disclosures

Novartis seized on the Board's decision and the examiner's notice of allowance as an opportunity to dump relevant prior art on the PTO. Shortly after receiving the allowance, Novartis disclosed, *for the first time*, two important prior art references.[70] First, in 1996, Zimmermann and others published an article revealing that imatinib mesylate had successfully been used in live experiments (the 1996 Buchdunger Article).[71] Second, in early 1997, Zimmermann and others published another article concluding that imatinib mesylate had significant potential as a leukemia treatment (the 1997 Zimmermann Article).[72] In the "remarks" it filed with these disclosures, Novartis argued that the examiner should ignore the articles. It contended that because the Board assumed, without deciding, that the Zimmermann patent described imatinib mesylate, the articles offered no new information.[73] The examiner accepted the amendment, but once again provided no explanation for her perfunctory allowance.

---

[70] JA-000520.

[71] JA-000527-31.

[72] JA-000521-26.

[73] JA-000517.

Half a year later, on October 25, 2004, Novartis disclosed five more relevant articles to the PTO.[74] Many of these articles described the properties, selection, and production of crystal forms in pharmaceutical development.[75] And while the examiner checked the boxes ostensibly showing she considered the publications, once again she provided no explanation for her allowance.

In addition to these late prior art submissions, the complaints allege Novartis failed entirely to disclose *three other* relevant prior art references to the PTO. First, Novartis did not disclose an article Zimmermann and others published that noted crystallization was a routine part of the manufacturing process for phenylamino-pyrimidines (the class of compounds to which imatinib belongs) (the 1996 Zimmermann Article).[76] In a footnote, the authors explained that a "typical synthesis" of such compounds includes crystallization.[77] Second, Zimmermann and others published another article revealing that imatinib mesylate selectively inhibits the proliferation of leukemia-causing cells (the 1996 Druker Article).[78] Finally, in 1995, a researcher working with Zimmermann, Brian Druker, gave a

---

[74] JA-000542-43.

[75] JA-000603-05 ("New crystal forms can often be obtained by cooling hot saturated solutions or partly evaporating clear saturated solutions."); JA-000651-54.

[76] JA-000684.

[77] JA-000684.

[78] JA-000673-77.

presentation on imatinib mesylate (the 1995 Druker Presentation). In this presentation, Druker described imatinib as "useful in the treatment of [chronic myeloid leukemia]."[79] Novartis never disclosed these three references to the PTO.

The complaints allege that disclosure of these publications would have led a careful examiner to require, correctly, that Novartis come forward with evidence showing the non-needle crystal was not inherent to imatinib mesylate through routine procedures.

On May 17, 2005, the second Gleevec application issued as U.S. Patent No. 6,894,051.[80] The examiner issued the patent without opinion; she never commented on any of the late disclosures. This patent was set to expire on November 23, 2019.[81]

## F. Novartis's Sham Lawsuits Against Generic Competitors

To ensure that generic drugs hit the market as soon as patent protection expires, the Food, Drug, and Cosmetic Act allows generic drug manufacturers to

---

[79] JA-000672.

[80] JA-000669.

[81] JA-000096 (¶ 262). In 2006, Novartis submitted a third Gleevec patent application. This application issued in 2009 as U.S. Patent No. 7,554,799. JA-000101 (¶ 288). In 2011, Novartis made a change to it, and it reissued as U.S. Patent 43,932. JA-000104 (¶ 301). This third patent was identical to the second. JA-000101 (¶ 289). The patent only issued because it contained a terminal disclaimer such that it expired on the same day on as the second. JA-000102-03 (¶ 293). For this reason, we do not discuss it here: the patent would have risen and fallen with the second Gleevec patent. JA-000096 (¶ 262).

obtain tentative approval for their drugs before the brand's patents have expired. If the Food and Drug Administration (FDA) tentatively approves a generic drug, the approval becomes final the minute those patents expire or are invalidated.

To obtain FDA approval, generic manufacturers file shortened applications known, appropriately, as Abbreviated New Drug Applications (ANDA).[82] In their ANDAs, generic manufacturers must make one of four certifications: (I) that *no patent* for the brand-name drug has been filed with the FDA; (II) that the patent for the brand has *expired*; (III) that the patent for the brand *will expire* on a particular date and the generic company does not seek to market its generic product before that date; or (IV) that the patent for the brand is *invalid or will not be infringed* by the generic product.[83] The final option is aptly known as a "Paragraph IV certification." Generic drug companies filing Paragraph IV certifications with the FDA must notify the patent holders of such filings.[84]

When a generic files a Paragraph IV certification, the patent statute treats this filing as a technical act of infringement, enabling the brand to sue the generic before a single infringing product has actually been sold. If the brand files suit against the generic within 45 days of receiving its Paragraph IV certification, that lawsuit triggers an automatic, 30-month stay of the FDA's approval of the generic

---

[82] 21 U.S.C. § 355(j).

[83] *Id.* § 355(j)(2)(A)(vii)(I)-(IV).

[84] *Id.* § 355(j)(2)(B).

drug.[85]

On June 16, 2006, the generic drug company Sun Pharma filed an application to market imatinib mesylate tablets.[86] In its ANDA, Sun Pharma indicated that it would wait for the first patent to expire on July 4, 2015 before requesting final FDA approval.[87] In other words, Sun would not challenge the validity of the Zimmermann patent. But, as to the second Gleevec patent, Sun *did* file a Paragraph IV certification, taking the position that this patent was invalid and/or would not be infringed by Sun's product.[88]

When Sun sent Novartis its Paragraph IV certification, around August 2006, Novartis did not sue Sun within the 45-day window[89]: the resultant 30-month stay was worthless to Novartis, as Sun submitted its ANDA nearly 10 years before the Zimmermann patent's expiration date. On November 13, 2009, the FDA granted tentative approval to Sun's application,[90] and by the summer of 2013, Sun began to plan for its intended 2015 launch. To that end, on June 7, 2013, Sun filed an action against Novartis in federal district court seeking a declaratory judgment that Novartis's second Gleevec patent was invalid and/or Sun's generic version did not

---

[85] *Id.* § 355(j)(5)(B)(iii).

[86] JA-000100 (¶ 283).

[87] JA-000101 (¶ 286).

[88] JA-000100-01 (¶ 283).

[89] JA-000101 (¶ 287).

[90] JA-000103 (¶ 297).

infringe.[91]

By 2013, Gleevec pulled in roughly $2 billion per year for Novartis.[92] But, as the purchasers allege, Novartis knew the entry of generics would wipe away most profits. The complaints allege Novartis chose to enforce the second patent despite knowing that, were the suit ever allowed to proceed through discovery to a judgment on the merits, it would not prevail.

Indeed, in the spring of 2013, the Supreme Court of India invalidated the Indian equivalent of the second patent. As the Supreme Court of India explained, "we are completely unable to see how Imatinib Mesylate can be said to be a new product . . . Imatinib Mesylate is all there in the Zimmermann patent. It is a known substance from the Zimmermann patent."[93] The court further remarked on the quality of the second Gleevec patent: "It may also be stated here that while going through the Zimmermann patent one cannot but feel that it relates to some very serious, important and valuable researches. The [second] patent application, on the other hand, appears to be a loosely assembled, cut-and-paste job . . . ."[94]

Faced with the loss of a substantial portion of its revenue stream – as would happen if the district court held the second patent invalid, unenforceable, or not

---

[91] JA-000105 (¶ 303).

[92] JA-000105 (¶ 307).

[93] JA-000779 (¶ 131).

[94] JA-000793 (¶ 164).

infringed – Novartis offered Sun a settlement deal. And on May 15, 2014, Sun accepted.[95] While the terms of this agreement are confidential, both parties announced that, under the agreement, Sun would launch its generic Gleevec on February 1, 2016 – seven months after the expiration of the Zimmerman patent.

Sun was the first company to file a Paragraph IV certification, but it was not the last. Eight other generic drugs companies filed Paragraph IV certifications with respect to imatinib mesylate.[96] Novartis sued every one of these generics, alleging patent infringement, and gained 30-month stays of their approval.[97] But not a single one of these infringement lawsuits has gone to trial: rather than defend its second patent, Novartis has settled *every single suit*.[98] In prosecuting these sham cases, Novartis prevented generic competition and safeguarded its own monopoly, causing $2.2 billion in damages to endpayer and direct purchasers of this drug.

### G. Procedural History

On June 22, 2015, the endpayers sued Novartis, seeking injunctive relief that would enable generic competition to enter the market.[99] On August 12, 2015,

---

[95] JA-000105 (¶ 308).

[96] *See infra* Table of Generic Infringement Lawsuits.

[97] *Id.*

[98] *Id*.

[99] JA-000009 (ECF No. 1).

Novartis moved to dismiss.[100] On February 1, 2016, that injunctive relief became moot; meanwhile, damages began to accrue. On April 8, 2016, the endpayers added a claim for damages under the antitrust statutes of 24 states.[101] On May 10, 2016, Novartis again moved to dismiss.[102] On June 30, 2017, the United States District Court for the District of Massachusetts granted that motion.[103]

On November 23, 2016, the direct purchasers sued under federal antitrust law, making the same factual allegations.[104] The same district court entered judgment under Federal Rule of Civil Procedure 54(b).[105] Both plaintiff groups appealed.[106]

## IV. SUMMARY OF THE ARGUMENT

The district court was wrong to dismiss the purchasers' sham litigation claim for two primary reasons. First, the district court committed a fundamental error when it failed to accept as true the purchasers' detailed factual allegations regarding the relevant state of scientific knowledge at the time Novartis applied for

---

[100] JA-000015 (ECF No. 60).

[101] JA-000121-24.

[102] JA-000019 (ECF. No. 111).

[103] ADD-004.

[104] JA-000025 (ECF No. 1). The direct purchasers allege a single claim for relief: unlawful monopolization of the market for imatinib mesylate in violation of § 2 of Sherman Act, 15 U.S.C. § 2.

[105] ADD-036 (ECF No. 21).

[106] ADD-048-64.

the second Gleevec patent. Second, the presumption of patent validity does not require plaintiffs in sham cases to show that a court has already invalidated or tarnished the patent. The presumption of patent validity, like all presumptions, is a procedural device, not evidence of the patent's validity.

The district court also improperly dismissed the purchasers' *Walker Process* claim for two reasons. First, it disregarded the purchasers' legal and factual explanations as to why Novartis's misrepresentations regarding surprise and the state of the prior art were material. Second, the court overlooked Novartis's decision to hide key facts and misrepresent its own prior publications throughout patent prosecution, which shows intent.

## V.     ARGUMENT

### A. Legal Standard for Motions to Dismiss

At the motion to dismiss stage, a party need only allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[107] In *Twombly* (also an antitrust action), the Supreme Court reiterated that this standard does not impose a "probability" requirement; "it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."[108] The Court emphasized that "a well-pleaded complaint may proceed

---

[107] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[108] *Twombly*, 550 U.S. at 556.

even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."[109]

This Court has echoed that understanding, stressing that, at the Rule 12(b)(6) stage, district courts must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor."[110] "'[C]ircumstantial evidence often suffices' to render an asserted claim plausible in the pleading context."[111] Factual allegations "need only be enough to nudge the claim 'across the line from conceivable to plausible,' thus 'raising a reasonable expectation that discovery will reveal evidence of'" the alleged wrong.[112]

## B. The district court wrongly dismissed the purchasers' sham litigation claim.

### 1. Legal Standard for Sham Litigation

The *Noerr-Pennington* doctrine shields private entities from antitrust liability for their attempts to influence government decisions.[113] But an important exception to this doctrine exists: sham litigation is not immune. If a party's

---

[109] *Id.* (quotation marks omitted).

[110] *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 87 (1st Cir. 2015) (quoting *García-Catalán v. United States*, 734 F.3d 100, 102 (1st Cir. 2013)).

[111] *Id.* (quoting *García-Catalán*, 734 F.3d at 103).

[112] *Id.* at 88 (alteration in original omitted) (quoting *Twombly*, 550 U.S. at 556, 570).

[113] The *Noerr-Pennington* doctrine takes its name from two Supreme Court cases: *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

petitioning activities – "ostensibly directed toward influencing governmental action" – are a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor,"[114] then a court can hold the wrongdoer accountable for her anticompetitive actions without offending the First Amendment principles *Noerr-Pennington* protects.

In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* (*PRE*),[115] the Supreme Court fashioned a two-pronged test for sham cases. A plaintiff must show that the alleged sham lawsuit was: (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and (2) subjectively motivated by a desire to "conceal[] 'an attempt to interfere *directly* with the business relationships of a competitor,' through the 'use of the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon.'"[116] *PRE* further explains that "objectively baseless" means "no reasonable litigant could realistically expect to secure favorable relief."[117]

## 2. Legal Standard for Patent Obviousness

Under 35 U.S.C. § 103, obvious inventions are not patentable. "[I]f the

_____

[114] *Noerr*, 365 U.S. at 144.

[115] 508 U.S. 49.

[116] *Id.* at 60-61 (internal alteration omitted) (quoting *Noerr*, 365 U.S. at 144 and *City of Columbia v. Omni Outdoor Adver., Inc*, 499 U.S. 365, 380 (1991)).

[117] *Id.* at 62.

differences between the claimed invention and the prior art are such that the claimed invention . . . would have been obvious . . . to a person having ordinary skill in the art to which the claimed invention pertains,"[118] the invention cannot be patented. This requirement prevents inventors from patenting minor tweaks to known inventions: "[T]he new device, however useful it may be, must reveal the flash of creative genius not merely the skill of the calling."[119] Section 103 is especially important in the pharmaceutical field, where the inventions at issue are often life-saving drugs. "Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress . . . ."[120]

Within the obviousness case law, the courts have developed the "obvious to try" doctrine: where an improvement to an invention would have been obvious to try given existing knowledge, it is not patentable. In 2007, the Supreme Court explicitly endorsed this doctrine,[121] rejecting a more stringent obviousness test the

---

[118] 35 U.S.C. § 103.

[119] *Cuno Eng'g Corp. v. Automatic Devices Corp.*, 314 U.S. 84, 91 (1942).

[120] *KSR Int'l Co. v. Teleflex*, 550 U.S. 398, 419 (2007).

[121] *Id.* at 421 (holding the court of appeals erred when it concluded "that a patent claim cannot be proved obvious merely by showing that the combination of elements was obvious to try. When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." (alteration and quotation marks in original omitted)).

Federal Circuit had devised. In *KSR International Co. v. Teleflex*, the Court

reminded that "if a technique has been used to improve one device, and a person of

ordinary skill in the art would recognize that it would improve similar devices in

the same way, using the technique is obvious unless its actual application is

beyond his or her skill."[122] The Court emphasized that, in obviousness cases, courts

need not locate "precise teachings directed to the specific subject matter of

the challenged claim" before they can invalidate such claims for obviousness.

Instead, courts "can take account of the inferences and creative steps that a person

of ordinary skill in the art would employ."[123] Put simply, "[t]he combination of

familiar elements according to known methods is likely to be obvious when it does

no more than yield predictable results."[124]

Both before and after *KSR*, courts have applied the "obvious to try" doctrine

to invalidate pharmaceutical patents.[125] For example, in *Pfizer, Inc. v. Apotex,*

*Inc.*,[126] the Federal Circuit invalidated a patent Pfizer obtained on a specific salt

---

[122] *Id.* at 417.

[123] *Id.* at 418.

[124] *Id.* at 416.

[125] *See, e.g.*, *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 965 (Fed. Cir. 2014)
("[O]bviousness does not require absolute predictability of success." (quotation
marks omitted)); *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342,
1364 (Fed. Cir. 2007) ("Good science and useful contributions do not necessarily
result in patentability.").

[126] 480 F.3d 1348 (Fed. Cir. 2007).

form of a compound Pfizer had previously patented in free-base form. There, as here, the patent examiner initially rejected Pfizer's claim to the salt form as obvious in light of the prior patent. Nonetheless, the examiner eventually acquiesced when Pfizer submitted a declaration representing that the claimed salt was a "unique compound" with a "highly desirable combination of physicochemical properties" that would not have been obvious to one skilled in the art.[127] Like the first Gleevec patent, Pfizer's first patent claimed certain compounds and their pharmaceutically acceptable salts and then disclosed a number of possible salts.[128] Other prior art references then narrowed the field, suggesting an even smaller group of salts, including the target of the second patent.[129] The Federal Circuit held that the second patent's claimed salt – benzene sulfonate – was obvious in light of the first patent and this relevant art.

In so holding, the court recognized that Pfizer's creation of benzene sulfonate required some experimentation. Nonetheless, the court stressed that "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success."[130] "[A] rule of law equating unpredictability to patentability . . . cannot

---

[127] *Id.* at 1355-56 (quoting Pfizer's representations to the PTO).

[128] *Id.* at 1353.

[129] *Id.* at 1354-55.

[130] *Id.* at 1364.

be the proper standard since the expectation of success need only be reasonable, not absolute."[131] In other words, where there are not "numerous parameters to try,"[132] and a person of ordinary skill in the art would have known how to try these parameters, the patent is obvious. A patentee can only escape this conclusion if she can show some evidence of an unexpected result[133] or that the prior art taught away from the claimed invention.[134]

Both *KSR*[135] and *Pfizer* highlight an important reality: the obviousness analysis requires courts to grapple with the *contents* of prior art and the practices of professionals in the area; what the relevant references teach, describe, and suggest. But whose job is it to determine the contents of such art? The Supreme Court has answered this question clearly: the fact finder, not the court, must decide what the prior art teaches.[136] As the Federal Circuit has summarized, any obviousness

---

[131] *Id.*

[132] *Id.* at 1366 (quotation marks omitted).

[133] *KSR*, 550 U.S. at 416 (when "elements work[] together in an unexpected and fruitful manner" that reality supports the conclusion that the "design was not obvious to those skilled in the art").

[134] *Id.* ("[W]hen the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious.").

[135] *Id.* at 406 ("Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained . . . ." (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966)).

[136] *Graham*, 383 U.S. at 17.

analysis requires the fact finder to determine: "(1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention was made; and (4) objective evidence of nonobviousness, if any."[137] Thus, while patent obviousness is ultimately a question of law, it is one based on *underlying findings of fact*. The First Circuit has long echoed this understanding.[138] Here, the jury – not the district court judge – is the proper fact-finder.[139]

### 3. The complaints adequately allege there was no realistic likelihood the second Gleevec patent would be upheld as non-obvious.

There are two components to Novartis's second Gleevec patent: (1) its claim to the mesylate salt form of imatinib, and (2) its claim to the β-crystal. As to the first component, there can be no contention that imatinib mesylate was non-obvious in light of the first Gleevec patent and the inventors' publications.[140] In

---

[137] *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009) (citing *Graham*, 383 U.S. at 17-18).

[138] *Koppers Co. v. Foster Grant Co.*, 396 F.2d 370, 372 (1st Cir. 1968) ("[A]lthough, within limits, a question of law, the determination whether a discovery of a new combination is or is not obvious must be a question of fact.").

[139] JA-000028-29, 129 (requesting a jury trial).

[140] Indeed, as the Board assumed, the first Gleevec patent anticipated imatinib mesylate, rendering the second patent's claim to this salt form unpatentable under 35 U.S.C. § 102. An invention may only obtain patent protection if it is both *novel* and *non-obvious*; novelty and non-obviousness are separate standards, codified at § 102 and § 103, respectively. Under § 102, when a single prior art reference – for example, a published article – discloses the very invention the patent applicant is attempting to claim, that prior article "anticipates" the application, rendering it

*Pfizer*, a prior art reference disclosed 53 pharmaceutically acceptable salts, with

other references pointing towards a smaller subset of salts.[141] Here, the first

Gleevec patent claimed imatinib in its salt forms[142] and listed 33 potential salts,

*including the mesylate salt*.[143] The first patent alone is sufficient to render the

second patent's claim to the mesylate salt form of imatinib obvious. But, what's

more, *Zimmermann himself* published articles disclosing the tumor inhibiting

properties of imatinib *mesylate* prior to applying for the second patent![144] Thus,

this is not a case where a prior patent pointed persons of ordinary skill in the art

towards a smaller group of salts. This is a case where *the inventor's own*

*publications* taught the specific salt he later claimed. If ever there were a perfect

case for the objective baselessness of a patent holder's infringement lawsuit, it

would be Novartis's attempt to defend a patent claim it had already patented,

tested, and published widely.

---

unpatentable. "Claimed subject matter is 'anticipated' when it is not new; that is, when it was previously known. Invalidation on this ground requires that every element and limitation of the claim was previously described in a single prior art reference, either expressly or inherently, so as to place a person of ordinary skill in possession of the invention." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1082 (Fed. Cir. 2008). Section 103 is a considerably easier standard to meet than § 102 because it looks to a body of prior art and practice, rather than a single reference.

[141] *Pfizer*, 480 F.3d at 1363.

[142] JA-000299 (Claim 23).

[143] JA-000284 (col. 3, ll. 23-40).

[144] *See supra* Part III.E.3.

Because the second patent's claim to the mesylate salt form of imatinib was so clearly obvious, Novartis made no attempt before the district court in this case to defend its patent on the novelty of the mesylate salt choice. Instead, Novartis focused on the β-polymorphism.[145]

But this polymorphism was also obvious, and, as the complaints allege, no litigant would realistically expect to prevail in an invalidity challenge. The purchasers' allegations are supported by the scientific literature: research suggests imatinib mesylate *naturally converts to a non-needle crystal form*.[146] And the facts pleaded show that even if the salt did not naturally convert to the claimed polymorph, conversion of needle crystals to their non-needle form would have been obvious to a chemist of ordinary skill in the art in the 1990s.[147] By this time, both the *problems* associated with needle-shaped crystals in pharmaceutical development and the *solution* to this problem – how to transfigure such crystals

---

[145] Br. of Novartis's in Supp. of Mot. to Dismiss at 9, 14, *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Novartis Pharm. Corp.*, No. 15-cv-12732, 2017 WL 2837002 (D. Mass. May 10, 2016), ECF No. 112.

[146] JA-000698, 705-07.

[147] JA-000045-46 (¶¶ 41-43); JA-000069-70 (¶¶ 136-38). The district court's opinion seems to reject the facts the purchasers pleaded. Before bringing this case, the purchasers consulted with experts in the pharma-chemical field as well as an expert in crystals. These specialists concluded that Novartis's claimed β-crystal would have been obvious to one of skill in the art in the 1990s. But such disputes are for a jury to decide, not the district court on a Rule 12(b)(6) motion.

into their non-needle forms – were well known.[148] In short, methods of modifying crystal structures (through changes to temperature and degrees of supersaturation, solvent, and nucleation) were commonplace by the 1990s.[149]

In fact, the examiner initially rejected the second patent application for this reason: "polymorphic forms are frequently encountered for pharmaceuticals and [] the desired form (e.g. [sic] less hygroscopic) can often be obtained a number of ways including the dissolution of other forms in various solvents including methanol."[150] As the examiner noted, Novartis's "list of alternate processes for making one or more crystalline forms . . . relies on standard procedures."[151] In its brief to the Board, even Novartis accepted that "polymorphic forms are frequently encountered for pharmaceuticals and [] the desired form can often be obtained a number of ways."[152]

Furthermore, the prior art references – both those Novartis disclosed and those it withheld – suggest the obviousness of Novartis's β-crystal claim. The 1996 Zimmermann Article described a "typical synthesis" of the relevant compounds as

---

[148] JA-000045-46 (¶¶ 41-43); JA-000069-70 (¶¶ 136-38).

[149] JA-000045-46 (¶¶ 41-43); JA-000069-70 (¶¶ 136-38).

[150] JA-000424.

[151] JA-000462.

[152] JA-000476.

including "[f]iltration, evaporation and *crystallisation*."[153] Second, a text book

from Novartis's own library (which Novartis failed to disclose to the examiner

until nearly a year after her notice of allowance) noted that "[s]ome of the

parameters routinely investigated are the number of polymorphs that exist, relative

degree of stability of the various polymorphs, . . . [and] method of preparation of

each form," among other things.[154] A third belatedly submitted article described

how to obtain different crystal forms and explained that "the physical properties of

the different polymorphs . . . can affect dosage form performance . . . or

manufacturing reproducibility."[155]

The second Gleevec patent is a near perfect example of the type of patent

*KSR* targeted for invalidation. Although Novartis did not disclose a prior art

reference describing how to convert a needle-shaped mesylate salt into its non-

needle form, such a disclosure was unnecessary to prove obviousness. The

Supreme Court emphatically reversed the Federal Circuit when it attempted to so

hold in *KSR*. There, the Federal Circuit held that "unless the 'prior art references

address[ed] the precise problem that the patentee was trying to solve,'" a court

---

[153] JA-000684.

[154] JA-000651.

[155] JA-000604.

should not invalidate the patent as obvious.[156] The Supreme Court overruled this "rigid approach."[157] To prove obviousness, all the purchasers must show here is that an ordinary pharmaceutical chemist would have been motivated to convert the needle crystal into its non-needle form and would have known how to do so with minimal experimentation. And this is exactly what the purchasers allege: that, in the 1990s, pharmaceutical chemists both knew how to convert needle crystals into non-needle crystals and understood the importance of doing so. The experimentation – if any – needed to arrive at the β-crystalline form of imatinib mesylate was "'nothing more than routine' application of a well-known problem-solving strategy";[158] "the work of a skilled chemist, not of an inventor."[159] Under the purchasers' construction of the prior art, there is no question that, if litigation proceeded to a decision on the merits, the second patent would have been held invalid for obviousness.

---

[156] *KSR*, 550 U.S. at 414 (alteration in original) (quoting *Teleflex, Inc. v. KSR Int'l Co.*, 119 Fed. App'x. 282, 288 (Fed. Cir. 2005), *rev'd sub. nom. KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007)).

[157] *Id.* at 415.

[158] *Pfizer*, 480 F.3d at 1368 (quoting *Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989)).

[159] *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1371 (Fed. Cir. 2006).

### 4. The district court erred in dismissing the purchasers' sham litigation claim.

#### i. The district court did not accept the purchasers' well-pleaded facts as true.

In dismissing the purchasers' sham claim, the district court erred in five principal ways: (1) It ignored the motion to dismiss standard, discrediting the purchasers' alleged facts instead of accepting them as true; (2) It mischaracterized the purchasers' alleged facts as "conclusory"; (3) It misinterpreted the presumption of patent validity, warping it into a heightened pleading requirement in sham litigation cases; (4) It gave undue weight to the patent examiner's consideration of belated prior art disclosures; and (5) It misunderstood the second patent's prosecution history. These errors led the district court to dismiss incorrectly the purchasers' sham theory.

First, in response to the purchasers' detailed allegations of the likelihood of an obviousness ruling against Novartis, the district court did exactly what district courts are not supposed to do at the motion to dismiss stage: it discredited the non-moving party's alleged facts and found its own.[160] Here, the district court acknowledged the endpayers' key factual allegation: "that the two techniques Novartis described in its patent application, which produced the β-crystalline form, were commonly known methods for developing alternate crystalline forms at the

---

[160] ADD-027.

time."[161] But the court immediately disparaged it: "[T]he prior art did not disclose the existence or properties of the β-crystalline form or the method by which it could be derived."[162]

Whether the prior art available in the 1990s taught an ordinary pharmaceutical chemist how to convert the needle-form of imatinib mesylate into its non-needle structure, or, better yet, whether the needle form *naturally converted* into the non-needle form, is question of fact for the *jury*, not the district court *judge*, to decide. Here, the jury should have been permitted to determine: "(1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention was made; and (4) objective evidence of nonobviousness, if any."[163] In usurping this determination, the district court committed a fundamental error.

The purchasers' sham litigation claim is, at its core, a factual dispute: did the relevant prior art so clearly teach Novartis's claimed invention such that no reasonable litigant – apprised of that knowledge – would have asserted that patent against a competitor? The purchasers allege that it did; Novartis argues the opposite. It was ultimately up to the jury, not the judge, to settle this factual dispute. Only after the jury construed the content of the prior art could the district

---

[161] ADD-026.

[162] ADD-027.

[163] *Kubin*, 561 F.3d at 1355 (citing *Graham*, 383 U.S. at 17-18).

court apply the law of patent obviousness to determine whether Novartis "had a colorable claim that the [second patent] was not obvious."[164]

The Third Circuit's recent decision in *In re Lipitor Antitrust Litigation* underscores this point.[165] There, Pfizer filed a citizen petition with the FDA raising concerns regarding how its generic competitor (Ranbaxy) planned to formulate the generic version of Pfizer's drug Lipitor. After Pfizer succeeded in delaying generic competition, endpayer and direct purchasers of Lipitor brought a sham litigation suit. These purchasers alleged that Pfizer's concerns were completely baseless and its citizen petition was a sham: Pfizer told the FDA that Ranbaxy's proposed formulation was "inferior in quality"[166] despite using this formulation in *its own safety and efficacy trials* for Lipitor. Moreover, the purchasers argued that the petition "ignored both a decade-old FDA policy and FDA statements expressing the immateriality of drug form."[167] Despite these allegations, the district court dismissed the purchasers' sham claim: "It reasoned that Pfizer's petition was not

---

[164] ADD-025. As an aside, the question is not whether Novartis had a "colorable claim" that their patent was non-obvious, as the district court held. The question is whether the *purchasers* presented a colorable claim that the second patent was so obvious that no reasonable litigation would have asserted it in a lawsuit.

[165] *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 272 (3d Cir. 2017) ("Given the pleading standard, it should not have been drawing inferences in Pfizer's favor . . . .").

[166] *Id.* at 243 (quoting Pfizer's citizen petition).

[167] *Id.*

objectively baseless because it was supported by science and the FDA believed it had merit."[168] But the Third Circuit reversed, holding that the purchasers' sham claim was plausible. "To conclude otherwise requires an evaluation of the scientific merit of Pfizer's petition" and "[s]uch an inquiry is unsuitable for resolution on a motion to dismiss."[169]

The district court committed the same error here. As in *Lipitor*, the obviousness analysis "requires an evaluation of the scientific merit of" the purchasers' claim that the prior art taught a person of ordinary skill in the art to form the non-needle crystal. Only after this *factual* dispute has been decided can the court turn the *PRE* inquiry: whether the second Gleevec patent was so obvious that no reasonable litigant would have asserted it in federal court. The purchasers do not contest that some polymorph patents are valid. Indeed, the district court pointed to one such patent in its opinion.[170] Instead, the purchasers allege that the polymorph patent at issue *here* was invalid based on prior art, practices of pharmaceutical formulation, and the particular characteristics of imatinib mesylate.

Furthermore, the standard for patent obviousness is not whether the prior art

---

[168] *Id.* at 273.

[169] *Id.*

[170] ADD-027 (citing *In re Armodafinil Patent Litig. Inc. ('722 Patent Litig.)*, 939 F. Supp. 2d 456, 490-94 (D. Del. 2013) (holding, *after a bench trial*, that the prior art disclosures did not render the polymorph patent at issue obvious: "a skilled artisan would not have had a reasonable expectation of success that [the specific compound at issue] [was] polymorphic in 2002.")).

"disclose[d] the existence or properties"[171] of the claimed invention, as the district court held. As the Supreme Court admonished in *KSR*, proof of obviousness only requires a showing that existing knowledge – whether scientific or not – would have motivated and enabled a person of ordinary skill in the art to solve the problem at issue. "[T]he analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."[172] Thus, it is enough to show that a variety of prior art teachings would have pointed chemists towards the creation of the β-crystal form, even if some experimentation was necessary.

For these reasons, the district court was wrong to discredit the purchasers' alleged facts. At the Rule 12(b)(6) stage, a district court must accept a plaintiff's well-pleaded facts as true, preserving the opportunity to interpret them for the jury.

### ii. The purchasers' allegations were not conclusory.

Part of the reason the district court felt comfortable construing the purchasers' alleged facts against them is because the district court viewed these facts as conclusory: "The [endpayers' amended complaint] largely contains conclusory allegations that deriving the β-crystalline form would have been

---

[171] ADD-027.

[172] *KSR*, 550 U.S. at 418.

predictable based on the mere disclosure of the mesylate salt and that the methods used to derive it were routine."[173]

To the contrary, the purchasers set forth – in 80 pages – the precise reasons *why* the β-crystal was obvious. The purchasers explained what crystals are;[174] how they are formed;[175] how their characteristics differ depending on their form;[176] what forms are preferred in pharmaceutical development;[177] how to convert unfavorable forms to favorable ones;[178] how common such conversions are;[179] and when this knowledge was available.[180] In short, the purchasers explain precisely *why*[181] and *how*[182] an ordinary pharmaceutical chemist in the 1990s would have

---

[173] ADD-027.

[174] JA-000044-45 (¶¶ 36-38).

[175] JA-000044 (¶¶ 36-37).

[176] JA-000045 (¶¶ 39-41); JA-000070 (¶ 138).

[177] JA-000046 (¶ 42); JA-000069 (¶ 135).

[178] JA-000046 (¶¶ 42-43); JA-000069 (¶ 137).

[179] JA-000069 (¶ 136).

[180] JA-000069 (¶ 136).

[181] JA-000045-46 (¶ 41) ("Well before the early 1990s it was known in the industry that needle-shaped crystals are very difficult to handle both in the laboratory and in commercial production due to the slow filtration and flow problems associated with the needle shape: needles behave like fiberglass, glass wool insulation, or cotton candy.").

[182] JA-000046 (¶ 43) ("Chemists routinely modify crystal habits by varying temperature and degree of supersaturation, solvent, nucleation, and mechanical means. Often, needle-forms are converted to more dense plates by suspending needles in a solvent and stirring overnight.").

produced the exact crystalline salt Novartis claimed. In fact, the purchasers described *the exact method* through which Novartis constructed the β-crystal:

> they used at least one of two known techniques. In one, a crystal or amorphous form of the methanesulfonic acid addition salt of imatinib is digested with a suitable polar solvent (usually methanol) in a suspension. In the other, a crystal or amorphous form of the methanesulfonic acid addition salt of imatinib is dissolved in a polar solvent (usually methanol) at a suitable heated temperature up to the reflux temperature of the reaction mixture, and then crystallization is initiated by adding a small amount of the non-needle form as seed crystal to the supersaturated solution.[183]

Moreover, the purchasers located a scientific study showing that imatinib inherently converts to the non-needle polymorphism.[184] It is unclear what more the purchasers could have alleged to satisfy the district court.

Indeed, the label "conclusory" is usually used in Rule 12(b)(6) decisions to describe a plaintiff's *legal* allegations, not factual ones.[185] This is because, to a certain extent, all factual allegations are "conclusory": at the motion to dismiss stage, evidence has yet to be adduced. It appears the district court used the label "conclusory" as a stand-in for "improbable."

But, as this Court has repeated, a complaint may survive a motion to dismiss

---

[183] JA-000069 (¶ 137).

[184] JA-000078 (¶ 181); JA-000698-708.

[185] *See Cardigan*, 787 F.3d at 84; *García-Catalán*, 734 F.3d at 103; *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012).

even when it is "improbable" that the plaintiff will be able to prove her alleged facts, even if the possibility of recovery is "remote and unlikely."[186] The Rule 12(b)(6) inquiry is "context-specific" and "does not demand 'a high degree of factual specificity.'"[187]

Here, the appellants do not believe that recovery is remote and unlikely, nor that proof of our alleged facts is improbable. Our complaints showed "a high degree of factual specificity." Nonetheless, the district court dismissed our factual allegations as conclusory. We cannot agree.

### iii. The district court misinterpreted the presumption of patent validity as requiring a heightened pleading requirement in sham litigation cases.

The district court's improper dismissal of the purchasers' sham claim also stemmed from its misinterpretation of the presumption of patent validity. Before the district court, Novartis argued that the presumption of patent validity prohibits purchasers from bringing sham litigation claims where the patents at issue have not been "invalidated" or "tarnished" in prior litigation. The district court accepted this logic: "[I]t is difficult to conceive of a scenario in which a sham litigation claim would go forward without the patent having been invalidated or otherwise

---

[186] *Cardigan*, 787 F.3d at 89 (quoting *Twombly*, 550 U.S. at 556).

[187] *García-Catalán*, 734 F.3d at 103 (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 47 (1st Cir. 2012)).

tarnished."[188] Although the court denied formal creation of a new "bright-line rule,"[189] it nonetheless relied on this logic to dismiss the purchasers' sham claim.[190] Drug companies in other cases are now relying on the district court's (incorrect) language to support the proposition that patents must be invalidated or tarnished before they can be asserted in sham litigation cases.[191]

This approach is both unprecedented and wrong. No court has ever interpreted the presumption of patent validity in this way. Indeed, the opposite is true: other courts have held that the presumption of patent validity requires no such showing of invalidity or tarnishment.[192] Courts routinely allow sham litigation claims to proceed where the underlying patent was never tarnished or invalidated, as the table below shows.

---

[188] ADD-023.

[189] ADD-023

[190] ADD-027 ("[I]t is noteworthy that the [second Gleevec patent] had never been previously invalidated or tarnished in any way.").

[191] *See* Reply Br. of Def. Sanofi-Aventis U.S. LLC in Supp. of Mot. to Dismiss at 7, *In re Lantus Direct Purchaser Antitrust Litig.*, No. 16-cv-12652 (D. Mass. July 31, 2017), ECF No. 26.

[192] *See, e.g.*, *Morton Grove Pharm., Inc. v. Par Pharm. Co.*, No. 04 C 7007, 2006 WL 850873, at *11 (N.D. Ill. March 28, 2006) (rejecting the argument that the presumption of validity required dismissal of a sham litigation antitrust claim at the motion to dismiss stage); *In re AndroGel Antitrust Litig. (No. II)*, 888 F. Supp. 2d 1336, 1341, 1356 (N.D. Ga. 2012) (implicitly acknowledging that the presumption of patent validity is not a bar to a sham litigation claim where the patent at issue has not been tarnished or invalidated).

| Case | Outcome of Prior Patent Infringement Litigation | Motion to Dismiss Decision in Sham Case |
|---|---|---|
| *In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-MD-2472-S-PAS, 2017 WL 3600938, at *7-9 (D.R.I. Aug. 8, 2017) | The patent holder settled its infringement claims against two generics *prior to any substantive rulings.* It settled a third suit after claim construction but prior to *any substantive patent validity rulings.* | Motion to dismiss denied even though the patent was never invalidated. |
| *In re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997, 2015 WL 9589217, at *7, *12-13 (D.N.J. Oct. 29, 2015) | The patent holder settled its infringement claims against one generic *prior to any substantive rulings.* It settled the others after claim construction, but prior to *any substantive patent validity rulings.* | Motion to dismiss denied even though the patents were never tarnished or invalidated. |
| *In re Effexor XR Antitrust Litig.*, No. 11-cv-5479, 2014 WL 4988410, at *10-11 (D.N.J. Oct. 6, 2014) | The patent holder settled its infringement claims against the generic manufacturers after claim construction but prior to *any substantive patent validity rulings.* | Motion to dismiss denied even though the patents were never invalidated. |
| *In re AndroGel Antitrust Litig. (No. II)*, 888 F. Supp. 2d 1336, 1341, 1356 (N.D. Ga. 2012) | The patent holder settled its infringement claims against generic manufacturers *prior to any substantive rulings.* | Motion to dismiss denied even though the patent was never tarnished or invalidated. |
| *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 643-44. (E.D. Mich. 2000)[193] | The patent holder settled its infringement claims against generic manufacturers prior to *any substantive rulings on infringement.* | Motion to dismiss denied as to endpayers even though the patents were never tarnished or invalidated. |

---

[193] *See* Andrx Mem. of Law in Opp'n to Mot. of "Direct" and "Indirect" Purchaser Pls. for Partial Summ. J. at 7-8, *In re Cardizem Antitrust Litig.*, No. 99-md-1278 (E.D. Mich. Jan. 10, 2000), ECF No. 55.

Moreover, many sham litigation claims do not fit into the district court's "tarnishment or invalidity" framework, as the issue is not patent validity, but rather whether the competitors' products infringe the patents' claims.[194] This incongruity further underscores the rule's unsuitability. In fact, here, the would-be generic competitors asserted that Novartis's second patent was invalid *or that their generic products did not infringe.*[195] Thus, the invalidity of the second Gleevec patent was not the only issue in those infringement lawsuits. And there is no presumption of patent infringement.

**(1)     The district court's tarnishment or invalidity rule undermines the purpose of sham litigation.**

Courts have declined to create an invalidity or tarnishment rule for good reason: such a rule creates all the wrong incentives, undermining the very purpose of the sham exception. An invalidity of tarnishment rule would enable the holders of invalid patents to reap the benefits of their ill-gotten monopolies while simultaneously avoiding antitrust liability. All they would have to do is sue their

---

[194] *See, e.g.*, *In re Neurontin Antitrust Litig.*, MDL No. 1479, No. 02-1390, 2009 WL 2751029, at *3-6, *21-22 & n.46 (D.N.J. Aug. 28, 2009) (motion to dismiss sham claim denied where the issue in the underlying patent litigation was infringement, not invalidity, and many statements in that litigation favored the defendant's antitrust case, i.e., "there is insufficient evidence to support a conclusion that Warner–Lambert's claim of infringement was unreasonable" and "[the accused infringer] has not demonstrated that Warner-Lambert initiated a frivolous suit with respect to this claim" (quotation marks omitted)).

[195] JA-000101 (¶ 285).

competitors and then offer them confidential settlements prior to any substantive rulings. In fact, the district court's tarnishment rule would have the perverse consequence of immunizing the *worst* antitrust offenders: it would prohibit purchasers from bringing sham claims against patent holders that had so little confidence in their patents that they immediately offered their competitors secret settlements rather than fight a single merits ruling. These are exactly the types of objectively baseless lawsuits *PRE* is meant to target.

And that is exactly what happened here. Novartis sued all nine generic manufacturers that attempted to enter the market, triggering mandatory 30-month stays in eight cases.[196] Novartis then obtained repeated delays in the lawsuits before eventually settling them, under terms kept secret from the public. These settlements occurred before a *single court* could hand down a merits ruling.

Were it not for Novartis's enforcement of the second Gleevec patent in court, Novartis would have had no vehicle through which to leverage a settlement from each generic competitor. And with no settlements, no delay.

Circuit courts confronted with Novartis's tarnishment or invalidity argument have explicitly disparaged this position. For example, the Second Circuit rejected an analogous argument in a *Walker Process* case. To prove *Walker Process* fraud, a plaintiff must show that the defendant procured its patent through fraud on the

---

[196] *See infra* Table of Generic Infringement Lawsuits.

PTO.[197] In *In re DDAVP Direct Purchaser Antitrust Litigation*, the defendant

pharmaceutical company argued that, "when dealing with a patent not yet found to

be fraudulently obtained, a party has *Walker Process* standing only if that party

*also* has standing to challenge the patent's validity."[198] In other words, the plaintiff

must be capable of mounting an invalidity challenge before it can bring a *Walker*

*Process* claim.

> The Second Circuit disagreed:

>> As the defendants would have it, direct purchasers would
>> be able to recover antitrust damages from a fraudulent
>> patentee *only* after that patentee first loses on a fraudulent
>> procurement claim. This asks too much of the generic
>> competitors and other potential patent challengers, who
>> may not have the strategic interest or the resources to
>> start or win such a battle, or who may be presented with
>> strong incentives to settle their challenge by patent
>> holders seeking not only to preserve their patent's
>> enforceability, but also to avoid potential *Walker*
>> *Process* liability.[199]

The court recognized that creating such a requirement would put consumers at the

mercy of generic manufacturers: consumers do not have standing to challenge the

validity of patents in federal court. And the generic manufacturers – even those

---

[197] *Walker Process*, 382 U.S. at 177.

[198] 585 F.3d 677, 690 (2d Cir. 2009) (emphasis added).

[199] *Id.* at 691 (citing C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553, 1616 (2006) (noting that "an innovator has an especially strong incentive to pay to neutralize . . . potential competition" when a generic manufacturer files an ANDA)).

with objectively strong invalidity claims – often settle their claims for a variety of reasons. Therefore, requiring a showing of invalidity as a prerequisite to antitrust claims "creat[es] the potential 'to leave a significant antitrust violation undetected or unremedied.'"[200]

In *Ritz Camera & Image, LLC v. SanDisk Corp.*,[201] the Federal Circuit further elaborated on this problem. Examining *DDAVP*, the court concurred that there is "no reason to limit the scope of *Walker Process* standing to cases in which the patents have been 'tarnished' in another proceeding."[202] As the court explained, "*Walker Process* contains no such limitation, and applying such a requirement would have the undesirable effect of subjecting injured parties' claims to the litigation strategies of others. It would also be likely to generate unproductive wrangling over what counts as a sufficiently 'tarnished' patent to support a *Walker Process* claim."[203]

Just so here. In many sham cases, the issue in the underlying patent litigation is not whether the patent was invalid, but rather whether the generic's product infringed. The district court's tarnishment or invalidity rule would saddle courts

---

[200] *Id.* (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983)).

[201] 700 F.3d 503 (Fed. Cir. 2012).

[202] *Id.* at 507 n.2.

[203] *Id.*

with the insuperable task of determining what constitutes "tarnishment" of the underlying patent.

In support of their position, Novartis and the district court cite Judge Posner's decision in *Asahi Glass Co., Ltd. v. Pentech Pharmaceuticals, Inc.*[204] But this case foresaw the very problem the purchasers raise:

> Suppose a seller obtains a patent that it knows is almost certainly invalid (that is, almost certain not to survive a judicial challenge), sues its competitors, and settles the suit by licensing them to use its patent in exchange for their agreeing not to sell the patented product for less than the price specified in the license. In such a case, the patent, the suit, and the settlement would be devices – masks – for fixing prices, in violation of antitrust law.[205]

As Judge Posner's hypothetical demonstrates, it is not "difficult to conceive of a scenario" where a sham claim should "go forward without the patent having been invalidated or otherwise tarnished."[206] Asahi reinforces the purchasers' position: when a patent holder sues its competitor for infringement – even though no reasonable litigant would believe such a suit could succeed – just so that the patent holder can offer its competitor a settlement that will keep it off the market a little longer, consumers may bring sham litigation claims. Or in Judge Posner's words: "A firm that has received a patent from the patent office . . . , and thus enjoys the

---

[204] 289 F. Supp. 2d 986 (N.D. Ill. 2003).

[205] *Id.* at 991 (citing 2 Herbert Hovenkamp, et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law* § 31.1c (2002)).

[206] ADD-023.

52

presumption of validity . . . , is entitled to defend the patent's validity in court, to sue alleged infringers, and to settle with them, . . . unless a neutral observer would reasonably think either that the patent was almost certain to be declared invalid . . . ." Consumers bringing sham claims need not show the patent at issue was tarnished or invalidated. Instead, all they must show is that no reasonable litigant would have brought the infringement suit but for "the benefit of collateral injuries inflicted." Here the collateral injury inflicted was the continued existence of Novartis's patent monopoly, despite the second patent's obvious invalidity.

The district court also discarded the purchasers' well-pleaded facts because it held that the purchasers' decision not to challenge the legality of Novartis's settlement agreements (i.e., the fact that the purchasers did not allege these settlements were unlawful reverse payments) undercut their sham litigation claim. That was an error. At the Rule 12(b)(6) stage, a district court should not draw inferences – at least not inferences negative to the plaintiff – from the fact that two parties settled prior litigation. "Cases settle for many reasons"[207]; where more than one "inference" is possible, a 12(b)(6) decision is inappropriate.[208] And as the purchasers pointed out to the district court, Novartis's settlement with Sun – with

---

[207] *Douglas v. City of Springfield*, No. 14-30210-MAP, 2017 WL 123422, at *9 (D. Mass. Jan. 12, 2017).

[208] *Cf. Regence Grp. v. TIG Specialty Ins. Co.*, 903 F. Supp. 2d 1152, 1162 (D. Or. 2012) (holding that when more than one inference is possible, summary judgment is inappropriate).

an agreed entry date many years before the second Gleevec patent's expiration date and with about $7.5 billion in lost sales to Novartis – shows, if anything, Novartis's weak patent position. Why would Novartis give up billions of dollars if it had anything close to a valid patent?

Nor can any inference be drawn from the fact that the purchasers have not (at this time) challenged the settlement agreements themselves. The terms of those agreements are secret. Since Novartis refuses to disclose their terms, and since it has refused to do so in this litigation even under a protective order, the only inference that may be drawn at the Rule 12(b)(6) stage is that Novartis has something in the settlement it wants to hide. Certainly the opposite inference (as drawn by the district court) cannot serve to discard the purchasers' well-pleaded sham allegations.

### (2)   The presumption of validity is not evidence of validity.

The idea that a patent must be invalidated or tarnished before a plaintiff can bring a sham litigation claim badly misinterprets the presumption of patent validity. The presumption of patent validity, like all legal presumptions, does *not* supply evidence of substantive facts.[209] It merely allocates the burden of

---

[209] *See Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1549 (Fed. Cir. 1983) (The presumption of patent validity is not "evidence." "Proof . . . relates not to legal presumptions, but to facts."); *Morton Grove*, 2006 WL 850873, at *11 ("These presumptions merely set forth the parties' evidentiary burdens. Patent invalidity is a statutory defense and the presumption of validity can be rebutted.");

persuasion and the standard of proof in patent validity challenges.[210] As the

Supreme Court has long recognized, "Nowhere is the presumption held to be a

substitute for proof of an independent and material fact."[211] Instead,

"[p]resumptions are indulged to supply the place of facts; they are never allowed

against ascertained and established facts. When these appear, presumptions

disappear."[212]

Section 282, commonly known as the presumption of patent validity, is no

---

Kristen Dietly, *Lightening the Load: Whether the Burden of Proof for Overcoming a Patent's Presumption of Validity Should Be Lowered*, 78 Fordham L. Rev. 2615, 2628-29 (2010) (presumption of validity is not evidence); Joshua D. Sarnoff, *Bilcare, KSR, Presumptions of Validity, Preliminary Relief, and Obviousness in Patent Law*, 25 Cardozo Arts & Ent. L.J. 995, 996-97 (2008) ("Unlike evidence (which may include the granted patent), a presumption of validity of a patent is only a logical inference to be drawn that the granted patent is valid."); *cf. In re Piasecki*, 745 F.2d 1468, 1471-72 (Fed. Cir. 1984) ("The concept of prima facie obviousness in ex parte patent examination is but a procedural mechanism to allocate in an orderly way the burdens of going forward and of persuasion as between the examiner and the applicant. Its origin is uncertain, but its ancestry includes mechanisms which were called 'presumptions of unpatentability' . . . .").

[210] *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 n.4, 102-04 (2011) (holding that the presumption of patent validity allocates both the burden and standard of proof).

[211] *United States v. Ross*, 92 U.S. 281, 285 (1875); *see Futorian Mfg. Corp. v. Dual Mfg. & Eng'g, Inc.*, 528 F.2d 941, 943 (1st Cir. 1976) ("[C]ourts have come to question whether the presumption has any independent function other than to place the burden of proof on him who asserts invalidity.").

[212] *Lincoln v. French*, 105 U.S. 614, 617 (1881).

different.[213] It places the "[t]he burden of establishing invalidity of a patent or any claim . . . on the party asserting such invalidity."[214] As both Federal Circuit and legal commentators have acknowledged, the presumption of patent validity, "like all legal presumptions, is a procedural device, not substantive law."[215] It requires "the decisionmaker to employ a decisional approach that starts with acceptance of the patent claims as valid and that looks to the challenger for proof of the contrary."[216]

Nonetheless, at Novartis's urging, the district court contorted this presumption into an elevated pleading requirement applicable to sham cases. The district court found it hard to believe the purchasers could ever meet *PRE*'s

---

[213] 35 U.S.C. § 282.

[214] *Id.*; *see i4i*, 564 U.S. at 102 (presumption of patent validity encompasses "the burden of proof" and the "standard of proof").

[215] *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983); *see Lorenz v. F.W. Woolworth Co.*, 305 F.2d 102, 105 (2d Cir. 1962) ("The statute does not require that the presumption be accorded the weight of actual evidence or that the use of the presumption should affect a decision of invalidity that would otherwise be reached with confidence. This court has recognized the unavoidable obstacles to an accurate and impartial decision that are inherent in ex parte proceedings in the patent office. We cannot properly allow decisions of that office to alter the preponderance of the evidence on the question of validity." (citations omitted)); Sarnoff, *Presumptions of Validity*, at 996-97 ("[T]he presumption of validity does not conclusively demonstrate the truth of the presumed facts or of any legal conclusions of validity based on the presumed facts. The presumption of validity – like any other presumption – can be overcome (rebutted) by additional relevant evidence sufficient to disprove the inference that the presumption embodies.").

[216] *Stratoflex*, 713 F.2d at 1534.

objective baselessness standard because it viewed the presumption of patent validity as evidence that someone might reasonably assert the patent, irrespective of the underlying merits of the litigation: "[I]t is difficult to conceive of a scenario in which a sham litigation claim would go forward without the patent having been invalidated or otherwise tarnished."[217] But empirical evidence tells us just the opposite. When Hatch-Waxman litigation reaches a resolution on the merits – either at trial or in a substantive decision – generic drug companies prevail nearly 75% of the time.[218]

The judiciary, *not the PTO*, is the ultimate authority on the validity of patents.[219] And the courts are the sole forum in which to adjudicate antitrust lawsuits. Misuse of the presumption of patent validity to dismiss otherwise well-

---

[217] ADD-023.

[218] *See* FTC, *Generic Drug Entry Prior to Patent Expiration* vi-vii (July 2002), http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf (reporting generic companies won 73% of the patent cases decided on the merits between 1992 and 2002); John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 Tex. L. Rev. 1769, 1787 (2014) ("Patentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

[219] The PTO issues hundreds of invalid patents: "there are strong structural and psychological pressures on examiners to issue patents rather than reject applications, no matter how weak the alleged invention seems," and "[e]xaminers have astonishingly little time to spend on each application." Mark A. Lemley, *Rational Ignorance at the Patent Office*, 95 Nw. U. L. Rev. 1495, 1496 n.3. As Professor Lemley has explained, "the only way for an examiner to guarantee that an application is finally disposed of is to issue a patent." *Id*. Furthermore, the PTO has declared "its mission to be 'helping our customers get patents.'" *Id*. (quoting PTO).

pleaded sham allegations abdicates the role of the judiciary, replacing it with the PTO. An agency has no place deciding matters of competition.

All the purchasers need allege in sham cases is that a reasonable litigant would not expect the patent at issue to withstand a validity or non-infringement challenge. While this is a high hurdle to prove at trial, no part of it requires proof of tarnishment or invalidity.

### iv. The district court incorrectly relied on the PTO's issuance of the second Gleevec patent to discard the purchasers' sham allegations.

The district court further rested its dismissal of the purchasers' sham allegations on the simple fact that the PTO issued the second patent: "Novartis had a colorable claim that the [second Gleevec patent] was valid and enforceable . . . consistent with . . . the patent examiner's and the PTO Board of Appeal's determinations."[220] This was an error.

The fact that the examiner issued the patent in the first place does not make the purchasers' sham claim any less plausible. Examiners issue patents that are later invalidated *all the time*. Patent examination is an *ex parte*, non-adversarial process, where examiners have, on average, a total of eighteen hours to: read the application, read the applicant's submitted prior art, search for and read other prior art, compare that prior art to the application, write an office action, read and

---

[220] ADD-024.

respond to the applicant's response to the office action, iterate the last two steps at least one and often more times, conduct an interview with the applicant, and then ensure the applicant's claims and accompanying diagrams are in form for allowance.[221] Furthermore, "the only way for an examiner to guarantee that an application is finally disposed of is to issue a patent."[222] Thus, "[e]xaminers who want credit for dispositions . . . have a strong incentive to issue patents to persistent applicants, rather than to continue rejecting the applications."[223]

For these reasons, an examiner's decision on a patent does not and should not carry the imprimatur that other agency decisions might. The presumption of patent validity is all the weight the patent examiner's decision carries in litigation, and this presumption is a rebuttable one. The mere fact that the examiner here issued the patent does not insulate Novartis from a sham litigation challenge. The patent examiner is not *PRE*'s "reasonable litigant." If she were, patent-based sham litigation would not exist. Patent holders would be immune from this entire area of antitrust liability. Purchasers in sham patent litigation cases need only allege what we have here: that the prior art – whether or not disclosed to the examiner – would have made the second Gleevec patent so clearly obvious that no reasonable litigant would have asserted it in litigation.

---

[221] *See* Lemley, *Rational Ignorance*, at 1496 n.3.

[222] *Id.*

[223] *Id.*

Furthermore, while the argument that PTO issuance of a patent should undercut well-pleaded sham allegations is incorrect in all cases, this is a particularly undeserving case in which to make it. Here, the Board reprimanded the examiner for failing to do her job: The Board instructed her to take the appropriate steps in her anticipation and obviousness analyses, instead of relying on short cuts. But the examiner declined to do so. Instead, she allowed the application without providing any basis for her complete one-eighty. Even after Novartis belatedly submitted prior art, the examiner declined to accompany her allowances with anything more than checked boxes indicating she "considered" the submissions.

The district court also reasoned that "the patent examiner considered much of the prior art at issue in the [amended complaint] before eventually issuing the patent, and it is not clear that the prior undisclosed art would have altered the examiner's obviousness analysis."[224] But whether the examiner considered much or all of the prior art does not impact the obviousness determination and, therefore, the *PRE* determination. The burden of proof in patent validity cases "does not suddenly change to something higher – 'extremely clear and convincing evidence' or 'crystal clear and convincing evidence' – simply because the prior art references were considered by the PTO."[225] Put another way, "there is no heightened or added

---

[224] ADD-027.

[225] *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012).

burden that applies to invalidity defenses that are based upon references that were before the Patent Office."[226] Accordingly, the fact that the patent examiner issued the second patent *despite* (purportedly) considering Novartis's belated prior art disclosures is irrelevant to the ultimate question of patent obviousness.[227]

> ## v. The district court misunderstood the patent prosecution history.

Finally, the district court relied on the Board's decision to support its rejection of the sham allegations. According to the court, the Board "disagreed with the examiner that [the first patent] would render obvious the claims in the [second] Patent."[228] And the court cited this characterization of the Board's decision as supporting Novartis's position that "the [second] Patent was valid and enforceable."[229] But this conclusion misreads the Board's decision.

Nothing in the Board's decision suggests that the second Gleevec patent was non-obvious.[230] Instead, the Board reversed the examiner based on two *procedural*

---

[226] *Id.*

[227] *See AndroGel*, 888 F. Supp. 2d at 1356 ("The Court, however, does not rely on . . . the opinions of the PTO examiner [] in deciding whether the Underlying Litigation was a sham. Clearly the PTO examiner believed that his interpretation of the [] Patent was not objectively baseless. Further, the opinions of the PTO examiner are accounted for by the presumption that a patent is valid and that patent examiners act properly.").

[228] ADD-009.

[229] ADD-024.

[230] *See* ADD-042-45.

shortcuts she took – her failure to articulate "scientific reasoning" justifying her belief that "the functional limitation is an inherent characteristic"[231] (for anticipation) and her failure to provide a "fact-specific analysis of claims and prior art"[232] (for obviousness). The Board reversed the patent examiner's anticipation and obviousness determinations on these grounds and these grounds *alone*.[233] In so holding, the Board expressed no opinion as to the second patent's actual validity.

> **5.  The district court should have applied *California Motor* instead of *PRE* to the purchasers' sham claim.**

Finally, the purchasers contest the district court's decision to apply *PRE* to the purchasers' sham litigation claim. In 1972, prior to *PRE*, the Supreme Court set forth a legal standard for sham litigation claims in *California Motor Transportation Co. v. Trucking Unlimited*.[234] There, multiple highway carriers alleged that a competitor group of carriers initiated state and federal proceedings to prevent the former's applications for highway operating rights, in violation of the antitrust laws. The district court dismissed the carriers' antitrust claim for failure to state a cause of action, but the Ninth Circuit reversed and the Supreme Court affirmed. As the Court explained, these allegations – "that petitioners instituted the

---

[231] ADD-044 (quotation marks omitted).

[232] ADD-045 (quotation marks omitted). During examination, the patent examiner typically "bears the initial burden of presenting a *prima facie* case of obviousness." *In re Huai-Hung Kao*, 639 F.3d 1057, 1066 (Fed. Cir. 2011).

[233] *See* ADD-042-45.

[234] *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972).

proceedings and actions with or without probable cause, and regardless of the merits of the cases"[235] – were sufficient to plead the sham litigation exception to the *Noerr-Pennington* doctrine.

In 1993, the Supreme Court revisited the sham standard in *PRE*. There, a movie studio brought a single copyright infringement action against a chain of hotels, challenging the chain's practice of renting copies of the studio's copyrighted videos.[236] The hotels counterclaimed, alleging that the movie studio's single copyright lawsuit constituted sham litigation. The district court granted summary judgment to the movie studio, and the Ninth Circuit and Supreme Court affirmed. *PRE* was an easy case.[237] Nonetheless, in affirming, the Court created a new test for sham litigation cases – the one applied here.

Following *PRE*, questions arose as to the relationship between the two cases, namely, whether *California Motor* survived *PRE*. To date, four appellate courts have reconciled the decisions in exactly the same way: *California Motor* applies "to a series of sham petitions and [*PRE*] to a single sham petition."[238] As the Third

---

[235] *Id.* at 512 (quotation marks omitted) (alteration omitted).

[236] *PRE*, 508 U.S. at 52.

[237] *PRE*, 508 U.S. at 76 (Stevens, J., concurring) ("I would not . . . use this easy case as a vehicle for announcing a rule that may govern the decision of difficult cases . . . .").

[238] *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 179 (3d Cir. 2015), *cert. denied sub nom., Vill. Supermarkets, Inc. v. Hanover 3201 Realty, LLC.*, 136 S. Ct. 2451 (2016); *see Waugh Chapel S., LLC v. United Food &*

Circuit explained, "[w]here there is only one alleged sham petition, [*PRE*'s] exacting two-step test properly places a heavy thumb on the scale in favor of the defendant. With only one 'data point,' it is difficult to determine with any precision whether the petition was anticompetitive."[239] However, where a defendant has filed multiple lawsuits, a more flexible standard is appropriate. "Not only do pattern cases often involve more complex fact sets and a greater risk of antitrust harm, but the reviewing court sits in a much better position to assess whether a defendant has misused the governmental process to curtail competition."[240]

The purchasers ask the First Circuit to weigh in on this issue[241] and apply *California Motor* to their sham litigation claim.[242] Just like the group of highway

---

*Commercial Workers Union Local 27*, 728 F.3d 354, 363-64 (4th Cir. 2013); *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 100-01 (2d Cir. 2000); *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994).

[239] *Hanover*, 806 F.3d at 180.

[240] *Id.*

[241] *See P.R. Tel. Co., Inc. v. San Juan Cable Co. LLC*, 196 F. Supp. 3d 207, 240 (D.P.R. 2016) (noting the First Circuit has not weighed in on the *California Motor* and holding that, "[a]bsent direct guidance from the First Circuit, this Court adopts the Second, Third, Fourth, and Ninth Circuit approaches to reconciling *California Motor Transport* and *PRE*").

[242] In the endpayers' lawsuit, the district court applied *PRE*, despite the fact that the endpayers alleged not one, but nine sham lawsuits. In their motion to dismiss briefing, the endpayers did not argue that *California Motor* governed their sham claim. Had the direct purchasers' lawsuit reached the motion to dismiss phase, they would have argued and briefed this issue. Therefore, the appellants in this consolidated appeal ask the Court not to deem this argument waived. As the

carriers in *California Motor*, Novartis instituted successive lawsuits – nine in total – "with or without probable cause, and regardless of the merits of the cases."[243] Novartis initiated these lawsuits to obtain 30-month stays against its generic competitors.[244] And the dockets of these lawsuits reveal that Novartis pushed for delay after delay, forestalling any merits rulings.[245] Even though Novartis did not allow a single suit to reach the merits stage, each one bought Novartis one to two years of delay. Novartis's push to settle the suits right before it would have to face merits rulings evinces Novartis's lack of confidence in its second patent. And its decision to bring these cases despite this utter lack of confidence demonstrates Novartis's disregard for the suits' merits. In short, Novartis did not initiate these suits because it believed competitors would infringe a valid patent; it did so to stave off their legitimate market entry. Novartis's actions here constitute the classic sham case: "repetitive lawsuits carrying the hallmark of insubstantial claims."[246] As Justice Stevens explained in his concurrence to *PRE*:

---

appellants now raise this argument in their opening brief, Novartis has a full and fair opportunity to respond to it, mitigating any prejudice.

[243] *California Motor*, 404 U.S. at 512; *see infra* Table of Generic Infringement Lawsuits.

[244] Novartis did not attempt to obtain a 30-month stay against Sun, the first generic filer, because that 30-month stay would have done Novartis no good: the stay would have ended prior to expiration of the first Gleevec patent.

[245] *See infra* Table of Generic Infringement Lawsuits.

[246] *Otter Tail Power Co. v. United States*, 410 U.S. 366, 380 (1973).

> The label "sham" is appropriately applied to a case, or series of cases, in which the plaintiff is indifferent to the outcome of the litigation itself, but has nevertheless sought to impose a collateral harm on the defendant . . . . It might also apply to a plaintiff who had some reason to expect success on the merits but because of its tremendous cost would not bother to achieve that result without the benefit of collateral injuries imposed on its competitor by the legal process alone.[247]

Here, Novartis filed infringement suit after infringement suit not to defend its patent, but to obtain a collateral harm: 30-month stays. It is safe to say Novartis would not have bothered to file these lawsuits but for "the benefit of collateral injuries inflicted through the use of legal process."[248]

The purpose of *California Motor* was to ensure that parties were not able to hide within the folds of the First Amendment while filing repetitive suits of little to no merit to inhibit legitimate competition. "One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused."[249] The purchasers here allege exactly the type of "baseless, repetitive claims" that *California Motor* intended to strip of immunity. Therefore, we ask this Court to follow its sister circuits and apply *California Motor*.

---

[247] *PRE*, 508 U.S. at 68-69 (Stevens, J., concurring).

[248] *Id.* at 65.

[249] *California Motor*, 404 U.S. at 513.

## C. The district court wrongly dismissed the purchasers' *Walker Process* claim.

Patent applicants must prosecute their applications "with candor, good faith, and honesty."[250] This duty of candor "includes a duty to disclose to the [PTO] all information known to [the applicant] to be material to patentability."[251] In short, information that "refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the [PTO], or (ii) Asserting an argument of patentability."[252] "The public interest is best served, and the most effective patent examination occurs[,] when . . . the Office is aware of and evaluates the teachings of all information material to patentability."[253] So patent holders "owe[] the obligation of frank and truthful disclosure."[254]

In *Walker Process*, the Supreme Court held that when a patent applicant fails to meet that obligation, obtains a patent through fraud on the PTO, and then enforces it to block competition, plaintiffs may recover antitrust damages.[255] "The

---

[250] *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1233 (Fed. Cir. 2003) (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995)).

[251] 37 C.F.R. § 1.56(a).

[252] *Id*. § 1.56(b)(2).

[253] *Id*. § 1.56(a).

[254] *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 439 F.2d 1369, 1379 (5th Cir. 1970) (quoting *Charles Pfizer & Co. v. F.T.C.*, 401 F.2d 574, 579 (6th Cir. 1968)).

[255] *Walker Process*, 382 U.S. at 177.

far-reaching social and economic consequences of a patent . . . give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud . . . and that such monopolies are kept within their legitimate scope."[256]

A court must permit antitrust claims under *Walker Process* to proceed if a plaintiff alleges that the defendant knowingly and willfully[257] made (1) "a false representation of a material fact," (2) "with the intent to deceive," (3) which induced the PTO "to act in justifiable reliance on the misrepresentation," and (4) "which caused injury that would not otherwise have occurred."[258] The misrepresentation can take many forms: an "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information."[259] Even an omission may constitute a material misrepresentation under *Walker Process*, so long as the plaintiff alleges "intent separable from the simple fact of the omission."[260]

Although Rule 9(b) governs *Walker Process* fraud allegations, an antitrust plaintiff need not be clairvoyant: "intent, knowledge, and other conditions of a

---

[256] *Id.* (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 816 (1945)).

[257] *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (citing *Walker Process*, 382 U.S. at 177).

[258] *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1364 (Fed. Cir. 1998) (citing *Nobelpharma*, 141 F.3d at 1069-70).

[259] *Molins*, 48 F.3d at 1178.

[260] *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007).

person's mind may be alleged generally,"[261] because "[t]he characterization of a state of mind, after all, does not lend itself to detailed pleading."[262]

### 1. The complaints allege Novartis misled the PTO regarding its production of the β-crystalline form of imatinib mesylate.

The purchasers' complaints identify two ways Novartis knowingly and willfully misled the PTO to secure the second Gleevec patent. First, Novartis called its manufacture of the β-crystalline form of imatinib mesylate "surprising[]"[263] in order to avoid the inevitable conclusion that the non-needle form of imatinib mesylate was obvious. Second, Novartis told the PTO that imatinib mesylate had never been "prepared"[264] prior to the second patent.

### i. Novartis's claim that its β-crystalline form of imatinib mesylate was surprising was a material misstatement.

The patent laws reward innovation and novelty: improvements to old inventions that are "obvious to try" are unpatentable under § 103.[265] Only when an inventor can show that such improvements were "surprising" or achieved an

---

[261] Fed. R. Civ. P. 9(b).

[262] *United States* ex rel. *Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004), *abrogated on other grounds by United States* ex rel. *Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29 (1st Cir. 2017). A plaintiff alleging *Walker Process* fraud must also plead facts sufficient to meet the traditional elements of an antitrust claim. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). The district court did not hold that the plaintiffs failed to allege causation, injury, or market power.

[263] JA-000372 (col. 1, l. 27).

[264] JA-000434.

[265] *See supra* Section V.B.2.

"unexpected result" can she obtain a patent.[266] Therefore, when a patent applicant

claims her invention was "surprising," this claim holds special meaning.

Nothing about the existence or the characteristics of β-crystalline imatinib

mesylate was surprising. To the contrary, any chemist with a basic knowledge of

pharmaceutical chemistry would have been able to obtain the non-needle version

of imatinib mesylate.[267] As the complaints explain in detail, imatinib mesylate

naturally converts into its β-crystalline form, and α-crystals are easily transfigured

to β-crystals through well-known and rudimentary steps.[268] So Novartis's

statement in its patent application that the formation of the β-crystal version of

imatinib mesylate was "surprising" was false.

Not only that, Novartis's supposed discovery of a β-crystalline form of

imatinib mesylate could not have been "surprising" in 2000 (when it submitted its

second patent application) because Novartis (and its predecessors) had been testing

and investigating the β-crystal version for seven years, since at least 1993.[269]

The district court failed to appreciate the materiality of Novartis's

misstatement, holding that the purchasers "have not sufficiently alleged that if

Novartis had avoided using the word 'surprising,' the patent would not have

---

[266] *See, e.g.*, *KSR*, 550 U.S. at 421; *Pfizer*, 480 F.3d at 1366.

[267] JA-000045-46 (¶¶ 41-43); JA-000069-70 (¶¶ 136-38).

[268] JA-000078 (¶ 181); JA-000698-708; JA-000069-70 (¶¶ 135-38).

[269] JA-000080 (¶¶ 189-90).

issued."[270]

But the Federal Circuit has explained why false claims of "surprise" are material. *Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*[271] is one such case. There, Purdue Pharma obtained a follow-on patent by claiming (as Novartis did here) it had "surprisingly discovered" that a lower dosage of oxycodone had the same clinical effectiveness as the higher dosages that older patents claimed.[272] Purdue implied its discovery was supported by clinical data.[273] However, in reality, this discovery was merely an unsupported "insight" by the inventor himself.[274]

The Federal Circuit found Purdue's implication misleading and material. As the court explained, there is "no doubt that Purdue disclosed its 'surprising discovery' . . . to support one of its central patentability arguments and to oppose the examiner's argument that Purdue's claims were unpatentable in view of the prior art."[275] The court noted that Purdue's "failure to inform the PTO whether a 'surprising discovery' was based on insight or experimental data does not in itself

---

[270] ADD-032.

[271] 438 F.3d 1123 (Fed. Cir. 2006).

[272] *Id.* at 1127 (quoting Purdue's patent application).

[273] *Id.* at 1131.

[274] *Id.* at 1130.

[275] *Id.* at 1132.

amount to a material omission."[276] However, Purdue had done more than characterize this discovery as surprising – it "relied on that discovery *to distinguish its invention* from other prior art opioids."[277]

Just so here. Novartis relied on its claim to the β-crystalline to distinguish the second Gleevec patent application from the first.[278] Because the first patent and the articles Zimmermann published disclosed imatinib mesylate, Novartis's only shot at obtaining a second patent was to present its manufacture of the non-needle crystal as somehow "surprising," an "unexpected result," differentiating that purported discovery from the development of the mesylate salt of imatinib. If the PTO knew this polymorphic form was the product of well-known techniques applied to a common problem to obtain a predictable result – or, worse, that imatinib mesylate *naturally converts* to the β-crystalline form – it would have rejected this patent as obvious. That is why Novartis feigned surprise.

The Federal Circuit has repeatedly held that failing to correct "unmistakably false" statements "alone establishes materiality."[279] "When an applicant files a false declaration, . . . the applicant [must] 'expressly advise the PTO of [the

---

[276] *Id.* at 1133.

[277] *Id.* (emphasis added).

[278] JA-000474.

[279] *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1342 (Fed. Cir. 2013).

misrepresentation's] existence, stating specifically wherein it resides.'"[280] And this correction must be express and unambiguous: an applicant cannot gloss over his misstatements by "merely suppl[ying] the examiner with accurate facts without calling his attention to the untrue or misleading assertions."[281] Put simply, "there is no room to argue that submission of false [information] is not material."[282]

Novartis neglected to correct its false claim that the β-crystalline polymorphism was surprising. This failure alone renders Novartis's claim to surprise material. As the courts have underscored, "[t]he Patent Office, not having testing facilities of its own, must rely upon information furnished by applicants and their attorneys."[283] Novartis "stood before the Patent Office in a confidential relationship and owed the obligation of frank and truthful disclosure."[284] Its misrepresentation of the β-crystalline polymorphism constitutes a serious breach of that duty.

In addition to its erroneous materiality holding, the district court misapplied the procedural law governing motions to dismiss: it failed to regard the purchasers'

---

[280] *Id.* at 1343 (second alteration in original) (quoting *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1572 (Fed. Cir. 1983)).

[281] *Id.* (quoting *Rohm*, 722 F.2d at 1572).

[282] *Id.* at 1344 (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc)).

[283] *Beckman Instruments*, 439 F.2d at 1379 (quoting *Charles Pfizer*, 401 F.2d at 579).

[284] *Id.* (quoting *Charles Pfizer*, 401 F.2d at 579).

factual allegations as true, opting instead to draw inferences *against* the purchasers.[285] The district court's observation that the patent examiner might have "reach[ed] her own opinion . . . based on the prior art that was available to her before the patent issued"[286] identifies an issue of fact for the jury: What conclusion might the examiner have drawn? The district court's observation should have led it to conclude discovery was necessary. Instead, it relied on this uncertainty as a basis for rejecting the purchasers' claims.

Finally, although the district court acknowledged the *existence* of the purchasers' allegations that Novartis had been testing and manufacturing the β-crystalline form of imatinib since well before it filed the second patent application,[287] the court failed to consider these allegations when analyzing the purchasers' claims.

### ii. Novartis's claim that imatinib mesylate had not previously been prepared was a blatant falsehood.

Novartis also told the PTO that, prior to the second patent application,

---

[285] *Cardigan*, 787 F.3d at 87 (emphasizing that courts must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor" (quotation marks omitted)).

[286] ADD-032.

[287] *See* ADD-029-30 (listing, among the purchasers' allegations, the fact "that 'Novartis misrepresented that the non-needle form of the compound was a recent, 'surprising' discovery, *despite the fact that Ciba-Geigy scientists had been using it for years*'" (emphasis added) (quoting the purchasers' complaint)).

imatinib mesylate had not been disclosed or "actually prepared."[288] And Novartis claimed that the "prior art does not suggest any particular form of imatinib mesylate or suggest that any particular form could be made by a particular method."[289]

These were misrepresentations: the *inventors' own publications* – both those Novartis belatedly submitted and those which it failed to disclose entirely – disclosed imatinib mesylate. As previously described, articles *Zimmermann himself published* taught the mesylate form of imatinib. The 1996 Buchdunger Article disclosed publicly that Zimmermann and others had used a "methane sulfonate salt" – i.e., *mesylate* – form of imatinib in all of the *in vivo* experiments described in the article.[290] The 1997 Zimmermann Article disclosed the *mesylate* version of imatinib and suggested that the compound might be a development candidate for use in treatment of leukemia.[291] And the 1996 Druker Article described preclinical studies of imatinib *mesylate* and disclosed that imatinib *mesylate* selectively inhibits the proliferation of leukemia-causing cells.[292]

---

[288] JA-000472.

[289] JA-000473.

[290] JA-000074-75 (¶¶ 159-64); JA-000527.

[291] JA-000077 (¶¶ 178-80); JA-000521-26 (including a diagram of imatinib mesylate).

[292] JA-000076 (¶ 172); JA-000673-77 (the compound diagrammed as Figure 1 is imatinib mesylate). Novartis never provided this relevant article to the PTO.

All of these prior art references show Novartis's claim that "there is no prior art form of imatinib mesylate"[293] to be a flagrant misrepresentation. As Novartis noted in its briefing before the Board, patents are often held invalid where a prior art reference discloses a "narrow genus" of compounds from which the claimed compound would be obvious.[294] Here, prior art references not only described the narrow genus, but *disclosed the specific compound*. Nonetheless, in its argument before the Board, Novartis misrepresented this reality, arguing that the genus described in the first patent did not disclose the mesylate salt form.[295]

The district court nonetheless found immaterial Novartis's representation that it had never previously prepared imatinib mesylate. First, the court reasoned that "the PTO . . . specifically assumed the mesylate salt of imatinib had been disclosed."[296] But, again, an "unmistakably false" representation "establishes materiality."[297] Furthermore, the Board did *not* decide that the first patent anticipated the second patent's claim to the mesylate salt form. Instead, the Board assumed this conclusion *without deciding* and reversed based on a procedural error the examiner had made. After the Board reversed, the examiner was left to decide

---

[293] JA-000455, JA-000473.

[294] JA-000472.

[295] JA-000472.

[296] ADD-031.

[297] *Intellect Wireless*, 732 F.3d at 1342.

whether the prior art rendered obvious and/or anticipated Novartis's claim to the mesylate salt form of imatinib.

Second, the district court found Novartis's prior art omissions immaterial because "Novartis did ultimately provide prior art that disclosed mesylate salt to the patent examiner."[298] But a patent applicant cannot absolve itself of fraud by simply providing the examiner with "accurate facts" that contradict the applicant's misrepresentation: it must "call[] his attention to the untrue or misleading assertions sought to be overcome."[299] So Novartis had "no room to argue" – and the district court had no room to conclude – "that submission of false [information] is not material.'"[300]

And third, the district court reasoned that, because Novartis's patent issued even though some of the prior art was belatedly "disclosed prior to issuance," the prior art must not have been material. But "a reference" is not "immaterial *simply because the claims are eventually deemed by an examiner to be patentable thereover.*"[301]

### 2. Novartis acted with intent to deceive.

Finally, *Walker Process* fraud requires "the intent to deceive or, at least, a

---

[298] ADD-031.

[299] *Intellect Wireless*, 732 F.3d at 1343 (quoting *Rohm,* 722 F.2d at 1572).

[300] *Id.* at 1344 (quoting *Therasense*, 649 F.3d at 1292).

[301] *Bristol-Myers Squibb*, 326 F.3d at 1237 (emphasis added) (quoting *Molins*, 48 F.3d at 1179).

state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter)."[302] "[B]ecause direct evidence of deceptive intent is rarely available," intent is generally "inferred from indirect and circumstantial evidence."[303] If a complaint alleges that a patent applicant made a "false or clearly misleading prosecution statement," or that "a patent applicant knew one fact and presented another," it has adequately pleaded "that the applicant intended by the misrepresentation to deceive the examiner."[304] In particular, false statements made "in order to overcome a prior art reference raises a strong inference of intent to deceive."[305] This inference grows stronger where a plaintiff can show "a pattern of deceit,"[306] such as multiple false prosecution statements.

Here, the purchasers allege such a pattern. Novartis lied to the PTO about its prior preparation of imatinib mesylate.[307] It claimed the β-crystal polymorphism was a surprising discovery when, in reality, it was an inherent product of imatinib

---

[302] *Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1349 (Fed. Cir. 2007) (quotation marks omitted); *see also Nobelpharma*, 141 F.3d at 1070-71.

[303] *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008); *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983) ("[P]roof of scienter required in fraud cases is often a matter of inference from circumstantial evidence. If anything, the difficulty of proving the defendant's state of mind supports a lower standard of proof.").

[304] *Dippin' Dots*, 476 F.3d at 1347.

[305] *Intellect Wireless*, 732 F.3d at 1345.

[306] *Id.*

[307] JA-000472.

mesylate or else the result of routine steps.[308] And it omitted *numerous* prior art articles from its principal submission to the PTO (many of which Zimmermann himself authored).[309] Although Novartis did eventually disclose some of these articles, it did so *after* the PTO had already issued its crucial decisions on the second patent (*after* the Board issued its decision and *after* the examiner issued the notice of allowance). This "pattern of deceit" supports the purchasers' allegation that Novartis acted with intent.

Nonetheless, the district court held that the purchasers failed to adequately plead intent. Despite the court's insistence that it "construed generously"[310] the purchasers' claims, it focused almost entirely on the belated prior art disclosures.[311] "At best," the court opined, this "allegation that the prior art was disclosed after an initial notice of allowance cuts equally in favor of and against Plaintiffs."[312] The court then held that such an allegation was insufficient to support an inference of intent at the Rule 12(b)(6) stage.

Past appellate reversals on the issue of intent show just how erroneous this conclusion was. In *Kaiser Foundation Health Plan, Inc. v. Abbott Laboratories,*

---

[308] JA-000070 (¶ 138); JA-000078 (¶ 181).

[309] *See supra* Section III.E.3.

[310] ADD-032.

[311] ADD-032-34.

[312] ADD-033.

*Inc.*,[313] the Ninth Circuit reversed a grant of summary judgment on the issue of intent, holding that where facts are susceptible to more than one reading, *the claim cannot be dismissed*. There, the pharmaceutical company, Abbott, made two omissions: (1) an English translation of a relevant, Japanese prior art reference, despite claiming on a PTO form it had included the translation, and (2) a relevant case citation.[314]

Unlike the district court here, the Ninth Circuit recognized that intent cannot be decided in a vacuum. First, Court held that the company's motives were relevant, citing Abbot's strong incentive to obtain the patent "to maintain its monopoly on [its branded drug]."[315] Second, the court instructed that Abbott's omissions must be read together. Although a non-fraudulent reading of Abbott's failure to submit the translation was of course possible,[316] Abbott's second omission cast doubt over Abbott's innocence. As the Ninth Circuit explained, Abbott's failure to mention the relevant case during patent prosecution "was unlikely to have been inadvertent, given that [Abbott] took [its] argument from a litigation brief filed by Abbott that had specifically mentioned and distinguished"

---

[313] 552 F.3d 1033 (9th Cir. 2009).

[314] *Id.* at 1048-49.

[315] *Id.* at 1050.

[316] *Id.* at 1050-51 ("It is of course possible that a competent in-house attorney could indicate . . . that a particular document was included in a patent application, but then inadvertently fail to include that document in the application.").

that case.[317] The court then reasoned that this omission *also* suggested Abbott's failure to include the Japanese translation was not inadvertent,[318] examining the totality of the circumstances. When coupled with Abbott's strong incentive to obtain extended patent protection, the Ninth Circuit concluded that Abbott's omissions could support an inference of intent.

Here, the district court suggests, without citation, that when two inferences are equally plausible – when an allegation "cuts equally in favor of and against Plaintiffs" – the plaintiffs have failed to offer plausible allegations of intent.[319] But that is not the law. So long as "a reasonable person would deem the inference of scienter . . . at least as compelling as any opposing inference one could draw from the facts alleged," "[a] complaint will survive."[320]

Whether such an inference is the best reading of the evidence is irrelevant: at the motion to dismiss phase, the question is whether such a factual conclusion is *plausible*. As the Ninth Circuit noted, "it would be naive to expect that someone

---

[317] *Id.* at 1051.

[318] *Id.*

[319] ADD-033.

[320] *Tellab, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1361 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394 (2006) ("The jury was entitled to find *all* of [the plaintiff's] evidence credible and to disbelieve *every* assertion that [the defendant] made about a disputed fact."); *see generally KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1573 (Fed. Cir. 1985) ("Good faith, intent to deceive, scienter, honest mistake are all questions of fact.").

who had sought to deceive the PTO would state in a deposition that this had been his intent."[321]

Here, the purchasers allege that Novartis concealed key facts and prior art from the PTO in order to overcome an obviousness determination. And they allege that Novartis had a $1.2-billion-dollar motive to do so. These allegations are sufficient to support an inference of intent.

## VI.    CONCLUSION

At bottom, the district court dismissed the purchasers' claims because it chose to adopt Novartis's explanation for its conduct. In doing so, it construed the purchasers' alleged facts in a light more favorable to their opponents. The district court leaned heavily, and incorrectly, on inferences it drew from the examiner's mere allowance of the second patent and on the presence of settlements. These errors – both legal and factual – should be reversed.

We respectfully ask the Court to enter an order directing the district court to vacate the judgment and dismissal orders and conduct further proceedings consistent with the rules.

Dated: December 1, 2017          Respectfully submitted,

                                 **/s/ Thomas M. Sobol**

                                 Thomas M. Sobol (BBO #471770)

---

[321] *Kaiser*, 552 F.3d at 1050.

Hannah W. Brennan (BBO #1181216)
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel.: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
hannahb@hbsslaw.com

*Counsel for the End Payer Purchaser
Appellants*

John D. Radice (BBO #1148856)
Radice Law Firm, P.C.
34 Sunset Blvd
Long Beach, NJ 08008
Tel.: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com

Noah Rosmarin (BBO #630632)
Adkins, Kelston & Zavez, P.C.
90 Canal Street, Suite 500
Boston, MA 02114
Tel.: (617) 367-1040
Fax: (617) 742-8280
nrosmarin@akzlaw.com

*Counsel for the Direct Purchaser Appellants*

## TABLE OF GENERIC INFRINGEMENT LAWSUITS

| Generic Manufacturer | ¶ IV | 30-Month Stay End Date | Lawsuit Filed | Patents Asserted | Settlement |
|---|---|---|---|---|---|
| Sun Pharma Global FZE | 8/24/07 | None. | No. 13-cv-03542 (D.N.J. June, 7, 2013). | '051 | Civil case terminated 5/15/2014. Generic launch permitted 2/1/2016. |
| Breckenridge Pharmaceutical, Inc. | 6/13/14 | 12/13/17 | No. 14-cv-05729 (S.D.N.Y. July 25, 2014). | '051, RE'932 | Dismissal without prejudice 5/20/2016. |
| Dr. Reddy's Laboratories Ltd. | 8/27/14 | 2/27/17 | Nos. 14-cv-00157, 14-cv-00387, 14-cv-01076, 14-cv-01283 (D. Del. Feb. 5, 2014). | '051, RE'932 | Dismissal without prejudice 6/22/2015. |
| Ranbaxy Inc. | 11/19/14 | 5/19/17 | 14-cv-01526 (D. Del. Dec. 29, 2014). | '051, RE'932 | Dismissal without prejudice 10/21/2015. |

| Generic | ¶ IV | 30-Month Stay End Date | Lawsuit Filed | Patents Asserted | Settlement |
|---|---|---|---|---|---|
| Roxane Laboratories, Inc. / Boehringer Ingelheim Roxane, Inc. | 8/31/15 | 2/28/18 | No. 15-cv-00908 (D. Del. Oct. 9, 2015) | '051, RE'932 | Dismissal without prejudice 4/5/2017. |
| Natco Pharma Ltd. | 9/15/15 | 3/15/18 | No. 15-cv-00987 (D. Del. Oct. 28, 2015) | '051, RE'932 | Dismissal without prejudice 1/4/2017. |
| Amneal Pharmaceuticals LLC | 9/17/15 | 3/17/18 | No. 15-cv-00986 (D. Del. Oct. 28, 2015) | '051, RE'932 | Dismissal without prejudice 1/24/2017. |
| Shilpa Medicare Ltd. | 10/26/15 | 2/26/18 | No. 15-cv-01111 (D. Del. Nov. 30, 2015) | '051, RE'932 | Dismissal without prejudice 7/27/2016. |
| Wockhardt Bio AG | 12/15/15 | 6/15/18 | No. 16-cv-00040 (D. Del. Jan. 26, 2016) | '051, RE'932 | Dismissal without prejudice 12/20/2016. |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the appellants certify that the foregoing consolidated brief is in 14-point Times New Roman proportional font and contains 18,957 words. It is thus in compliance with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) and the Order of this Court dated November 17, 2017.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, by agreement of the parties, I caused a true and correct copy of the foregoing to be served on defense counsel of record by ECF and hand-delivery and on co-appellants by ECF and electronic mail.

**/s/ Thomas M. Sobol**
Thomas M. Sobol, Esq.

Dated: December 1, 2017

# United States Court of Appeals
## for the First Circuit

_____

No. 17-1714

UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST
HEALTH BENEFITS FUND, on behalf of themselves and others similarly situated; LABORERS
HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves
and others similarly situated; AFSCME HEALTH AND WELFARE FUND, on behalf of themselves and
others similarly situated; MINNESOTA LABORERS HEALTH AND WELFARE FUND, on behalf of
themselves and others similarly situated; PENNSYLVANIA EMPLOYEES BENEFIT TRUST FUND,
on behalf of themselves and others similarly situated; LOUISIANA HEALTH SERVICE AND
INDEMNITY COMPANY, d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA, on behalf of
themselves and others similarly situated,

Plaintiffs, Appellants,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION; NOVARTIS
AG,

Defendants, Appellees

_____

No. 17-1776

RXDN, INC., on behalf of themselves and others similarly situated,

Plaintiff, Appellant,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION; NOVARTIS
AG,

Defendants, Appellees.

_____

On Appeal from the United States District Court for the District of Massachusetts
Civil Action Nos. 15-12732-ADB, 15-13461-ADB, 15-13724-ADB, 15-13725-ADB, 15-13726-
ADB, 16-12399-ADB

_____

**ADDENDUM**

_____

UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST
HEALTH BENEFITS FUND, on behalf of themselves and others similarly situated; LABORERS
HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves
and others similarly situated; AFSCME HEALTH AND WELFARE FUND, on behalf of themselves and
others similarly situated; MINNESOTA LABORERS HEALTH AND WELFARE FUND, on behalf of
themselves and others similarly situated; PENNSYLVANIA EMPLOYEES BENEFIT TRUST FUND,
on behalf of themselves and others similarly situated; LOUISIANA HEALTH SERVICE AND
INDEMNITY COMPANY, d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA, on behalf of
themselves and others similarly situated,

Plaintiffs, Appellants,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION; NOVARTIS
AG,

Defendants, Appellees

_____

No. 17-1776

RXDN, INC., on behalf of themselves and others similarly situated,

Plaintiff, Appellant,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION; NOVARTIS
AG,

Defendants, Appellees.

On Appeal from the United States District Court for the District of Massachusetts
Civil Action Nos. 15-12732-ADB, 15-13461-ADB, 15-13724-ADB, 15-13725-ADB, 15-13726-
ADB, 16-12399-ADB

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Thomas M. Sobol
Hannah W. Brennan
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
tom@hbsslaw.com
hannahb@hbsslaw.com

*Counsel for End Payer Purchaser Appellants*

**RADICE LAW FIRM, P.C.**
John D. Radice
34 Sunset Blvd
Long Beach, NJ 08008
Tel.: (646) 245-8502
jradice@radicelawfirm.com

**ADKINS, KELSTON & ZAVEZ, P.C.**
Noah Rosmarin
90 Canal Street, Suite 500
Boston, MA 02114
Tel.: (617) 367-1040
nrosmarin@akzlaw.com

*Counsel for Direct Purchaser Appellants*

# TABLE OF CONTENTS

District Court Order of Dismissal of End Payers' Case dated
July 6, 2017 (Dkt. No. 141) ........................................... ADD001 – ADD002

District Court Memorandum and Order Granting Motion to
Dismiss End Payers' Case dated June 30, 2017 (Dkt.
No. 140) ......................................................................... ADD003 – ADD034

District Court Order of Final Judgment in End Payers' Case
dated July 18, 2017 (Dkt. No. 146) .................................................. ADD035

District Court Electronic Order Granting Judgment under
Rule 54(b) in Direct Purchasers' Case (Dkt. No. 21) ...................... ADD036

Patent Trial and Appeal Board Decision dated November 24,
2003 ............................................................................... ADD037 – ADD047

End Payers' Amended Notice of Appeal dated July 20, 2017
(Dkt. No. 147) ............................................................... ADD048 – ADD050

End Payers' Unopposed Motion to Amend Notice of Appeal
dated September 22, 2017 .............................................. ADD051 – ADD059

First Circuit Order Granting End Payers' Motion to Amend
Notice of Appeal dated October 30, 2017 ....................... ADD060 – ADD061

Direct Purchasers' Notice of Appeal dated July 31, 2017
(Dkt. No. 22) ................................................................. ADD062 – ADD064

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND and LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated,<br>Plaintiffs,<br>v.<br>NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION,<br>Defendants. | Civil Action No. 15-cv-12732 (lead) |

| | |
|---|---|
| LOUISIANA HEALTH SERVICE AND INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA, on behalf of themselves and others similarly situated,<br>Plaintiff,<br>v.<br>NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION,<br>Defendants. | Civil Action No. 15-cv-13461 |

| | |
|---|---|
| AFSCME HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated,<br>Plaintiff,<br>v.<br>NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION,<br>Defendants. | Civil Action No. 15-cv-13724 |

| | |
|---|---|
| MINNESOTA LABORERS HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated,<br>Plaintiff,<br>v.<br>NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION,<br>Defendants. | Civil Action No. 15-cv-13725 |

| | |
|---|---|
| PENNSYLVANIA EMPLOYEES BENEFIT TRUST FUND, on behalf of themselves and others similarly situated,<br>Plaintiff,<br>v.<br>NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION, Defendants. | Civil Action No. 15-cv-13726 |

## **ORDER OF DISMISSAL**

BURROUGHS, D. J.

In accordance with the Court's Memorandum and Order issued on June 30, 2017 granting the Motion to Dismiss, it is hereby ORDERED that the above-entitled action be and hereby is dismissed.

By the Court,

_____July 6, 2017_____          _/s/ Mariliz Montes_
Date                                          Deputy Clerk

**ADD-002**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND and LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated, | * * * * * * | |
| Plaintiffs, | * * | Civil Action No. 15-cv-12732 |
| v. | * * | |
| NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION, | * * * | |
| Defendants. | * * * | |
| LOUISIANA HEALTH SERVICE AND INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA, on behalf of themselves and others similarly situated, | * * * * * | |
| Plaintiff, | * | Civil Action No. 15-cv-13461 |
| v. | * * | |
| NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION, | * * * | |
| Defendants. | * * * | |
| AFSCME HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated, | * * * | |
| Plaintiff, | * * | Civil Action No. 15-cv-13724 |
| v. | * * | |
| NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION, | * * * | |
| Defendants. | * | |

1

```
                                                      *
MINNESOTA LABORERS HEALTH AND                         *
WELFARE FUND, on behalf of themselves and others      *
similarly situated,                                   *
                                                      *
                Plaintiff,                            *
                                                      *    Civil Action No. 15-cv-13725
        v.                                            *
                                                      *
NOVARTIS PHARMACEUTICALS CORP.,                       *
NOVARTIS AG, and NOVARTIS CORPORATION,                *
                                                      *
                Defendants.                           *
                                                      *
                                                      *
PENNSYLVANIA EMPLOYEES BENEFIT TRUST                  *
FUND, on behalf of themselves and others similarly    *
situated,                                             *
                                                      *
                Plaintiff,                            *
                                                      *    Civil Action No. 15-cv-13726
        v.                                            *
                                                      *
NOVARTIS PHARMACEUTICALS CORP.,                       *
NOVARTIS AG, and NOVARTIS CORPORATION,                *
                                                      *
                Defendants.                           *
```

## **MEMORANDUM AND ORDER GRANTING MOTION TO DISMISS**

BURROUGHS, D.J.

## I.    INTRODUCTION

In this putative class action, Laborers Health and Welfare Trust Fund for Northern

California and Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue

Shield of Louisiana ("Plaintiffs") bring state-law claims against Defendants Novartis

Pharmaceuticals Corporation, Novartis AG, and Novartis Corporation (collectively, "Novartis"),

on behalf of themselves and all others similarly situated, for engaging in an alleged

"monopolistic scheme" in connection with Gleevec®, a brand-name prescription drug used to

treat certain types of chronic myeloid leukemia and acute lymphoblastic leukemia. Specifically, Plaintiffs allege that Novartis, which held the patent rights to Gleevec, engaged in illegal, anticompetitive conduct designed to delay the entry of generic forms of the drug into the U.S. market. Presently before the Court is Novartis' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) [ECF No. 111] and End Payer Plaintiffs' Motion for a Rule 26(f) Conference [ECF No. 135]. For the reasons set forth below, the motion to dismiss is GRANTED, and the motion for a conference is DENIED.

## II.    PROCEDURAL HISTORY

Plaintiffs filed their original Class Action Complaint on June 22, 2015, seeking only declaratory and injunctive relief under federal antitrust law. [ECF No. 1]. In July and August 2015, Novartis filed motions to dismiss. [ECF Nos. 53, 60]. On February 1, 2016, while the motions were pending, a generic form of Gleevec was introduced into the market, thus mooting the request for injunctive relief. On March 24, 2016, the Court denied the motions to dismiss as moot and gave Plaintiffs leave to amend their complaint. [ECF No. 104]. In addition, the Court consolidated the action for pretrial purposes with four other cases involving similar claims against Novartis. On April 8, 2016, Plaintiffs filed the operative Consolidated Amended Class Action Complaint ("CAC"). [ECF No. 105]. The parties stipulated that the CAC would supersede all other complaints filed by any plaintiff in any of the consolidated actions. In contrast to the original complaint, the CAC does not contain any claims arising out of federal antitrust law; instead, it asserts only state-law antitrust and unfair trade practices claims, under the laws of 23 states and the District of Columbia. This Court appears to have diversity jurisdiction pursuant to 28 U.S.C. § 1332.

On May 10, 2016, Novartis filed a motion to dismiss for failure to state a claim and lack of jurisdiction [ECF Nos. 111, 112] and a supporting declaration [ECF No. 113]. Plaintiffs opposed the motion [ECF No. 120] and Novartis filed a reply [ECF No. 121]. On August 1, 2016, the Court held a hearing on the motion. [ECF No. 126].

## III.    ALLEGATIONS IN THE CONSOLIDATED CLASS ACTION COMPLAINT

The CAC alleges a single claim for relief on behalf of the putative class—that Novartis' conduct amounted to "monopolization and [a] monopolistic scheme" in violation of the laws of 23 states and the District of Columbia. Specifically, Plaintiffs allege that Novartis "engaged in an exclusionary, anticompetitive scheme designed to create and maintain a monopoly for Gleevec and its generic substitutes," and that "as part of this scheme, Novartis: (1) [w]ith intent to mislead or deceive, failed to disclose to the PTO [U.S. Patent and Trademark Office] material information known to it and made material misrepresentations to the PTO, but for which the '051 patent would not have issued; (2) [i]mproperly listed the '051, '799, and RE'923 patents in the Orange Book; and (3) [p]rosecuted sham patent litigation lawsuits against generic manufacturers." Plaintiffs further allege that at all relevant times, Novartis intended to, and did, maintain and extend its monopoly power, which allowed it to continue charging supra-competitive prices for Gleevec without a substantial loss in sales, and that as a direct and proximate result of this conduct, Plaintiffs and other members of the putative class were injured, in that they paid more for the drug than they would have if a generic had been allowed onto the market.

The following facts are derived from the CAC unless otherwise noted.

### A.    Prosecution of the Polymorph Patents

Defendant Novartis Pharmaceuticals Corporation (a subsidiary of Defendant Novartis

AG), with FDA approval, markets and distributes Gleevec in the United States. Defendant

Novartis Corporation is the assignee of U.S. Patent No. 5,521,184 ("the '184 Patent"), which is

the basic compound patent claiming Gleevec's active ingredient, commonly known as

"imatinib." In addition to claiming the imatinib compound in its "free base" form, the '184

Patent also claims certain "salts" of the imatinib compound and their use as tumor-inhibiting

agents.[1] The '184 Patent issued on May 28, 1996, and expired on July 4, 2015.

Prior to the expiration of the '184 Patent, Novartis obtained two follow-on patents that

claim particular crystalline ("polymorphic") "non-needle" forms of the mesylate salt of

imatinib:[2] (1) U.S. Patent No. 6,894,051 ("the '051 Patent") issued on May 17, 2005, and (2)

U.S. Patent No. 7,554,799 ("the '799 Patent) issued on June 9, 2009, which was subsequently

surrendered and reissued as RE43'932 ("the RE'932 Patent")[3] (collectively, the "Polymorph

---

[1] Because the "free base" forms of many pharmaceutical compounds often do not exhibit the range of physical properties that are suitable for drug development, chemists sometimes modify the characteristics of the compound by adding an acid to form an "acid addition salt." One common acid addition salt is a salt of methanesulfonic acid, also known as "mesylate." Novartis sells Gleevec with imatinib mesylate in a tablet form.

[2] Once a salt is selected, a drug manufacturer can also select a polymorphic form of the salt. Salts crystallize in a variety of different shapes, depending on conditions like temperature, solvent, and degree of supersaturation. When a salt is to be used in pharmaceutical drugs, some crystalline forms are preferable to others, as the form of the salt can affect drug qualities such as stability, dissolution, and bioavilability. In addition, certain crystalline forms may not be ideal for mass-scale production, in light of the form's flow properties, compressibility, bulk density, and particle sizes. Plaintiffs allege that "[n]eedle-shaped crystals, which are long and very thin . . . are very difficult to handle both in the laboratory and in commercial production." Id. ¶ 41. Accordingly, it is preferable to use a non-needle crystalline form when developing a salt for use in prescription drugs. Id. ¶ 42.

[3] The '051 Patent is alleged to expire November 23, 2019. CAC ¶ 262. The CAC alleges that the '799 Patent, due to the terminal disclaimer, would expire the same day, id. ¶ 293, but Novartis represents that the RE'932 Patent expires on July 16, 2019 [ECF No. 112 at 4 n.6].

Patents"). The CAC alleges that the Polymorph Patents are invalid, although Plaintiffs do not

contest the validity of the original '184 Patent.

The application for the '051 Patent, filed in January 2000, purported to disclose and claim

the methanesulfonate salt of imatinib, along with a particular polymorphism—namely, the non-

needle form, which Novartis referred to as the "β-crystalline" form.[4] In September 2000, the

patent examiner issued a non-final rejection of Novartis' claims, concluding that the claims were

both anticipated and rendered obvious by the '184 Patent. Specifically, the examiner rejected the

claims as anticipated by the '184 Patent's disclosure of the "free form" of imatinib and a "list of

intended salts, including the methanesulfonate [mesylate] salt." She also held that the burden was

on the applicant to show that the claimed β-crystalline form would not be inherently produced

using routine procedures described in the '184 Patent. Although Novartis responded to the

examiner's rejections, the examiner nonetheless issued a final office action on July 5, 2001 in

which she found that Novartis' patent claims were anticipated and rendered obvious by the '184

Patent.

Novartis appealed this rejection to the Patent Board. On November 24, 2003, the Patent

Board reversed the examiner's decision. The Patent Board's decision assumed, without deciding,

that the original '184 Patent described the mesylate salt of imatinib. The Patent Board

nevertheless held that the '184 Patent "contains insufficient disclosure to support a finding of

anticipation of the appealed claims which recite a non-hygroscopic or β-crystalline form of the

methanesulfonic acid addition [mesylate] salt of imatinib." See Declaration of Wyley S. Proctor

---

[4] The Court understands the term "methanesulfonate salt" to be identical to "mesylate salt" in
this case, and thus uses them interchangeably.

[ECF No. 113] ("Proctor Decl."), Ex. D.[5] Further, the Patent Board held that the examiner had

erred in shifting the burden of persuasion to Novartis "to establish that the β-crystalline form

recited in their claims 'cannot be made following routine conditions.'" Id. This, the Patent Board

explained, was reversible error, because "before an applicant can be put to this burdensome task,

the examiner must provide some evidence or scientific reasoning to establish the reasonableness

of the examiner's belief that the functional limitation is an inherent characteristic of the prior

art." Id. (internal quotations and citation omitted). Because no such evidence or reasoning

appeared in the record, the Patent Board reversed the examiner's rejections based on

anticipation.

    Similarly, the Patent Board reversed the examiner's rejections based on obviousness.

Again, the Patent Board assumed, *arguendo*, that the '184 Patent described the mesylate salt of

imatinib. Id. The Patent Board, however, disagreed with the examiner that this disclosure would

render obvious the claims in the '051 Patent. The Board found that the examiner had not

adequately explained how a person having ordinary skill in the art "would have been led from

'here to there,' *i.e.*, from the methanesulfonic acid addition [mesylate] salt of imatinib to the . . .

β-crystalline form of that compound recited in the appealed claims." Id.; see also CAC ¶ 244.

    On December 31, 2003, six weeks after the Patent Board reversed the examiner's

rejections and without conducting any further proceedings, the examiner issued a notice of

allowance.[6] Plaintiffs allege that the file wrapper reflects no further developments to the record

---

[5] Although the Patent Board's decision is not attached to the CAC, it is cited at length therein. Moreover, because documents in the patent's prosecution history are public records, the Court may take judicial notice of their contents. See Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16–17 (1st Cir. 1998).

[6] "If, on examination, it appears that the applicant is entitled to a patent under the law, a notice of allowance will be sent to the applicant . . . ." 37 C.F.R. § 1.311(a).

following the Board's decision, except a notice that the patent term would be extended by 311

days due to the pendency of the appeal to the Board. In Plaintiffs' view, the Board's decision

was based on an incomplete prior art record and that the examiner's subsequent decision

allowing the patent to issue was not on the merits.

The CAC alleges that Novartis specifically withheld five prior art references—

publications by its own scientists—that disclosed the earlier use of the mesylate salt form of

imatinib to inhibit the growth of tumor cells:

(1) A 1996 article published in *Cancer Research* by Novartis scientists Buchdunger, Zimmerman, Lydon, Druker, and others entitled "Inhibition of the Ab1 Protein-Tyrosine Kinase in vitro and in vivo by a 2-Phenylaminopyrimidine Derivative." The article allegedly disclosed that the scientists had made a series of compounds that inhibited tyrosine kinases, and described a single compound (imatinib) that showed potent inhibition of the Abl kinase associated with chronic myeloid leukemia. The article explained that the scientists had also synthesized a methanesulfonate salt form of the compound, and that they did so well before the article was submitted on July 31, 1995. The Court will refer to this article as the "**1996 Buchdunger Article**." See CAC ¶¶ 159–64.

(2) A 1997 article published in *Bioorganic & Medicinal Chemistry Letters* by Zimmerman, Buchdunger, and others from Novartis' Oncology Research Department, entitled "Potent and Selective Inhibitors of the Abl-Kinase: Phenylamino-Pyrimidine (PAP) Derivatives." The article, which was submitted for publication on August 21, 1996, described development and optimization of a new class of phenylamino-pyramidine derivatives that yielded highly potent and selective Bcr-Abl kinase inhibitors. The article advised that in one particular series of the PAP derivatives, "improvement of the aqueous solubility can be accomplished by attachment of a salt forming group on the indole side chain." Thus, the article suggested that the compound might be a development candidate for use in treatment of certain leukemias. The Court will refer to this article as the "**1997 Zimmerman Article.**" See id. ¶¶ 178–80.

(3) A 1996 Article published in *Nature Medicine* by Druker, Buchdunger, Zimmerman, Lydon, and others entitled "Effects of a Selective Inhibitor of the Abl Tyrosine Kinase on the Growth of Bcr-Ab1 Positive Cells." The article allegedly detailed the design of imatinib and its effect of selectively inhibiting proliferation of Bcr-Abl expressing cells in vitro and in vivo. The Court will refer to this article as the "**1996 Druker Article**." See id. ¶ 172.

(4) A 1995 presentation that Druker gave at the American Society of Hematology's annual meeting in Seattle, entitled "Preclinical evaluation of a selective inhibitor of the Abl tyrosine kinase as a therapeutical agent for chronic myelogenous leukemia." The presentation abstract allegedly disclosed the imatinib compound as a potent and specific inhibitor of the ABL protein tyrosine kinase, and concluded that the compound may be useful in the treatment of certain leukemias. The Court will refer to this as the "**1995 Druker Presentation**." See id. ¶¶ 157–58.

(5) A 1996 Article published in *Bioorganic & Medicinal Chemistry Letters* by Zimmerman, Buchdunger, Lydon, and others entitled "Phenylamino-Pyrimidine (PAP) – Derivatives: A New Class of Potent and Highly Selective PDGF-Receptor Autophosphorylation Inhibitors." In that article, Zimmerman noted that the phenylamino-pyramidine compounds at issue "show poor solubility in water . . . but are soluble under acidic conditions." In a footnote, the authors described a "typical synthesis" of the compounds, which involved filtration, evaporation, and crystallization. The Court will refer to this as the "**1996 Zimmerman Article**." See id. ¶¶ 165–67.

On March 26, 2004, Novartis submitted a Continued Prosecution Application Request and a supplemental Information Disclosure Statement ("IDS") that disclosed, for the first time, two of these prior art references (the 1996 Buchdunger Article and 1997 Zimmerman Article). See id. ¶ 252. Other prior art—the 1995 Druker Presentation, 1996 Zimmerman Article, and 1996 Druker Article—was allegedly never disclosed. Id. ¶¶ 252, 271, 272. Along with the IDS, Novartis filed "remarks," in which it argued that because the Patent Board had presumed that the mesylate salt of imatinib was described in the prior art, yet still reversed the examiner's rejections, principles of *res judicata* required that the patent claims be allowed, even assuming that the prior art disclosed the mesylate salt. Id. ¶ 253; Proctor Decl. Ex. G.

Plaintiffs further allege that during the prosecution of the '051 Patent before the PTO, Novartis made intentional false statements and material omissions, including

(i) misrepresenting that the mesylate salt of imatinib was not actually prepared in Zimmermann [the '184 Patent], (ii) misrepresenting that obviousness and anticipation depend on whether the salt form compound was actually made in Zimmermann [the '184 Patent] (when the relevant question is whether its preparation is within the knowledge of those of ordinary skill in light of Zimmerman [the '184 Patent]), (iii) failing to disclose that the specific salt, imatinib

mesylate, had been publicly disclosed in publications authored by Novartis's own scientists, (iv) withholding relevant prior art until after the PTO sent a notice of allowability, thereby failing to disclose information material to patentability during the prosecution of the patent, (v) misrepresenting, when it did finally disclose some material prior art, that the Board had already decided that prior art disclosing the mesylate salt form would not invalidate the patent (when the Board did *not* consider whether other prior art disclosed the mesylate salt, in part because Novartis had not provided the relevant prior art).

CAC ¶ 265.

Plaintiffs additionally claim that Novartis misrepresented in its patent application that the non-needle, β-crystalline form of imatinib mesylate was a recent and "surprising" discovery when, in fact, Novartis scientists had been using the β-crystalline form since August 1993 and anyone skilled in the art would have been both motivated and easily able to formulate a non-needle, crystalline form using routine laboratory procedures.

The PTO ultimately issued the '051 Patent on May 17, 2005. In 2006, Novartis filed and obtained the second follow-on patent, the '799 Patent, which purportedly disclosed the methanesulfonate salt of imatinib and its β-crystalline form. According to Plaintiffs, parts of the '799 Patent application were identical to the '051 Patent application. Novartis again stated that it was "surprised" to find the β-crystalline form in the methanesulfonate salt of the compound, even though the form had been known to have advantageous properties since July 31, 1995 and was the basis of the '051 Patent. Plaintiffs allege that the '799 Patent was broader than the '051 Patent, which claimed the β-crystalline form, because the '799 Patent ultimately also claimed the non-needle crystal of imatinib mesylate. The '799 Patent eventually issued on June 9, 2009. Plaintiffs argue that it is invalid for the same reasons that the '051 Patent is invalid. The '799 Patent was eventually reissued as the RE'932 Patent.

### B.      The Orange Book Listing

The Orange Book lists FDA-approved drug products along with the corresponding patents that cover the drugs. One objective of the Orange Book is to provide would-be generic manufacturers with notice of any patent rights that are implicated by a brand-name drug. The information published in the Orange Book, however, is based on drug manufacturers' submissions and representations to the FDA. The FDA does not independently determine whether a particular drug product actually reads on a particular patent claim, and it does not examine the asserted patents to ensure their validity.[7]

Novartis submitted all three patents—the original '184 Patent, the '051 Patent, and the '799 Patent—to the FDA to be listed in the Orange Book as covering Gleevec. CAC ¶ 295. Plaintiffs allege that Novartis did so knowing that the Polymorph Patents had "no realistic

---

[7] Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), a drug manufacturer must obtain FDA approval to market a drug product by filing a New Drug Application ("NDA"). The FDA will approve the NDA if the drug applicant is able to demonstrate that the drug is safe and effective to treat a particular condition. Within thirty days after the FDA approves an NDA, the drug applicant must submit a "Form 3542" to the FDA, in which the sponsor discloses all patents that it believes are implicated by its new drug. Specifically, FDA regulations require the applicant to disclose

> each patent that claims the drug or a method of using the drug that is the subject of the [new drug application] . . . and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product.

21 C.F.R. § 314.53(b)(1). If, however, there are no relevant patents that could reasonably be asserted, the applicant is also required to disclose this information. The regulation provides that

> [i]f the applicant believes that there are no relevant patents that claim the drug substance . . . drug product . . . or the method(s) of use for which the applicant has received approval, and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product, the applicant will verify this information in the appropriate forms.

Id. § 314.53(c)(3). The FDA publishes the patent information provided by the drug applicant in a compendium called *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book).

likelihood" of ever being able to stand up in court as valid patents, and that those patents would

pose an impediment to the launch of generic imatinib mesylate. Id.

### C.    Litigation and Settlement Between Sun Pharma and Novartis

On June 16, 2006, Sun Pharma ("Sun") filed an abbreviated new drug application

("ANDA"), pursuant to the Hatch-Waxman amendments to the Federal Food, Drug, and

Cosmetic Act, with the FDA, seeking approval to market 100mg and 400mg generic imatinib

mesylate tablets, with Gleevec as the brand-name reference.[8] In its ANDA, Sun told the FDA

that it would wait until the '184 Patent expired in July 2015 before marketing its drug, but that

the follow-on '051 Patent was invalid and would not be infringed. Accordingly, Sun sought FDA

approval to market its generic no later than July 5, 2015.

Novartis did not file a Hatch-Waxman infringement suit with respect to the '051 Patent

within the period set forth in the statute. Accordingly, no 30-month stay of FDA approval ever

---

[8] The CAC explains the Hatch-Waxman amendments as follows. See CAC ¶¶ 58–64. In 1984, Congress passed the "Hatch-Waxman" amendments to the FDCA, which were designed to speed the introduction of low-cost generic drugs into the market by permitting generic manufactures to file abbreviated new drug applications. The FDA will approve an ANDA as long as the applicant can show that the proposed generic is therapeutically equivalent to an existing brand-name drug on the market. The Hatch-Waxman amendments also created a mechanism to resolve potential patent disputes between would-be generic manufacturers and brand-name manufacturers before the launch of a generic product. When filing an ANDA, the generic manufacturer must certify, in one of four ways, that its proposed drug will not infringe any patents listed in the Orange Book for the brand-name drug. See 21 U.S.C. § 355(j)(2)(A)(vii). If the generic drug sponsor files a "Paragraph IV Certification," a brand-name manufacturer can sue the ANDA applicant for patent infringement (notwithstanding the fact that the applicant is not yet infringing). The resulting lawsuit, which is commonly known as "Hatch-Waxman Litigation," has the effect of staying the FDA's final approval of the ANDA until the earlier of (1) the passage of 30 months or (2) a court entering final judgment finding that the patent is invalid or not infringed by the generic. Until one of those conditions occurs, the FDA cannot authorize the generic manufacturer to go to market with its product. In addition, the Hatch-Waxman amendments provide that the first ANDA drug applicant to challenge a patent through a Paragraph IV Certification is eligible for six months of marketing exclusivity after it brings its drug to market.

went into effect for the Sun ANDA, and on November 13, 2009, the FDA granted tentative approval to Sun's ANDA for a generic version of Gleevec.

On June 7, 2013, while Sun was preparing for the timely entry of its generic into the marketplace, Sun filed an action against Novartis in the United States District Court for the District of New Jersey, seeking a declaratory judgment that Sun would not be infringing the '051 Patent and/or that the '051 Patent was invalid or unenforceable. Novartis counterclaimed, alleging infringement of the '051 Patent and seeking a declaration that the '051 Patent was valid and enforceable.[9] Plaintiffs allege that at the time Novartis filed its counterclaims, Novartis knew that the '051 Patent was invalid for obviousness or anticipation and that "Novartis also knew that it had very likely committed inequitable conduct before the PTO during the prosecution of the '051 Patent." CAC ¶ 306.

Sun and Novartis settled the case on May 15, 2014, less than one year after the litigation was filed and before the court issued any substantive rulings in the action. Shortly after the settlement, both parties announced that under their settlement agreement, Sun would be permitted to launch its generic version of Gleevec on February 1, 2016.

> **D.      Litigation And Settlement With Other Generic Manufacturers**

In or around 2014, several other generic manufacturers filed ANDAs for generic Gleevec, which included Paragraph IV Certifications as to some or all of the Orange Book-listed patents for Gleevec. In contrast to its approach in the Sun litigation, Novartis immediately filed Hatch-Waxman infringement suits against each of these generics, resulting in 30-month stays of FDA approval as to those ANDAs.

---

[9] Novartis did not assert the '799 Patent or the RE'932 Patent against Sun.

Two of those cases, one involving Dr. Reddy's Laboratories and the other involving Ranbaxy, have already resulted in settlements, the terms of which are not disclosed in the CAC. Plaintiffs represent that Novartis is still actively pursuing litigation as to six other ANDA filers, including Breckenridge, Roxane/Boehringer Ingelheim, Natco, Amneal, Shilpa Medicare Ltd., and Wockhardt Bio AG. These suits are currently pending in the District Courts for the District of Delaware and the Southern District of New York, with 30-month stays that expire between December 2017 and June 2018.

## IV.    LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)). This pleading standard requires "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

When evaluating the sufficiency of a complaint, the Court "first must 'distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" Cardigan Mountain Sch., 787 F.3d at 84 (quoting García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013)) (further internal quotations and citation omitted). "Second, the court must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged." García-Catalán, 734 F.3d at 103 (internal quotations and citation omitted). In

conducting this analysis, the Court must accept all well-pleaded facts as true and analyze those facts in the light most favorable to the plaintiff's theory, drawing all reasonable inferences in favor of the plaintiff. <u>U.S. ex rel. Hutcheson v. Blackstone Med., Inc.</u>, 647 F.3d 377, 383 (1st Cir. 2011).

"When considering a motion to dismiss under subsection 12(b)(1) of the Federal Rules of Civil Procedure, the Court should apply a standard of review 'similar to that accorded a dismissal for failure to state a claim' under subsection 12(b)(6)." <u>Menge v. N. Am. Specialty Ins. Co.</u>, 905 F. Supp. 2d 414, 416 (D.R.I. 2012) (quoting <u>Murphy v. United States</u>, 45 F.3d 520, 522 (1st Cir. 1995)).

> When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first . . . . It is not simply formalistic to decide the jurisdictional issue when the case would be dismissed in any event for failure to state a claim. Different consequences flow from dismissals under 12(b)(1) and 12(b)(6): for example, dismissal under the former, not being on the merits, is without res judicata effect.

<u>Ne. Erectors Ass'n of the BTEA v. Sec'y of Labor, Occupational Safety & Health Admin.</u>, 62 F.3d 37, 39 (1st Cir. 1995).

## V.    DISCUSSION

Although Plaintiffs' monopolization claims are based solely on state law, Plaintiffs and Novartis have both raised legal arguments that rely heavily on doctrines developed in federal antitrust cases—specifically, the <u>Noerr-Pennington</u> doctrine, as set forth in <u>E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127 (1961) and <u>United Mine Workers of Am. v. Pennington</u>, 381 U.S. 657 (1965)—and on the related grounds for antitrust liability—a "<u>Walker Process</u>" theory, as described in <u>Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.</u>, 382 U.S. 172 (1965), and a sham litigation theory.

The Noerr-Pennington doctrine, which arose in antitrust cases under the Sherman Act, holds that a party petitioning the government for redress is generally immune from antitrust liability based on that conduct. See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56 (1993) (hereinafter, "PRE"). Although it appears that the doctrine developed, at least in part, out of First Amendment concerns, see PRE, 508 U.S. at 56 (citing Noerr, 365 U.S. at 138); In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14-md-02503-DJC, 2015 WL 5458570, at *11 (D. Mass. Sept. 16, 2015); Hamilton v. Accu-tek, 935 F. Supp. 1307, 1316 (E.D.N.Y. 1996), the Supreme Court has confirmed that Noerr-Pennington immunity extends to "petitioning" activities before the courts (i.e., litigation), see Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972).

There are exceptions to Noerr-Pennington immunity, however, including when a defendant engages in sham litigation or Walker Process fraud on the PTO, both of which Plaintiffs allege here. The Federal Circuit has held that the sham litigation and Walker Process exceptions "provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws," and that "either or both may be applicable to a particular party's conduct in obtaining and enforcing a patent." Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1071 (Fed. Cir. 1998); see also Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 994 (9th Cir. 1979) (distinguishing sham litigation from Walker Process).

In this case, Plaintiffs' state-law monopolization claims, which closely track the sham litigation and Walker Process exceptions, are based on allegations that Novartis (1) made misrepresentations and omissions when prosecuting the '051 Patent before the PTO; (2) wrongfully submitted the Polymorph Patents for publication in the Orange Book; and (3) initiated alleged sham litigation against Sun and other generic manufacturers. Novartis has

moved to dismiss, asserting that Plaintiffs fail to allege facts supporting either a sham litigation or Walker-Process-type claim. Plaintiffs' opposition brief argues the contrary. Thus, it appears that both parties have presumed that (1) Noerr-Pennington shields parties from liability under all of the state antitrust and unfair competition laws cited in the CAC; and that (2) in order to plead viable claims under these state laws, the Plaintiffs must plausibly allege sham litigation and/or Walker-Process theories of antitrust liability.

The First Circuit has not decided whether the Noerr-Pennington doctrine is applicable to state law claims as a matter of federal law. See Davric Me. Corp. v. Rancourt, 216 F.3d 143, 148 n.7 (1st Cir. 2000). The majority of circuits, however, have recognized that Noerr-Pennington emanated, at least in part, from First Amendment concerns and therefore can apply to certain state law claims as well as federal claims. See, e.g., Coll v. First Am. Title Ins. Co., 642 F.3d 876, 895 (10th Cir. 2011) ("[T]he Noerr-Pennington doctrine is based upon the First Amendment, which applies to [the states] through the Fourteenth Amendment . . . ."); see also VIBO Corp. v. Conway, 669 F.3d 675, 683–84 (6th Cir. 2012) ("Where private actors petition the government for action that would violate antitrust law, the Petition Clause [of the First Amendment] immunizes the actors from litigation in connection with their petitioning."); Kottle v. Nw. Kidney Centers, 146 F.3d 1056, 1059 (9th Cir. 1998) (noting that the Noerr-Pennington doctrine "sweeps broadly and is implicated by both state and federal antitrust claims that allege anticompetitive activity in the form of lobbying or advocacy before any branch of either federal or state government"); John J. Miles, Health Care and Antitrust Law, § 7:8 n.7 (2017) (collecting cases). Further, many states have actually adopted the Noerr-Pennington doctrine and applied it to certain state-law claims. See Coll, 642 F.3d at 895 (noting that "many other states have adopted and apply the Noerr–Pennington doctrine to state antitrust claims, as well as other state-

law claims," collecting cases, and anticipating that the <u>Noerr-Pennington</u> doctrine would be applied to the New Mexico Antitrust Act); <u>Apple, Inc. v. Motorola Mobility, Inc.</u>, 886 F. Supp. 2d 1061, 1077 (W.D. Wis. 2012) (applying <u>Noerr-Pennington</u> immunity to bar state-law unfair competition claim); <u>Bayou Fleet, Inc. v. Alexander</u>, 26 F. Supp. 2d 894, 897 (E.D. La. 1998) (dismissing claim under Louisiana Unfair Trade Practices Act as barred by <u>Noerr-Pennington</u>). Accordingly, as both parties have already done, albeit without explicitly addressing the issue, the Court applies the <u>Noerr-Pennington</u> doctrine to Plaintiffs' state-law claims in this case.

In addition to arguing that Plaintiffs fail to allege plausible sham litigation or <u>Walker Process</u> claims, Novartis argues that Plaintiffs lack standing to assert these claims and that their <u>Walker Process</u> claims are preempted by federal patent law.

**A.     Standing**

Novartis argues, first, that Plaintiffs lack standing to challenge the validity of the patents and can therefore not pursue sham litigation claims based on invalidity, and second, that Plaintiffs do not have standing to bring <u>Walker Process</u> claims because they are indirect purchasers. Plaintiffs argue that they have standing to pursue both state-law antitrust claims that involve issues of patent invalidity and <u>Walker Process</u> fraud despite the fact that they are indirect purchasers.

Article III of the U.S. Constitution requires that three conditions be satisfied in order for a plaintiff to have standing. U.S. Const. art. III, § 2, cl. 1. "First and foremost, there must be alleged (and ultimately proved) an 'injury in fact.'" <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 103 (1998) (quoting <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 155 (1990)). This injury "must be concrete in both a qualitative and temporal sense," "distinct and palpable" as opposed to "abstract," and "actual or imminent" as opposed to "conjectural or hypothetical." <u>Whitmore</u>,

495 U.S. at 155 (internal quotations and citations omitted). Second, standing requires causation, defined as a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." Steel Co., 523 U.S. at 103. Finally, standing requires "redressability—a likelihood that the requested relief will redress the alleged injury." Id.

In addition to the Article III standing requirements, plaintiffs pleading federal antitrust claims must meet two other requirements: "the plaintiff must also allege antitrust injury and must demonstrate, through a series of related factors, that its injuries are more than speculative and that it is well-situated to serve as an 'efficient enforcer' of the antitrust laws." William B. Rubenstein, Newberg on Class Actions § 20:3 (5th ed. 2017); see also Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 535–38 (1983) (establishing factors to consider in assessing antitrust standing). Antitrust standing is generally justified on prudential, rather than on constitutional, grounds. Sullivan v. Tagliabue, 25 F.3d 43, 45 n.5 (1st Cir. 1994) ("It is unquestioned that the requirements of antitrust standing exceed those of standing in a constitutional sense."); see also In re Modafinil Antitrust Litig., 837 F.3d 238, 264 n.30 (3d Cir. 2016), as amended (Sept. 29, 2016) ("Antitrust standing, unlike Article III standing, is not a jurisdictional requirement."); Ethypharm S.A. Fr. v. Abbott Labs., 707 F.3d 223, 232 (3d Cir. 2013).

Although the arguments are somewhat unclear, Novartis seems to challenge Plaintiffs' standing based on antitrust and patent prudential considerations, which relate to Plaintiffs' ability to meet non-Article III standing requirements, rather than challenging their constitutional standing. In any event, the Court finds the Article III standing requirements met here.[10]

---

[10] Although the Court need not reach the antitrust standing issue because the claims are dismissed on other grounds, it notes that whether Plaintiffs, as indirect purchasers, have antitrust standing to recover under state antitrust statutes in federal court is a question of state law, see

B.      **Sham Litigation Claims**

      i.      <u>Relevant Legal Standard</u>

In order to bring a sham litigation claim, a plaintiff must plausibly plead that the litigation was:

> (1) 'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits'; and (2) subjectively motivated by a desire to 'interfere *directly* with the business relationships of a competitor, through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.

<u>Solodyn</u>, 2015 WL 5458570, at * 11 (quoting <u>PRE</u>, 508 U.S. at 60–61). "The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." <u>PRE</u>, 508 U.S. at 62. The Court addresses the two <u>PRE</u> prongs sequentially because "[o]nly if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." <u>Id.</u> at 60.

      ii.     <u>"Objectively Baseless" Prong</u>

Novartis argues that Plaintiffs have not plausibly alleged that the Sun infringement litigation was "objectively baseless," as required to satisfy the first prong of the <u>PRE</u> test.

---

<u>Salveson v. JP Morgan Chase & Co.</u>, 166 F. Supp. 3d 242, 256 (E.D.N.Y.), <u>aff'd</u>, 663 F. App'x 71 (2d Cir. 2016), <u>cert. denied</u> 137 S.Ct. 1826, (Apr. 24, 2017); <u>see also</u> <u>In re Lithium Ion Batteries Antitrust Litig.</u>, No. 13-MD-2420 YGR, 2014 WL 4955377, at *7 (N.D. Cal. Oct. 2, 2014) ("[A]ntitrust standing under state law is just that, a matter of state law."); <u>D.R. Ward Constr. Co. v. Rohm & Haas Co.</u>, 470 F. Supp. 2d 485, 494 (E.D. Pa. 2006), that the parties failed to adequately brief. Furthermore, the Court does not understand Novartis' challenge to Plaintiffs' standing to assert claims in states where they do not reside and have not been injured to raise an Article III standing issue that must be addressed now. <u>See</u> Newberg on Class Actions § 2:3; <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 307 (3d Cir. 1998) ("The absentee class members are not required to make a similar [Article III] showing, because once the named parties have demonstrated they are properly before the court, 'the issue [becomes] one of compliance with the provisions of Rule 23, not one of Article III standing.'" (quoting <u>Goodman v. Lukens Steel Co.</u>, 777 F.2d 113, 122 (3d Cir. 1985), <u>aff'd</u>, 482 U.S. 656 (1987))).

Novartis asserts that in order to plead a plausible case for "objective baselessness," Plaintiffs need to allege that the patent was either (1) declared invalid by some other court; or (2) that its validity was "tarnished" by an adverse Markman ruling or some other judicial ruling that calls its validity into question. Plaintiffs aver that a prior invalidity finding is not a pre-condition to a sham litigation claim, and that by alleging the patent's invalidity here, they have sufficiently pleaded sham litigation. The Court declines to adopt a bright-line rule requiring that a patent be invalidated or tarnished before a plaintiff can allege a sham litigation claim, but notes that it is difficult to conceive of a scenario in which a sham litigation claim would go forward without the patent having been invalidated or otherwise tarnished.

In support of the "objectively baseless" prong, Plaintiffs argue that the '051 Patent is invalid because it would have been obvious to an ordinary person skilled in the art or inherently anticipated in the prior art and thus not patentable. Specifically, Plaintiffs aver that the prior art—the '184 Patent and at least two articles—disclosed that Novartis had made mesylate salt of imatinib, that an ordinary person with the requisite skill would have been motivated to create a usable crystal form, and that the β-crystal form would have been an obvious choice. Further, Plaintiffs assert that the fact that Novartis failed to sue Sun within the requisite time period to obtain a mandatory 30-month stay, and then agreed to a settlement very favorable to Sun, allowing Sun to share in $7.5 billion in potential Gleevec sales that it otherwise would not have been entitled to unless it succeeded in litigation, all shows that Novartis did not believe that it could win on the merits.

Here, Plaintiffs have not alleged a plausible sham litigation claim. The possible invalidity of a patent does not, in and of itself, establish that the litigation asserting it was objectively baseless. "A firm that has received a patent from the patent office (and not by fraud . . . ), and

21

thus enjoys the presumption of validity that attaches to an issued patent, 35 U.S.C. § 282, is entitled to defend the patent's validity in court, to sue alleged infringers, and to settle with them, whatever its private doubts, unless a neutral observer would reasonably think either that the patent was almost certain to be declared invalid, or the defendants were almost certain to be found not to have infringed it, if the suit went to judgment." Asahi Glass Co. v. Pentech Pharm., Inc., 289 F. Supp. 2d 986, 992–93 (N.D. Ill. 2003). Absent meeting the PRE criteria, "[n]either the bringing of an unsuccessful suit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust liability." C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1369 (Fed. Cir. 1998). In other words, even if a patent is ultimately found to be invalid, that does not necessarily prove that the relevant claims, without a prior invalidity finding, were "so baseless that no reasonable litigant could realistically expect to secure favorable relief." PRE, 508 U.S. at 62. Thus, a merely plausible patent invalidity claim is not enough to support a plausible sham litigation claim.

"[T]he determination of whether such a suit is a sham depends not on what the patentee believes but 'on the nature of and the underlying merits of the patentee's case.'" Asahi Glass Co., 289 F. Supp. 2d at 995 (quoting FilmTec Corp. v. Hydranautics, 67 F.3d 931, 936 (Fed. Cir. 1995)). Even on the facts alleged in the CAC, Novartis had a colorable claim that the '051 Patent was valid and enforceable by arguing that it was neither inherently anticipated by nor obvious in the prior art, which is consistent with both the patent examiner's and PTO Board of Appeal's determinations.

To prove invalidity by anticipation, a party must show that "every element and limitation of the claim was previously described in a single prior art reference, either expressly or inherently, so as to place a person of ordinary skill in possession of the invention." Sanofi–

Synthelabo v. Apotex, Inc., 550 F.3d 1075, 1082 (Fed. Cir. 2008). The prior art, identified by Plaintiffs as belatedly presented or withheld completely from the patent examiner, neither describes the β-crystalline form of the imatinib mesylate salt nor a method to produce it. The prior art only mentions imatinib mesylate itself, CAC ¶ 140, which has many different crystalline forms, CAC ¶¶ 35–36. "[D]ifferences between the prior art reference and a claimed invention, however slight, invoke the question of obviousness, not anticipation." Net MoneyIN, Inc. v. VeriSign, Inc., 545 F.3d 1359, 1371 (Fed. Cir. 2008). Furthermore, not only did the PTO assume that the prior art disclosed the imatinib mesylate, but the patent examiner also received some of the prior art identified in the CAC, initialed it, and still issued the '051 Patent. Thus, the facts in the CAC show that Novartis had a colorable argument that the '051 Patent was not inherently anticipated by prior art, and Plaintiffs cannot, without more, plausibly allege that the Sun litigation was objectively baseless on that theory of patent invalidity.

With respect to Plaintiffs' theory of patent invalidity based on obviousness, the CAC also establishes that Novartis had a colorable claim that the '051 Patent was not obvious. Section 103 of the Patent Act provides that subject matter cannot be patented if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The Supreme Court explained how to apply § 103 as follows:

> the scope and content of the prior art are . . . determined; differences between the prior art and the claims at issue are . . . ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

Graham v. John Deere Co. of Kan. City, 383 U.S. 1, 17–18 (1966); see also KSR Int'l Co. v.

Teleflex Inc., 550 U.S. 398, 406–07 (2007) (explaining that Graham "set out a framework for

applying the statutory language of § 103" and controls inquiries of whether claimed subject

matter is obvious). Furthermore, "[t]he combination of familiar elements according to known

methods is likely to be obvious when it does no more than yield predictable results," KSR Int'l

Co., 550 U.S. at 416, however, a patent "is not proved obvious merely by demonstrating that

each of its elements was, independently, known in the prior art," id. at 418. "Often, it will be

necessary for a court to look to interrelated teachings of multiple patents; the effects of demands

known to the design community or present in the marketplace; and the background knowledge

possessed by a person having ordinary skill in the art, all in order to determine whether there was

an apparent reason to combine the known elements in the fashion claimed by the patent at issue."

Id.

    The CAC alleges that any person skilled in the art at the time would have tried to find a

crystalline form that was suitable for commercial pharmaceutical production, and thus would

have been motivated to find a more stable, less hygroscopic (i.e., one that absorbed less moisture

from the air) form. CAC ¶¶ 206–07. It further claims that anyone skilled in the art at the time

would have known that the needle-shaped, α-crystalline form of mesylate salt was not suitable

for pharmaceutical production and would have tried to find a non-needle form (such as the β-

crystalline form). CAC ¶ 208. It also alleges that the two techniques Novartis described in its

patent application, which produced the β-crystalline form, were commonly known methods for

developing alternate crystalline forms at the time. CAC ¶ 211.

    The fact that someone might have been "motivated" to discover a crystalline form of a

compound that would be more suitable for pharmaceutical production does not on its own

establish that the subject matter was obvious. See In re Armodafinil Patent Litig. Inc., 939 F. Supp. 2d 456, 487 (D. Del. 2013) (explaining that obviousness "requires 'a reasonable expectation of success'" (quoting Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1165 (Fed. Cir. 2006))). Even following extensive presentation of evidence in trial, analogous arguments involving the obviousness of polymorphic forms have failed to invalidate patents. See id. at 494. Here, the prior art did not disclose the existence or properties of the β-crystalline form or the method by which it could be derived.[11] The CAC largely contains conclusory allegations that deriving the β-crystalline form would have been predictable based on the mere disclosure of the mesylate salt and that the methods used to derive it were routine. Even if this were enough to allege a plausible invalidity claim, it is not enough to show that Novartis' litigation based on the '051 Patent was objectively baseless.

Moreover, the patent examiner considered much of the prior art at issue in the CAC before eventually issuing the patent, and it is not clear that the prior undisclosed art would have altered the examiner's obviousness analysis. Further, it is noteworthy that the '051 Patent had never been previously invalidated or tarnished in any way. See Solodyn, 2015 WL 5458570, at *11.

Finally, the fact that Novartis has obtained settlements involving challenges to the validity of the Polymorph Patents and that these patents have never actually been called into question by a judicial authority, while not dispositive, further undercuts Plaintiffs' ability to

---

[11] Plaintiffs alleged that the Buchdunger and Druker articles disclosed that scientists used the β-crystalline form of the mesylate salt. CAC ¶ 183. The actual description of these articles calls that allegation into question. The 1996 Buchdunger Article apparently discussed "crystalline derivatives" without describing any specific crystalline form. See CAC ¶¶ 165–67. The 1996 Druker Article only seems to discuss mesylate salt generally, not its crystalline forms. See CAC ¶¶ 159–64. In any event, both were disclosed prior to the issuance of the '051 Patent.

allege objective baselessness, particularly where Plaintiffs have not called the settlements

themselves into question. See Asahi Glass Co., 289 F. Supp. 2d at 992 ("If, however, there is

nothing suspicious about the circumstances of a patent settlement, then to prevent a cloud from

being cast over the settlement process a third party should not be permitted to haul the parties to

the settlement over the hot coals of antitrust litigation."). Although the '051 Patent could

ultimately be invalid, that issue is not directly before this Court. Accordingly, Plaintiffs have

failed to allege a plausible claim that litigation based on the '051 Patent, and therefore the other

Polymorph Patent, was "objectively baseless."

### C.   **Walker Process** Fraud Claims

#### i.   Relevant Legal Standard

In Walker Process, the Supreme Court held that if a party obtains a patent "by knowingly

and willfully misrepresenting facts to the Patent Office," this is "sufficient to strip [the party] of

its exemption from the antitrust laws." 382 U.S. at 177. To adequately allege Walker Process

fraud, Plaintiffs must claim "(1) a false representation or deliberate omission of a fact material to

patentability, (2) made with the intent to deceive the patent examiner, (3) on which the examiner

justifiably relied in granting the patent, and (4) but for which misrepresentation or deliberate

omission the patent would not have been granted."[12] C.R. Bard, 157 F.3d at 1364; see also

---

[12] The Federal Circuit has described Walker Process fraud as distinct from inequitable conduct because "[t]he heightened standard of materiality in a *Walker Process* case requires that the patent would not have issued but for the patent examiner's justifiable reliance on the patentee's misrepresentation or omission." Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1346–47 (Fed. Cir. 2007); see also C.R. Bard, 157 F.3d at 1365 (explaining that "an equitable defense . . . may be satisfied when material information is withheld with the intent to deceive the examiner, whether or not the examiner is shown to have relied thereon"); SanDisk Corp. v. STMicroelectronics, Inc., No. C 04-4379 JF (RS), 2008 WL 4615605, at *5 n.5 (N.D. Cal. Oct. 17, 2008) ("Walker Process fraud essentially is a more egregious version of inequitable conduct."). In Metris U.S.A., Inc. v. Faro Techs., Inc., the court observed that, following a Federal Circuit decision in 2011 that heightened the standard for inequitable conduct, "it appears that Walker Process fraud is

Nobelpharma, 141 F.3d at 1070–71. The fraud must be "knowing and willful." C.R. Bard, 157 F.3d 1364 (quoting Walker Process, 382 U.S. at 177). Where the fraud is based on omission, "there must be evidence of intent separable from the simple fact of omission." Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1347 (Fed. Cir. 2007).

In addition, a plaintiff must plausibly allege all other required elements of an antitrust claim—causation, antitrust injury, and market power. See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993); see also Ritz Camera & Image, LLC, v. SanDisk Corp., 700 F.3d 503, 506 (Fed. Cir. 2012) (explaining that Walker Process fraud claim requires showing "all the elements otherwise necessary to establish a Sherman Act monopolization charge"); C.R. Bard, 157 F.3d at 1368 ("Unless the patent had been obtained by fraud such that the market position had been gained illegally, the patent right to exclude does not constitute monopoly power prohibited by the Sherman Act."). Finally, plaintiffs alleging Walker Process fraud must comply with the heightened pleading requirements of Rule 9(b) as applied by the Federal Circuit. Medimmune, Inc. v. Genentech, Inc., 427 F.3d 958, 967 (Fed. Cir. 2005), rev'd and remanded on other grounds, 549 U.S. 118 (2007); see also Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326–28 (Fed. Cir. 2009) (explaining that Rule 9(b) particularity requirement entails alleging the specific "who, what, when, where, and how").

ii.     Misrepresentation/Omission and Materiality

Plaintiffs base their state-law Walker Process fraud claims on the following: (1) the withholding of prior art publications by Novartis' own scientists "that explicitly disclosed the

---

now largely coextensive with the new inequitable conduct doctrine." 882 F. Supp. 2d 160, 174 (D. Mass. 2011). Thus, although the Federal Circuit has not clarified how coextensive Walker Process fraud is with inequitable conduct, it seems to remain the case that a plaintiff that fails to allege inequitable conduct, necessarily fails to allege Walker Process fraud. Dippin' Dots, 476 F.3d at 1346–47.

mesylate salt form imatinib that had the desired qualities of kinase inhibition;" (2) that "Novartis misrepresented that the non-needle form of the compound was a recent, 'surprising' discovery, despite the fact that Ciba-Geigy scientists had been using it for years," that "anyone skilled in the art would have been both motivated and easily able to formulate a non-needle crystal form using routine laboratory procedures," and that Novartis' scientists did in fact do that; and (3) that Novartis improperly argued to the patent examiner that the PTO Board of Appeals decision had *res judicata* effect. CAC ¶¶ 5–7.

Novartis argues that three of the five prior art references at issue were not withheld from the PTO and that the remaining two references were cumulative or immaterial. The two prior art references that were ultimately disclosed to the PTO in an IDS and which the examiner herself initialed, see Proctor Decl., Exs. G–H, indicating that she considered them, cannot form the basis of a plausible Walker Process fraud claim, where they were disclosed prior to issuance. See Fiskars, Inc. v. Hunt Mfg. Co., 221 F.3d 1318, 1327 (Fed. Cir. 2000) ("An applicant cannot be guilty of inequitable conduct if the reference was cited to the examiner, whether or not it was a ground of rejection by the examiner."). Further, Plaintiffs failed to show how a third prior art reference (the 1996 Druker Article) that was actually cited in the '051 Patent's specification, see Proctor Decl., Ex. A, can support a fraud allegation. See Oracle Corp. v. Drug Logic, Inc., No. 11-00910, 2011 WL 5576267, at *11 (N.D. Cal. Nov. 16, 2011) (holding that, where prior art references were disclosed in patent's specifications, allegations did not support inference that applicant deliberately withheld material information).

Novartis' *res judicata* argument to the patent examiner regarding the prior art that was disclosed post-appeal also cannot support a Walker Process fraud claim because it does not qualify as a material misrepresentation and the patent examiner was not bound by it. See

Rothman v. Target Corp., 556 F.3d 1310, 1328–29 (Fed. Cir. 2009) ("While the law prohibits genuine misrepresentations of material fact, a prosecuting attorney is free to present argument in favor of patentability without fear of committing inequitable conduct."); Environ Prods., Inc. v. Total Containment, Inc., 951 F. Supp. 57, 61 (E.D. Pa. 1996) ("[T]here is no policy reason which would support the unprecedented expansion of the interpretation of 'material information' to include legal arguments."). Plaintiffs make no argument to the contrary in their opposition brief.

Furthermore, the two prior art references that Novartis admits were withheld—the 1995 Druker Presentation and the 1996 Zimmerman Article—also do not support a Walker Process fraud claim in this case. Plaintiffs' allegations of materiality with respect to the undisclosed prior art do not reach the plausibility threshold. In their brief, they explain that the prior art is relevant as to "whether the mesylate salt had been made or disclosed earlier," but the PTO, on appeal, specifically assumed the mesylate salt of imatinib had been disclosed and, moreover, Novartis did ultimately provide prior art that disclosed mesylate salt to the patent examiner. Plaintiffs also argue that the prior art is relevant as to "whether the β-crystal form could be made following routine conditions." Yet Plaintiffs fail to allege how either the 1995 Druker Presentation or the 1996 Zimmerman Article are material in that respect and, as required by Rule 9(b), how they are material to any particular claim in the '051 Patent. See Exergen Corp., 575 F.3d at 1329 ("[T]he pleading fails to identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found—i.e., the 'what' and 'where' of the material omissions."). Moreover, the Court cannot infer that they plausibly are material where they neither discuss the β-crystalline form of the mesylate salt specifically nor mention methods for creating it.

Finally, Novartis' statement that the discovery of the β-crystalline form was "surprising" does not support a plausible fraud claim. Firstly, it is unclear whether such a statement qualifies as a misrepresentation, particularly where the examiner was free to reach her own opinion about whether such a discovery was in fact "surprising" based on the prior art that was available to her before the patent issued. Cf. LifeScan, Inc. v. Home Diagnostics, Inc., 103 F. Supp. 2d 379, 386 (D. Del. 2000) ("As the Federal Circuit has recognized, the mere fact that a patent applicant attempts to distinguish its patent from the prior art does not constitute a material omission or misrepresentation where the patent examiner has the prior art before him or her, and therefore, is free to make his or her own conclusions regarding the claimed invention."). Further, Plaintiffs have not sufficiently alleged that if Novartis had avoided using the word "surprising," the patent would not have issued in light of the relevant prior art.

Accordingly, Plaintiffs have failed to sufficiently allege that the claimed misrepresentations or omissions were material to the patent examiner's determination.

### iii.  Fraudulent Intent

"Although 'knowledge' and 'intent' may be averred generally, . . . the pleadings [must] allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." Exergen Corp., 575 F.3d at 1327 (citing Fed. R. Civ. P. 9(b)). The facts alleged, even construed generously, do not support a plausible inference of fraudulent intent. In their opposition brief, Plaintiffs point to no specific factual allegations in the CAC that would permit such an inference, and argue only that "no other inference . . . can be drawn from the facts alleged in the complaint." [ECF No. 120 at 29]. "[T]he simple fact of omission" is insufficient. Dippin' Dots v. Mosey, 476 F.3d 1337, 1347 (Fed. Cir. 2007). Further, Plaintiffs' belated disclosure of certain prior art does not permit this Court, without more, to plausibly infer

that Novartis acted with fraudulent intent. At best, the allegation that the prior art was disclosed after an initial notice of allowance cuts equally in favor of and against Plaintiffs, in that it suggests that Novartis did not intend to hide information as evidenced by the fact that it did, in fact, disclose it. Where the prior art at issue was largely disclosed and the remaining undisclosed prior art is not clearly material in light of the disclosed prior art, the fact that Novartis' scientists authored the prior art does not demonstrate deceptive intent. Lastly, based on all of the above, there are insufficient factual allegations that would allow the Court to infer that the characterization of the β-crystal as "surprising" was intended to deceive the PTO.

Accordingly, the Court concludes that Plaintiffs have failed to adequately plead a state-law Walker Process fraud claim.[13] Moreover, where Plaintiffs have failed to state a claim based on sham litigation or Walker-Process fraud, Plaintiffs' Orange Book listing allegations cannot form a separate basis for liability and therefore fail as well. See Daiichi Sankyo, Inc. v. Apotex, Inc., No. CIVA.030937(SDW-MCA), 2009 WL 1437815, at *9 (D.N.J. May 19, 2009) (noting that "the Orange Book listing was only wrongful if the patent was obtained through fraud or was 'objectively baseless'"); see also Solodyn, 2015 WL 5458570, at *12. Because Plaintiffs have

---

[13] Novartis also argues that the state-law Walker Process fraud claims should be dismissed because they are preempted by federal patent law. When determining whether state-law claims are preempted by federal patent law, Federal Circuit law controls. Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH, 524 F.3d 1254, 1260 (Fed. Cir. 2008). In Hunter Douglas, Inc. v. Harmonic Design, Inc., the Federal Circuit considered whether federal patent law preempted state law claims for, *inter alia*, state unfair competition law that prohibited tortious activities in the marketplace. 153 F.3d 1318 (Fed. Cir. 1998), overruled on other grounds, Midwest Industries, Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1358–59 (Fed. Cir. 1999). It held that there was no field preemption of state unfair competition law by federal patent law. Hunter Douglas, 153 F.3d at 1334–35. With respect to conflict preemption, Hunter Douglas held that state-law claims were preempted by federal patent law only "[i]f a plaintiff bases its tort action on conduct that is protected or governed by federal patent law." Id. at 1335. Because Novartis' preemption argument does not implicate this Court's jurisdiction, the Court need not address it here. This Court also need not address Defendants' state law-specific arguments for dismissal.

failed to adequately allege claims sufficient to avoid the bar of <u>Noerr-Pennington</u> immunity, their state-law claims must be dismissed.

## VI.    CONCLUSION

Accordingly, Novartis' motion to dismiss [ECF No. 111] is <u>GRANTED</u>. In light of this ruling, there is no need for a Rule 26(f) conference and that motion [ECF No. 135] is <u>DENIED as moot</u>.

**SO ORDERED.**

Dated: June 30, 2017                                    /s/ Allison D. Burroughs
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND and LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION,<br><br>                    Defendants. | Civil Action No. 1:15-cv-12732-ADB |

## (~~PROPOSED~~) ORDER OF FINAL JUDGMENT

Plaintiffs' unopposed motion for entry of judgment is GRANTED. Final judgment is

hereby ENTERED in favor of Defendants Novartis Pharmaceuticals Corporation, Novartis AG,

and Novartis Corporation.

**SO ORDERED.**

Dated: ___7/18/17___

<br>

ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

**ADD-035**

| | | |
|---|---|---|
| | | **ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Montes, Mariliz) (Entered: 01/19/2017) |
| 01/19/2017 | 10 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 7 Motion for Leave to Appear Pro Hac Vice Added Kenneth Pickle. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Montes, Mariliz) (Entered: 01/19/2017) |
| 01/19/2017 | 11 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 8 Motion for Leave to Appear Pro Hac Vice Added Daniel Rubenstein. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Montes, Mariliz) (Entered: 01/19/2017) |
| 01/19/2017 | 12 | NOTICE of Appearance by Noah N. Rosmarin on behalf of RXDN, Inc. (Rosmarin, Noah) (Entered: 01/19/2017) |
| 01/19/2017 | 13 | MOTION to Appoint Counsel *(Lead Counsel)* by RXDN, Inc.. (Attachments: # 1 Text of Proposed Order)(Rosmarin, Noah) (Entered: 01/19/2017) |
| 01/19/2017 | 14 | MEMORANDUM in Support re 13 MOTION to Appoint Counsel *(Lead Counsel)* filed by RXDN, Inc.. (Rosmarin, Noah) (Entered: 01/19/2017) |
| 02/06/2017 | 15 | Judge Allison D. Burroughs: ORDER entered granting 13 Motion for Appointment of John D. Radice as Interim Lead Counsel and Liaison Counsel for the Direct Purchaser Plaintiff Class (Montes, Mariliz) (Entered: 02/06/2017) |
| 02/08/2017 | 16 | NOTICE of Appearance by Wyley S. Proctor on behalf of Novartis AG, Novartis Corporation, Novartis Pharmaceuticals Corporation (Proctor, Wyley) (Entered: 02/08/2017) |
| 02/08/2017 | 17 | STIPULATION *AND REQUEST FOR ORDER REGARDING RESPONSE TO COMPLAINT AND CERTAIN CASE MANAGEMENT MATTERS* by Novartis AG. (Proctor, Wyley) (Entered: 02/08/2017) |
| 02/15/2017 | 18 | Judge Allison D. Burroughs: ENDORSED ORDER entered. approving 17 Stipulation and Request for Order Regarding Response to Complaint and Certain Case Management Matters (Montes, Mariliz) (Entered: 02/15/2017) |
| 07/24/2017 | 19 | MOTION for Entry of Judgment under Rule 54(b) *(Unopposed)* by RXDN, Inc..(Rosmarin, Noah) (Entered: 07/24/2017) |
| 07/24/2017 | 20 | MEMORANDUM in Support re 19 MOTION for Entry of Judgment under Rule 54(b) *(Unopposed)* filed by RXDN, Inc.. (Attachments: # 1 Text of Proposed Order)(Rosmarin, Noah) (Entered: 07/24/2017) |
| 07/25/2017 | 21 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 19 Motion for Entry of Judgment under Rule 54(b) (Folan, Karen) (Entered: 07/25/2017) |
| 07/31/2017 | 22 | NOTICE OF APPEAL as to 21 Order on Motion for Entry of Judgment under Rule 54(b) by RXDN, Inc. Filing fee: $ 505, receipt number 0101–6734036 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be |

**ADD-036**

The opinion in support of the decision being entered today was not written
for publication and is not binding precedent of the Board.

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE BOARD OF PATENT APPEALS AND INTERFERENCES

Ex parte JÜRG ZIMMERMANN,
BERTRAND SUTTER, and
HANS M. BÜRGER

Appeal No. 2003-0919
Application No. 09/463,097

```
MAILED

NOV 2 4 2003

U.S. PATENT AND TRADEMARK OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES
```

ON BRIEF

WINTERS, SCHEINER, and MILLS, Administrative Patent Judges.

WINTERS, Administrative Patent Judge.

### DECISION ON APPEAL

This appeal was taken from the examiner's decision rejecting claims 1 through 8,

10, and 13 through 16.   Claim 12, which is the only other claim remaining in the

application, stands allowed.  (Examiner's Answer, Paper No. 17, section (3)).

### The Invention

The invention relates to a particular, non-hygroscopic crystalline form of the

methanesulfonic acid addition salt of 4-(4-methylpiperazin-1-ylmethyl)-N-[4-methyl-3-(4-

pyridin-3-yl)pyrimidin-2-ylamino)phenyl]-benzamide, said to have advantageous flow

properties. In their specification and claims, applicants describe this non-hygroscopic

form as the β-crystal form of the above-mentioned compound. Claims 1, 4, 10, and 14,

which are illustrative of the subject matter on appeal, read as follows:

1. A crystalline form of the monomethanesulfonic acid addition salt of a compound of formula I,



(I)

which is non-hygroscopic in a glass climatic chamber at 25 °C and relative humidities up to and including 93%.

4. A crystalline form according to claim 1 of the methanesulfonic acid addition salt of a compound of formula I, which comprises at least 99% by weight crystals of the β-modification and has a melting point below 225°C.

10. A pharmaceutical composition, comprising the β-crystal form according to claim 1 of the methanesulfonic acid addition salt of a compound of formula I and a pharmceutically acceptable carrier.

14. A method for treating a tumor disease in a patient, which comprises administering to the patient an effective amount of a compound of the formula



in its β-crystal modification.

For the sake of completeness, we note what appears to be an inadvertent error

in claim 14. In that claim, applicants do not recite the β-crystal form of the

methanesulfonic acid addition salt of the illustrated compound. Manifestly, the

methanesulfonic acid addition salt is intended. (Appeal Brief, Paper No. 16, page 5,

second full paragraph).

### The Prior Art Reference

The prior art reference relied on by the examiner is:

Zimmermann              5,521,184              May 28, 1996

### The Rejections

Claims 1, 4 through 8, 15, and 16 stand rejected under 35 U.S.C. § 112, second

paragraph, as not particularly pointing out and distinctly claiming the subject matter

which applicants regard as their invention. Claim 14 stands rejected under 35 U.S.C.

§ 112, first paragraph, as based on a non-enabling disclosure. Finally, claims 1 through

8, 10, and 13 through 16 stand rejected under 35 U.S.C. § 102(b) as anticipated by or,

in the alternative, under 35 U.S.C. § 103(a) as unpatentable over Zimmermann.

### Deliberations

Our deliberations in this matter have included evaluation and review of the

following materials: (1) the instant specification, including Figures 1, 2, and 3, and all of

the claims on appeal; (2) applicants' Appeal Brief (Paper No. 16) and the Reply Brief

(Paper No. 18); (3) the Examiner's Answer (Paper No. 17); and (4) the above-cited
Zimmermann patent.

On consideration of the record, including the above-listed materials, we <u>reverse</u>
each of the examiner's rejections.

## Section 112

In our judgment, claims 1, 4 through 8, 15, and 16 set out and circumscribe a
particular area with a reasonable degree of precision and particularity; and the
examiner's rejection of these claims under 35 U.S.C. § 112, second paragraph, for
indefiniteness, lacks merit. We shall not belabor the record with extensive commentary
on this point, but simply refer to applicants' discussion in the Appeal Brief, page 4, with
which we agree. Additionally, the examiner does not invite attention to any language or
limitation in claims 1, 4 through 8, 15, or 16 which would give rise to a case of
indefiniteness.

The rejection under 35 U.S.C. § 112, second paragraph, is <u>reversed</u>.

Respecting the rejection of claim 14 under 35 U.S.C. § 112, first paragraph, we
again refer to applicants' discussion in the Appeal Brief (pages 5 and 6), with which we
agree. We also find that the examiner, in setting forth this rejection, did not adequately
take into account relative teachings in the prior art. In this regard, we here reproduce
claims 21 and 22 of the Zimmerman patent:

> 21. A pharmaceutical composition for the treatment of tumours in warm-
> blooded animals including humans, comprising, in a dose effective against
> tumours, a compound of formula I according to claim 1, or a

pharmaceutically acceptable salt of such a compound having at least one
salt-forming group, together with a pharmaceutical carrier.

22. A method of treating warm-blooded animals including humans, which
comprises administering to such a warm-blooded animal suffering from a
tumoral disease a dose, effective against tumours, of a compound of
formula I according to claim 1 or of a pharmaceutically acceptable salt of
such a compound having at least one salt-forming group.

Under the provisions 35 U.S.C. § 282, a patent shall be presumed valid; and each claim

of a patent shall be presumed valid independently of the validity of other claims.

Accordingly, claims 21 and 22 of U.S. Patent No. 5,521,184 (the Zimmermann patent),

shall be presumed valid. We may presume, therefore, that claims 21 and 22 are based

on an enabling disclosure; and that the specification of the Zimmermann patent teaches

any person skilled in the art how to use a compound of formula I, or a pharmaceutically

acceptable salt thereof, in a pharmaceutical composition for treating tumours or in a

method of treating warm-blooded animals suffering from a tumoral disease. In claim

23, Zimmermann recites imatinib, a specific compound within the scope of formula I, or

a pharmaceutically acceptable salt thereof. In light of 35 U.S.C. § 282, therefore, we

may presume that the specification of the Zimmermann patent teaches any person

skilled in the art how to use imatinib, or a pharmaceutically acceptable salt thereof, in a

pharmaceutical composition for treating tumours or in a method of treating warm-

blooded animals suffering from a tumoral disease. On these facts, we disagree that the

examiner has set forth adequate reasons or evidence to doubt the objective truth of

statements in applicants' specification that an effective amount of the β-crystal form of

imatinib mesylate may be administered to a patient as the manipulative step in a

method for treating tumour disease in a patient.

The rejection under 35 U.S.C. § 112, first paragraph, is reversed.


### Sections 102(b)/103(a)

For the purposes of this appeal, we shall assume arguendo, without deciding,

that Zimmermann describes the methanesulfonic acid addition salt of imatinib within the

meaning of 35 U.S.C. § 102(b). Nonetheless, we agree with applicants that

Zimmermann contains insufficient disclosure to support a finding of anticipation of the

appealed claims which recite a non-hygroscopic or β-crystalline form of the

methanesulfonic acid addition salt of imatinib. In fact, with respect to the particular

polymorphic form recited (non-hygroscopic or β-crystalline form), the examiner

acknowledges that "Zimmermann is silent as to the existence of one or more forms for

its salts." (Paper No. 17, page 7, lines 5 and 6).

The examiner would shift the burden of persuasion to applicants to establish that

the β-crystalline form recited in their claims "cannot be made following routine

conditions." (Paper No. 17, page 9, line 4). Stated another way, the examiner would

place the burden on applicants to establish that the non-hygroscopic or β-crystalline

form of the methanesulfonic acid addition salt of imatinib is not inherently produced

using "routine procedures" disclosed by Zimmermann in column 19. (Paper No. 17,

page 7, lines 4 through 9). This constitutes reversible error.

As stated in applicants' specification:

> It has now been surprisingly found that a crystal form may under certain
> conditions be found in the methanesulfonate salt of this compound
> [imatinib] which is described hereinafter as β-crystal form, and which has
> very advantageous properties. [Specification, page 1, third paragraph].

The examiner does not deny that applicants' specification teaches any person

skilled in the art how to make the β-crystalline form of the methanesulfonic acid addition

salt of imatinib. Nor can the examiner point to any passage in Zimmermann disclosing

or suggesting applicants' method for making the β-crystalline form, or establishing a

reasonable basis for concluding that the methanesulfonic acid addition salt of imatinib

meets all limitations of the appealed claims. On the contrary, the examiner

acknowledges that "Zimmermann is silent as to the existence of one or more forms for

its salts;" and the examiner has withdrawn the previously entered rejection of process

claim 12 (Paper No. 17, section (3)).

On these facts, the examiner is not in a position to invoke the principles

enunciated in In re Fitzgerald, 619 F.2d 67, 70, 205 USPQ 594, 596-97 (CCPA 1980);

In re Best, 562 F.2d 1252, 1255, 195 USPQ 430, 433-34 (CCPA 1977); and In re

Swinehart, 439 F.2d 210, 213, 169 USPQ 226, 229 (CCPA 1971). Rather, the facts

here more closely resemble those presented to another merits panel of this board in Ex

parte Skinner, 2 USPQ2d 1788 (Bd. Pat. App. & Int. 1986). As stated by the Board in

Skinner:

> We are mindful that there is a line of cases represented by In re
> Swinehart, 439 F.2d 210, 169 USPQ 226 (CCPA 1971) which indicates
> that where an examiner has reason to believe that a functional limitation
> asserted to be critical for establishing novelty in the claimed subject

matter may, in fact, be an inherent characteristic of the prior art, the
examiner possesses the authority to require an applicant to prove that the
subject matter shown to be in the prior art does not possess the
characteristic relied on. Nevertheless, before an applicant can be put to
this burdensome task, the examiner must provide some evidence or
scientific reasoning to establish the reasonableness of the examiner's
belief that the functional limitation is an inherent characteristic of the prior
art. In the case before us, no such evidence or reasoning has been set
forward. [Id. at 1789].

*See Ex. Ans.*

The rejection under 35 U:S.C. § 102(b) is reversed.

Respecting the rejection under 35 U.S.C. § 103(a), the examiner notes that

Zimmermann's compounds can be used in the therapy of tumoral diseases. Again, we

shall assume arguendo, without deciding, that Zimmermann describes the

methanesulfonic acid addition salt of imatinib. The examiner apparently would invoke a

per se rule of obviousness, viz., that merely changing the form, purity, or another

characteristic of an old product, the utility remaining the same as that for the old

product, does not render the claimed product patentable. See Ex parte Hartop, 139

USPQ 525 (Bd. App. 1962). The examiner argues that (1) the β-crystalline form of the

methanesulfonic acid addition salt of imatinib is merely a different polymorphic form of

Zimmermann's methanesulfonic acid addition salt of imatinib; (2) the β-crystalline form

recited in applicants' claims and the compound described by Zimmermann both

possess anti-tumoral activity; and (3) accordingly, the subject matter sought to be

patented in the appealed claims would have been prima facie obvious in view of

Zimmermann. We disagree.

First, as stated in In re Ochiai, 71 F.3d 1565, 1572, 37 USPQ2d 1127, 1133

(Fed. Cir. 1995):

The use of per se rules, while undoubtedly less laborious than a searching comparison of the claimed invention--including all its limitations--with the teachings of the prior art, flouts section 103 and the fundamental case law applying it. Per se rules that eliminate the need for fact-specific analysis of claims and prior art may be administratively convenient for PTO examiners and the Board. Indeed, they have been sanctioned by the Board as well. But reliance on per se rules of obviousness is legally incorrect and must cease.

Second, the principle of law enunciated in Ex parte Hartop, 139 USPQ 525 (Bd. App. 1962) has been substantially discredited in In re Cofer, 354 F.2d 664, 667-68, 148 USPQ 268, 270-71 (CCPA 1966).

Third, on this record, the examiner has not adequately explained how a person having ordinary skill would have been led from "here to there," i.e., from the methanesulfonic acid addition salt of imatinib to the non-hygroscopic or β-crystalline form of that compound recited in the appealed claims.

The rejection under 35 U.S.C. § 103(a) is reversed.

### Conclusion

In conclusion, for the reasons set forth, we do not sustain the examiner's rejections 35 U.S.C. § 112, second paragraph; 35 U.S.C. § 112, first paragraph; 35 U.S.C. § 102(b); or 35 U.S.C. § 103(a).

The examiner's decision rejecting claims 1 through 8, 10, and 13 through 16 is

reversed.

REVERSED

Sherman D. Winters
Administrative Patent Judge

)
)
)
)
)
) BOARD OF PATENT
)
)  APPEALS AND
)
) INTERFERENCES
)
)

Toni R. Scheiner
Administrative Patent Judge

Demetra J. Mills
Administrative Patent Judge

Thomas Hoxie, Novartis
Novartis, Corporate Intellectual Property
One Health Plaza 430/2
East Hanover, NJ  07936-1080

dem

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND and LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated, | C.A. No. 15-cv-12732-ADB |
| Plaintiffs, | |
| v. | |
| NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, AND NOVARTIS CORPORATION, | |
| Defendants. | |

**DIRECT PURCHASER CLASS PLAINTIFFS' AMENDED NOTICE OF APPEAL**

Notice is hereby given that United Food and Commercial Workers Unions and

Employers Midwest Health Benefit Fund, and Laborers Health and Welfare Trust Fund for

Northern California. ("Plaintiffs"), individually and on behalf of the Direct Purchaser Class,

appeal to the United States Court of Appeals for the First Circuit from:

(1)     Orders and rulings granting Defendants' Motion to Dismiss pursuant to Federal

rules of Civil Procedure 12(b)(6) and 12(b)(1): Orders dated June 30, 2017 [ECF

No. 140] and July 6th, 2017 [ECF No. 141].

(2)     Order of Final Judgement entered July 19, 2017 [ECF No. 146]

Each Plaintiff is qualified to bring an appeal pursuant to Fed. R. App. P. 3(c)(3).

The required fee of $505.00 was paid on July 18, 2017 using the CM/ECF system.

**ADD-048**

Dated:  July 20, 2017                    Respectfully submitted,

/s/ Thomas M. Sobol
Thomas M. Sobol (BBO #471770)
Kristen A. Johnson (BBO #667261)
Hannah Schwarzschild (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Tel.: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
kristenj@hbsslaw.com
hannahs@hbsslaw.com

Kenneth A. Wexler
Edward A. Wallace
Bethany R. Turke
Justin N. Boley
WEXLER WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, IL  60604
(312) 346-2222
kaw@wexlerwallace.com
eaw@wexlerwallace.com
brt@wexlerwallace.com
jnb@wexlerwallace.com

Jonathan D. Karmel
KARMEL LAW FIRM
221 N. LaSalle Street, Suite 1307
Chicago, IL  60601
(312) 641-2910
jon@karmellawfirm.com

J. Gerard Stranch IV
Joe P. Leniski, Jr.
BRANSTETTER, STRANCH & JENNINGS PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN  37203
(615) 254-8801
gerards@bsjfirm.com
joeyl@bsjfirm.com

Counsel for Plaintiffs and the Proposed Class in C.A.
No. 15-12732

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas M. Sobol, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: July 20, 2017

<u>**/s Thomas M. Sobol**</u>
Thomas M. Sobol

# United States Court of Appeals
## For the First Circuit

---

No. 17-1714

UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST
HEALTH BENEFITS FUND; LABORERS HEALTH AND WELFARE TRUST FUND FOR
NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated,
INDIRECT PURCHASER CLASS,

Plaintiffs, Appellants,

LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a Blue Cross Blue Shield of
Louisiana; AFSCME HEALTH AND WELFARE FUND, on behalf of themselves and others
similarly situated; MINNESOTA LABORERS HEALTH AND WELFARE FUND, on behalf of
themselves and others similarly situated; PENNSYLVANIA EMPLOYEES BENEFIT TRUST
FUND, on behalf of themselves and others similarly situated,

Plaintiffs,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION;
NOVARTIS AG,

Defendants, Appellees.

On Appeal from the United States District Court for the District of Massachusetts,
Case Nos. 15-cv-12732, 15-cv-13461, 15-13724, 15-13725, 15-13726

---

No. 17-1776

RXDN, INC., on behalf of itself and all others similarly situated;
DIRECT PURCHASER PLAINTIFF CLASS,

Plaintiffs, Appellants,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS AG; NOVARTIS
CORPORATION,

Defendants, Appellees.

On Appeal from the United States District Court
for the District of Massachusetts, Case No. 16-12399

---

**INDIRECT PURCHASER APPELLANTS' UNOPPOSED MOTION TO AMEND
NOTICE OF APPEAL**

---

**ADD-051**

## I.     INTRODUCTION

Appellants United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund and Laborers Health and Welfare Trust Fund for Northern California ("appellants" or "indirect purchasers") move to clarify the named appellants and correct a typographical error in their notice of appeal. First, the indirect purchasers move to amend the caption for their notice of appeal such that all representatives of the indirect purchaser class are listed as appellants. Second, the indirect purchasers move to correct a typographical error in their notice of appeal: the title of the appeal should be "*Indirect* Purchaser Class Plaintiffs' Amended Notice of Appeal," not "*Direct* Purchaser Class Plaintiffs' Amended Notice of Appeal."[1] And text should read: they bring the appeal "on behalf of the *Indirect* Purchaser Class," not the "*Direct* Purchaser Class." These changes are clerical: they do not add any new plaintiff classes to the appeal. And as the appeal has not yet been briefed or argued, such changes will have no prejudicial effect.

---

[1] [In]Direct Purchaser Class Plaintiffs' Amended Notice of Appeal, Civ. A. No. 15-cv-12732, July 20, 2017, ECF No. 147.

## II.    ARGUMENT

### A.    Correction to the Caption of the Notice of Appeal

The indirect purchasers move to correct the caption of their notice of appeal such that it lists all indirect purchaser class representatives. In the summer and fall of 2015, six different plaintiffs filed five class action lawsuits before the United States District Court for the District of Massachusetts.[2] Because all six plaintiffs sought to represent the same class, the district court consolidated the cases on November 6, 2016. In its order consolidating the five cases, the district court named United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund and Laborers Health and Welfare Trust Fund for Northern California ("United Food" and "Laborers") the lead plaintiffs. The court instructed that all future filings should be made in the lead case, Civil Action Number 15-12732.[3]

[2] United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund and Laborers Health and Welfare Trust Fund for Northern California v. Novartis Pharm. Corp., Novartis AG, and Novartis Corp., Civ. A. No. 15-12732, June 22, 2015; Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana v. Novartis Pharm. Corp., Novartis AG, and Novartis Corp., Civ. A. No. 15-13461, Sept. 29, 2015; AFSCME Health and Welfare Fund v. Novartis Pharm. Corp., Novartis AG, and Novartis Corp., Civ. A. No. 15-13724, Nov. 3, 2015; Minnesota Laborers Health and Welfare Fund v. Novartis Pharm. Corp., Novartis AG, and Novartis Corp., Civ. A. No. 15-13725, Nov. 3, 2015; Pennsylvania Employees Benefit Trust Fund v. Novartis Pharm. Corp., Novartis AG, and Novartis Corp., Civ. A. No. 15-13726, Nov. 3, 2015.

[3] Order Consolidating Cases, Civ. A. No. 15-12732, Nov. 6, 2015, ECF No. 87.

On June 30, 2017, the district court issued a memorandum and order granting the defendant-appellees' motion to dismiss the case.[4] The case caption on that memorandum and order listed all six class representatives and their corresponding civil action numbers (United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund and Laborers Health and Welfare Trust Fund for Northern California, Civ. A. No. 15-12732; Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana, Civ. A. No. 15-13461; AFSCME Health and Welfare Fund, Civ. A. No. 15-13724; Minnesota Laborers Health and Welfare Fund, Civ. A. No. 15-13725; Pennsylvania Employees Benefit Trust Fund, Civ. A. No. 15-13726). On July 6, 2016, the district court entered an order dismissing the class action.[5] This order, again, listed all six class representatives and their five civil action numbers.

On July 18, 2017, the lead plaintiffs, United Food and Laborers, filed a motion for entry of final judgment with the district court.[6] The caption on this motion only explicitly listed United Food and Laborers.[7] However, the caption stated that these plaintiffs were filing "on behalf of themselves and others similarly

---

[4] Memorandum and Order, Civ. A. No. 15-12732, June 30, 2016, ECF No. 140.

[5] Order, Civ. A. No. 15-12732, July 6, 2017, ECF No. 141.

[6] Motion for Entry of Final Judgment, July 18, 2016, ECF No. 143.

[7] *Id.* at 1.

situated."[8] The lead plaintiffs intended to file the motion on behalf of all six class

represenatives, including Louisiana Health Service and Indemnity Company d/b/a

Blue Cross and Blue Shield of Louisiana, AFSCME Health and Welfare Fund,

Minnesota Laborers Health and Welfare Fund, and Pennsylvania Employees

Benefit Trust Fund.

In response to this motion, the district court entered an order of final

judgment on July 18, 2017.[9] The caption on this order mimicked that of the

plaintiffs' motion for entry of final judgment, only explicitly naming United Food

and Laborers.

Also on July 18, 2017, the plaintiffs filed a notice of appeal.[10] Again, the

lead plaintiffs filed this notice of appeal and named themselves in the caption. But,

again, they intended this notice of appeal to serve on behalf of all class

representatives of the indirect purchaser class. After the district court entered its

order of final judgment, the plaintiffs amended their notice of appeal to account for

this order of final judgment.[11] The notice of appeal, order of final judgment, and

---

[8] *Id.*

[9] Order of Final Judgment, Civ. A. No. 15-12732, July 18, 2017, ECF No. 146.

[10] Notice of Appeal, Civ. A. No. 15-12732, July 18, 2017, ECF No. 143.

[11] Amended Notice of Appeal, Civ. A. No. 15-12732, July 18, 2017, ECF No. 147.

amended notice of appeal were all filed on July 18, 2017, and all have the same caption.

The indirect purchasers now move the Court to amend their notice of appeal such that all class representatives are listed on the notice caption. Pursuant to Federal Rule of Appellate Procedure 3(c)(3), "[i]n a class action, whether or not the class has been certified, the notice of appeal is sufficient if it names one person qualified to bring the appeal as representative of the class."[12] The lead plaintiffs in this consolidated appeal, United Food and Laborers, constitute a "person qualified to bring the appeal as a representative of the class."[13] Thus, the other class representatives reasonably believed the notice of appeal the lead plaintiffs filed served as a notice of appeal on their behalf. The indirect purchasers write to amend their notice of appeal and clarify this issue. This change is clerical: all of the class representatives represent the exact same class. Therefore, addition of the other four class representatives to the notice of appeal caption works no substantive change to the appeal.

**B.    Correction to the Typographical Error in the Notice of Appeal**

The indirect purchasers also made an important typographical error in their amended notice of appeal. They refer to themselves in this notice of appeal as the

---

[12] Fed. R. App. Pro. 3(c)(3).

[13] *Id.*

"Direct Purchaser Class," not the "Indirect Purchaser Class."[14] United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund, Laborers Health and Welfare Trust Fund for Northern California, Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana, AFSCME Health and Welfare Fund, Minnesota Laborers Health and Welfare Fund, and Pennsylvania Employees Benefit Trust Fund are *indirect* purchasers of drugs, not direct purchasers. This typographical error was inadvertent. The indirect purchasers now move to correct this error.

### III.    CONCLUSION

For the above described reasons, the indirect purchasers move to add Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shiled of Louisiana, AFSCME Health and Welfare Fund, Minnesota Laborers Health and Welfare Fund, and Pennsylvania Employees Benefit Trust Fund to the caption of their notice of appeal. The indirect purchasers also move to correct the typographical error in their notice of appeal.

---

[14] Amended Notice of Appeal, Civ. A. No. 15-12732, July 18, 2017, ECF No. 147.

Dated: September 22, 2017      Respectfully submitted,

<u>/s/ Thomas M. Sobol</u>
Thomas M. Sobol (BBO #471770)
Kristen A. Johnson (BBO #667261)
Hannah W. Brennan (BBO #1181216)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel.: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
kristenj@hbsslaw.com
hannahb@hbsslaw.com

**ADD-058**

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas M. Sobol, hereby certify that on this 22nd day of September, 2017, the within document was electronically filed with the Clerk of the Court using the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Additionally, the within document will be sent by on this 22nd day of September to the following counsel by e-mail:

John Radice at jradice@radicelawfirm.com;

Kenneth Pickle at kpickle@radicelawfirm.com;

Daniel Rubenstein at drubenstein@radicelawfirm.com;

Noah Rosmarin at nrosmarin@akzlaw.com.

*/s/ Thomas M. Sobol*
Thomas M. Sobol

# United States Court of Appeals
## For the First Circuit
_____

No. 17-1714

UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST
HEALTH BENEFITS FUND; LABORERS HEALTH AND WELFARE TRUST FUND FOR
NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated; AFSCME
HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated;
MINNESOTA LABORERS HEALTH AND WELFARE FUND, on behalf of themselves and
others similarly situated; PENNSYLVANIA EMPLOYEES BENEFIT TRUST FUND, on behalf
of themselves and others similarly situated; LOUISIANA HEALTH SERVICE & INDEMNITY
COMPANY, d/b/a Blue Cross and Blue Shield of Louisiana, on behalf of themselves and others
similarly situated,

Plaintiffs, Appellants,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION;
NOVARTIS AG,

Defendants, Appellees.
_____

No. 17-1776

RXDN, INC., on behalf of itself and on behalf of the Direct Purchaser Class,

Plaintiff, Appellant,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS AG; NOVARTIS
CORPORATION,

Defendants, Appellees.
_____

**ORDER OF COURT**

Entered: October 30, 2017

**ADD-060**

The Indirect Purchaser Appellants' Unopposed Motion to Amend the Notice of Appeal and the First Circuit Case Caption are provisionally <u>granted</u>, without prejudice to reconsideration by the panel that decides the appeal.  The appeal shall proceed with all Plaintiffs listed as Plaintiffs, Appellants, and the parties are directed to use the revised caption that appears at the top of this order.

By the Court:

<u>/s/ Margaret Carter, Clerk</u>

cc:
Edward A. Wallace
Thomas M. Sobol
Kenneth A. Wexler
Kristen A. Johnson
Justin N. Boley
Michael Joseph Wall
Joey Paul Leniski Jr.
James Gerard Stranch IV
Hannah Schwarzschild
Michael Gilman Stewart
Hannah W. Brennan
Jeffrely L. Kodroff
John A. Macoretta
Adam M. Stewart
Diana J. Zinser
Devona L. Wells
Saul P. Morgenstern
William A. Zucker
Wyley Sayre Proctor
Mark D. Godler
Alice C.C. Huling
David K. Barr
Laura Scott Shores
Grant J. Esposito
Jessica L. Kaufman
Noah Rosmarin
John D. Radice

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RXDN INC., on behalf of itself and all others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION,<br><br>              Defendants. | Civil Action No.  1:16-cv-12399-ADB |

## <u>DIRECT PURCHASER CLASS PLAINTIFFS' NOTICE OF APPEAL</u>

Notice is hereby given that RxDN, Inc., individually and on behalf of the Direct Purchaser Class, appeals to the United States Court of Appeals for the First Circuit from this Court's order of judgment, dated July 25, 2017 [ECF No. 21], against the direct purchasers in accordance with its order of dismissal in the end payors' case.[1]

RxDN, Inc. is qualified to bring an appeal pursuant to Fed. R. App. P. 3(c)(3). The required fee of $505.00 was paid on July 31, 2017 using the CM/ECF system.

---

[1] *United Food and Commercial Workers Union and Employers Midwest Health Benefits Fund v. Novartis Pharmaceuticals Corp.*, Civil Action No. 1:15-cv-12732-ADB ("UFCW v. Novartis" or "the end payors' case") (D. Mass. June 22, 2015), ECF Nos. 1, 140-41.

Dated: July 31, 2017                    Respectfully submitted,


                                        ***/s/ Noah Rosmarin***


                                        Jason Adkins, BBO #558560
                                        Noah Rosmarin, BBO #630632
                                        **Adkins, Kelston & Zavez, P.C.**
                                        90 Canal Street, Suite 500
                                        Boston, MA 02114
                                        Tel: (617) 367-1040
                                        Fax: (617) 742-8280
                                        jadkins@akzlaw.com

                                        John D. Radice (*admitted pro hac vice*)
                                        Daniel Rubenstein (*admitted pro hac vice*)
                                        Kenneth Pickle (*admitted pro hac vice*)
                                        **Radice Law Firm, PC**
                                        34 Sunset Blvd
                                        Long Beach, NJ 08008
                                        Tel: (646) 245-8502
                                        Fax: (609) 385-0745
                                        jradice@radicelawfirm.com

                                        Eric L. Young (*pro hac vice motion forthcoming*)
                                        **McEldrew Young**
                                        123 S. Broad St., Suite 2250
                                        Philadelphia, PA 19109
                                        Tel: (215) 367-5151
                                        Fax: (215) 367-5143
                                        eyoung@mceldrewyoung.com

                                        *Counsel for Plaintiff and the Proposed Class*

**CERTIFICATE OF SERVICE**

I, Noah Rosmarin, hereby certify that I caused a copy of the attached document to be filed electronically via the Court's electronic filing system, as well as sent by email and U.S. Mail to defense counsel.  Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: July 31, 2017                         Respectfully submitted,

                                             ***/s/ Noah Rosmarin***