# United States Court of Appeals
## For the First Circuit

No. 17-1714

UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND, on behalf of themselves and others similarly situated; LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated; AFSCME HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated; MINNESOTA LABORERS HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated; PENNSYLVANIA EMPLOYEES BENEFIT TRUST FUND, on behalf of themselves and others similarly situated; LOUISIANA HEALTH SERVICE AND INDEMNITY COMPANY, d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA, on behalf of themselves and others similarly situated,

Plaintiffs, Appellants,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION; NOVARTIS AG,

Defendants, Appellees

No. 17-1776

RXDN, INC., on behalf of themselves and others similarly situated,

Plaintiff, Appellant,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION; NOVARTIS AG,

Defendants, Appellees

On Appeal from the United States District Court for the District of Massachusetts
Civil Action Nos. 15-12732-ADB, 15-13461-ADB, 15-13724-ADB, 15-13725-ADB, 15-13726-ADB, 16-12399-ADB

## BRIEF OF DEFENDANTS-APPELLEES

Saul P. Morgenstern
saul.morgenstern@apks.com
David K. Barr
david.barr@apks.com
Mark D. Godler
mark.godler@apks.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
212-836-8000
212-836-8689 (fax)

William A. Zucker
wzucker@mcarter.com
Wyley S. Proctor
wproctor@mccarter.com
MCCARTER & ENGLISH LLP
265 Franklin Street
Boston, MA 02110
617-449-6500
617-607-9200 (fax)

Laura S. Shores
laura.shores@apks.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
202-942-6855
202-942-5999 (fax)

*Attorneys for Defendants Novartis Pharmaceuticals Corporation and Novartis Corporation*

William A. Zucker
wzucker@mccarter.com
Wyley S. Proctor
wproctor@mccarter.com
MCCARTER & ENGLISH LLP
265 Franklin Street
Boston, MA 02110
617-449-6500
617-607-9200 (fax)

Grant J. Esposito
gesposito@mofo.com
Jessica Kaufman
jkaufman@mofo.com
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
212-468-8000
212-468-7900 (fax)

*Attorneys for Defendant Novartis AG*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, the undersigned attorneys of record for Novartis Corporation state that Novartis Corporation is an indirect, wholly owned subsidiary of Novartis AG, which trades on the SIX Swiss Exchange under the ticker symbol NOVN and whose American Depository Shares are publicly traded on the New York Stock Exchange under the ticker symbol NVS.

Pursuant to Fed. R. App. P. 26.1, the undersigned attorneys of record for Novartis Pharmaceuticals Corporation state that Novartis Pharmaceuticals Corporation is an indirect, wholly owned subsidiary of Novartis AG, which trades on the SIX Swiss Exchange under the ticker symbol NOVN and whose American Depository Shares are publicly traded on the New York Stock Exchange under the ticker symbol NVS.

Pursuant to Fed. R. App. P. 26.1, the undersigned attorneys of record for Novartis AG state that Novartis AG is publicly traded on the SIX Swiss Exchange under the ticker symbol NOVN and its American Depository Shares are publicly traded on the New York Stock Exchange under the ticker symbol NVS. No publicly traded company owns more than 10% of Novartis AG.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

COUNTERSTATEMENT OF THE ISSUES.......................................................... 6

STATEMENT OF THE CASE ............................................................................. 7

A. The Patents Covering Gleevec® ............................................................... 7

B. The Prosecution History of the '051 Patent.............................................. 9

C. The Orange Book Listing.......................................................................... 14

D. Plaintiffs' Invalidity Allegations .............................................................. 15

E. The Sun Litigation and Settlement ........................................................... 18

F. Procedural History and the Decision Below............................................. 19

SUMMARY OF ARGUMENT .............................................................................. 21

ARGUMENT........................................................................................................... 23

I. APPLICABLE LEGAL STANDARDS....................................................... 23

    A. Standards Governing This Appeal...................................................... 23

    B. Standards Governing Sham Litigation ............................................... 24

    C. Standards Governing Patent Cases..................................................... 26

    D. Standards Governing *Walker Process* Fraud Claims ......................... 27

II. THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS'
    SHAM LITIGATION CLAIM ..................................................................... 31

    A. The Complaint Does Not Plausibly Allege that
        Enforcement of the Gleevec® Patent Was Objectively Baseless.......... 32

    B. Plaintiffs Allege No Prior Findings Questioning
        the Patent at Issue .............................................................................. 33

C.     Plaintiffs May Not Create the Missing Factual Predicate in This Case ........................................................ 39

D.     Plaintiffs' Patent Allegations Do Not Establish Objective Baselessness ............................................. 47

     1.     Plaintiffs' Invalidity Allegations Further Negate an Inference of Objective Baselessness........................... 51

     2.     The Court Did Not Give Any Undue Weight to the Presumption of Patent Validity ................................. 58

E.     Plaintiffs' "Serial Litigation" Theory Is Without Merit ...................... 59

III.  THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' *WALKER PROCESS*-TYPE CLAIMS FAIL...................................... 62

A.     The Complaint Does Not Support a Plausible Inference that the Patent Would Not Have Issued But For the Alleged Misrepresentations ................................................................. 62

     1.     The Prior Art References Were Either Disclosed or Cumulative .................................................................. 63

     2.     The Court Below Properly Rejected Plaintiffs' Assertion that Novartis' Use of the Term "Surprising" in the '051 Specification Could Support an Inference of Fraud on the PTO ............................................................................ 65

B.     None of the Alleged Misrepresentations Qualify for the "Egregious Misconduct" Exception to But-For Materiality................. 69

C.     The Complaint Does Not Support a Plausible Inference of Fraudulent Intent as Required for a *Walker Process* Claim ................. 74

CONCLUSION ................................................................. 76

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Display Sys. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000) ........................................................27

*Akron Polymer Container Corp. v. Exxel Container, Inc.*,
148 F.3d 1380 (Fed. Cir. 1998) ........................................................75

*Argus Chem. Co. v. Fibre Glass-Evercoat Co.*,
812 F.2d 1381 (Fed. Cir. 1987) ........................................................74

*Asahi Glass Co. v. Pentech Pharms.*,
289 F. Supp. 2d 986 (N.D. Ill. 2003).......................................*passim*

*Barry v. Medtronic, Inc.*,
245 F. Supp. 3d 793 (E.D. Tex. 2017)..............................................71

*Beddall v. State St. Bank & Trust Co.*,
137 F.3d 12 (1st Cir. 1998) ................................................................9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................23

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,
661 F.3d 629 (Fed. Cir. 2011) ........................................................51

*C.R. Bard, Inc. v. M3 Sys.*,
157 F.3d 1340 (Fed. Cir. 1998) ................................... 25, 26, 27, 41

*California Motor Transport Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)..........................................................................24

*Carroll v. Xerox Corp.*,
294 F.3d 231 (1st Cir. 2002) ............................................................21

*Cat Tech v. TubeMaster, Inc.*,
528 F.3d 871 (Fed. Cir. 2008) ....................................................20, 42

*Cataphote Corp. v. DeSoto Chem. Coatings, Inc.*
450 F.2d 769 (9th Cir. 1991) ............................................................28

*Cooperman v. Individual, Inc.*,
171 F.3d 43 (1st Cir. 1999) ...........................................................23

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
398 F.3d 666 (D.C. Cir. 2005) .......................................................33

*Cuno Eng'g Corp. v. Automatic Devices Corp.*,
314 U.S. 84 (1942).........................................................................55

*CVD, Inc. v. Raytheon Co.*,
769 F.2d 842 (1st Cir. 1985) ...........................................................1

*Dippin' Dots, Inc. v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007) ...............................................29, 30

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961).................................................................2, 31

*ESCO Corp. v. Cashman Equip. Co.*,
158 F. Supp. 3d 1051, 1074 (D. Nev. 2016)..................................29

*Exergen Corp. v. Kaz USA, Inc.*, 120 F. Supp. 3d 1
(D. Mass. 2015) .............................................................................72

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009)........................................30, 67, 74

*FilmTec Corp. v. Hydranautics*,
67 F.3d 931 (Fed. Cir. 1995)..........................................................43

*Fiskars, Inc. v. Hunt Mfg. Co.*,
221 F.3d 1318, 1327 (Fed. Cir. 2000) ...........................................64

*Flex-Foot, Inc. v. CRP, Inc.*,
238 F.3d 1362 (Fed. Cir. 2001) .....................................................45

*FMC Corp. v. Manitowoc Co.*,
835 F.2d 1411 (Fed. Cir. 1987) .....................................................29

*FTC v. Actavis*,
570 U.S. 136 (2013)..................................................................4, 47

*Garcia-Catalan v. United States*,
  734 F.3d 100 (1st Cir. 2013) ..........................................................23

*Glaxo Inc. v. Novopharm Ltd.*,
  52 F.3d 1043 (Fed. Cir. 1995).................................................52, 54

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)........................................................................55

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
  806 F.3d 162 (3d Cir. 2015), *cert. denied sub nom., Vill.*
  *Supermarkets, Inc. v. Hanover 3201 Realty, LLC.*,
  136 S. Ct. 2451 (2016)..................................................................60

*Highmark, Inc. v. Allstate Mgmt. Sys., Inc.*,
  701 F.3d 1351, 1362 (Fed. Cir. 2012) ...........................................62

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)......................................................................20

*iLOR, LLC v. Google, Inc.*,
  631 F.3d 1372 (Fed. Cir. 2011) .....................................................33

*In re AndroGel Antitrust Litig. (No. II)*,
  687 F. Supp. 2d 1371 (N.D. Ga. 2010)...........................................37

*In re AndroGel Antitrust Litig. (No. II)*,
  888 F. Supp. 2d 1336 (N.D. Ga. 2012)...........................................33

*In re Armodafinil Patent Litig. Inc.*,
  939 F. Supp. 2d 456 (D. Del. 2013) .......................................*passim*

*In re Cardizem CD Antitrust Litig.*,
  105 F. Supp. 2d 618 (E.D. Mich. 2000) .........................................37

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
  261 F. Supp. 2d 188 (E.D.N.Y. 2003)............................................46

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
  363 F. Supp. 2d 514 (E.D.N.Y. 2005)............................................46

*In re Effexor Antitrust Litig.*,
  No. 11-5479, 2014 WL 4988410 (D.N.J. Oct. 6, 2014)...................38

*In re Lantus Direct Purchaser Antitrust Litig.*,
No. 16-12652, 2018 WL 355372 (D. Mass. Jan. 10, 2018) .............................34

*In re Lipitor Antitrust Litig.*,
868 F.3d 231 (3d Cir. 2017)..............................................................................50

*In re Lipitor Antitrust Litig.*,
No. 3:12-CV-2389, 2013 WL 4780496 (D.N.J. Sept. 5, 2013).........................9

*In re Lister*,
583 F.3d 1307 (Fed. Cir. 2009) ........................................................................62

*In re Loestrin 24 Fe Antitrust Litig.*,
261 F. Supp. 3d 307 (D.R.I. 2017) ...................................................................36

*In re Oetiker*,
977 F.2d 1443 (Fed. Cir. 1992) ........................................................................11

*In re Pub. Serv. Co. of N.H.*,
879 F.2d 987 (1st Cir. 1989) .............................................................................21

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
No. 14-md-02503, 2015 WL 5458570 (D. Mass. Sept. 16, 2015) ...................34

*In re Thalomid & Revlimid Antitrust Litig.*,
Civil No. 14-6997, 2015 WL 9589217 (D.N.J. Oct. 29, 2015) ........................36

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
868 F.3d 132 (3d Cir. 2017).............................................................................32

*Intellect Wireless, Inc. v. HTC Corp.*,
732 F.3d 1339 (Fed. Cir. 2013) ..........................................................72, 73, 74

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
No. 1:13-cv-00740, 2013 WL 6682981
(E.D. Va. Dec. 18, 2013).................................................................................34

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*,
552 F.3d 1033 (9th Cir. 2009)..........................................................................75

*Kinetic Concepts, Inc. v. Bluesky Med. Corp.*,
No. SA-08-CV-102-RF, 2010 WL 11463260
(W.D. Tex. Jan. 29, 2010)................................................................................62

*Lexington Luminance LLC v. Osram Sylvania Inc.*,
   972 F. Supp. 2d 88 (D. Mass. 2013)................................................................31

*LifeScan, Inc. v. Home Diagnostics, Inc.*,
   103 F. Supp. 2d 379 (D. Del. 2000), *aff'd*, 13 F. App'x 940
   (Fed. Cir. 2001) ....................................................................................66

*Molins PLC v. Textron, Inc.*,
   48 F.3d 1172 (Fed. Cir. 1995)..................................................................64

*Morales-Cruz v. Univ. of P.R.*,
   676 F.3d 220 (1st Cir. 2012) ...................................................................23

*Mowry v. Whitney*,
   81 U.S. 434 (1872)..................................................................................45

*N. Telecom, Inc. v. Datapoint Corp.*,
   908 F.2d 931 (Fed. Cir. 1990), *cert. denied*,
   498 U.S. 920 (1990)................................................................................74

*Nobelpharma AB v. Implant Innovations, Inc.*,
   141 F.3d 1059 (Fed. Cir. 1998)................................................................28

*Oracle Corp. v. DrugLogic, Inc.*,
   No C 11-00910, 2011 WL 5576267 (N.D. Cal. Nov. 16, 2011) .....................64

*P.R. Tel. Co., Inc. v. San Juan Cable Co. LLC*,
   196 F. Supp. 3d 207 (D.P.R. 2016) ...........................................................60

*P.R. Tel. Co., Inc. v. San Juan Cable Co. LLC*,
   874 F.3d 767 (1st Cir. 2017). ...................................................................60

*ParkerVision, Inc. v. Qualcomm Inc.*,
   924 F. Supp. 2d 1314 (M.D. Fla. 2013)..................................................63, 64

*Pfizer Inc. v. Mylan Pharm. Inc.*,
   71 F. Supp. 3d 458 (D. Del. 2014), *aff'd*, 628 F. App'x 764
   (Fed. Cir. 2016) ....................................................................................57

*Pfizer v. Apotex*,
   491 F.3d 1348 (Fed. Cir. 2007)................................................................57

*Picone v. Shire PLC*,
  No. 16-cv-12396, 2017 WL 4873506 (D. Mass. Oct. 20, 2017) ................ 34, 61

*Polaris Indus. Inc. v. Arctic Cat Inc.*,
  No. 14-3412, 2015 WL 4636544 (D. Minn. Aug. 4, 2015) .............................. 50

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*,
  508 U.S. 49 (1993) .................................................................................. *passim*

*Purdue Pharma L.P. v. Endo Pharms., Inc.*,
  438 F.3d 1123 (Fed. Cir. 2006) .............................................................. 67, 68

*Rodi v. S. New England Sch. of Law*,
  389 F.3d 5 (1st Cir. 2004) ................................................................................ 24

*Rohm & Haas Co. v. Brotech Corp.*,
  127 F.3d 1089 (Fed. Cir. 1997) ....................................................................... 32

*Rohm & Haas Co. v. Crystal Chem. Co.*,
  722 F.2d 1556 (Fed. Cir. 1983) ....................................................................... 72

*Rothman v. Target Corp.*,
  556 F.3d 1310 (Fed. Cir. 2009) ....................................................................... 65

*Sanofi-Synthelabo v. Apotex, Inc.*,
  550 F.3d 1075 (Fed. Cir. 2008) ....................................................................... 57

*Schatz v. Republican State Leadership Comm.*,
  669 F.3d 50 (1st Cir. 2012) .............................................................................. 24

*Senju Pharm. Co., Ltd. v. Apotex, Inc.*,
  921 F. Supp. 2d 297 (D. Del. 2013) ................................................................ 72

*Server Tech., Inc. v. Am. Power Conversion Corp.*,
  No. 3:06-00698, 2014 WL 3894075 (D. Nev. Aug. 8, 2014),
  *vacated on other grounds by* 2017 WL 736881
  (D. Nev. Feb. 23, 2017) ................................................................................... 63

*Shwarz v. United States*,
  234 F.3d 428 (9th Cir. 2000) ........................................................................... 23

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013) ...............................................................23

*Smith & Nephew, Inc. v. Interlace Med., Inc.*,
    955 F. Supp. 2d 69 (D. Mass. 2013).....................................................71

*Takeda Pharm. Co., Ltd v. Handa Pharm., LLC*,
    No. C-11-00840, 2013 WL 9853725
    (N.D. Cal. Oct. 17, 2013) ...........................................................56, 57

*Tdata Inc. v. Aircraft Tech. Publrs.*,
    Nos. 2:03-cv-264, 2:04-cv-1072,
    2006 WL 1133313 (S.D. Ohio April 26, 2006) ...............................36

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) .......................................29, 71, 72

*Transweb LLC v. 3M Innovative Properties Co.*,
    812 F.3d 1295 (Fed. Cir. 2016) .....................................................29

*Tyco Healthcare Grp. v. Mut. Pharm. Co.*,
    762 F.3d 1338 (Fed. Cir. 2014) .........................................3, 25, 59

*U.S. Rubber Recycling v. ECORE Int'l*,
    NO.: CV 09-09516, 2011 WL 13043495
    (C.D. Cal. Aug. 8, 2011) ...............................................................71

*Valeant Int'l (Barbados) SRL v. Watson Pharm., Inc.*,
    No. 10-20526-CIV, 2011 WL 6792653 (S.D. Fla. Nov. 8, 2011),
    *aff'd sub nom. Valeant Int'l Bermuda v. Actavis, Inc.*,
    534 F. App'x 999 (Fed. Cir. 2013) .................................................58

*Watterson v. Page*,
    987 F.2d 1 (1st Cir. 1993) ...............................................................9

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990).......................................................................46

## Statutes

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ...................................................18

35 U.S.C. § 103 .........................................................................55

35 U.S.C. § 251 ...........................................................................8

35 U.S.C. § 271(e)(5) ................................................................18

35 U.S.C. § 303-307 ..................................................................41

35 U.S.C. § 311 *et seq.* .............................................................41

## Rules

Fed. R. Civ. P. 8(a)(2) ...............................................................23

## Constitutional Provisions

U.S. Const. amend. I .................................................................24

## Other Authorities

21 C.F.R. § 314.53(b)(1) ...........................................................15

21 C.F.R. § 314.53(c)(3) ...........................................................15

37 C.F.R. § 1.313(c)(2) .............................................................14

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 207
(4th ed. 2013)...........................................................................2

# INTRODUCTION

Plaintiffs-Appellants [1] ("Plaintiffs" or "Purchasers") filed lawsuits against Novartis Pharmaceuticals Corporation, Novartis Corporation, and Novartis AG (collectively, "Novartis"), complaining that Novartis' assertion of its patent covering Gleevec® in litigation with Sun Pharma FZE ("Sun") was a sham, and that the patent was fraudulently obtained. They do not challenge the lawfulness of the settlement itself; rather, they assert that had Novartis and Sun not settled, and the patent litigation proceeded to a decision on the merits, the only possible outcome would have been the invalidation of Novartis' patent, resulting in the entry of Sun's generic version seven months earlier than the date agreed to in the settlement.

The district court correctly dismissed these allegations as insufficient to state a plausible claim of sham litigation. "[A] patentee who has a good faith belief in the validity of a patent will not be exposed to antitrust damages even if the patent proves to be invalid, or the infringement action unsuccessful." *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 850 (1st Cir. 1985). All that is required is a "reasonable belief that there is a chance that [a] claim may be held valid upon adjudication". *Prof'l Real Estate Inv'rs., Inc. v. Columbia Pictures Indus.* ("*PREI*"), 508 U.S. 49, 62-63 (1993) (quotation marks omitted). As a result, to state a plausible sham claim, a plaintiff must plead facts showing that the underlying action was objectively

---

[1] Plaintiffs-Appellants purport to represent classes of direct and end payor purchasers of Gleevec®.

meritless when filed, not merely that it ultimately would have been lost. Satisfying this standard is difficult by design:

> [T]he antitrust plaintiff has the burden of proving that a sham exists. That burden will not often be met, for only the exceptional lawsuit or other use of government machinery is objectively unreasonable in its inception or abusive in its pursuit. But the conclusory allegation of sham is easy, and such easy allegations can themselves chill the exercise of rights that *Noerr*[2] would protect, for defending oneself against such claims can be burdensome. The sham claim can itself be harassment, an invitation to retry prior disputes in an antitrust forum, and a burden on the legal system. Accordingly, there has been a strong impulse to identify and dispose of the invalid sham claim as early as possible in an antitrust suit.

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 207 (4th ed. 2013).

This hurdle is even higher when the challenged litigation involves the assertion of patent rights. In an alleged sham patent infringement case, the threshold issue is whether, at the inception of the litigation, "a neutral observer would reasonably think . . . that the patent was almost certain to be declared invalid." *Asahi Glass Co. v. Pentech Pharms.*, 289 F. Supp. 2d 986, 993 (N.D. Ill. 2003) (Posner, J.). "Given the presumption of patent validity and the burden on the patent challenger to prove invalidity by clear and convincing evidence, it will be a rare case in which a patentee's assertion of its patent in the face of a claim of invalidity will be

---

[2] *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961). *Noerr* and subsequent cases hold that for reasons grounded in the First Amendment, attempts to influence government action are immune from liability under the antitrust laws.

so unreasonable as to support a claim that the patentee has engaged in sham litigation." *Tyco Healthcare Grp. v. Mut. Pharm. Co.*, 762 F.3d 1338, 1345 (Fed. Cir. 2014).

Plaintiffs' sham litigation allegations, no matter how favorably viewed, fall far short of this standard. The end payor plaintiffs' Amended Complaint (the "Complaint") does not allege facts that would permit the inference that a reasonable litigant would have concluded that it would be frivolous to defend the Gleevec® patent; it alleges no prior finding of any kind that establishes, or even casts doubt on, the patent's validity. Rather, the Complaint proffers Plaintiffs' own theory of patent invalidity, based on prior art that they assert renders the patent invalid. Hoping to create factual support for their invalidity theory, Plaintiffs urged the district court to conduct an expedited hearing at the outset to determine the "core issue" of whether the patent claimed a patentable invention.[3] Plaintiffs lack standing to litigate this issue in the first instance; only accused infringers have standing under the Patent Act to contest the validity of a patent in court. Moreover, Plaintiffs' request acknowledged that the patent's alleged invalidity is a litigable issue, not one so unambiguous that a suit to enforce it would be frivolous.

Plaintiffs now argue that the district court erred in failing to accept as true the Complaint's allegations in support of the patent's invalidity, and that the

---

[3] Joint Statement of Plaintiffs and Defendants Pursuant to July 16, 2015 Order, SA-000004-05.

district court was required to accept Plaintiffs' interpretation of the prior art. Brief of Plaintiffs-Appellants ("App. Br.") at 37. The court below, however, **did** accept Plaintiffs' factual allegations as true, and even assumed that they might support a plausible case for patent invalidity, but found that the patent allegations were not sufficient to establish that Novartis' assertion of its patent was objectively baseless. "Even if [plaintiffs' factual allegations] were enough to allege a plausible invalidity claim, it is not enough to show that Novartis' litigation based on [its] Patent was objectively baseless." Memorandum and Order Granting Motion to Dismiss, Plaintiffs' Addednum ("ADD"), at ADD-027. Determining whether litigation is objectively baseless is a question of law, and the district court correctly ruled that even plausible allegations of patent invalidity will not support a claim that litigation to enforce it was baseless.

Plaintiffs' suggestion that objective baselessness can be inferred from the mere fact that Novartis settled the case by allowing Sun to enter before the patent expired is equally untenable. In addition to conflicting with longstanding public policy in favor of settlements, this contention is squarely at odds with the Supreme Court's explicit assurance in *F.T.C. v. Actavis*, 570 U.S. 136 (2013), that parties may settle patent litigation by means of pre-expiration entry without fear of antitrust scrutiny. Moreover, it turns antitrust policy on its head. Early entry is procompetitive, not anticompetitive. The district court was right to reject Plaintiffs'

suggestion that a stronger inference that the litigation was meritless could be drawn from an early entry date, thus increasing the risk of a treble-damages antitrust suit.

The district court's rejection of Plaintiffs' "*Walker Process*"[4] fraud allegations was also correct. The Complaint acknowledges that Novartis disclosed, and the patent examiner considered and acknowledged, two of the prior art references alleged to have been withheld, negating both materiality and intent. The other references, as the district court found, were either cited in the patent specification or "were not clearly material in light of the disclosed prior art," rendering allegations that Novartis intentionally withheld prior art implausible. ADD-033.

Plaintiffs' claims that Novartis willfully misrepresented that the discovery of the patented β-crystalline form was "surprising" and failed to disclose that it was achieved using "routine" laboratory methods also miss the mark. There is nothing in the Complaint, other than Plaintiffs' own conclusory allegations, to support an inference that the inventors' subjective expression of "surprise" was unfounded or that it was material to the patent's issuance. The same is true regarding the method used to produce the β-crystalline form. Novartis described that method in the patent specification and, if material, the examiner was able to

---

[4]  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965).

make an independent judgment as to whether the method was "routine." Simply put, conclusory characterizations like these cannot support a *Walker Process* claim.

## COUNTERSTATEMENT OF THE ISSUES

1. **Sham Patent Litigation**. Whether the district court correctly concluded as a matter of law – after accepting Plaintiffs' factual allegations as true and accepting that they might state a litigable claim for patent invalidity – that Plaintiffs failed to state a plausible antitrust claim premised on the sham exception to *Noerr-Pennington* immunity because a reasonable litigant could reasonably perceive there was a chance that the patent would be found valid upon adjudication, given that there was no prior finding questioning the validity of the patent, the existence of the presumption of validity, and the fact that Plaintiffs' asserted theory of invalidity rested entirely on their own construction of prior art.

2. ***Walker-Process*-Type Claims (Fraudulent Patent Procurement).** Whether the district court correctly dismissed as implausible Plaintiffs' state law *Walker Process*-type fraud claims, where the Complaint acknowledges that the principal prior art references on which Plaintiffs' claims rely were disclosed to the Patent Office, the rest were cumulative, and other statements were not plausibly alleged to be material or made with made with the requisite fraudulent intent.

**STATEMENT OF THE CASE**

Defendant Novartis Pharmaceuticals Corporation markets and distributes Gleevec® (imatinib mesylate), a drug approved by the FDA for, among other things, the treatment of certain types of chronic myeloid leukemia and acute lymphoblastic leukemia. Defendant Novartis Corporation is the assignee of the basic compound patent claiming the active ingredient in Gleevec®, commonly known as "imatinib." Novartis AG is a Swiss holding company and the ultimate parent company in the Novartis Group. NPC and Novartis Corporation are both indirect subsidiaries of Novartis AG.

**A.      The Patents Covering Gleevec®**

Gleevec® contains the compound imatinib in the form of a methane sulfonic salt, which is also known as a "mesylate salt." Imatinib, along with other related compounds and their pharmaceutically acceptable salts, was described and claimed in Novartis' U.S. Patent No. 5,521,184 ("the '184 patent"). Although the '184 patent expired on January 4, 2015, the FDA awarded Gleevec® an additional period of pediatric exclusivity, which extended exclusivity until July 4, 2015. Plaintiffs' antitrust allegations are directed to two unexpired patents covering particular crystalline ("polymorphic") forms[5] of the imatinib mesylate salt contained

---

[5]      As explained in an FDA Guidance, "polymorphs" are "[c]rystalline forms [that] have different arrangements and/or conformations of the molecules in their crystal lattice." As the Guidance further explains, polymorphic forms of a drug

in Gleevec®, U.S. Patent No. 6,894,051 ("the '051 patent") (Joint Appendix ("JA"), JA-0000369-80), issued on May 17, 2005; and reissue Patent RE43,932 ("RE932 patent"),[6] issued on January 15, 2013 (collectively, the "Polymorph Patents"). The '051 patent and RE932 patent are based on the discovery of new and different physical forms of imatinib mesylate that have different crystalline structures and properties.[7] Plaintiffs' Complaint alleges that the claims of the '051 and RE932 patents directed to the β-crystalline form of imatinib mesylate are invalid over the prior art and Novartis knew they were invalid at the time those claims were asserted against Sun. Am. Compl. ¶¶ 314-16, JA-000107.[8]

---

substance can affect the quality, safety, and efficacy of the drug product. Guidance for Industry, ANDAs: Pharmaceutical Solid Polymorphism at 2 (U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research ("CDER"), July 2007.

[6] In accordance with the reissue statute, 35 U.S.C. § 251, upon reissuing of a patent, the original patent (here, U.S. Patent 7,554,799) ("the '799 patent") is surrendered.

[7] As listed in the Orange Book, exclusivity under the '051 patent ends on November 23, 2019, and exclusivity under the RE932 patent ends on July 16, 2019. The RE932 patent issued from a "continuation" of the application that issued as the '051 patent. Because Plaintiffs' theories of invalidity and *Walker Process* fraud are the same for both patents, the arguments regarding why Plaintiffs' antitrust claims directed to the '051 patent (the only patent at issue in the Sun Litigation) were correctly dismissed also apply to the RE932 patent.

[8] Plaintiffs' brief incorrectly states that the '051 patent claims "the mesylate salt form of imanitib." App. Br. at 32. To the contrary, the '051 Patent claims particular crystalline forms of imatinib mesylate, not the mesylate salt itself.

**B.**     <u>The Prosecution History of the '051 Patent</u>

The U.S. Patent Office ("PTO") Board of Appeals directly and expressly rejected Plaintiffs' underlying premise that different polymorphic forms of the same compound are not patentable. After the application for the '051 patent was filed with the PTO, it was assigned to a patent examiner for review. The patent examiner initially rejected the claims to the β-crystalline form in view of the '184 compound patent describing imatinib. *Id.* ¶¶ 214-16, JA-000087. The examiner rejected the claims as anticipated by the '184 patent's disclosure of the "free form" of imatinib and a "list of intended salts, including the methanesulfonate [mesylate] salt." The examiner stated further that the burden was on the applicants to show that the claimed β-crystalline form would not be inherently produced from the disclosure of the '184 compound using routine procedures. *Id.* ¶ 216 (September 28, 2000 Office Action, JA-000423). For essentially the same reasons, the examiner also rejected the claims for obviousness over the '184 patent. JA-000424.[9]

---

[9]     Because Plaintiffs' Complaint cites to documents contained in the '051 patent's prosecution file, those documents are reviewable on a motion to dismiss. *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16-17 (1st Cir. 1998) ("a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)"); *accord Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). Additionally, documents from the '051 prosecution file itself are also judicially noticeable. *In re Lipitor Antitrust Litig.*, No. 3:12-CV-2389, 2013 WL 4780496, at *1, 20 (D.N.J. Sept. 5, 2013).

Novartis argued in response to the examiner's rejection that the '184 compound patent did not describe the mesylate salt of imatinib because, among other reasons, the '184 compound patent "contains no specific disclosure that would lead one skilled in the art to select the methane sulfonic acid salt . . . of the present compound from the myriad of possibilities." Am. Compl. ¶ 218, JA-000087; March 28, 2001 Amendment, JA-000434. Novartis also pointed out that, even if the '184 compound patent did disclose imatinib mesylate, "the existence of presently claimed β crystal modification is neither taught nor suggested by [the '184 compound patent]." JA-000435.

The patent examiner maintained her rejection (Am. Compl. ¶ 227, JA-000089), which Novartis appealed to the PTO Board of Appeals. *Id.* ¶ 233, JA-000090. After briefing, the Board of Appeals reversed. *Id.* ¶ 6, 234-37, JA-000037, 000090-91. Significantly for this case, the Board of Appeals assumed that the prior art '184 compound patent described the mesylate salt of imatinib: "[W]e shall assume *arguendo*, without deciding, that Zimmermann [the '184 compound patent] describes the methanesulfonic [mesylate] acid addition salt of imatinib . . . ." *Id.* ¶ 240, JA-000091; November 24, 2003 Board of Appeals Decision, JA-000500, 000503. The Board of Appeals reversed the patent examiner and held the claimed β-crystalline form patentable: "Nonetheless, we agree with applicants that Zimmermann [the '184 patent] contains insufficient disclosure to

support a finding of anticipation of the appealed claims which recite a *non-hygroscopic or β-crystalline form* of the methanesulfonic acid addition salt of imatinib." November 24, 2003 Board of Appeals Decision, JA-000500. Under the same assumption that the '184 compound patent disclosed imatinib as a mesylate salt, the Board also reversed the examiner's obviousness determination, explicitly rejecting the argument that "the β-crystalline form of the methanesulfonic acid addition salt of imatinib is merely a different polymorphic form of Zimmermann's methanesulfonic acid addition salt of imatinib." [10] *Id.*, JA-000502.

The Board of Appeals held that the patent examiner erred, *not* in concluding that the '184 compound patent described the mesylate salt of imatinib, *but* in concluding that the '184 compound patent anticipated or rendered obvious the specific β-crystalline form of imatinib mesylate claimed in the application. In particular, the Board of Appeals concluded that the patent examiner could not "point

_____

[10] Plaintiffs discount the Board of Appeals' decision on the ground that it was based on the examiner's having improperly shifted the burden. Am. Compl. ¶ 6, JA-000037. But the placement of the burden is important in the issuance of a patent; patent examiners may reject an application only if "they are able to set forth a *prima facie* case of unpatentability." Manual of Patent Examining Procedure ("M.P.E.P.") § 2103; *see, e.g.*, *In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992) ("If examination at the initial stage does not produce a prima facie case of unpatentability, then without more the applicant is entitled to grant of the patent."). In reversing, the Board determined that the examiner had improperly shifted the burden to applicants to disprove what she was unable to establish – that the β-crystalline form was somehow disclosed by the assumed description of the mesylate salt of imatinib in the '184 patent. Plainly, the issuance of the '051 patent reflects that once the burden was properly placed, a case for obviousness or anticipation could not be made.

to any passage in Zimmermann [the '184 compound patent] disclosing or suggesting applicants' method for making the β-crystalline form, or establishing a reasonable basis for concluding that the methane sulfonic acid addition salt of imatinib meets all limitations of the appealed claims." *Id.* JA-000501.

On December 31, 2003, six weeks after the Patent Board reversed the examiner's rejections and without conducting any further proceedings, the examiner issued a notice of allowance. ADD-009; Am. Compl. ¶ 246, JA-000092. On March 26, 2004, Novartis re-opened prosecution of the application by filing a Continued Prosecution Application, paid the required filing fee, and disclosed to the PTO in an Information Disclosure Statement ("IDS") two additional references: a 1996 article published in *Cancer Research* by Novartis scientists Buchdunger, Zimmermann, Lydon, Druker, and others entitled "*Inhibition of the Ab1 Protein-Tyrosine Kinase in Vitro and in Vivo by a 2-Phenylaminopyrimidine Derivative*" (the "1996 Buchdunger Article")[11] and a 1997 article published in *Bioorganic & Medicinal Chemistry Letters* by Zimmerman, Buchdunger, and others from Novartis' Oncology Research Department, entitled "*Potent and Selective Inhibitors of the Abl-Kinase: Phenylamino-Pyrimidine (PAP) Derivatives*" (the "1997 Zimmermann Article").[12]

---

[11] Buchdunger et al., *Inhibition of the Abl Protein-Tyrosine Kinase in Vitro and in Vivo by a 2-Phenylaminopyrimidine Derivative*, 56 Cancer Research 100-104 (1996), JA-000527-31; *see also* Am. Compl. ¶¶ 159-164, JA-000074-75.

[12] Zimmermann et al., *Potent and Selective Inhibitors of the Ab1-Kinase: Phenylamino-Pyrimidine (PAP) Derivatives*, 7 Bioorganic &

Plaintiffs primarily base their allegations of inequitable conduct on these references. Am. Compl. ¶ 252, JA-000093. Novartis informed the patent examiner that "[t]he publications being submitted disclose that imatinib mesylate was utilized in certain published experiments." March 26, 2004 Preliminary Amendment, JA-000517. Novartis also pointed out that "the Board of Appeals . . . clearly indicates that its decision assumes that the methane sulfonic acid addition salt of imatinib was described in the prior art . . . . Because the presently submitted publications disclose only what the Board of Appeals assumed was in the prior art, Applicants assert that the principles of *res judicata* require that the claims be allowed over the newly submitted publications." *Id.* Neither of these publications described imatinib mesylate in the β-crystalline, or any other, polymorphic form. ADD-025.

Accordingly, two prior art references which Plaintiffs assert were withheld from the PTO were, as the Complaint acknowledges, not withheld at all. With the application back in prosecution before the patent examiner, on May 27, 2004, the examiner signed the IDS submitted by Novartis, individually initialing the entries in the IDS for both the 1997 Zimmermann and 1996 Buchdunger prior art references to show that she considered them prior to allowing the '051 patent to issue. May 27, 2004 List of References Cited by Applicant and Considered by Examiner, JA-000537.

Medicinal Chemistry Letters 187-192 (1997), JA-000521-526; *see also* Am. Compl. ¶¶ 178-180, JA-000077.

The examiner then issued a new Notice of Allowance on June 3, 2004, and Novartis paid the issue fee on September 1, 2004. June 3, 2004 Notice of Allowance and Issue Fee Due, JA-000532-37. On October 21, 2004 Novartis petitioned to withdraw the application from allowance and filed a Request for Continued Examination so that the examiner could consider additional references not at issue here. October 21, 2004 Request for Continued Examination ("RCE") and Petition Under 37 C.F.R. § 1.313(c)(2) to Withdraw Application from Issue, JA-000538-61. Thereafter, on February 3, 2005, the examiner acknowledged the additional prior art references and on February 4, 2005 issued a final Notice of Allowance. February 4, 2005 Notice of Allowance and Fee(s) Due, JA-000662-67. Novartis paid the issue fee on March 7, 2005 and the '051 Patent issued on May 17, 2005, listing on its face both the 1997 Zimmermann and 1996 Buchdunger references among the references considered by the patent examiner during prosecution.

## C.      The Orange Book Listing

The Federal Drug Administration ("FDA") publication, Approved Drug Products with Therapeutic Equivalence Evaluations, or the "Orange Book," lists FDA-approved drug products along with the corresponding patents that cover the drugs. One objective of the Orange Book is to provide would-be generic manufacturers with notice of any patent rights that cover a brand-name drug. The

information published in the Orange Book, however, is based on drug manufacturers' submissions and representations to the FDA. The FDA does not independently determine whether a listed patent actually covers a drug product, and it does not examine the listed patents to ensure their validity.[13] Novartis submitted all three patents – the original '184 patent, the '051 patent, and the '799 patent – to the FDA to be listed in the Orange Book as covering Gleevec®. Am. Compl. ¶ 295, JA-000103.

## D.  **Plaintiffs' Invalidity Allegations**

As the court below explained, the heart of Plaintiffs' allegations is that the claimed non-needle shaped "beta" or β-crystalline polymorphic form of the imatinib mesylate active ingredient in Gleevec® was either anticipated by or obvious over the prior art, rendering the Polymorph Patents invalid. Indeed, Plaintiffs assert in their Complaint as a general matter that the development of different polymorphic forms of a compound is routine and should not be patentable. *Id.* ¶¶ 35-45, 137-38, JA-000044-46.  However, Plaintiffs also acknowledge that "[p]olymorphism is

---

[13]  Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), a drug manufacturer must obtain FDA approval to market a drug product by filing a New Drug Application ("NDA").  The FDA will approve the NDA if the drug applicant is able to demonstrate that the drug is safe and effective to treat a particular condition. Within thirty days after the FDA approves an NDA, the drug applicant must submit a "Form 3542" to the FDA, disclosing all patents that it believes are implicated by its new drug.  21 C.F.R. § 314.53(b)(1).  If, however, there are no relevant patents that could reasonably be asserted, the applicant is also required to disclose this information. *Id.* § 314.53(c)(3).

important in the development of pharmaceutical ingredients." *Id.* ¶ 35, JA-000044. This is unassailable: the FDA has issued a specific Guidance for Industry on polymorphism in active pharmaceutical ingredients explaining that different polymorphic forms of the same compound can have significantly different properties, *supra* n.5; the PTO routinely issues patents claiming polymorphic forms of pharmaceutical compounds and the FDA expressly provides for listing patents claiming polymorphs in the Orange Book.[14]

Plaintiffs further allege that during prosecution of the Polymorph Patents, Novartis attempted to conceal from the PTO the fact that the mesylate salt of imatinib had been described in the prior art. *Id.* ¶¶ 252-58, JA-00093-95. The district court noted that in support of this claim, the Complaint asserts that Novartis specifically withheld five prior art references: the 1996 Buchdunger Article, the 1997 Zimmerman Article and three additional articles (ADD -010-11):

(1)     A 1996 article published in *Nature Medicine* by Druker, Buchdunger, Zimmerman, Lydon, and others entitled "*Effects of a Selective Inhibitor of the Abl Tyrosine Kinase on the Growth of Bcr-Ab1*

---

[14]     FDA Form 3542a, "Patent Information Submitted with the Filing of An NDA, Amendment, or Supplement," provides for listing patents claiming polymorphic forms of the active ingredient of drug products in the Orange Book. http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM048352.pdf.

*Positive Cells*" (the "1996 Druker Article").  *See* Am. Compl. ¶ 172, JA-000076.

(2)    A 1995 presentation that Druker gave at the American Society of Hematology's annual meeting in Seattle, entitled "*Preclinical evaluation of a selective inhibitor of the Abl tyrosine kinase as a therapeutic agent for chronic myelogenous leukemia*" (the "1995 Druker Presentation"). *See id.* ¶¶ 157-58, JA000073-74.

(3)    A 1996 article published in *Bioorganic & Medicinal Chemistry Letters* by Zimmerman, Buchdunger, Lydon, and others entitled "*Phenylamino-Pyrimidine (PAP) – Derivatives: A New Class of Potent and Highly Selective PDGF-Receptor Autophosphorylation Inhibitors*" (the "1996 Zimmerman Article").  *See id.* ¶¶ 165-67, JA-000075-76.

The Complaint acknowledges – as it must – (i) that the PTO Board of Appeals determined that the Polymorph Patents claimed patentable subject matter even though the Board assumed the very fact that Plaintiffs assert Novartis withheld – that the prior art described the mesylate salt of imatinib (*id.* ¶¶ 240-45, JA-000091-92); and (ii) that Novartis submitted two of the prior art references describing the existence of the mesylate salt of imatinib – the 1996 Buchdunger Article and the 1997 Zimmerman Article (*Id.* ¶ 252; JA-000093) – more than a year

before the PTO issued the first of the Polymorph Patents in May 2005.  *Id.*
¶¶ 252-58, JA-000093-95.

## E.    The Sun Litigation and Settlement

Several generic manufacturers filed Abbreviated New Drug Applications ("ANDAs") seeking FDA approval to market generic versions of Gleevec® before the expiration of the Polymorph Patents.  Sun filed the first ANDA on June 16, 2006 (*id.* ¶ 283, JA-000100-01), which certified under the Hatch-Waxman Act, 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV Certification"), that in its opinion the '051 polymorph patent was invalid or would not be infringed.  Sun did not challenge the validity of the '184 compound patent, and thus did not seek FDA approval until after the exclusivity based on the '184 patent expired, on July 4, 2015.  *Id.*  Sun subsequently notified Novartis that it had filed an ANDA with a Paragraph IV Certification.  *Id.* ¶ 285, JA-000101.

On June 7, 2013, Sun sued Novartis, seeking a declaratory judgment that its planned generic imatinib product would not infringe the '051 patent and/or that the '051 patent was invalid (the "Sun Litigation").[15]  *Id.* ¶ 303, JA-000105.

---

[15]    Sun sought a declaratory judgment against Novartis AG and NPC based on 35 U.S.C. § 271(e)(5), which authorizes a party that has filed an ANDA referencing a drug covered by a patent listed in the Orange Book to seek declaratory judgment that such patent is invalid or not infringed, if the holder of the patent has not brought an infringement suit within 45 days of receiving notice of the application. *Sun Pharma Global FZE v. Novartis Pharms. Corp.*, No. 13-cv-3542, (Dkt. #1) at ¶ 11 (D.N.J. 2013), Supplemental Appendix ("SA"), SA-00093.

Novartis answered and counterclaimed, alleging infringement of the '051 patent and seeking a declaration that the patent was valid and enforceable. *Id.* ¶ 304; *see also* Answer and Counterclaims of Novartis Pharmaceuticals Corporation and Novartis AG, SA000102-15. On May 15, 2014, the parties settled and announced publicly that Novartis had agreed to grant Sun a license to market its generic commencing prior to the '051 patent's expiration. Am. Compl. ¶ 308, JA-000105-06.[16] The court accordingly dismissed the case, without ever calling into question the validity of the '051 patent. *Id.*[17]

**F.    Procedural History and the Decision Below**

The end payor plaintiffs, on behalf of a putative class of health plans that purchase drugs from other healthcare providers for their beneficiaries, originally brought an action for injunctive relief, seeking an order directing Novartis to allow immediate entry of generic Gleevec®. Novartis moved to dismiss, and while its motion was pending, Sun entered the market pursuant to the terms of the settlement. Sun's entry mooted the request for injunctive relief, and, at the district court's direction, the end payor plaintiffs filed an amended complaint seeking damages

---

[16] The RE932 patent was not challenged in Sun's declaratory judgment complaint and was not part of the Sun Litigation.

[17] There were no substantive rulings in the Sun Litigation. Am. Compl. ¶ 308, JA-000105.

under the laws of 23 states and the District of Columbia.[18]  RXDN, Inc. filed a

complaint on November 23, 2016 on behalf of a putative class of direct purchasers,

asserting the same allegations under federal antitrust laws.[19]

The district court dismissed all claims in the end payors' complaint on

June 30, 2017,[20] under Fed. R. Civ. P 12(b)(6).  The court held that Plaintiffs failed

to allege a plausible sham litigation claim, reasoning that a "merely plausible patent

invalidity claim is not enough to support a plausible sham litigation claim."

ADD-024.  The court held that Plaintiffs had failed to plausibly allege that Novartis'

litigation with Sun was objectively baseless, finding that "[e]ven on the facts alleged

in the [Complaint], Novartis had a colorable claim that the '051 Patent was valid and

enforceable."[21]  *Id.*  The court also held that the Complaint failed to allege a

---

[18]  The indirect purchaser plaintiffs are prohibited from recovering damages under federal antitrust law.  *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977).  As a result, their complaint asserts sham litigation and *Walker Process*-type fraud allegations under the laws of various states that purportedly permit indirect purchaser damages claims.

[19]  Because the direct purchaser claims asserted by RXDN rested on the same theories as the end payors' claims, RXDN agreed to stay its action pending a determination of Novartis' motion to dismiss the end payors' complaint.

[20]  The court granted the end payors' motion for final entry of judgment on July 18, 2017.  *See* SA-00090.

[21]  Novartis also moved to dismiss Plaintiffs' sham litigation claim on the ground that Plaintiffs cannot proceed with this claim without invalidating the patent, and that as purchasers of a patented product, Plaintiffs did not have standing to challenge the validity or enforceability of a patent in the first instance.  *See Cat Tech v. TubeMaster, Inc.*, 528 F.3d 871, 881 (Fed. Cir. 2008) (only potential infringers or parties having taken "significant, concrete steps to conduct infringing

plausible *Walker Process* claim, finding that Plaintiffs had failed to sufficiently allege materiality and intent.[22] *Id.* at 30-31. This appeal followed.[23]

<h2 style="text-align:center">SUMMARY OF ARGUMENT</h2>

The district court correctly held that Plaintiffs failed to state plausible antitrust claims based on sham litigation and *Walker Process*-type fraud.

The Complaint fails to allege facts that would support a plausible claim that Novartis' counterclaim to enforce its patent was objectively baseless when filed; the patent's validity is not alleged to have been tarnished in any prior proceeding,

---

activity" have standing to challenge the validity of a patent in court). The district court did not address this issue because it held that Plaintiffs failed to satisfy the pleading requirements for sham litigation. It is well-settled that, in reviewing a district court's dismissal pursuant to Rule 12(b)(6), this Court may "affirm on any basis supported by the record[,]" *Carroll v. Xerox Corp.*, 294 F.3d 231, 241 (1st Cir. 2002), including when the district court's order was "correct for any reason, even a reason not considered by the district court." *In re Pub. Serv. Co. of N.H.*, 879 F.2d 987, 989 (1st Cir. 1989) (citation omitted). Plaintiffs' lack of standing is an alternative ground for affirmance.

[22] Novartis also argued that, as indirect purchasers, the end payor plaintiffs lacked standing to assert their *Walker Process*-type state law claims. *See, e.g.*, *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 711 (9th Cir. 2003) ("Only an actual competitor or one ready to be a competitor can suffer antitrust injury"); *In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522, 529 (D.N.J. 2004) (denying standing to direct plaintiffs on the ground that "a party does not gain standing to assert a *Walker Process* claim until the patent holder has taken some action to enforce the patent against that party"). The court below did not reach this issue because it held that the end payor plaintiffs' *Walker Process*-type claims were subject to dismissal on other grounds.

[23] After the district court granted Novartis' motion to dismiss the indirect purchaser complaint, RXDN moved for entry of judgment dismissing its complaint, filed a notice of appeal and joined in this appeal.

and no other facts are alleged that would cause an objective patent owner to conclude that the patent was almost certain to be invalidated. Plaintiffs cannot overcome those deficiencies with their own invalidity theories, even if they would be sufficient to survive dismissal in a patent case; a sham litigation claim requires facts that would show the case was frivolous when filed, not that it would have been unsuccessful.

The district court was also correct in dismissing Plaintiffs' *Walker Process*-type fraud claims. The Complaint fails to allege facts that would establish that the patent would not have issued but for Novartis' alleged omissions and misrepresentations. It acknowledges that the prior art on which Plaintiffs principally rely was disclosed to the Patent Office before the patent issued, and fails to explain how and why Novartis' statements, had they not been made, would have resulted in the denial of its application. The Complaint's allegations with respect to Novartis' intent are deficient for similar reasons; an applicant's disclosure of the prior art that is alleged to prevent patentability cannot give rise to a reasonable inference of fraudulent intent.

## ARGUMENT

## I. APPLICABLE LEGAL STANDARDS

### A. Standards Governing This Appeal

Whether a complaint alleges sufficient facts to state a claim on which relief can be granted is reviewed *de novo*. *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 101 (1st Cir. 2013). A complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In considering a motion to dismiss, a court is to accept as true all well-pleaded factual allegations and draw all reasonable inferences in plaintiff's favor. *See Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999). The same is not true for conclusory legal allegations; a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly,* 550 U.S. at 555 (citation and quotation marks omitted). Accordingly, to assess the sufficiency of a complaint, the court must first "distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir.) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).

Additionally, the court need not accept as true factual allegations that are contradicted by facts of which the court may take judicial notice. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). A court may consider "implications from documents attached to or fairly incorporated into the complaint . . . facts susceptible to judicial notice . . . [and] concessions in plaintiff's response to the motion to dismiss." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55-56 (1st Cir. 2012); *see also Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 2004) (in ruling on a motion to dismiss, the court "must consider the complaint, documents annexed to it, and other materials fairly incorporated within it[,]" which "sometimes includes documents referred to in the complaint but not annexed to it" and "matters that are susceptible to judicial notice").

## B.  Standards Governing Sham Litigation

The First Amendment guarantees the rights of citizens to petition the government for the redress of grievances, without regard to the motives underlying the petition. U.S. Const. amend. I. Consistent with these principles, the *Noerr-Pennington* doctrine immunizes efforts to influence government, including courts, from antitrust liability. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *see also PREI*, 508 U.S. at 57. A "narrow" exception established in *PREI* exists for "sham" litigation that is (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits";

and (2) subjectively motivated by a desire to "interfere *directly* with the business relationships of a competitor, through the use of the governmental *process* – as opposed to the outcome of that process – as an anticompetitive weapon." 508 U.S. at 60-61 (citation and quotation marks omitted). A suit brought with probable cause does not qualify as a sham, and the party filing it is accordingly immune under *Noerr-Pennington*. *Id*. at 54. Probable cause "requires no more than a 'reasonable belief that there is a chance that a claim may be held valid upon adjudication.'" *Id*. at 62 (citation omitted).

The *PREI* standards are particularly difficult to satisfy where sham claims are premised on allegedly baseless patent litigation. A presumption exists that patent infringement actions are brought in good faith. *See C.R. Bard, Inc. v. M3 Sys.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998) ("The law recognizes a presumption that the assertion of a duly granted patent is made in good faith."). Accordingly, "[g]iven the presumption of patent validity and the burden on the patent challenger to prove invalidity by clear and convincing evidence, it will be a rare case in which a patentee's assertion of its patent in the face of a claim of invalidity will be so unreasonable as to support a claim that the patentee has engaged in sham litigation." *Tyco Healthcare*, 762 F.3d at 1345.

A litigant is not subject to antitrust liability even when he loses the case alleged to be a sham; in *PREI*, the Supreme Court cautioned that "when the antitrust

defendant has lost the underlying litigation, a court must 'resist the understandable temptation to engage in post hoc reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation.'" 508 U.S. at 60 n.5 (citation omitted). In light of the presumption that infringement actions are brought in good faith, a "patentee must have the right of enforcement of a duly granted patent, unencumbered by punitive consequences should the patent's validity or infringement not survive litigation," except in the rare case in which objective baselessness is shown. *C.R. Bard*, 157 F.3d at 1369.

C. **Standards Governing Patent Cases**[24]

In a patent infringement case, invalidity must be proved by clear and convincing evidence. *C.R. Bard,* 157 F.3d at 1351. Obviousness requires determinations with regard to "(1) the scope and content of the prior art, (2) the level of ordinary skill in the field of the invention, (3) the differences between the claimed invention and the prior art, and (4) any objective evidence of nonobviousness, such as long felt need, commercial success, the failure of others, or copying." *Id.* The

---

[24] The question in this case is whether Plaintiffs adequately pleaded a plausible antitrust case premised on sham litigation and *Walker Process* fraud. Evaluating the sufficiency of Plaintiffs' sham claim requires a determination of whether a reasonable patent holder in Novartis' position would have perceived a chance of prevailing in the underlying patent litigation. That determination involves an assessment of how a patent holder, cognizant of the legal standards applicable to a patent infringement case, would have assessed its chances of winning. The standards governing patent cases are relevant to that question, and are accordingly set forth here.

ultimate determination of obviousness is a question of law. *Id.* Invalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation. *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).

### D. <u>Standards Governing *Walker Process* Fraud Claims</u>

In *Walker Process Equip., Inc. v. Food Mach. and Chem. Corp.*, 382 U.S. 172 (1965), the Supreme Court held that the enforcement of a patent procured by fraud on the PTO may subject the patent holder to antitrust liability under Section 2 of the Sherman Act, 15 U.S.C. § 2. *Id.* at 174. The opinion dismissed concerns that expanding antitrust claims to include such a theory would subject patent holders to "innumerable vexatious suits" by making clear that it was limited to "a special class of patents, *i.e.*, those procured by intentional fraud." *Id.* at 176. In a concurring opinion, Justice Harlan underscored that a claim would not be made out if the plaintiff "showed no more than invalidity of the patent arising, for example, from a judicial finding of 'obviousness,' or from other factors sometimes compendiously referred to as 'technical fraud.'" *Id.* at 179. He explained that:

> [T]o hold, as we do not, that private antitrust suits might also reach monopolies practiced under patents that for one reason or another may turn out to be voidable under one or more of the numerous technicalities attending the issuance of a patent,

might well chill the disclosure of inventions through the obtaining of a patent because of fear of the vexations or punitive consequences of treble-damage suits. Hence, this private antitrust remedy should not be deemed available to reach § 2 monopolies carried on under a nonfraudulently procured patent.

*Id.* at 180. The lower courts[25] have accordingly applied a stringent stardard to claims based on *Walker Process*:

Deceptive intent is not inferred simply because information was in existence that was not presented to the examiner; and indeed, it is notable that in the usual course of patent prosecution, many choices are made, recognizing the complexity of inventions, the virtually unlimited sources of information, and the burdens of patent examination.

*C.R. Bard*, 157 F.3d at 1365; *see also Cataphote Corp. v. DeSoto Chem. Coatings, Inc.,* 450 F.2d 769 (9th Cir. 1991) ("The road to the Patent Office is so tortuous and patent litigation is usually so complex, that 'knowing and willful fraud' as the term is used in *Walker*, can mean no less than clear, convincing proof of intentional fraud involving affirmative dishonesty, 'a deliberately planned and carefully executed scheme to defraud . . . the Patent Office.'") (citation omitted).

*Walker Process* fraud requires an antitrust plaintiff to establish, by clear and convincing evidence, that the defendant procured the relevant patent by knowing and willful fraud on the PTO. This requires proof of "(1) a false representation or deliberate omission of a fact material to patentability, (2) made

---

[25] Whether conduct in procuring a patent rises to the level of *Walker Process* fraud is decided under Federal Circuit law. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998).

with the intent to deceive the patent examiner, (3) on which the examiner justifiably relied in granting the patent, and (4) but for which misrepresentation or deliberate omission the patent would not have been granted." *C.R. Bard, Inc.*, 157 F.3d at 1364. To successfully plead a *Walker Process* claim, the plaintiff must allege facts from which the court can infer all four of the enumerated elements. *ESCO Corp. v. Cashman Equip. Co.*, 158 F. Supp. 3d 1051, 1074 (D. Nev. 2016). Where the alleged fraud is based on an omission, "there must be evidence of intent separable from the simple fact of the omission." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007).

A finding of inequitable conduct is required, but not sufficient, to support a claim of *Walker Process* fraud. *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1417 (Fed. Cir. 1987). The elements are similar to the elements for *Walker Process* fraud. Materiality for inequitable conduct purposes is also "but-for materiality." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011). This means that "[w]hen an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.*[26] With respect to intent, the court

---

[26] In view of its *Therasense* decision, the Federal Circuit has since observed that the "showing required for proving inequitable conduct and the showing required for proving the fraud component of *Walker Process* liability may be nearly identical." *Transweb LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1307 (Fed. Cir. 2016).

in *Therasense* held that in a case "involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." *Id*. at 1290 (citation and quotation marks omitted). "[A] district court may not infer intent solely from materiality." *Id*. The Federal Circuit has emphasized that the party alleging a *Walker Process* fraud claim must "present evidence of [its] own . . . which affirmatively shows [the opposing party's] fraudulent intent." *Dippin' Dots*, 476 F.3d at 1348.

Both *Walker Process* fraud and inequitable conduct are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b). "To plead the 'circumstances' of inequitable conduct with the requisite 'particularity' under Rule 9(b), the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc*., 575 F.3d 1312, 1328 (Fed. Cir. 2009). Pleading inequitable conduct requires the plaintiff to "identify the particular claim limitations, or combination of claim limitations, that are supposedly absent from the information" cited during examination, to "explain both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims." *Id*. at 1329-30. In addition, "a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a

specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO." *Id*. at 1328-29; *see also Lexington Luminance LLC v. Osram Sylvania Inc.*, 972 F. Supp. 2d 88, 91-92 (D. Mass. 2013).

## II.     THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' SHAM LITIGATION CLAIM

The district court properly concluded that the Complaint fails to state a plausible sham litigation claim. To fall within the sham exception to *Noerr-Pennington*, a challenged lawsuit must be objectively baseless from the outset, brought for the purpose of injuring a competitor. If an objective litigant would perceive even a chance of winning, the lawsuit is not a sham, and the litigant is immune from antitrust liability:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part . . . the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor, through the use of the governmental *process* – as opposed to the outcome of that process – as an anticompetitive weapon. This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability.

*PREI*, 508 U.S. at 60-61 (internal quotation marks, citations, alteration, and footnote omitted). The Complaint fails to allege facts that would satisfy the "objectively baseless" prong of this test, obviating the need to address its allegations regarding Novartis' motivation for filing its counterclaim. Plaintiffs' sham claim therefore was appropriately dismissed.

A. **The Complaint Does Not Plausibly Allege that Enforcement of the Gleevec® Patent Was Objectively Baseless**

Plaintiffs premise their sham claim on allegations that Novartis' '051 patent would have been invalidated had the parties to the Sun Litigation continued to litigate. They argue that "as discovery would bear out," the invention would have been shown to be inherently anticipated or obvious, and a court would "ultimately" have found the '051 patent invalid. App. Br. at 3. This is not sufficient to plead an antitrust claim premised on sham litigation.

The question in a sham case is not, as Plaintiffs would have it, whether the lawsuit alleged to be a sham would have succeeded. Rather, it is whether, from the standpoint of a neutral observer, there was probable cause to sue at the outset, based on information available at the time. "[T]he essential question is not whether the suit succeeds, but whether the suit was a sham at the time it was filed." *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 148 (3d Cir. 2017); *see also Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1093 (Fed. Cir.

1997) (objective baselessness evaluated "in light of . . . information [available] at the time of filing").

To answer this question, antitrust courts routinely consider the record of the allegedly baseless case to make a judgment as to whether the litigant's position was reasonable. *See, e.g.*, *Covad Commc'n Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005) (considering decisions in underlying patent case in affirming dismissal of sham claim, while acknowledging that the fact that the patentee lost "tells us little about whether [its] patent suit lacked objective merit"). Some courts have even suggested that the inquiry should be confined to the record in the underlying case: "'[a] finding of objective baselessness is to be determined by the record made in the infringement proceedings.'" *In re AndroGel Antitrust Litig. (No. II)*, 888 F. Supp. 2d 1336, 1344 (N.D. Ga. 2012) (quoting *iLOR, LLC v. Google, Inc.,* 631 F.3d 1372, 1380 (Fed. Cir. 2011)). An adverse finding in the case alleged to be a sham, however, is not dispositive. *PREI*, 508 U.S. at 60 n.5 (quoting *Christiansburg*, 434 U.S. at 421-22).

**B.** **Plaintiffs Allege No Prior Findings Questioning the Patent at Issue**

The Complaint does not, because it cannot, allege that the '051 patent was invalidated or "tarnished" in any other proceeding. Am. Compl. ¶ 308, JA-000105-06. There are no findings in the Sun Litigation that would support an

inference as to whether a reasonable litigant could realistically have expected to succeed, and the patent's validity has not been adjudicated in any other case.

The absence of such prior findings resulted in dismissal of sham allegations as implausible in four other district court cases: *In re Lantus Direct Purchaser Antitrust Litig.*, No.-12652, 2018 WL 355372, at *13 (D. Mass. Jan. 10, 2018) (dismissing sham allegations in the absence of prior adverse findings, reasoning that while a prior finding of invalidity or unenforceability "is not a prerequisite to a claim of sham litigation, it is not irrelevant: patents are presumed to be valid, and patent holders are entitled to enforce their rights under their patents, so parties claiming sham litigation must overcome these presumptions."); *Picone v. Shire PLC*, No. 16-cv-12396, 2017 WL 4873506, at *7 (D. Mass. Oct. 20, 2017) (purchasers' claims "that the Intuniv Patents were 'weak' or that after the litigation began, they appeared likely to be invalidated, do not plausibly suggest that Shire's initiation of the litigation was objectively baseless"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2015 WL 5458570, at *11 (D. Mass. Sept. 16, 2015) ("The '838 Patent has never been invalidated by any court and was upheld by the PTO after re-examination so it was objectively reasonable for Medicis to believe that it had a chance of prevailing in its infringement suits.") and *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 1:13-cv-00740, 2013 WL 6682981, at *24 (E.D. Va. Dec. 18, 2013) (dismissing sham counterclaim where

counterclaimant did "not allege any specific litigation history to support that claim or identify any patents . . . that have expired, been cancelled or adjudicated to be invalid.").

The court here agreed that the absence of allegations that the patent had been "tarnished" in some prior proceeding weighed against any plausible inference that a patent holder would have concluded that an infringer would be certain to prevail in rebutting the presumption of validity. In so doing, the court specifically "decline[d] to adopt a bright-line rule requiring that a patent be invalidated or tarnished before a plaintiff can allege a sham litigation claim." ADD-023. It reasoned, however, that "it is difficult to conceive of a scenario in which a sham litigation claim would go forward without the patent having been invalidated or otherwise tarnished."[27] *Id.*

Indeed, no court has allowed a sham case to proceed based solely on an antitrust plaintiff's novel and untested theory as to why a patent is invalid. Any clever antitrust plaintiff could devise a theory under which a patent might be invalid, even a plausible one with which a patent court might ultimately agree. But the question here is whether a neutral patentee, confronted with Sun's allegation that "all claims of the '051 patent are not infringed and/or invalid" (Complaint, *Sun*

---

[27] Plaintiffs suggest that the court nevertheless did apply a bright-line rule when it "relied on this logic to dismiss the purchasers' sham claim." App. Br. at 46. This is incorrect; the opinion reflects that the court simply took into account the undisputed fact that the patent had not been tarnished. ADD-027.

*Pharma Global FZE v. Novartis Pharmaceuticals Corp., et al.*, SA-000091-101),

would have perceived a chance of prevailing on a counterclaim.[28]  Plaintiffs cite

nothing from the record of any prior judicial proceeding that would have caused a

reasonable patent holder, in considering how to respond to Sun's complaint, to

conclude that a ruling in Sun's favor was a foregone conclusion.  Nor do Plaintiffs

point to any findings in any subsequent proceeding that would suggest that the

decision to defend the patent was unreasonable.  The Complaint's failure to allege

some objective basis, independent of Plaintiffs' own invalidity arguments premised

on their own construction of the prior art, for why a neutral observer would have

perceived no chance of successfully enforcing the patent renders their sham

allegations implausible under *Twombly*.

  The cases cited by Plaintiffs in a chart at page 47 of their brief are not to

the contrary.  In each case, something in the prior patent litigation proceedings

presented a concrete basis for questioning whether the patent was valid and

infringed, and therefore a basis in the pleadings from which to infer that the

litigation to enforce it was meritless.  In both *In re Loestrin 24 Fe Antitrust Litig.*,

261 F. Supp. 3d 307, 320-23 (D.R.I. 2017) and *In re Thalomid & Revlimid Antitrust*

---

[28] Novartis' counterclaim was compulsory. *See Tdata Inc. v. Aircraft Tech. Publishers.*, Nos. 2:03-cv-264, 2:04-cv-1072, 2006 WL 1133313, at \*7 (S.D. Ohio April 26, 2006) (declining to find a counterclaim for validity objectively baseless because it was compulsory under Fed. R. Civ. P. 13(a), reasoning that if the patentee had "failed to bring its counterclaim it may have very well lost its ability to protect its patents against infringement in the future.").

*Litig.*, Civil No.: 14-6997, 2015 WL 9589217, at *12 (D.N.J. Oct. 29, 2015), the plaintiffs alleged that the parties entered into reverse payment settlements, which were found to provide a plausible basis to question whether the patent holder had probable cause to sue. Plaintiffs have not challenged the lawfulness of the settlement here.

*In re AndroGel Antitrust Litig. (No. II)*, 687 F. Supp. 2d 1371 (N.D. Ga. 2010), and *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000), involve claims that the patent holder lacked a reasonable basis for asserting that the generic's product actually infringed – an issue that almost inevitably presents a question of fact. In *AndroGel*, the district court permitted the sham claim to proceed based on the antitrust plaintiff's allegations that the generic plainly did not infringe the patent as written, which, if taken as true, would have made the patent holder's infringement claim frivolous. The patent holder (now the antitrust defendant) had argued that had there not been a mistake in drafting the patent, the generic's product would literally infringe, and that it had a reasonable belief when it claimed infringement that the mistake could be corrected by the patent court. The antitrust court deemed these arguments to raise factual issues that could not be resolved at the pleading stage. *Id.* at 1380. Following discovery, and based upon subsequent case law, the *AndroGel* court concluded that the patent case was not sham litigation and granted summary judgment in favor of the antitrust defendant.

888 F. Supp. 2d at 1345-55.  No such factual issues regarding infringement are alleged in the Complaint, making *AndroGel* entirely irrelevant here.

*Cardizem CD* also involved factual issues regarding the basis for the patent holder's position on infringement.  Plaintiffs there alleged that the patent holder continued litigation even after the generic amended its ANDA to specify a dissolution profile that the patent holder had specifically excluded during its prosecution of the patent.  *Id.* at 632.  The court found that these allegations supported an inference that continued litigation of the infringement claim was objectively and subjectively baseless.  *In re Effexor Antitrust Litig.*, No. 11-5479, 2014 WL 4988410, at *10 (D.N.J. Oct. 6, 2014), did involve the legal question of validity, but in that case there *was* an allegation of "tarnish," and so the sham claim had some plausible basis on which to proceed.  The antitrust plaintiffs alleged that the court in the underlying patent case had issued a *Markman* ruling that would have caused the patent holder to conclude that "loss of the litigation was right around the corner."  *Id.* at *10.

In none of these cases did the court permit an antitrust plaintiff to proceed solely on the basis of its own novel theories of invalidity where there were no prior adverse findings and nothing was alleged to be suspicious about the circumstances of the settlement.  Yet that is all Plaintiffs offer here.  This is not enough to satisfy *Twombly*.  *See Asahi Glass*, 289 F. Supp. 2d  at 992 ("If, however,

there is nothing suspicious about the circumstances of a patent settlement, then to prevent a cloud from being cast over the settlement process a third party should not be permitted to haul the parties to the settlement over the hot coals of antitrust litigation.").

### C. Plaintiffs May Not Create the Missing Factual Predicate in This Case

Deprived of any findings from any other proceeding or anything other than their own invalidity theory, Plaintiffs attempted to convince the court to give them an opportunity to create a factual predicate for their sham claim.  Upon filing the Complaint, they urged the district court to conduct a full-blown patent hearing on an expedited basis to determine what they characterize here as "the one core issue that needs to be decided:  Was Novartis's selection of a non-needle form of imatinib mesylate in the mid-1990s a patentable invention?"  Joint Statement of Plaintiffs and Defendants Pursuant to July 16, 2015 Order, SA-000005-06.  In making this telling request, Plaintiffs conceded the insufficiency of their sham claim; if an evidentiary hearing is required to resolve the issue of patentability, then a reasonable patent holder could have perceived some chance of prevailing in the Sun Litigation.  That should end the issue.

Plaintiffs' effort to substitute their subjective view for an objective finding invalidating the patent continues on appeal:

> To prove obviousness, all the purchasers must show here is that an ordinary pharmaceutical chemist would have been motivated to convert the needle crystal into its non-needle form and would have known how to do so with minimal experimentation. . . . . *Under the purchasers' construction of the prior art*, there is no question that, if litigation proceeded to a decision on the merits, the second patent would have been held invalid for obviousness.

App. Br. at 37 (emphasis added; citations omitted). Plaintiffs' argument fails for multiple reasons, as the court below properly concluded.

First, as the district court observed, Plaintiffs confuse what is required to plead a plausible patent invalidity claim with what is required to plead a plausible sham antitrust claim. The question is not what ultimately would have happened in the Sun Litigation had Sun advanced, and the court there accepted, Plaintiffs' reading of the prior art; rather, the question is whether a reasonable patent holder would have concluded that there was no defensible basis for litigating the issue from the outset. This case requires plausible allegations not that the patent was invalid, but that the case for validity was so weak that defending it would be frivolous.

The Complaint fails to satisfy this standard. Plaintiffs' request for a hearing to determine the "core issue" of patentability makes this clear; the Complaint's allegations do not rule out a chance that the patent may be valid, and that is all that was required for probable cause. Equally misguided is Plaintiffs' insistence on appeal that Sun would have prevailed under "purchasers' construction of the prior art." *Id.* Plaintiffs' construction of the prior art is not the only possible

one, and a patent holder in Novartis' position would not have been obliged to assume that Plaintiffs' construction of the prior art would be adopted when evaluating whether to enforce the patent.[29] In any event, even assuming that Plaintiffs' construction of the prior art is correct, they have at best merely stated a plausible case for invalidity. A plausible sham claim requires facts that would compel the conclusion that the patent had virtually no chance of surviving. "Neither the bringing of an unsuccessful suit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust liability." *C.R. Bard*, 157 F.3d at 1369.

Second, Plaintiffs lack standing to mount a judicial challenge to the validity of a patent in order to establish a basis for a putative antitrust claim.[30] They cannot make up for the Complaint's lack of an existing factual basis for their sham claim by constructing one in this case. Only potential infringers or parties having taken "significant, concrete steps to conduct infringing activity" have standing under

---

[29] Notably, the Complaint contains no allegation that "Plaintiffs' construction" of the prior art had been alleged by Sun or anyone else, making implausible the notion that an objective patent holder would necessarily conceive of it, let alone be certain that a court would agree with it.

[30] Plaintiffs could have challenged the validity of the '051 patent in the PTO. Congress has created two avenues for parties dissatisfied with the issuance of a patent to challenge it administratively: the Inter Partes Review procedure created by the America Invents Act, 35 U.S.C. § 311 *et seq.*, and Ex Parte Reexamination. *See* 35 U.S.C. §§ 303-307. Plaintiffs have not pursued either of these administrative avenues.

the Patent Act to challenge the validity of a patent in court. *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 880 (Fed. Cir. 2008). Plaintiffs fall into neither category.

Plaintiffs cannot avoid this statutory limitation by couching an attack on patent validity in an antitrust claim. Judge Posner, sitting as a district judge, addressed a supplier's attempt to challenge a patent in *Asahi Glass*, 289 F. Supp. 2d at 990-91. The plaintiff, Asahi, was a supplier of the active ingredient used in generic versions of GlaxoSmithKline's Paxil. Glaxo had previously sued both Pentech, which sought approval for a generic version of Paxil, for patent infringement, and Asahi, claiming that it had induced infringement of Glaxo's patent. *Id*. at 988. Glaxo settled its dispute with Pentech by granting it a license to resell branded Paxil, and the claim against Asahi was dismissed. *Id*. at 989. Glaxo brought a second case before Judge Posner against Apotex, another generic manufacturer, based on the same patent (the '723 patent). Judge Posner ruled that the '723 patent was valid, but not infringed. *Id*.

That ruling was on appeal when Asahi, the supplier (which as a result of Glaxo's and Pentech's settlement was no longer needed), brought its own case seeking a declaration that the '723 patent was invalid. *Id*. Asahi also challenged the settlement between Glaxo and Pentech as an unlawful market division agreement under the antitrust laws. It alleged that Glaxo's enforcement actions would deter

other manufacturers from sourcing the ingredient from Asahi. *Id*. at 990. The court, questioning Asahi's standing as a supplier to seek a declaration that the patent was invalid, dismissed Asahi's patent claim for lack of subject matter jurisdiction, characterizing it as a request for an advisory opinion. *Id*. at 989-90. The court reasoned that while Asahi's prospective customers might someday have a legitimate fear of being sued by Glaxo for patent infringement, that was not the case for Asahi. *Id*. at 990.

Particularly relevant here, Judge Posner also dismissed Asahi's sham litigation and *Walker Process* claims under Fed. R. Civ. P. 12(b)(6). Admonishing that "to avoid turning every patent case into an antitrust case, some threshold of plausibility must be crossed at the outset before a patent case should be permitted to go into its inevitably costly and protracted discovery phase," the court stressed that whether "a suit is a sham depends not on what the patentee believes but 'on the nature of and the underlying merits of the patentee's case.'" *Asahi Glass*, 289 F. Supp. 2d at 995 (quoting *FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 936 (Fed. Cir. 1995)). The court found that Glaxo had a colorable infringement claim against both defendants, and that the suit was not objectively baseless. *Id*.

Specifically, the court rejected invalidity allegations as insufficient to support an antitrust attack on a settlement agreement:

> It is true that Asahi *alleges* that the defendants knew when they settled that Pentech's amorphous paroxetine product would not

infringe patent 723, true that factual allegations in a complaint are *normally* assumed to be true for purposes of deciding a motion to dismiss the complaint for failure to state a claim, and true too that I ruled in the *Apotex* case that Apotex had not infringed patent 723 – and if Apotex's product did not infringe 723, it is unlikely that Pentech's would. But the private thoughts of a patentee, or of the alleged infringer who settles with him, about whether the patent is valid or whether it has been infringed is not the issue in an antitrust case. A firm that has received a patent from the patent office . . . and thus enjoys the presumption of validity that attaches to an issued patent, 35 U.S.C. § 282, is entitled to defend the patent's validity in court, to sue alleged infringers, and to settle with them, whatever its private doubts, unless a neutral observer would reasonably think either that the patent was almost certain to be declared invalid, or the defendants were almost certain to be found to have not infringed it, if the suit went to judgment. It is not "bad faith" to assert patent rights that one is not certain will be upheld in a suit for infringement pressed to judgment and to settle the suit to avoid risking the loss of the rights. No one can be *certain* that he will prevail in a patent suit.

*Id*. at 992-93 (citations omitted).

Plaintiffs' invalidity allegations are in all relevant respects no different from those that were rejected in *Asahi Glass*. Plaintiffs allege that "Novartis knew that the '051 patent was invalid for obviousness and anticipation" and that it settled to avoid an adverse ruling in the patent case. Am. Compl. ¶¶ 306-07, JA-000105. While they do not allege that the Sun Litigation settlement is unlawful in itself, they argue that the patent's weakness can be inferred from the fact that Sun was allowed to enter before the patent expired. App. Br. at 53-54. As Plaintiffs would have it, the earlier a patent holder allows competition, the greater its exposure to antitrust liability. Plaintiffs' insinuation that there is something sinister about the fact that

Novartis settled all of its patent cases involving the '051 patent before any rulings on the merits is equally specious. App. Br. at 23. The fact that the parties settled patent litigation before the court addressed dispositive motions does not create an inference that the litigation lacked merit; indeed, an equally plausible inference is that an accused infringer who was confident that the patent would be invalidated would not have settled at all. As a result, the only reasonable inference to be drawn from the fact of settlement is that both parties determined that they were better off settling than litigating.

A purchaser of patented goods cannot use the antitrust laws to challenge settled patent litigation without some concrete basis to question the lawfulness of the settlement itself. *Asahi Glass*, 289 F. Supp. 2d at 992. If a purchaser could do so by simply bringing a sham claim based on the allegation that the patent is invalid, the parties to the patent case will have settled nothing. This would work a sweeping transformation of the patent law, and would expose every patent holder to "innumerable vexatious suits to set aside his patent[.]" *Mowry v. Whitney*, 81 U.S. 434, 441 (1871). It would also run contrary to the general policy in favor of settlements. *See, e.g.*, *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1368 (Fed. Cir. 2001). Accordingly, an antitrust plaintiff cannot challenge the terms of a patent settlement, or state a plausible claim that the settled litigation was a sham, simply by offering its own theory of patent invalidity.

Courts have repeatedly rejected efforts by antitrust plaintiffs to litigate patent validity, most frequently in the context of challenges to so-called "reverse payment" settlements. The court in *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514 (E.D.N.Y. 2005) ("*Cipro II*"), for example, concluded that it would be "inappropriate for an antitrust court, in determining the reasonableness of a patent settlement agreement, to conduct an after-the-fact inquiry into the validity of the underlying patent[,]" because "[s]uch an inquiry would undermine any certainty for patent litigants seeking to settle their disputes." *Id.* at 530. The court in another case involving the same drug dismissed sham allegations for the same reasons. In *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188 (E.D.N.Y. 2003) ("*Cipro I*"), purchasers pressed sham claims premised on the theory that but for the settlement, which was agreed to prior to a ruling on motions for summary judgment, a generic manufacturer would have prevailed in the patent litigation. As here, the challenged settlement concerned a patent that had never been invalidated. *Id.* at 233. The *Cipro I* court dismissed the plaintiffs' claim on the ground that "a legal theory dependent on predicting the outcome of a specific lawsuit is unduly speculative[,]" *id.* at 200 (*citing Whitmore v. Arkansas,* 495 U.S. 149, 159-60 (1990)), and "without a showing of patent invalidity, all that the Complaints contain is conjecture." *Id.* at 201. *See id.* at 201 (granting in part defendants' motion to dismiss).

In *F.T.C. v. Actavis*, 570 U.S. 136 (2013), the Supreme Court noted the additional concern that such an exercise "will prove time consuming, complex, and expensive." *Id.* at 153. The Court accordingly fashioned a shortcut, holding that "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration of the validity of the patent itself." *Id.* at 158. Notably, to allay fears that such a rule would deter settlements, the Court explicitly assured that parties "may . . . settle in other ways, for example by allowing the generic manufacturer to enter the patentee's market before the patent expires without the patentee's paying the challenger to stay out prior to that point." *Id.* The settlement here allowed Sun to enter the market before patent expiration in the very manner that *Actavis* contemplates, and the Complaint does not allege that it is unlawful. There is no basis for Plaintiffs' suggestion that the court below was required to embark on its own exploration of the '051 patent's validity, precisely the type of "time consuming, complex, and expensive" litigation of a patent case within an antitrust case that the Court's ruling in *Actavis* was designed to prevent.

### D. Plaintiffs' Patent Allegations Do Not Establish Objective Baselessness

Plaintiffs dedicate most of their brief to the contention that they have adequately alleged patent invalidity. They argue either that the district court failed

to accept as true their allegations that the patent was invalid in light of prior art, or that they raise questions of fact that cannot be resolved at the pleading stage.

The district court rightly concluded that the issue is not whether Plaintiffs adequately pleaded a claim for patent invalidity, but whether they adequately pleaded a sham litigation claim. The court correctly concluded that even if Plaintiffs' allegations sufficiently stated a colorable invalidity claim, they failed to plausibly allege objective baselessness. ADD-027. Plaintiffs ignore this critical distinction.

Plaintiffs argue that their "sham litigation claim is, at its core, a factual dispute" over whether "the relevant prior art so clearly t[aught] Novartis's claimed invention such that no reasonable litigant – apprised of that knowledge – would have asserted the patent against a competitor." App. Br. at 39. Plaintiffs contend that the district court erred in not accepting as true their assertion that the patent was obvious, instead of leaving it to the jury to decide whether they are correct. App. Br. at 31-32. But the issue in a sham antitrust case is not whether plaintiffs can manufacture a "factual dispute" about which party's legal position in the underlying case was the stronger one; that is easy to do, especially if a plaintiff's allegations are accepted as "true." The issue is whether the underlying case was baseless at its inception. And "[w]here, as here, there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law."

*PREI*, 508 U.S. at 63. There were no disputed facts here; the only disputes concerned the legal conclusions and inferences to be drawn from those facts.

The district court, in fact, accepted Plaintiffs' factual allegations as to patent invalidity as true. ADD-024. For example, the court credited Plaintiffs' allegations that anyone skilled in the art would have tried to find a suitable crystalline form, and that the methods to derive the β-crystalline form were routine. *Id.* at 24-25. Even accepting these allegations as true, the court questioned whether they are sufficient to establish obviousness. But the court gave Plaintiffs the benefit of the doubt in addressing the ultimate question: "*Even if this were enough to allege a plausible invalidity claim*, it is not enough to show that Novartis' litigation based on the '051 Patent was objectively baseless." *Id.* at 25 (emphasis added).

The court also accepted as true Plaintiffs' allegations regarding the references alleged to have been "belatedly presented" to or withheld from the patent examiner. It noted, however, that the patent record confirms that (i) Novartis reopened prosecution in order to submit two of those references, which were then considered and acknowledged by the patent examiner, before the patent was allowed, *id.* at 23, 25, and (ii) a third reference had already been cited in the '051 patent's specification. As to the additional references that Plaintiffs claim should have been submitted and were not, the court concluded that the allegations were insufficient to plausibly allege that they would have changed the examiner's

analysis. *Id.* at 25. Finally, the court noted that none of the asserted prior art was alleged to disclose the β-crystalline form of imatinib mesylate or the method by which it could be derived. *Id.* at 23.

The district court thus considered Plaintiffs' factual allegations, properly analyzed them under the controlling legal framework, and reached the legal conclusion that they were insufficient to support a plausible claim of objective baselessness.[31] The court was correct: those allegations, taken as true, do not plausibly show that a reasonable patent holder would conclude that clear and convincing evidence of invalidity could be shown. Under the facts as alleged, "Novartis had a colorable claim that the '051 patent was valid and enforceable,"

---

[31] Plaintiffs' reliance on *In re Lipitor Antitrust Litig.*, 868 F.3d 231 (3d Cir. 2017), App. Br. 41, for the proposition that the district court erred in addressing the merits of their invalidity theory is misplaced. *Lipitor* concerns an allegedly sham Citizen Petition, submitted to the FDA allegedly in order to prevent the market entry of a generic version of Lipitor. The plaintiffs there claimed that the Citizen Petition was sham because it was not supported by scientific evidence. The Third Circuit reversed the dismissal of the complaint, in part because determining the Citizen Petition's scientific merits was a fact question that could not be resolved on a motion to dismiss. *Id.* at 273-74. Contrary to Plaintiffs' claim, this case does not require an evaluation of the scientific merit of Plaintiffs' theory of invalidity; it requires only an assessment of whether Plaintiffs had plausibly pleaded facts showing that Novartis had no legitimate basis on which to enforce its patent. When considering the sufficiency of sham patent litigation claims, courts in antitrust cases may look to the patent prosecution history for this purpose. *See Polaris Indus. Inc. v. Arctic Cat Inc.*, No. 14-3412, 2015 WL 4636544, at *6 (D. Minn. Aug. 4, 2015) (reviewing patent prosecution record on a motion to dismiss sham litigation claim to determine whether the PTO reviewed references). The Complaint relies heavily on the patent prosecution history, and Plaintiffs have no basis for objecting to consideration of it on a motion to dismiss.

ADD-024, and thus "cannot be faulted for trying to enforce it." *Asahi Glass*, 289 F. Supp. 2d at 992.

### 1. Plaintiffs' Invalidity Allegations Further Negate an Inference of Objective Baselessness

Plaintiffs' invalidity allegations, based on two theories of patent law, inherent anticipation and obviousness, demonstrate that the patent's validity was at best a litigable issue. Neither theory, even accepting as true the factual allegations offered in support of it, would permit an inference that Novartis' counterclaim was objectively baseless.

### a) The court properly rejected as insufficient Plaintiffs' inherent anticipation theory

The court below properly rejected as insufficient Plaintiffs' assertion that the '051 patent is invalid because the β-crystalline form is "inherent" in the prior art. ADD-024. To anticipate by inherency, a patent challenger must show that what is missing from a prior art reference – in this case the β-crystalline form – must "necessarily and inevitably" flow from the practice of what is disclosed in that prior art reference. *In re Armodafinil Patent Litig. Inc.*, 939 F. Supp. 2d 456, 465 (D. Del. 2013) (citation and quotation marks omitted); *see also Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 639 (Fed. Cir. 2011) ("Inherency can be established when prior art necessarily functions in accordance with, or includes, the claimed limitations . . . [but] may not be established by probabilities or possibilities. The

mere fact that a certain thing may result from a given set of circumstances is not sufficient." (citation and quotation marks omitted)). If the teachings of the prior art reference can be practiced in a way that yields a product lacking the allegedly inherent property, the prior art does not "inherently anticipate." *See Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047-48 (Fed. Cir. 1995) (finding no inherent anticipation where testing evidence demonstrated that the prior art could yield crystals of either the claimed polymorph or a different polymorph).

There is no support for Plaintiffs' assertion that the prior art "inherently anticipates" the β-crystalline form of imatinib mesylate. At most, the prior art references on which plaintiffs rely mention imatinib in its mesylate salt form, but are completely silent as to the existence of, or a way to make, any form of imatinib mesylate (crystalline or amorphous), let alone a method that would "necessarily and inevitably" produce the β-crystalline form.[32] Plaintiffs' belated reliance on a 2012 article on polymorphism in imatinib mesylate proves the point.[33] That article cites a

---

[32] Thus, the 1996 Buchdunger Article describes experiments with "CGP 57148 [imatinib as a free compound] and its methane sulfonate salt (CGP 57148B)" (*see* JA-000527) and the 1997 Zimmerman Article describes imatinib as a free compound and also that "the corresponding methane sulfonate [mesylate salt] shows good solubility in water . . . ." JA-000522. Neither of these references, nor any other prior art reference Plaintiffs identify, teaches that imatinib mesylate can exist in more than one crystalline form, let alone describes the claimed features of the β-crystalline form or how to make it.

[33] App. Br. at 9-10; *see also* JA-000698, 705-07. Notably, the 2012 article that Plaintiffs cite in support of their argument that the "scientific literature . . . suggests imatinib mesylate naturally converts to a non-needle crystal

52

published patent application, US2008/0090833 A1 (*see* JA-000708 n.15), that identifies more than *12 different crystalline forms of imatinib mesylate.* Given the proliferation of crystalline forms acknowledged in the "scientific literature" plaintiffs cite, the mere mention of "imatinib mesylate" does not disclose any particular polymorphic form, let alone the β-crystalline form.

On facts far more favorable to the patent challenger than those alleged here, the district court in *Armodafinil* rejected an inherent anticipation defense asserted against a polymorph patent. 939 F. Supp. 2d at 495. In *Armodafinil*, the branded company, Cephalon, asserted a patent claiming a particular polymorphic form ("Form I") of the drug compound armodafinil against multiple generic drug companies. The prior art reference that was asserted to have inherently anticipated the patent described a method for making armodafinil, and the parties disputed whether the prior art method would "necessarily and inevitably" produce the claimed Form I. *Id.* at 464. After a four-day bench trial, which included evidence of tests attempting to reproduce the prior art and expert testimony for both sides, the

---

form" (App. Br. at 34) was not cited in their Complaint, was published long after the 2005 issuance of the '051 patent, and cannot be relied upon to defeat a 12(b)(6) motion to dismiss. Further, the only discussion of conversion from the alpha form to the "non-needle" beta form contained in the article is in reference to an experiment in which a sample of alpha form was deliberately contaminated with a certain amount of beta form. It does not support any inference that the alpha form converts to the beta form without such contamination, JA-00698, 704 (Figure 7), let alone "necessarily and inevitably" converts to the β-crystalline form, as required under the law of inherent anticipation.

court rejected the "inherent anticipation" defense and held that the evidence "fail[ed] to clearly and convincingly demonstrate that Form I armodafinil claimed in the '570 Patent necessarily results from [the prior art]." *Id*. at 470-71. Here, the prior art asserted by plaintiffs does not describe a crystallization method and conditions for making the mesylate salt of imatinib that can be tested for inherent anticipation.[34]

At best, a claim of patent invalidity based on inherent anticipation is a fact-intensive inquiry subject to expert opinion. Simply asserting that there is a basis for such an inquiry does not satisfy plaintiffs' burden to plead facts showing that no reasonable patent owner could conclude that it had a chance of prevailing against this defense at the outset. To the contrary, it implies that a litigation outcome would be uncertain. As the district court correctly held, "the facts in the [Complaint] show that Novartis had a colorable argument that the '051 Patent was not inherently anticipated by prior art, and Plaintiffs cannot, without more, plausibly allege that the Sun litigation was objectively baseless on that theory of patent invalidity." ADD-025.

**b) The court below correctly rejected Plaintiffs' obviousness theory**

---

[34] Similarly, in *Glaxo Inc. v. Novopharm Ltd.*, the Federal Circuit affirmed the district court's rejection after trial of an inherent anticipation defense because the generic defendant failed to prove – through extensive tests attempting to reproduce the prior art method – that the practice of the prior art always resulted in the production of the claimed polymorph. 52 F.3d at 1047-48.

As the district court stated, obviousness requires determinations with regard to (1) the scope and content of the prior art, (2) the differences between the claimed subject matter and the prior art, (3) the level of ordinary skill in the art, and (4) secondary considerations of non-obviousness. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966). Plaintiffs' allegations fail to support an inference that their position on obviousness rendered the assertion of the patent objectively indefensible.[35]

Indeed, precisely the same obviousness arguments were rejected in *Armodafinil* as to the claimed polymorph, Form I of armodafinil. 939 F. Supp. 2d at 495. The generic defendants claimed "a person of ordinary skill in the art in 2002 would have expected to obtain the most stable polymorph of armodafinil using well known and merely routine techniques, such as ageing and polymorph screening, because the most stable polymorph is 'by far the easiest [] to obtain.'" *Id.* As additional support, the defendants in *Armodafinil*, like plaintiffs here, cited the FDA's 1987 guidelines, "which instructed drug developers to examine polymorphism and stressed the importance of controlling a compound's

---

[35] Plaintiffs incorrectly state (App. Br. at 28) that inventions can be patentable only if made by a "flash of creative genius[,]" citing a legislatively overruled Supreme Court case, *Cuno Eng'g Corp. v. Automatic Devices Corp.*, 314 U.S. 84 (1942). In fact, 35 U.S.C. § 103 states that "[p]atentability shall not be negated by the manner in which the invention was made." *See, e.g.*, *Graham*, 383 U.S. at 13, 15 ("It seems apparent that Congress intended . . . to abolish the test it believed this Court has announced . . . in *Cuno Engineering*.").

polymorphic form." *Id*. at 496. And, like plaintiffs here, the defendants argued that "a skilled artisan would have been motivated to conduct a polymorph screen of armodafinil and that it would have been 'a simple and routine matter . . . to identify the most stable polymorph' using this technique." *Id*.

The court rejected each of these arguments and found that the defendants had "failed to demonstrate clearly and convincingly that a person of ordinary skill in the art in 2002 would have a reasonable expectation of success of obtaining Form I armodafinil using routine techniques and methods." *Id*. at 497.[36] The court noted that even if there were "a motivation to obtain the 'most stable' form of armodafinil, a skilled artisan would have expected to resort to trial and error experimentation, using a large number of conditions, to try to make this form." *Id.*; *accord Takeda Pharm. Co., Ltd v. Handa Pharm., LLC*, No. C-11-00840, 2013 WL 9853725, at *68 (N.D. Cal. Oct. 17, 2013) (claimed crystalline form held nonobvious because, *inter alia*, "a skilled artisan would have to try each of numerous possibilities in terms of solvents, solvent combinations, and or conditions until possibly arriving at a successful result.").

Moreover, the *Armodafinil* court determined, based on expert testimony at trial, that as a general proposition, "polymorphism is inherently

---

[36] In *Armodanofil*, the critical time for determining obviousness of the claimed crystalline form was 2002, five years *later* than the Novartis inventors filed their Swiss priority application for the '051 patent in 1997. Yet, the *Armodanofil* court found that as of 2002, polymorphism was a highly unpredictable art.

unpredictable" and that "[e]ven if there were a way of predicting that a compound would be polymorphic and what the crystal structures might be, the evidence presented shows that a person of skill would not know how to make a specific polymorph or predict its properties." 939 F. Supp. 2d at 491, 492.[37] In light of this well-documented lack of predictability, Plaintiffs' reliance on language from *KSR* – a case involving an automobile gas pedal, not polymorphs – regarding the "likely" finding of obviousness when the prior art "yield[s] predictable results" (App. Br. at 29) is entirely misplaced. The very lack of predictability in the science of polymorphs supports their patentability.[38] Accordingly, the court's conclusion that

---

[37] *See also Takeda Pharm.*, 2013 WL 9853725, at *68 ("crystallization of benzimidazole compounds such as dexlansoprazole is unpredictable . . . [defendant's expert] admitted that even he could not predict *a priori* whether any given solvent or solvent combination would lead to crystallization of dexlansoprazole").

[38] Equally misplaced is Plaintiffs' reliance on *Pfizer v. Apotex*, 480 F.3d 1348 (Fed. Cir. 2007), which involved the patentability of a particular salt of a compound, not polymorphic forms of crystalline compounds. App. Br. at 29-31. Indeed, *Armodafinil* expressly distinguished *Pfizer*, which involved the predictability of salts, from the unpredictability of polymorphs. 939 F. Supp. 2d at 500-01. Moreover, in *Pfizer*, the Federal Circuit was careful to limit its decision to the "*particularized facts of this case*." 480 F.3d at 1367. The Federal Circuit and district courts have subsequently narrowed the *Pfizer* holding in finding valid patents claiming salt forms of prior art compounds. *E.g.*, *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075 (Fed. Cir. 2008); *Valeant Int'l (Barbados) SRL v. Watson Pharms., Inc.*, No. 10-20526, 2011 WL 6792653, at *12 (S.D. Fla. Nov. 8, 2011), *aff'd sub nom. Valeant Int'l Bermuda v. Actavis, Inc.*, 534 F. App'x 999 (Fed. Cir. 2013); *see also Pfizer Inc. v. Mylan Pharms. Inc.*, 71 F. Supp. 3d 458, 469, 474 (D. Del. 2014), *aff'd*, 628 F. App'x 764 (Fed. Cir. 2016) (process of going from dimethyl sunitinib to sunitinib to sunitinib malate was not obvious).

the Complaint's invalidity allegations fail to establish objective baselessness was plainly correct.

### 2. The Court Did Not Give Any Undue Weight to the Presumption of Patent Validity

Plaintiffs also argue that the district court improperly relied on the statutory presumption of validity as *evidence*. App. Br. at 54-58 (emphasis added). They fail to cite anything in the court's opinion for this claim, however, and there is no basis for it. While it is true that the presumption would not in itself establish the patent's validity in a patent case, it is relevant in determining whether an action to enforce it is baseless. As Judge Posner explained in *Asahi Glass*, in the very language that both the district court and Plaintiffs quote: "A firm that has received a patent from the patent office (and not by fraud . . .), and thus enjoys the presumption of validity that attaches to an issued patent, 35 U.S.C. § 282, is entitled to defend the patent's validity in court, to sue alleged infringers, and to settle with them, whatever its private doubts, unless a neutral observer would reasonably think either that the patent was almost certain to be declared invalid . . . if the suit went to judgment." 289 F. Supp. 2d at 992-93; *see* ADD-023-24 and App. Br. at 52-53.

There is nothing to suggest that the district court relied on the presumption as evidence of validity or "contorted this presumption into an elevated pleading requirement." App. Br. at 56. Rather, the court took it into account in determining how a reasonable patent holder would assess its chances of successfully

defending its patent. This was entirely proper. "Given the presumption of patent validity and the burden on the patent challenger to prove invalidity by clear and convincing evidence, it will be a rare case in which a patentee's assertion of its patent in the face of a claim of invalidity will be so unreasonable as to support a claim that the patentee has engaged in sham litigation." *Tyco Healthcare*, 762 F.3d at 1345; *Asahi Glass*, 289 F. Supp. 2d at 992-93. Any reasonable patent holder would take the presumption into account in assessing the odds of successfully defending its patent.[39]

### E.   Plaintiffs' "Serial Litigation" Theory Is Without Merit

Plaintiffs argue that the district court erred in applying *PREI* to their sham claim given their allegations concerning Novartis' litigation against other generic companies seeking approval to market generic versions of Gleevec®. App. Br. at 62-66. Despite having acknowledged that *PREI* applies to their claim in the section of their brief devoted to legal standards (*id*. at 27), and having failed to make this argument below, Plaintiffs assert in the body of their brief that the "more

---

[39] Plaintiffs' assertion that "when 'presumptively valid' patents are tested in litigation, they are held invalid more often than not" (Am. Compl. ¶ 71, JA-000053) does not advance Plaintiffs' position in the least. By definition, even if such patents are held invalid "more often than not," they are upheld a substantial percentage of the time. Consequently, a reasonable litigant could realistically expect that it could succeed on the merits in a Gleevec® patent dispute.

flexible standard" of *California Motor* applies in those circumstances "where a defendant has filed multiple lawsuits." App. Br. at 64.[40]

Plaintiffs rely on the Third Circuit's decision in *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 179 (3d Cir. 2015), *cert. denied sub nom., Vill. Supermarkets, Inc. v. Hanover 3201 Realty, LLC.*, 136 S. Ct. 2451 (2016). The Third Circuit, however, has explicitly rejected the application of *Hanover* in the Hatch-Waxman context, reasoning that the brand manufacturer's lawsuits against prospective generic competitors were consistent with the design and intent of Hatch-Waxman. In *Wellbutrin XL*, the Court explained:

> The Act incentivizes brand-name drug manufacturers to promptly file patent infringement suits . . . We are not inclined to penalize a brand-name manufacturer whose "litigiousness was a product of Hatch-Waxman." Doing

---

[40] Plaintiffs, citing *P.R. Tel. Co., Inc. v. San Juan Cable Co. LLC*, 196 F. Supp. 3d 207 (D.P.R. 2016), state that this Court has not "weighed in" on the interplay between *California Motor* and *PREI*. App. Br. at 64 n.241. In fact, this Court addressed this issue in the appeal from the case Plaintiffs cite. *P.R. Tel. Co., Inc. v. San Juan Cable Co. LLC*, 874 F.3d 767 (1st Cir. 2017). There, the district court had found that the defendant filed 24 petitions that "were 'objectively reasonable' in the sense that a reasonable litigant could realistically expect success on the merits." *Id.* at 769 (citation and quotation marks omitted). The plaintiff did not challenge that determination on appeal, and as a result, the issue before this Court was limited to whether the filing of serial meritorious petitions "materially distinguishes this case from *PREI*; that is to say, a jury could find [the defendant] liable for launching a fusillade of ultimately unsuccessful petitions even if no one petition was sufficiently baseless to fit within the 'sham' exception under *PREI*." *Id.* at 770-71. Under those circumstances, this Court concluded that the *PREI* standard applies. Accordingly, if the Court affirms the district court's finding that Novartis had probable cause to file its counterclaim in the Sun Litigation, *PREI*, rather than *California Motor,* governs Plaintiffs' serial petitioning allegations.

so would punish behavior that Congress sought to encourage. *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1047 (9th Cir. 2009). *See id.* (recognizing that the "volume of . . . suits" filed by a brand name manufacturer is "dependent on the number of generic companies attempting to enter the marketplace, a matter over which the [brand-name manufacturer] ha[s] no control."

868 F.3d at 157-58.  None of the other serial petitioning cases cited by Plaintiffs involves allegedly sham Hatch-Waxman suits, and they are therefore inapposite.

\* \* \* \*

The Complaint therefore fails to allege facts that would, if proved, show that Novartis' assertion of its patent was objectively baseless.  It cites nothing from any proceeding tarnishing the patent's validity, and therefore no basis from which to conclude that litigation to enforce it was frivolous.  Even if Plaintiffs have alleged a plausible case for invalidity – which the district court assumed – they failed to allege facts that would establish that the litigation was a sham.  "It is not 'bad faith' to assert patent rights that one is not certain will be upheld in a suit for infringement pressed to judgment and to settle the suit to avoid risking the loss of those rights.  No one can be *certain* that he will prevail in a patent suit." *Asahi Glass*, 289 F. Supp. 2d at 993 (citations omitted); *see also Picone*, 2017 WL 4873506, at *7 (D. Mass. Oct. 20, 2017) (complaint did not contain "sufficient factual allegations to allow the Court to reasonably infer that there was no 'probably cause to institute legal proceedings'" based on the patents).  Plaintiffs' allegations

that Novartis' patent would not have survived litigation are not enough to state a sham litigation antitrust claim.

## III. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' *WALKER PROCESS*-TYPE CLAIMS FAIL

The Court below properly held that the Complaint's allegations are not sufficient to satisfy the requirements for *Walker-Process* fraud.

### A. The Complaint Does Not Support a Plausible Inference that the Patent Would Not Have Issued But For the Alleged Misrepresentations

The Complaint's allegations that Novartis made misrepresentations and omissions that were material to patentability largely focus on five publications that were allegedly either "belatedly" or never disclosed. The court below considered these references[41] and correctly found that Plaintiffs' allegations fail to satisfy the but-for materiality element of a *Walker Process* claim. In their brief on appeal, Plaintiffs focus on three: the 1996 Buchdunger Article, the 1997 Zimmerman Article, and the 1996 Druker Article. App. Br. at 75. Plaintiffs do not specify to

---

[41] It was entirely appropriate for the court to consider the pertinence of these references, all of which were specifically identified in the Complaint. The PTO's construction of prior art is a legal question, and when a court's "analysis turns on purely legal issues, the judge not the jury should be the fact finder." *Highmark, Inc. v. Allstate Mgmt. Sys., Inc.*, 701 F.3d 1351, 1362 (Fed. Cir. 2012); *In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009); *see also Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, No. SA-08-CV-102, 2010 WL 11463260, at *2 (W.D. Tex. Jan. 29, 2010) ("The ultimate question of whether a reference constitutes prior art is a question of law based on underlying facts.").

which claims of the Polymorph Patents, much less which limitations in the claims, the cited references are relevant, as *Exergen* requires. *See* 575 F.3d at 1328.

### 1. The Prior Art References Were Either Disclosed or Cumulative

As the court below found, three of the five references cited in Plaintiffs' brief were not withheld from the PTO at all. The Complaint itself acknowledges that the 1996 Buchdunger Article and the 1997 Zimmermann Article *were* disclosed to the PTO prior to the issuance of the patent. Am. Compl. ¶¶ 252-53, JA-000093-94. The patent examiner acknowledged both of these references by signing and initialing the IDS. JA-000537.[42] Moreover, both the 1996 Buchdunger Article and the 1997 Zimmermann Article are listed on the face of the '051 patent itself in a list of references that were considered by the patent examiner.[43]

---

[42] An examiner's "initials and signature on the information disclosure statement establish that he reviewed and considered the [cited references]." *Server Tech., Inc. v. Am. Power Conversion Corp.*, No. 3:06-00698, 2014 WL 3894075, at *13 (D. Nev. Aug. 8, 2014), *vacated on other grounds*, 2017 WL 736881 (D. Nev. Feb. 23, 2017); *see also LifeScan*, 103 F. Supp. 2d at 382 (same); M.P.E.P. § 609.05(b) ("Examiners must consider all citations submitted in conformance with the rules, and their initials when placed adjacent to the considered citations on the list or in the boxes provided on a[n IDS form] . . . provides a clear record of which citations have been considered by the Office.").

[43] M.P.E.P. § 1302.12 ("All references which have been cited by the examiner during the prosecution" are "printed in the patent"). Plaintiffs' allegation that the 1996 Buchdunger and 1997 Zimmermann references were only "belatedly" disclosed is irrelevant; the record clearly and conclusively shows that both were considered by the patent examiner in allowing the '051 patent to issue. *See, e.g.*, *ParkerVision, Inc. v. Qualcomm Inc.*, 924 F. Supp. 2d 1314, 1319 (M.D. Fla. 2013)

A third reference, the 1996 Druker Article[44], is cited and discussed in the '051 patent's specification, at column 7, line 62 (JA-000375) and at column 11, lines 35-38 (JA-000377). The court correctly found that a reference discussed in a patent's specification is not withheld and is not a basis for an inequitable conduct allegation. ADD-030, citing *Oracle Corp. v. DrugLogic, Inc.*, No. C 11-00910, 2011 WL 5576267, at *11 (N.D. Cal. Nov. 16, 2011) (striking inequitable conduct defense where allegedly withheld reference was discussed in the patent's specification).

As a result, three of the references addressed in Plaintiffs' brief were disclosed to and considered by the PTO and cannot support a claim of fraud. "When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1185 (Fed. Cir. 1995) (citation and quotation marks omitted). *See also Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000) (patent holder's citation to prior art "defeats [the] charge that the [prior art] was withheld with deceptive intent"); *ParkerVision, Inc. v.*

---

("Because the PTO received the Parssinen reference before issuing the patent, the belated disclosure of the reference was not but-for material.").

[44] The 1996 Druker Article, like the 1995 Druker Presentation abstract discussed *infra* n.45, describes experiments with the imatinib compound, which was designated CGP 57148, and not the mesylate salt of imatinib, which was separately designated CGP 57148B. These designations are set forth on the first page of the 1996 Buchdunger Article.

*Qualcomm Inc.*, 924 F. Supp. 2d 1314, 1319 (M.D. Fla. 2013). As to the two additional references cited in the Complaint, the court properly found that neither of them could support an inference of fraud because they were cumulative or immaterial.[45] ADD-030.

> ## 2. The Court Below Properly Rejected Plaintiffs' Assertion that Novartis' Use of the Term "Surprising" in the '051 Specification Could Support an Inference of Fraud on the PTO

On appeal, Plaintiffs focus on Novartis' use of the word "surprise," arguing that Novartis deceived the PTO into issuing the patent by stating in the '051 patent specification that it "'surprisingly' found that imatinib mesylate could be made in the β-crystal form," when that form resulted from what Plaintiffs argue is "routine lab work." *See, e.g.*, Am. Compl. ¶¶ 5-7, 270, JA-000037-38, 98. Plaintiffs

---

[45] The 1995 Druker Presentation (Am. Compl. ¶¶ 157, 271, JA-000073-74, JA-000099), describes experimental work with the compound CGP 57148. This refers to imatinib in its free form, not the mesylate salt of imatinib, much less the β-crystalline form of imatinib mesylate. It is at most cumulative of the 1996 Druker Article described above, which was disclosed in the specification of the '051 patent. A reference that is only cumulative of prior art already before the patent examiner is not material. *See, e.g.*, *Rothman v. Target Corp.*, 556 F.3d 1310, 1326-27 (Fed. Cir. 2009).

Similarly, the 1996 Zimmermann Article (Am. Compl. ¶¶ 165-67, JA-000075-76), describes the work of inventors Zimmermann and Buchdunger along with others on a class of phenylamino-pyrimidine compounds, but does not describe or disclose the compound imatinib, let alone its mesylate salt. Accordingly, the court below properly concluded that it could not infer that the 1996 Zimmerman Article was material. ADD-031.

contend that Novartis professed surprise "in order to avoid the inevitable conclusion that the non-needle form of imatinib mesylate was obvious." App. Br. at 69.

As the district court observed, it is questionable whether "such a statement qualifies as a representation, particularly where the examiner was free to reach her own opinion about whether such a discovery was in fact 'surprising' based on the prior art that was available to her before the patent issued." ADD-032. Even if it were, Plaintiffs have not sufficiently alleged but-for materiality – that the patent would not have issued had Novartis not made it. The Complaint makes only conclusory allegations that Novartis' assertion of "surprise" was "made to support patentability" and that in order to be patentable "Novartis had to claim that its mesylate salt crystal form was somehow surprising or unexpected." JA-00083-84, ¶¶ 201-03 These allegations are not enough. *LifeScan, Inc. v. Home Diagnostics, Inc.*, 103 F. Supp. 2d 379, 386 (D. Del. 2000), *aff'd*, 13 F. App'x 940 (Fed. Cir. 2001) ("the mere fact that a patent applicant attempts to distinguish its patent from the prior art does not constitute a material omission or misrepresentation where the patent examiner has the prior art before him or her, and therefore, is free to make his or her own conclusions"). Absent factual allegations that show why the patent would not have issued but for this specific representation, Novartis' characterization of its discovery as "surprising" cannot support a plausible *Walker Process* claim.

Plaintiffs insist that the district court usurped the role of the jury in addressing the materiality of Novartis' expression of surprise, and that it failed to accept as true their factual allegations and drew inferences on that issue against them. App. Br. at 73-74. They complain in particular about the court's statement that the patent examiner "was free to reach her own opinion about whether such a discovery was in fact 'surprising' based on the prior art that was before her before the patent issued." ADD-032. Plaintiffs argue that discovery was necessary to determine what conclusion the examiner might have drawn, and that this was an issue of fact for the jury. *Id*. The law, however, requires a party pleading inequitable conduct to explain "both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims." *Exergen*, 575 F.3d at 1329. Plaintiffs have not complied with this standard.

Plaintiffs' reliance on *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123 (Fed. Cir. 2006), is misplaced. (App. Br. at 71-72). There, the applicants' characterization of the discovery as "surprising" was found to imply that the discovery was supported by clinical data. Purdue had made "repeated and convincing representations to the PTO" that it had made the "surprising discovery" that its controlled-release oxycodone controlled pain over a four-fold dosage range, compared to an eight-fold range of other opioids. *Id.* at 1129, 1131. This

representation, according to the trial court, was a "prominent, and at times, the only, argument in favor of patentability." *Id*. at 1130. The alleged misrepresentation there was not just Purdue's characterization of the results as "surprising," but the suggestion that they were supported by clinical data when they were not. *Id*. at 1133. The Federal Circuit accordingly affirmed the trial court's materiality finding, and concluded that "[t]his explanation of the clinical significance of the four-fold dosage range, placed after a discussion of clinical studies, suggests that [the inventor's] discovery was supported by clinical results." *Id*.[46] In reaching this conclusion, the court stressed that the facts there were unique:

> We emphasize that this case is an unusual one. A failure to inform the PTO whether a "surprising discovery" was based on insight or experimental data does not in itself amount to a material omission. In this case, however, Purdue did much more than characterize the four-fold dosage range of the claimed oxycodone formulation as a surprising discovery. Purdue repeatedly relied on that discovery to distinguish its invention from other prior art opioids while using language that suggested the existence of clinical results supporting the reduced dosage range. Presented with these unique facts, we cannot say the trial court erred in finding that Purdue failed to disclose material information to the PTO.

*Id*. at 1133. And even under those facts, the court concluded that the "level of materiality is not especially high." *Id*.

---

[46] *Purdue* involved an allegation of inequitable conduct, which at the time required a lesser showing of materiality. *See id*. at 1132.

Here, there is no claim that Novartis used the term "surprising" to suggest the presence of supporting data that did not exist. Further, the Complaint does not allege facts that support its conclusory allegation that Novartis relied on the "surprising" nature of its discovery, and none are offered to support the conclusory assertion in Plaintiffs' brief on appeal that Novartis had to "feign[]" surprise in order to avoid having the examiner reject the patent as "obvious." App. Br. at 72. As the district court found, the examiner had the prior art before her to enable her to reach her own independent conclusion as to whether the invention was obvious. Even assuming that, as Plaintiffs allege, those references undermine Novartis' characterization of its results as surprising, the only plausible inference to be drawn is that the examiner did not consider it to be sufficiently material to defeat patentability. Allegations like these are not enough to proceed to discovery in an antitrust case.

### B. None of the Alleged Misrepresentations Qualify for the "Egregious Misconduct" Exception to But-For Materiality

Perhaps recognizing the weakness of their materiality allegations, Plaintiffs now suggest that Novartis' claim of surprise was an "unmistakably false" statement as to which materiality is presumed. App. Br. at 73. They make the same claim with respect to Novartis' representation that "imatinib mesylate had not been disclosed or 'actually prepared.'" App. Br. at 75-76. Departing from the Complaint's more measured allegations that this latter representation was

"misleading, if not false," (Am. Compl. ¶¶ 195, 197, JA-000081), Plaintiffs' brief on appeal characterizes it as a "flagrant misrepresentation" and a "blatant falsehood." App. Br. at 72, 74, 76. This is an apparent effort to avoid *Walker Process*' but-for materiality requirement by casting these representations as "affirmative[ly] egregious misconduct" as to which materiality need not be shown. *See Therasense*, 649 F.3d at 1292 ("When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material").

This argument was not raised below. Plaintiffs argued to the district court that Novartis withheld prior art purportedly disclosing that the mesylate salt had been made previously, and that had it been disclosed, the β-crystalline "invention" would have been rendered unpatentable. Purchasers' Opposition to Novartis's Motion to Dismiss, SA-000063-65. Plaintiffs did not argue that Novartis' characterization of its manufacture of the β-crystalline form of imatinib mesylate as "surprising" qualified as "egregious" misconduct, so that materiality need not be pleaded. The district court therefore properly analyzed whether the Complaint adequately alleged that it was material. Because the publications alleged by Plaintiffs to disprove the proposition were either disclosed to the PTO, or were cumulative of other references, the court concluded that Plaintiffs' allegations of materiality were implausible. ADD-030-31.

None of the alleged "misrepresentations" falls within the exception carved out in *Therasense* for "egregious" misconduct. That is reserved for extreme conduct, such as the filing of an unmistakably false affidavit or declaration, perjury, and manufacturing evidence[47] – a distinction ignored by Plaintiffs in their brief. In *Therasense*, the Federal Circuit explained that "[a]lthough but-for materiality generally must be proved to satisfy the materiality prong of inequitable conduct, this court recognizes an exception in cases of affirmative egregious misconduct. . . . When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material." 649 F.3d at 1292. The court focused on the filing of false affidavits, but suggested that "egregious misconduct" would include perjury and suppression of evidence. *Id.* at 1293. However, neither "mere nondisclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative

---

[47] *See, e.g.*, *Barry v. Medtronic, Inc.*, 245 F. Supp. 3d 793, 811 (E.D. Tex. 2017) (exception did not apply to allegations that plaintiff withheld material information from and made incorrect statements because, "[u]nlike cases in which affirmative egregious misconduct has been found, this case is not one involving fabricated evidence or bribery" and statements "were not made in a sworn affidavit or declaration"); *Smith & Nephew, Inc. v. Interlace Med., Inc.*, 955 F. Supp. 2d 69, 73 (D. Mass. 2013) (exception did not apply where party asserting it failed to "point[] to any explicitly false statements, manufactured evidence, or other blatant deceit rising to the level that *Therasense* requires"); *U.S. Rubber Recycling v. ECORE Int'l*, NO.: CV 09-09516, 2011 WL 13043495, at *6 (C.D. Cal. Aug. 8, 2011) (exception did not apply where party failed to proffer any evidence that the applicant affirmatively committed perjury, manufactured evidence, bribed individuals, and suppressed evidence).

egregious misconduct"; accordingly, "claims of inequitable conduct that are based on such omissions require proof of but-for materiality." *Id*. at 1292-93.[48]

Plaintiffs' brief obscures this critical distinction and argues that this exception applies to Novartis' conduct. They state that "the Federal Circuit has repeatedly held that failing to correct 'unmistakably false' *statements* 'alone establishes materiality.'" App. Br. at 72 (emphasis added), *citing Intellect Wireless, Inc. v. HTC Corp*., 732 F.3d 1339, 1343 (Fed. Cir. 2013). *Intellect*, however, involved an inventor's "unmistakably false" *declaration*, which the Federal Circuit held "alone establishes materiality." Similarly, the obligation to cure referred to in Plaintiffs' brief arises when the applicant files a false *declaration*. This is confirmed by including the language omitted from Plaintiffs' quotation of *Rohm & Haas Co. v. Crystal Chem. Co*., 722 F.2d 1556 (Fed. Cir. 1983): Plaintiffs say "there is no room to argue that submission of false [information] is not material." App. Br. at 73. The Federal Circuit says there is "no room to argue that submission of false *affidavits* is not material." 722 F.2d at 1571 (emphasis added). The narrow and sharply delineated exception to the but-for materiality requirement does not apply to the

---

[48] *See, e.g.*, *Exergen Corp. v. Kaz USA, Inc.*, 120 F. Supp. 3d 1, 3 n.3 (D. Mass. 2015) ("Mere non-disclosure of prior art references does not constitute affirmative egregious misconduct" under *Therasense*); *Senju Pharm. Co., Ltd. v. Apotex, Inc.*, 921 F. Supp. 2d 297, 308 n.15 (D. Del. 2013) (alleged "material misrepresentations and omissions" did not qualify as affirmative egregious misconduct because "[o]missions . . . cannot constitute affirmative egregious misconduct" under *Therasense*).

representations alleged in this case. None of the Complaint's "misleading, if not false" statements or omissions is alleged to have been made in a sworn statement, and none of the alleged misconduct comes close to that at issue in any of the cases Plaintiffs cite.

Plaintiffs' newly asserted argument that Novartis had a duty to "correct its false claim that the β-crystalline polymorphism was surprising," and that its failure to do so alone establishes materiality, is wrong for the same reason. App. Br. at 73. The duty to correct applies to statement rising to the level of a declaration. *Intellect,* the case on which Plaintiffs rely for this proposition, involved the submission of a declaration containing "multiple unmistakably false statements" of fact regarding when the invention was reduced to practice. 732 F.3d at 1342. The declaration's false statements were never fully corrected; instead, they were "followed by a replacement declaration that, rather than expressly admitting the earlier falsity, dance[d] around the truth." *Id.* at 1345. The court held that failure to expressly correct a false declaration or other affirmative false statement of fact is material *per se.* The court emphasized that it was not enough for the applicant to provide accurate information; it was required to call "attention to the untrue or misleading assertions sought to be overcome." *Id.* at 1343. Here, unlike in *Intellect*, Novartis did not submit a false declaration, and its use of the word "surprising" did

not constitute an "unmistakably false statement[]" that it was required to bring to the attention of the examiner or otherwise correct. *Id.* at 1342.

### C. The Complaint Does Not Support a Plausible Inference of Fraudulent Intent as Required for a *Walker Process* Claim

The district court correctly found that the allegations in the Complaint, "even construed generously, do not support a plausible inference of fraudulent intent." ADD-032. To establish intent under *Walker Process*, something "greater than an intent evidenced by gross negligence or recklessness" is required. *Argus Chem. Co. v. Fibre Glass-Evercoat Co.*, 812 F.2d 1381, 1385 (Fed. Cir. 1987). "[G]iven the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive, clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required. . . ." *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990), *cert. denied*, 498 U.S. 920 (1990). Accordingly, as the court below explained, "'[a]lthough "knowledge" and "intent" may be averred generally, . . . the pleadings [must] allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind,'" citing *Exergen*, 575 F.3d at 1327 (citing Fed. R. Civ. P. 9(b)). ADD-032.

Plaintiffs' allegations do not support a plausible inference that Novartis intended to deceive the patent examiner. As set forth above, neither the alleged representation that imatinib mesylate had not been previously prepared nor the

characterization of its discovery of the β-crystalline form as "surprising" could support a finding of culpable intent. Am. Compl. ¶ 270, JA-000098-99. The Complaint itself acknowledges that three of the prior art references allegedly showing that imatinib mesylate had been prepared previously *were* disclosed. Am. Compl. ¶¶ 252-53, JA-000093-94. An applicant's disclosure of information that was considered by the patent examiner before the patent issued, in addition to negating the claim of materiality, defeats any plausible inference of fraudulent intent. As the district court explained, "the allegation that the prior art was disclosed after an initial notice of allowance" – and before issuance of the patent – "suggests that Novartis did not intend to hide information as evidenced by the fact that it did, in fact, disclose it." ADD-033. [49]

Plaintiffs' reliance on *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033 (9th Cir. 2009), and *Intellect Wireless* (App. Br. at 79-80), is wholly misplaced. In *Kaiser*, the Ninth Circuit reversed a grant of summary

_____

[49] Plaintiffs' attempt to turn the district court's observation that, "[a]t best, the allegation that the prior art was disclosed after an initial notice of allowance cuts equally in favor of and against Plaintiffs, in that it suggests that Novartis did not intend to hide information" (ADD-033) into legal error (App. Br. at 81) is wholly unavailing. Nothing in the court's opinion suggests that it relied on any such inference to reach the conclusion that "[t]he facts alleged, even construed generously, do not support a plausible inference of fraudulent intent." ADD-032. Moreover, it is not reasonable to infer from a party's disclosure of information that it intended to conceal it. *See Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998) (the applicant "hardly could be seeking to deceive the PTO as to the existence of copending applications when it actually disclosed the fact of copendency to [one of the] examiner[s]").

judgment where the patent owner failed to disclose plainly material prior art and documents revealing prior public sales, each of which called into question whether the patent at issue should have been granted.  552 F.3d at 1048-49.  Here, Plaintiffs failed to plausibly plead that any non-cumulative material prior art was withheld.  As the district court found, "[w]here the prior art at issue was largely disclosed and the remaining undisclosed prior art is clearly not material in light of the disclosed prior art, the fact that Novartis' scientists authored the prior art does not demonstrate deceptive intent."  ADD-033.  Plaintiffs also failed to allege a "pattern of deceit" like that involved in *Intellect Wireless*.  There, the inventor filed "multiple unmistakably false declarations during prosecution."  732 F.3d at 1342.  The Complaint does not allege that Novartis filed any false declarations, much less multiple ones.  Cobbling together allegations of unrelated alleged misrepresentations of the sort Plaintiffs rely on here does not suffice to allege intent.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court affirm the dismissal of Plaintiffs' Consolidated Amended Complaint.

Dated: January 26, 2018

Respectfully Submitted,

Novartis Pharmaceuticals Corporation and Novartis Corporation, Defendants

Laura S. Shores

By: /s/ Saul P. Morgenstern

laura.shores@apks.com
ARNOLD & PORTER KAYE SCHOLER
601 Massachusetts Avenue, NW
Washington, DC 20001
202-942-6855
202-942-5999 (fax)

William A. Zucker, BBO # 541240
wzucker@mccarter.com
Wyley S. Proctor, BBO # 666613
wproctor@mccarter.com
MCCARTER & ENGLISH LLP
265 Franklin Street
Boston, MA 02110
617-449-6500
617-607-9200 (fax)


William A. Zucker, BBO # 541240
wzucker@mccarter.com
Wyley Proctor, BBO # 666613
wproctor@mccarter.com
MCCARTER & ENGLISH LLP
265 Franklin Street
Boston, MA 02110
617-449-6500
617-607-9200 (fax)

Saul P. Morgenstern
saul.morgenstern@apks.com
David K. Barr
david.barr@apks.com
Mark D. Godler
mark.godler@apks.com
ARNOLD & PORTER KAYE SCHOLER
250 West 55th Street
New York, NY 10019
212-836-8000
212-836-8689 (fax)


NOVARTIS AG, DEFENDANT

By: /s/ Grant J. Esposito
Grant J. Esposito
gesposito@mofo.com
Jessica Kaufman
jkaufman@mofo.com

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
212-468-8000
212-468-7900 (fax)

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the appellees certify that the foregoing consolidated brief is in 14-point Times New Roman proportional font and contains **19,948** words. It is thus in compliance with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) and the Order of this Court dated December 22, 2017.

*/s/ Wyley Proctor*
Wyley Proctor

# CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused a true and correct copy of this Brief of Defendants-Appellees to be served on Appellants' counsel of record by ECF and to all counsel of record and additionally will cause to be served by electronic mail and FedEx, as follows:

By electronic mail (as tendered) to

Thomas M. Sobol
tom@hbsslaw.com
Kristen Johnson
kristenj@hbsslaw.com
Hannah W. Brennan
hannahb@hbsslaw.com
David Nalven
davidn@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

John D. Radice
jradice@radicelawfirm.com
Kenneth Pickle
kpickle@radicelawfirm.com
RADICE LAW FIRM, P.C.
34 Sunset Blvd,
Long Beach, NJ 08008

James R. Dugan, II
jdugan@dugan-lawfirm.com
DUGAN LAW FIRM, LLC
365 Canal Street
Suite 1000
New Orleans, LA 70130

By FedEx (as filed) to

Hannah Brennan
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142

*/s/ Wyley Proctor*
Wyley Proctor

Dated: January 26, 2018