# United States Court of Appeals for the First Circuit

## No. 17-1714

UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND, on behalf of themselves and others similarly situated; LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated; AFSCME HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated; MINNESOTA LABORERS HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated; PENNSYLVANIA EMPLOYEES BENEFIT TRUST FUND, on behalf of themselves and others similarly situated; LOUISIANA HEALTH SERVICE AND INDEMNITY COMPANY, d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA, on behalf of themselves and others similarly situated,

Plaintiffs-Appellants,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION; NOVARTIS AG,

Defendants-Appellees.

## No. 17-1776

RXDN, INC., on behalf of themselves and others similarly situated,

Plaintiff-Appellant,

v.

NOVARTIS PHARMACEUTICALS CORPORATION; NOVARTIS CORPORATION; NOVARTIS AG,

Defendants-Appellees.

---

*On Appeal from the United States District Court for the District of Massachusetts*

Civil Action Nos. 15-12732-ADB, 15-13461-ADB, 15-13724-ADB, 15-13725-ADB, 15-13726-ADB, 16-12399-ADB

---

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

Thomas M. Sobol
Kristen A. Johnson
Hannah W. Brennan
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Counsel for End Payer Purchaser Appellants*

John D. Radice
RADICE LAW FIRM, P.C.
34 Sunset Blvd
Long Beach, NJ 08008

Noah Rosmarin
ADKINS, KELSTON & ZAVEZ, P.C.
90 Canal Street, Suite 500
Boston, MA 02114

*Counsel for Direct Purchaser Appellants*

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................1

II.   ARGUMENT...................................................................4

    A.    The purchasers adequately allege *facts* supporting their sham litigation antitrust claim. ......................................................4

        1.    The purchasers allege facts establishing no reasonable pharmaceutical manufacturer in Novartis's position would have realistically expected to succeed in obtaining a declaration that the second Gleevec patent was valid and infringed. ......................................................4

        2.    The purchasers allege that Novartis "asserted," not just "defended," its patent.................................................9

        3.    The purchasers allege that Sun challenged the second Gleevec patent's validity........................................10

        4.    Novartis misinterprets the Patent Trial and Appeals Board's decision........................................................11

    B.    The purchasers adequately allege an antitrust claim premised on sham litigation. ..............................................................11

        1.    Patent validity can be addressed in an antitrust case. ...............12

        2.    Patent tarnishment is not a prerequisite to sham patent litigation. ......................................................16

        3.    Novartis's tarnishment rule runs contrary to the purpose of the sham exception to *Noerr Pennington*'s limited protection. ......................................................20

        4.    "Realistic expectation of success" does not mean "a ghost of a chance."................................................21

        5.    Novartis's insistence that objective baselessness be determined at the *filing* of the underlying patent litigation contradicts its position that the purchasers' sham claims turn on the *outcome* of that litigation.......................22

C.     Purchasers have standing to bring patent-based antitrust claims........23

    1.    The purchasers have standing to bring this antitrust action........................................................................23

    2.    The end payers have standing to bring their *Walker Process* claim. ............................................................25

D.     The legality of Novartis's settlement with Sun is not at issue............26

E.     The First Circuit's recent decision in *Puerto Rico Telephone* supports application of the *California Motor* standard to this case. ....................................................................................28

F.     The purchasers allege a viable *Walker Process* claim. ......................30

    1.    The purchasers allege that Novartis made misrepresentations and omissions during prosecution of the second Gleevec patent.........................................................30

    2.    The purchasers allege materiality under any standard.............33

    3.    The purchasers allege intent to deceive. ...................................37

III.    CONCLUSION............................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Abbott Labs. v. Teva Pharm. USA, Inc.*,
    432 F. Supp. 2d 408 (D. Del. 2006) ................................................................. 25

*Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*,
    764 F.3d 1366 (Fed. Cir. 2014) ..................................................................... 6

*Alcon Research, Ltd. v. Apotex, Inc.*,
    No. 09-cv-102, 2013 WL 2244338 (S.D. Ind. May 21, 2013) ............................ 34

*Allergan, Inc. v. Teva Pharm. USA, Inc.*,
    No. 15-cv-1455, 2017 WL 4803941 (E.D. Tex. Oct. 16, 2017) .......................... 31

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................. 20

*In re AndroGel Antitrust Litig. (No. II)*,
    687 F. Supp. 2d 1371 (N.D. Ga. 2010) ........................................... 12, 16, 17, 18

*Argus Chem. Corp. v. Fibre Glass-Evercoat Co.*,
    812 F.2d 1381 (Fed. Cir. 1987) ..................................................................... 37

*Asahi Glass Co. v. Pentech Pharm.*,
    289 F. Supp. 2d 986 (N.D. Ill. 2003) ............................................................. 15

*Bourns, Inc. v. Raychem Corp.*,
    331 F.3d 704 (9th Cir. 2003) ........................................................................ 26

*Bristol-Myers Squibb Co. v. Ben Venue Labs.*,
    90 F. Supp. 2d 522 (D.N.J. 2000) .............................................................. 30, 36

*Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*,
    752 F.3d 967 (Fed. Cir. 2014) ....................................................................... 6

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) .................................................................................... 28

*In re Cardizem CD Antitrust Litig.*,
  105 F. Supp. 2d 618 (E.D. Mich. 2000) ..................................................13, 17, 18

*In re Celebrex (Celecoxib) Antitrust Litig.*,
  No. 14-cv-361, 2015 WL 13264206 (E.D. Va. Nov. 6, 2015) ..........................38

*In re Ciprofloxacin Hydrochloride Antitrust Litig. (Cipro I)*,
  261 F. Supp. 2d 188 (E.D.N.Y. 2003) .................................................................14

*In re Ciprofloxacin Hydrochloride Antitrust Litig. (Cipro II)*,
  363 F. Supp. 2d 514 (E.D.N.Y. 2005) .................................................................14

*D.R. Ward Constr. Co. v. Rohm & Haas Co.*,
  470 F. Supp. 2d 485 (E.D. Pa. 2006)..................................................................26

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) ..............................................................................24

*Dippin' Dots, Inc. v. Mosey*,
  476 F.3d 1337 (Fed. Cir. 2007) ............................................................30, 36, 37

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick
  Co.*,
  464 F.3d 1356 (Fed. Cir. 2006) ............................................................................6

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013).......................................................................2, 3, 5, 9

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
  575 F.3d 1312 (Fed. Cir. 2009) .........................................................................36

*In re Flonase Antitrust Litig.*,
  795 F. Supp. 2d 300 (E.D. Pa. 2011)..................................................................15

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013)......................................................................................14, 27

*Grogan v. Garner*,
  498 U.S. 279 (1991)............................................................................................20

*Gunn v. Minton*,
  568 U.S. 251 (2013)......................................................................................14, 15

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
  701 F.3d 1351 (Fed. Cir. 2012) .........................................................13

*Hydril Co. LP v. Grant Prideco LP*,
  474 F.3d 1344 (Fed. Cir. 2007) .........................................................37

*Intellect Wireless, Inc. v. HTC Corp.*,
  732 F.3d 1339 (Fed. Cir. 2013) .........................................................37

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
  No. 13-cv-740, 2013 WL 6682981 (E.D. Va. Dec. 18, 2013) ...........19

*King Drug Co. of Florence v. Cephalon, Inc.*,
  702 F. Supp. 2d 514 (E.D. Pa. 2010).................................................25

*La. Wholesale Drug Co. v. Sanofi-Aventis*,
  No. 07-cv-7343, 2009 WL 2708110 (S.D.N.Y. Aug. 28, 2009) .......15

*In re Lantus Direct Purchaser Antitrust Litig.*,
  No. 16-cv-12652, 2018 WL 355372 (D. Mass. Jan. 10, 2018) .........19

*In re Lidoderm Antitrust Litig.*,
  103 F. Supp. 3d 1155 (N.D. Cal. 2015)..............................................25

*LifeScan, Inc. v. Home Diagnostics, Inc.*,
  103 F. Supp. 2d 379 (D. Del. 2000)...................................................35

*In re Lipitor Antitrust Litig.*,
  855 F.3d 126 (3d Cir. 2017) ..............................................................15

*In re Lipitor Antitrust Litig.*,
  868 F.3d 231 (3d Cir. 2017) ..............................................................13

*In re Lipitor Antitrust Litig.*,
  No. 12-cv-2389, 2013 WL 4780496 (D.N.J. Sept. 5, 2013) .............15

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-md-2420, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) .........26

*In re Loestrin 24 Fe Antitrust Litig.*,
  261 F. Supp. 3d 307 (D.R.I 2017) .........................................15, 18, 30

*In re Loestrin 24 Fe Antitrust Litig.*,
    814 F.3d 538 (1st Cir. 2016) ................................................................27

*In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*,
    Nos. 06-cv-52, 06-cv-71, 2010 WL 1485328 (D. Del. Apr. 13,
    2010) ......................................................................................................25

*In re Modafinil Antitrust Litig.*,
    837 F.3d 238 (3d Cir. 2016) ................................................................26

*Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.*,
    402 F. Supp. 2d 276 (D.D.C. 2005) ....................................................26

*Morton Grove Pharm., Inc. v. Par Pharm. Co.*,
    No. 04-cv-7007, 2006 WL 850873 (N.D. Ill. Mar. 28, 2006) ............16

*In re Netflix Antitrust Litig.*,
    506 F. Supp. 2d 308 (N.D. Cal. 2007) ................................................26

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015) ....................................................................27

*Nobelpharma AB v. Implant Innovations, Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998) ..............................................30, 36, 37

*P.R. Tel. Co., Inc. v. San Juan Cable LLC*,
    874 F.3d 767 (1st Cir. 2017) ..............................................2, 11, 12, 29

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*,
    984 F.2d 1182 (Fed. Cir 1993) ....................................................30, 36

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2008) ............................................................6

*Pfizer Inc. v. Mylan Pharm. Inc.*,
    71 F. Supp. 3d 458 (D. Del. 2014) ........................................................6

*Picone v. Shire PLC*,
    No. 16-cv-12396, 2017 WL 4873506 (D. Mass. Oct. 20, 2017) ........19

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945) ............................................................................34

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ......................................................................................*passim*

*Refac Int'l Ltd. v. Lotus Dev. Corp.*,
    81 F.3d 1576 (Fed. Cir. 1996) .................................................................30, 36

*In re Relafen Antitrust Litig.*,
    346 F. Supp. 2d 349 (D. Mass. 2004) ................................................................25

*In re Remeron Antitrust Litig.*,
    335 F. Supp. 2d 522 (D.N.J. 2004) ...................................................................26

*Ritz Camera & Image, LLC v. SanDisk Corp.*,
    700 F.3d 503 (Fed. Cir. 2012) ..........................................................14, 24, 25

*SanDisk Corp. v. STMicroelectronics, Inc.*,
    No. 04-cv-4379, 2008 WL 4615605 (N.D. Cal. Oct. 17, 2008) ........................37

*Sanofi-Synthelabo v. Apotex, Inc.*,
    550 F.3d 1075 (Fed. Cir. 2008) ..........................................................................6

*Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*,
    204 F.3d 1368 (Fed. Cir. 2000) ........................................................................30

*Sheet Metal Workers Local 441 Health & Welfare Plan v.
    GlaxoSmithKline, PLC*,
    737 F. Supp. 2d 380 (E.D. Pa. 2009) ................................................................25

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
    No. 12-md-2343, 2013 WL 2181185 (E.D. Tenn. May 20, 2013) .....................12

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
    No. 14-md-02503, 2015 WL 5458570 (D. Mass. Sept. 16, 2015) .....................19

*Sun Pharma Global FZE v. Novartis Pharm. Corp.*,
    No. 13-cv-03542 (D.N.J. Aug. 19, 2013), ECF No. 16 .....................................10

*In re Thalomid & Revlimid Antitrust Litig.*,
    No. 14-cv-6997, 2015 WL 9589217 (D.N.J. Oct. 29, 2015) ............12, 18, 19, 25

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) .................................................................30, 33

*TransWeb, LLC v. 3M Innovative Props. Co.*,
812 F.3d 1295 (Fed. Cir. 2016) .........................................................37

*Unitherm Food Sys. Inc. v. Swift-Eckrich, Inc.*,
375 F.3d 1341 (Fed. Cir. 2004) .........................................................37

*Valeant Int'l (Barbados) SRL v. Watson Pharm., Inc.*,
No. 10-cv-20526, 2011 WL 6792653 (S.D. Fla. Nov. 8, 2011).........................6

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
382 U.S. 172 (1965)................................................................14, 23, 24

*In re Wellbutrin XL Antitrust Litigation*,
868 F.3d 132 (3d Cir. 2017) ...............................................................28

*Xitronix Corp. v. KLA-Tencor Corp.*,
No. 16-2746, 2018 WL 798662 (Fed. Cir. Feb. 9, 2018)...................................15

**Other Authorities**

37 C.F.R. § 1.4(d)(4)(i) .......................................................................34

37 C.F.R. § 1.56(a)..............................................................................35

37 C.F.R. § 11.18(b)(1).........................................................................34

C. Scott Hemphill & Bhaven Sampat, *Drug Patents at the Supreme
Court*, 339 Science 1386 (2013) ...........................................................8

Elec. Clerk's Notes, *In re Lantus Direct Purchaser Antitrust Litig.*,
No. 16-cv-12652 (D. Mass. Feb. 9, 2018), ECF No. 45....................................19

FTC, *Generic Drug Entry Prior to Patent Expiration: An FTC Study*
(2002),
https://www.ftc.gov/sites/default/files/documents/reports/generic-
drug-entry-prior-patent-expiration-ftc-
study/genericdrugstudy_0.pdf ...............................................................8

Order, *In re Effexor Antitrust Litig.*, No. 11-cv-05479 (D.N.J. Jan. 16,
2015), ECF No. 403 ...........................................................................25

USPTO, *Manual of Patent Examining Procedure* (8th ed. Rev. 8, Jan.
2018) ..........................................................................................34

# I.    INTRODUCTION

This case is about whether Novartis may escape antitrust scrutiny for using an almost certainly invalid patent to prolong its monopoly over the life-saving drug Gleevec.

The purchasers' complaints explain, in detail, why a reasonable pharmaceutical manufacturer in Novartis's position would not realistically expect to prove that Novartis's second Gleevec patent was valid and infringed. The β crystal (non-needle) form of imatinib mesylate possesses utterly predictable qualities. It either spontaneously occurs, or is so close to occurring on its own that it can be created with minimal laboratory work. Whether one labels this "inherent anticipation" or "obviousness," the non-needle form is unpatentable over Novartis's earlier Gleevec patent.

Novartis convinced the PTO to issue the second Gleevec patent by misrepresenting and omitting key facts: Novartis averred that the non-needle form was "surprising" and that it had never before prepared imatinib mesylate. Both were untrue.

Novartis tries to counter the purchasers' allegations by emphasizing that *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* ("*PRE*")[1] is a high bar and the *Noerr-Pennington* doctrine protects corporations'

---

[1] 508 U.S. 49 (1993).

petitioning activities. But the purchasers' allegations meet *PRE*. And *Noerr-Pennington* provides only a limited immunity, one with firm boundaries that ensure anticompetitive conduct dressed up as petitioning is not allowed. As the First Circuit recently highlighted, courts must balance a corporation's right to petition against the public's interest in "free and unfettered competition."[2]

Novartis implies that it had a "good faith" or "reasonable" belief that the second patent "may" have been adjudicated valid.[3] But Novartis cannot insulate itself with such vague, self-serving suggestions at the motion to dismiss phase, particularly not when the purchasers allege detailed facts to the contrary.[4]

Novartis's position is that purchasers must functionally *prove* their allegations to survive a motion to dismiss in a patent-based antitrust action. But as this Court emphasized in *Evergreen Partnering Group, Inc. v. Pactiv Corp.*,[5] at the motion to dismiss stage, district courts "need not concern [them]selves with the evidentiary sufficiency of [a plaintiff's] antitrust claims on the merits."[6] Instead,

---

[2] *P.R. Tel. Co., Inc. v. San Juan Cable LLC*, 874 F.3d 767, 774 (1st Cir. 2017) (Barron & Torruella, JJ., concurring) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958)).

[3] Br. of Defendants-Appellees at 1-2 ("Novartis's Br.").

[4] If Novartis wishes to put its "good faith" at issue it may do so when this case proceeds to discovery, and only if the purchasers are permitted to test that assertion.

[5] 720 F.3d 33 (1st Cir. 2013).

[6] *Id.* at 43.

they must "accept as true all factual allegations contained in a complaint, make all reasonable inferences in favor of the plaintiff, and properly refrain from any conjecture as to whether . . . allegations may prove deficient at the summary judgment or later stages."[7] "Requiring . . . heightened pleading requirements at the earliest stages of litigation," as Novartis advocates here, "would frustrate the purpose of antitrust legislation and the policies informing it."[8] This Court has sought to stem the "slow influx of unreasonably high pleading requirements at the earliest stages of antitrust litigation" that has "resulted from citations to case law evaluating antitrust claims at the summary judgment and post-trial stages . . . ."[9] This appeal presents another opportunity for the Court to arrest that trend.

Invalid patents do not endow pharmaceutical companies with a right to restrain competition. Where a reasonable litigant has no realistic expectation that its patent will be upheld, a company may not use that patent to keep its competitors out of the market. Novartis's right to petition must give way to society's interest in access to affordable medicines.

---

[7] *Id.* at 45 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

[8] *Id.* at 47 (citing *Radovich v. NFL*, 352 U.S. 445, 454 (1957)).

[9] *Id.* at 44.

## II.    ARGUMENT

**A.    The purchasers adequately allege *facts* supporting their sham litigation antitrust claim.**

**1.    The purchasers allege facts establishing no reasonable pharmaceutical manufacturer in Novartis's position would have realistically expected to succeed in obtaining a declaration that the second Gleevec patent was valid and infringed.**

The purchasers' complaints allege that a reasonable pharmaceutical manufacturer in Novartis's position would not realistically expect to succeed on the merits of Novartis's counterclaim – i.e., win a declaratory judgment that all claims of the second Gleevec patent were valid.[10] The purchasers allege detailed facts in support.

Novartis formulated and used the mesylate salt form of imatinib years earlier; Novartis disclosed the mesylate salt in earlier articles and the Zimmerman patent.[11] These actions rendered the mesylate salt form of imatinib, on its own, obvious.

As to the β crystal form: this non-needle form possessed entirely predictable properties. It had better flow, greater stability, and less hygroscopicity.[12] And imatinib mesylate either (1) naturally converts to the non-needle form or (2) is so close to converting without help that it can be resolved through simple laboratory

---

[10] SA-000110-11.

[11] JA-000081 (¶¶ 195, 197).

[12] JA-000070 (¶ 138).

techniques well known to pharmaceutical formulation chemists at the time.[13] By 2000, both the *problems* associated with needle-shaped crystals (poor flow, instability, a tendency to absorb water) and the *solution* to these problems (how to modify crystals into their non-needle forms) were well known.[14] According to the examiner, Novartis's disclosed methods for making the non-needle form (polar solvents with heat, crystal seeding) "relie[d] on standard procedures."[15]

It did not take Novartis's scientists long to develop the non-needle form.[16] The state of the art taught toward, not away from, non-needle forms.[17] It was neither surprising nor unexpected for Novartis to seek and then successfully manufacture the non-needle form.[18] Novartis never professed that producing the non-needle form was difficult or required undue experimentation.[19]

---

[13] JA-000045-46 (¶¶ 41-43); JA-000069-70 (¶¶ 136-38); JA-000085-86 (¶¶ 210-11). The district court's opinion seems to reject the facts the purchasers pleaded. Before bringing this case, the purchasers consulted with experts in the pharma-chemical field as well as an expert in crystals. These specialists concluded that Novartis's claimed β crystal would have been obvious to one of skill in the art in the 1990s. But such factual disputes are for a jury to decide at trial, not the district court on a Rule 12(b)(6) motion. *See Evergreen*, 720 F.3d at 43, 45.

[14] JA-000045-46 (¶¶ 41-45); JA-000069-70 (¶¶ 136-38).

[15] JA-000462.

[16] JA-000083-84 (¶¶ 201-03).

[17] JA-000084 (¶ 203).

[18] JA-000069-70 (¶¶ 136-38).

[19] JA-000084 (¶¶ 202-03).

The purchasers allege, on these facts, that the second Gleevec patent was invalid due to either inherency by anticipation (because imatinib mesylate naturally converts to its non-needle form) or obviousness (because it is so close to converting on its own that simple laboratory techniques complete the process). Manufacture of non-needle imatinib mesylate was "'nothing more than routine' application of a well-known problem-solving strategy"[20] – "the work of a skilled chemist, not of an inventor."[21]

---

[20] *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1368 (Fed. Cir. 2008) (quoting *Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989)). The purchasers rely on *Pfizer* as canonical example of the obvious-to-try doctrine. Despite Novartis's claim, Novartis's Br. at 57 n.38, the Federal Circuit has *not* narrowed *Pfizer*'s holding, but instead regularly relies on it. *See, e.g.*, *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1379 (Fed. Cir. 2014); *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 973 (Fed. Cir. 2014). *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075 (Fed. Cir. 2008), which Novartis cites, is factually distinct: according to experts, the invention at issue there was *not* the result of "simple or routine procedures," but rather resulted from years of experimentation that entailed synthesization of at least 1500 compounds. The other two district court cases Novartis cites reference *Pfizer* approvingly and then distinguish *Pfizer* on the facts. *See Pfizer Inc. v. Mylan Pharm. Inc.*, 71 F. Supp. 3d 458, 467, 474 (D. Del. 2014), *aff'd*, 628 F. App'x 764 (Fed. Cir. 2016); *Valeant Int'l (Barbados) SRL v. Watson Pharm., Inc.*, No. 10-cv-20526, 2011 WL 6792653, at *12 (S.D. Fla. Nov. 8, 2011), *aff'd sub nom. Valeant Int'l Bermuda v. Actavis, Inc.*, 534 F. App'x 999 (Fed. Cir. 2013). These district court decisions cannot narrow *Pfizer*. And the Federal Circuit affirmed them in non-precedential opinions, which do not "add[] significantly to the body of law." Fed. Cir. R. Practice 32.1(b).

[21] *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1371 (Fed. Cir. 2006).

The purchasers also identify materials that support the plausibility of these factual allegations.

*First*, a 2012 study addressing crystal forms of imatinib mesylate reports that amorphous imatinib mesylate (a form where the molecules are not organized into a crystal structure) converts to the β crystal form at room temperature and that Novartis's seeding technique was unnecessary.[22]

*Second*, the Supreme Court of India invalidated the Indian version of the second Gleevec patent, holding that patent obvious (under Indian law) in light of Zimmermann and the prior art.[23]

*Third*, before 2006, when settlements between brand and generic companies in patent infringement lawsuits were less common, brand companies, such as Novartis, lost *86 percent* of all suits brought to enforce secondary patents, such as

---

[22] JA-0000705-07 ("[T]he amorphous phase suffered a transition to form β with time at room temperature."); JA-0000708 ("[S]eeding is not important in this case and the amorphous material is able to form critical nuclei that continually grow into the matrix to produce form β."). The FDA's 2007 guidance on polymorphism, cited by Novartis, instructed pharmaceutical companies to explore the different polymorphic forms of active ingredients and encouraged use of polymorphic forms suitable for making commercial quantities of drugs. JA-000691. This guidance supports the purchasers' allegations that Novartis would have been motivated to study, identify, and use the non-needle form when manufacturing commercial quantities of Gleevec.

[23] JA-000803.

the second Gleevec patent, that were litigated to completion.[24] These figures

expose an important reality: just because a secondary patent issues does not mean

that it is valid.

At the motion to dismiss stage, the purchasers' detailed factual allegations

must be accepted as true. Novartis may dispute the purchasers' factual allegations

at summary judgment and trial, after discovery.

Novartis claims that the district court "accepted Plaintiffs' factual allegations

as to patent invalidity as true."[25] Not so. The district court *acknowledged* some of

the purchasers' allegations but did not *accept all of them*. The district court recited

the purchasers' allegation that "anyone skilled in the art at the time would have

known that the needle-shaped, α-crystalline form of mesylate salt was not suitable

for pharmaceutical production and would have tried to find a non-needle form

(such as the β-crystalline form)."[26] And the court recounted the purchasers'

allegation that "the two techniques Novartis described in its patent application,

which produced the β-crystalline form, were commonly known methods for

---

[24] C. Scott Hemphill & Bhaven Sampat, *Drug Patents at the Supreme Court*, 339 Science 1386, 1387 (2013), http://awa2014.concurrences.com/IMG/pdf/drug_patents_at_the_supreme_court_science.pdf; *see also* FTC, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* vi-vii (2002), https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf (generic companies prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002).

[25] Novartis's Br. at 49.

[26] ADD-026.

developing alternate crystalline forms at the time."[27] But the court *rejected* these allegations: "Here, the prior art did not disclose the existence or properties of the β-crystalline form or the method by which it could be derived."[28] This was error.[29]

### 2. The purchasers allege that Novartis "asserted," not just "defended," its patent.

Novartis argues throughout its opening brief that it was entitled to "defend" the second Gleevec patent.[30] But Novartis did not just "defend" itself, it affirmatively *asserted* its patent against its would-be competitor, Sun.

Sun sent Novartis a paragraph IV notice setting forth its basis for alleging that the second Gleevec patent was invalid and not infringed.[31] Novartis did not, then, sue Sun for infringement. But when Sun later sought a declaratory judgment that the patent was invalid and not infringed, Novartis *counterclaimed*. Novartis sought a judgment "that the [second Gleevec] patent is valid and enforceable" and infringed, and a permanent injunction keeping Sun off the market until the second

---

[27] ADD-026.

[28] ADD-027.

[29] *See Evergreen*, 720 F.3d at 45 ("At these early stages in the litigation, the court has no substantiated basis in the record to credit a defendant's counterallegations. Instead, we may at this early stage only accept as true all factual allegations contained in a complaint . . . .").

[30] *See, e.g.*, Novartis's Br. at 3, 36, 40, 58.

[31] SA-000098 (¶ 40).

Gleevec patent expired.[32] Properly framed, the *PRE* sham litigation inquiry asks whether a reasonable litigant would have realistically expected success on the merits of *that* litigation – Novartis's counterclaim asserting validity and infringement of the second Gleevec patent.

### 3. The purchasers allege that Sun challenged the second Gleevec patent's validity.

The purchasers are not the first to challenge the validity of the second Gleevec patent. Sun did so earlier, maintaining, from its June 2006 ANDA filing through its May 2014 settlement with Novartis, that the patent was invalid.[33] The purchasers allege that: Sun told both the FDA and Novartis that it believed the second Gleevec patent was invalid;[34] Sun sent Novartis a "detailed factual and legal statement as to why the [second] patent is invalid, unenforceable, and/or not infringed by Sun's ANDA product";[35] Sun's complaint alleged the second patent was invalid for obviousness and anticipation;[36] and Sun's answer to Novartis's counterclaim re-alleged invalidity, obviousness, and anticipation.[37]

---

[32] SA-000110, 112.

[33] JA-000100 (¶ 283) (ANDA filing date); JA-000105 (¶ 308) (settlement date).

[34] JA-000100-01 (¶¶ 283-85).

[35] JA-000101 (¶ 285). The purchasers do not have this letter.

[36] SA-000091-92, 99 (¶¶ 1, 50).

[37] Answer & Affirmative Defenses to Countercls. at 7, *Sun Pharma Global FZE v. Novartis Pharm. Corp.*, No. 13-cv-03542 (D.N.J. Aug. 19, 2013), ECF No. 16.

### 4. Novartis misinterprets the Patent Trial and Appeals Board's decision.

Novartis misrepresents that the Patent Trial and Appeals Board held "the claimed β-crystalline form [was] patentable."[38] Not so. The Board expressed no opinion as to the second patent's validity; it decided neither anticipation nor obviousness.[39] Instead, it addressed a procedural, burden-shifting issue: the Board concluded that the examiner had not identified specific facts that would allow her to shift the burden to Novartis to prove lack of anticipation and non-obviousness.[40] The purchasers allege that the Board reversed the examiner because she took incorrect procedural shortcuts in her anticipation and obviousness analyses.[41]

### B. The purchasers adequately allege an antitrust claim premised on sham litigation.

The First Circuit recently cautioned that the sham exception to *Noerr-Pennington* should not be read so rigidly as to "afford litigious monopolists a potentially significant safe harbor from antitrust liability."[42] In so doing, it relied on a "record-based, case-specific" analysis to determine whether the sham

---

[38] Novartis's Br. at 10-11.

[39] JA-000091-92 (¶¶ 240-45); JA-000094-95 (¶¶ 256-58); ADD-042-45.

[40] ADD-042-45.

[41] JA-000092 (¶¶ 242, 244); JA-000094-95 (¶¶ 256-58).

[42] *See P.R. Tel. Co.*, 874 F.3d at 773 (Barron & Torruella, JJ., concurring).

exception applied to the particular facts at hand.[43] And it reiterated that a corporation's right to petition the courts must be balanced against the public's interest in free and unfettered competition.[44]

### 1. Patent validity can be addressed in an antitrust case.

To invoke the sham litigation exception to *Noerr-Pennington* under *PRE*, purchasers must allege that no reasonable pharmaceutical company in Novartis's position would have realistically expected to obtain a declaration of validity and non-infringement as to the claims of the second Gleevec patent. There are a number of ways purchasers can plausibly plead such a claim: they can point to other judicial decisions that have disparaged the patent at issue;[45] they can point to facts suggesting the patent was obtained through fraud;[46] they can point to facts suggesting the patented invention was inherent in an earlier patent; they can explain why the state of scientific understanding at the time of the patent application rendered the professed invention obvious;[47] and they can establish the

---

[43] *Id.*

[44] *Id.* at 774.

[45] *See, e.g.*, *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-md-2343, 2013 WL 2181185, at *10, 18-19 (E.D. Tenn. May 20, 2013).

[46] *See, e.g.*, *In re Thalomid & Revlimid Antitrust Litig.*, No. 14-cv-6997, 2015 WL 9589217, at *12-13 (D.N.J. Oct. 29, 2015).

[47] *See, e.g.*, *In re AndroGel Antitrust Litig. (No. II)*, 687 F. Supp. 2d 1371, 1380 (N.D. Ga. 2010).

generic product did not actually infringe the brand company's patent.[48] Courts have denied motions to dismiss sham litigation claims for each avenue.[49]

Here, the purchasers point to facts that state a plausible claim that the second Gleevec patent was obtained through fraud, point to facts suggesting the second patent was inherent in an earlier invention, and explain – given the state of scientific understanding at the time – why it was obvious. Yet, Novartis would have the Court overlook these allegations and foreclose all possible routes, restricting sham to only those cases where an earlier judicial proceeding tarnished the patent at issue.

Novartis contends that the purchasers cannot make arguments about a patent's validity within an antitrust lawsuit,[50] citing two old and related decisions from the District Court for the Eastern District of New York (*Cipro I* and *Cipro*

---

[48] *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 643-44 (E.D. Mich. 2000).

[49] *See supra* notes 45-48. Courts have consistently recognized that objective baselessness is usually a mixed question of fact and law. *See, e.g.*, *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 272 (3d Cir. 2017) (holding that a factual dispute as to objective baselessness precluded dismissal); *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 701 F.3d 1351, 1360 (Fed. Cir. 2012) (explaining that objective baselessness "may turn on legal positions taken, on factual support for those positions, or both").

[50] Novartis's Br. at 46.

*II*).[51] The Supreme Court rejected this position in *Walker Process*[52] and then

reaffirmed its stance in *FTC v. Actavis, Inc.*[53] (where it functionally reversed *Cipro*

*II*). In *Actavis*, the patentee complained that litigating antitrust claims would

require "litigat[ing] the validity of the patent," which "will prove time consuming,

complex, and expensive" and ought not be permitted.[54] The Court found this gripe

unpersuasive. It confirmed that adjudicating an antitrust claim may sometimes

require determining an underlying patent's validity – *particularly in sham*

*litigation cases*.[55] The Court referred to the defendant's position as "throw[ing] the

baby out with the bath water" and an unnecessarily "drastic step."[56]

That same year, in *Gunn v. Minton*,[57] the Supreme Court held that just

because a state law malpractice claim necessarily required resolution of a federal

patent question did not mean the patent question divested the state court of

---

[51] *In re Ciprofloxacin Hydrochloride Antitrust Litig.* (*Cipro II*), 363 F. Supp. 2d 514 (E.D.N.Y. 2005); *In re Ciprofloxacin Hydrochloride Antitrust Litig.* (*Cipro I*), 261 F. Supp. 188 (E.D.N.Y. 2003).

[52] *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 175 (1965) (permitting a plaintiff to challenge the validity of a patent in an antitrust suit); *see also Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 507 (Fed. Cir. 2012) (describing *Walker Process* as allowing plaintiffs to challenge patent validity in antitrust suits).

[53] 570 U.S. 136 (2013).

[54] *Id.* at 153.

[55] *Id.* at 157.

[56] *Id.*

[57] 568 U.S. 251 (2013).

jurisdiction over the case.[58] The state court could not toss out a lawsuit just because it involved a "case within a case."[59] Just so here.

Novartis's reliance on another 2003 district court opinion – *Asahi Glass Co. v. Pentech Pharmaceuticals*[60] – does not help. First, *Asahi* is pre-*Actavis*. Second, *Asahi* again reinforces the purchasers' position: a patent holder is not allowed to enforce a patent that a "neutral observer would reasonably think . . . was almost certain to be declared invalid."[61]

---

[58] *Id.* at 259; *see also Xitronix Corp. v. KLA-Tencor Corp.*, No. 16-2746, 2018 WL 798662, at *3-5 (Fed. Cir. Feb. 9, 2018) (functionally overruling a portion of the Federal Circuit's affirmance in *Cipro II* and explaining that "mere resolution of a patent issue in a 'case within a case'" is insufficient grounds to transfer the case to the Federal Circuit (quoting *Gunn*, 568 U.S. at 257, 262-64)); *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 146 (3d Cir. 2017) (same).

[59] *Gunn*, 568 U.S. at 259.

[60] 289 F. Supp. 2d 986 (N.D. Ill. 2003).

[61] *Id.* at 993. *PRE* speaks of a "reasonable litigant," not a "neutral observer." The reasonableness of the enforcement action must be assessed from the point of view of a reasonable litigant in the antitrust defendant's position, apprised of the knowledge it had. *See In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 348 (D.R.I 2017) (crediting the "reasonable pharmaceutical company" construction); *In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300, 313 (E.D. Pa. 2011) (imputing the defendant's knowledge to *PRE*'s reasonable litigant); *La. Wholesale Drug Co. v. Sanofi-Aventis*, No. 07-cv-7343, 2009 WL 2708110, at *4 (S.D.N.Y. Aug. 28, 2009); *cf. In re Lipitor Antitrust Litig.*, No. 12-cv-2389, 2013 WL 4780496, at *22 (D.N.J. Sept. 5, 2013) (framing the question, in the citizen petition context, as whether a "reasonable pharmaceutical manufacturer could have 'realistically expected the FDA to grant the relief sought'" (quoting *La. Wholesale Drug*, 2013 WL 4780496, at *4)).

## 2.     Patent tarnishment is not a prerequisite to sham patent litigation.

Novartis complains that the purchasers "cite nothing from the record of any prior judicial proceeding that would have caused a reasonable patent holder . . . to conclude that a ruling in Sun's favor was a foregone conclusion."[62] Novartis concludes that this "failure" renders the purchasers' "sham allegations implausible under *Twombly.*"[63]

But patent "tarnishment" is not a prerequisite to sham patent litigation.[64] Courts routinely allow sham patent litigation cases to proceed even though no earlier judicial proceeding has invalidated or tarnished the patent at issue.[65] Novartis's efforts to distinguish the purchasers' cases overlook or ignore the portions of those decisions that undermine its "tarnishment" theory.

In *AndroGel*, the purchasers argued that the brand company's lawsuit against a generic was a sham because (1) the generic company's product did not literally infringe the brand's company's patent, and (2) the brand company's patent was invalid.[66] The patent at issue had never been tarnished.[67] The district court denied a

---

[62] Novartis's Br. at 36.

[63] *Id.*

[64] *See, e.g.*, *Morton Grove Pharm., Inc. v. Par Pharm. Co.*, No. 04-cv-7007, 2006 WL 850873, at *11 (N.D. Ill. Mar. 28, 2006) (rejecting the argument that the presumption of validity required dismissal of a sham litigation antitrust claim at the motion to dismiss stage).

[65] *See* Purchasers' Br. at 47.

[66] 687 F. Supp. 2d at 1379-81.

motion to dismiss the sham litigation claim.[68] The court first explained that the purchasers' infringement argument presented an issue of fact that could not be resolved at the 12(b)(6) stage.[69] The court then explained that the purchasers set forth a *patent invalidity theory* that was "sufficient to state a plausible antitrust claim."[70] Novartis ignores this second ground.[71]

And even if the district court had decided based solely on non-infringement grounds, *AndroGel* still applies. In both *AndroGel* and *Cardizem*, the purchasers allege the generic products did not infringe the asserted patents, and, therefore, the lawsuits were shams. As here, the *Cardizem* and *AndroGel* sham litigation theories were fact-bound.[72] And *no prior court had tested these non-infringement theories or validated them.*[73] But the courts still denied the defendants' Rule 12(b)(6)

---

[67] *Id.* at 1375.

[68] *Id.* at 1380-81.

[69] *Id.* at 1381.

[70] *Id.* Novartis further misinterprets a later *AndroGel* opinion (the summary judgment opinion) as supporting the proposition "that the inquiry [in sham cases] should be confined to the record in the underlying case." Novartis's Br. at 33. Novartis quotes this decision as stating "[a] finding of objective baselessness is to be determined by the record made in the infringement proceedings." *Id.* (quoting *In re AndroGel Antitrust Litig. (No. II)*, 888 F. Supp. 2d 1336, 1344 (N.D. Ga. 2012)). Novartis ignores the fact that the district court *considered* the purchasers' patent invalidity argument in the sham case *even though* there was no substantive ruling on that invalidity theory in the patent litigation below.

[71] *See* Novartis's Br. at 37-38.

[72] *See AndroGel*, 687 F.3d at 1379-81; *Cardizem*, 105 F. Supp. 2d at 643 n.11.

[73] *See AndroGel*, 687 F.3d at 1375; *Cardizem*, 105 F. Supp. 2d at 632.

motions[74] because no prior judicial validation of the purchasers' underlying patent theory is necessary.

Novartis also attempts to distinguish the purchasers' citations to *Loestrin 24* and *In re Thalomid & Revlimid Antitrust Litigation*.[75] Novartis claims the courts in those cases "found" that reverse payments – not invalidity arguments – "provide[d] a plausible basis to question whether the patent holder had probable cause to sue."[76] Both cases involved pay-for-delay settlements. But neither decision suggests that the sham litigation claim could proceed only *because of* the alleged reverse payment. The *Loestrin 24* court considered the purchasers' sham litigation and reverse payment allegations separately, never drawing a link between the two.[77] The *Thalomid* court first explained that the purchasers' "factual allegations showing that [antitrust defendant] *procured the [patents at issue] by committing fraud* plausibly show that the patent infringement suits were objectively baseless because a reasonable litigant would know that a lawsuit to enforce invalid patents is without probable cause."[78] That the court later recognized that the alleged

---

[74] *See AndroGel*, 687 F.3d at 1380-81; *Cardizem*, 105 F. Supp. 2d at 643-44.

[75] 2015 WL 9589217.

[76] Novartis's Br. at 37.

[77] 261 F. Supp. 3d at 348-49 (sham analysis without reference to the reverse payment allegation).

[78] *Thalomid*, 2015 WL 9589217, at *12 (emphasis added).

reverse payment added further plausibility to the sham allegations does not change its earlier conclusion that the fraud facts were sufficient.[79]

None of the four district court cases Novartis cites supports its tarnishment rule. In three cases, the antitrust plaintiffs apparently failed to provide detailed factual support for their sham allegations, asserting only that the patents were "weak" or "not infringed."[80] (In two of these, the courts allowed the plaintiffs to amend their complaints to cure these deficiencies.[81]) The unspecific allegations in those cases are unlike the detailed allegations the purchasers provide here.

The fourth case merely observed that there had been no prior tarnishment. The court then went on to consider the merits of the sham allegations.[82] If that court had intended to draw the line at tarnishment, it would not have then proceeded to a detailed analysis of the sham claim.

---

[79] *Id.* at *13.

[80] *See In re Lantus Direct Purchaser Antitrust Litig.*, No. 16-cv-12652, 2018 WL 355372, at *12 (D. Mass. Jan. 10, 2018); *Picone v. Shire PLC*, No. 16-cv-12396, 2017 WL 4873506, at *7 (D. Mass. Oct. 20, 2017); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 13-cv-740, 2013 WL 6682981, at *7 (E.D. Va. Dec. 18, 2013). *Lantus* did not involve a sham litigation via invalidity argument. It makes little sense to discuss tarnishment in a non-infringement context when infringement is a highly fact-specific analysis of the particular product at issue.

[81] *Picone*, 2017 WL 4873506, at *7; Elec. Clerk's Notes, *In re Lantus Direct Purchaser Antitrust Litig.*, No. 16-cv-12652 (D. Mass. Feb. 9, 2018), ECF No. 45 (the court indicated during a telephone conference with purchasers last week that they could amend their complaint).

[82] *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2015 WL 5458570, at *11 (D. Mass. Sept. 16, 2015).

### 3. Novartis's tarnishment rule runs contrary to the purpose of the sham exception to *Noerr Pennington*'s limited protection.

Purchasers forced to pay higher drug prices due to brand pharmaceutical companies' sham enforcement of invalid patents should be allowed to challenge such conduct. *PRE* is a powerful gatekeeper[83]: pharmaceutical companies that enforce properly obtained patents – even when those suits are ultimately unsuccessful – face no antitrust liability. Only those companies that prosecute lawsuits to harass and delay their competitors, when a reasonable company would not realistically expect to win, will answer to antitrust claims – *as they should.*

A tarnishment rule would immunize the anticompetitive conduct of companies that enforce obviously invalid patents and then settle those suits quickly, before courts have to rule on the merits. It would immunize patent holders who had so little confidence in their patents that they immediately settled rather than face a decision.

Finally, what type of "tarnishment" ruling would count? An unfavorable *Markman* decision? A denial of a motion to dismiss in the underlying patent infringement action? An international decision invalidating the patent at issue?

---

[83] Novartis argues for a "clear and convincing" standard of proof. Novartis's Br. at 25. The preponderance of the evidence standard applies. *See, e.g.*, *Grogan v. Garner*, 498 U.S. 279, 286 (1991). But various Supreme Court Justices have acknowledged that there is little practical difference between the "clear and convincing" and "preponderance of the evidence" standards at summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 267 (1986) (Brennan, J., dissenting); *id.* at 269-73 (Rehnquist, J. & Berger, C.J., dissenting).

Here, the Supreme Court of India invalidated the second Gleevec patent as obvious in light of the prior art. Presumably, Novartis does not think this constitutes tarnishment.

### 4. "Realistic expectation of success" does not mean "a ghost of a chance."

When the end payer purchasers first filed this lawsuit, they sought injunctive relief on an expedited track. They asked for limited discovery and an expedited trial on the patent issue at the center of this antitrust action.[84] But, as the purchasers explained, the clarity and simplicity of the patent issue would require no claim construction briefing or *Markman* hearing.[85]

Novartis tries to spin the purchasers' request for an expedited hearing on the second patent's validity as a concession: "if an evidentiary hearing is required to resolve the issue of patentability, then a reasonable patent holder could have perceived some chance of prevailing in the Sun Litigation."[86] But the *PRE* standard is not whether there could be "*some chance*" of prevailing.[87] The *PRE* standard asks whether a reasonable litigant would have a *realistic* expectation of success; whether a *reasonable* litigant would sue, absent the collateral benefit of delayed

---

[84] SA-000004-06.

[85] *Id.* (the purchasers believed that the patent issue could be "discovered, and decided, by November 2015").

[86] Novartis's Br. at 39.

[87] *Id.* (emphasis added).

competition.[88] Ignoring reasonableness eviscerates *PRE*'s objectivity. As Justice Stevens warned in his concurrence to *PRE*, "[i]t might not be objectively reasonable to bring a lawsuit just because some form of success on the merits – no matter how insignificant – could be expected."[89] A mere ghost of a possibility is not enough.

> ### 5. Novartis's insistence that objective baselessness be determined at the *filing* of the underlying patent litigation contradicts its position that the purchasers' sham claims turn on the *outcome* of that litigation.

Novartis states: "[t]he question in a sham case is not, as Plaintiffs would have it, whether the lawsuit alleged to be a sham would have succeeded. Rather, it is whether, from the standpoint of a neutral observer, there was probable cause to sue at the outset, based on information available at the time."[90] Here, this distinction is without difference. The purchasers allege that Novartis knew all the relevant facts at the *outset* of the Sun litigation.[91] And nothing transpired during that lawsuit that would have improved Novartis's likelihood of success.

---

[88] *PRE*, 508 U.S. at 65; *id.* at 67-69 (Stevens, J., concurring).

[89] *Id.* at 68 (Stevens, J., concurring).

[90] Novartis's Br. at 32. Novartis cites the purchasers' statement that "no litigant would realistically expect success on the merits of a suit asserting [the second Gleevec patent] because, as discovery would bear out, the non-needle crystal was an inherent characteristic of imatinib mesylate or else entirely obvious." Purchasers' Br. at 5. The fact that discovery would undermine Novartis's position supports, rather than undermines, the purchasers' sham allegations.

[91] JA-000105 (¶ 306).

Novartis's emphasis on the importance of determining probable cause at the outset of infringement litigation is at odds with Novartis's position on tarnishment. On the one hand, Novartis argues that the "question" in a sham case is whether "there was probable cause to sue *at the outset* [of the patent infringement litigation], based on information available at th[at] time."[92] On the other, Novartis claims that a sham case cannot proceed unless, *after the filing of the patent infringement suit*, some finding of tarnishment occurs.[93] Which is it? Either the proceedings in the infringement litigation matter or they do not. If the question is truly whether probable cause existed *at the outset*, tarnishment should not matter.

## C. Purchasers have standing to bring patent-based antitrust claims.

### 1. The purchasers have standing to bring this antitrust action.

The Supreme Court, appellate courts, and the district courts have all recognized that drug purchasers can bring antitrust actions related to specific patents *even if* they lack standing to directly challenge those patents in an infringement case.

As the Supreme Court explained, an antitrust action "is not barred by the rule that only the United States may sue to cancel or annul a patent."[94] The Court held that the antitrust plaintiff need not have standing under the patent laws to seek

---

[92] Novartis's Br. at 32.

[93] *See id.* at 33-34.

[94] *Walker Process*, 382 U.S. at 175.

a declaration of invalidity.[95] Instead, "an injured party" has standing to "attack the misuse of patent rights" under antitrust law.[96] As the concurrence noted, "as to this class of improper patent monopolies, antitrust remedies should be allowed room for full play."[97]

The Second Circuit and Federal Circuit have embraced this conclusion. In *DDAVP*, the Second Circuit observed that standing to bring antitrust claims emanates from antitrust law.[98] It dismissed concerns that an "avalanche" of patent challenges in antitrust cases would follow. The court noted that *Walker Process* itself "reflects a willingness to let antitrust liability impact the patent system,"[99] and that embracing the defendants' position would "creat[e] the potential 'to leave a significant antitrust violation undetected or unremedied.'"[100]

In *Ritz Camera*, the Federal Circuit held that a plaintiff's status as a direct purchaser gave it standing to bring *Walker Process* claims.[101] "[T]here is nothing novel about the fact that [the purchasers' antitrust claim] includes as one of its

---

[95] *Id.* at 176.

[96] *Id.*

[97] *Id.* at 180.

[98] *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 687-90 (2d Cir. 2009). Nothing in *DDAVP* limits the court's reasoning to direct purchasers.

[99] *Id.* at 690.

[100] *Id.* at 691 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983)).

[101] *Ritz Camera*, 700 F.3d at 508.

elements the need to prove a violation that is not independently actionable between the same parties."[102]

## 2. The end payers have standing to bring their *Walker Process* claim.

Courts routinely allow end payers to bring "*Walker Process* claims": at least eight district courts have permitted end payers to bring state-law antitrust claims based on the defendants' enforcement of patents procured through fraud on the PTO.[103] This is so uncontroversial that most defendants do not make (so most courts do not address) arguments to the contrary. And, as the district court here

---

[102] *Id.*

[103] *Thalidomid*, 2015 WL 9589217, at *11-12 (refusing to dismiss end payer *Walker Process* and state-law claims); *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1173-74 (N.D. Cal. 2015) (permitting end payer state-law claims to proceed based on allegations of fraud on the PTO); *In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, Nos. 06-cv-52, 06-cv-71, 2010 WL 1485328, at *9 (D. Del. Apr. 13, 2010) (refusing to dismiss end payer *Walker Process* claims); *King Drug Co. of Florence v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 531-32 (E.D. Pa. 2010) (permitting end payer *Walker Process* claims to proceed), *abrogated on other grounds by In re K-Dur Antitrust Litig.*, 686 F.3d 197 (3d Cir.), *vacated, Upsher-Smith Labs., Inc. v. La. Wholesale Drug Co., Inc.*, 133 S. Ct. 2849 (2013); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 389 n.1, 393-402 (E.D. Pa. 2009) (permitting end payer state-law claims to proceed based on allegations of fraud on the PTO); *Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408, 434 (D. Del. 2006) (permitting end payer state-law claims to proceed based on allegations of fraud on the PTO); *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 365-70 (D. Mass. 2004) (denying summary judgment (and, inferentially, a motion to dismiss) on end payer *Walker Process* claims); Order, *In re Effexor Antitrust Litig.*, No. 11-cv-05479 (D.N.J. Jan. 16, 2015), ECF No. 403 (adopting the reasoning in its direct purchaser opinion and denying motion to dismiss end payer *Walker Process* fraud and sham litigation claims).

noted, whether purchasers have standing to bring state-law antitrust claims is a question of state law.[104] Because antitrust standing under state law is not a jurisdictional question,[105] and Novartis has declined to argue that the purchasers lack standing under state law, this argument is waived.[106]

## D. The legality of Novartis's settlement with Sun is not at issue.

The purchasers do not challenge the lawfulness of Novartis's settlement with Sun. That agreement, whether lawful or not, is a consequence of Novartis's unlawful acts: obtaining a patent by fraud, and asserting that patent against a would-be competitor in sham litigation.

---

[104] ADD-021-22 (citing *Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 256 (E.D.N.Y.), *aff'd*, 663 F. App'x 71 (2d Cir. 2016), *cert. denied* 137 S. Ct. 1826 (2017)); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 4955377, at *7 (N.D. Cal. Oct. 2, 2014) ("[A]ntitrust standing under state law is just that, a matter of state law."); *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 494 (E.D. Pa. 2006)).

[105] *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 264 n.30 (3d Cir. 2016) (citing *Associated Gen. Contractors*, 459 U.S. at 535 n.31) ("Antitrust standing, unlike Article III standing, is not a jurisdictional requirement.").

[106] Novartis cites *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 711 (9th Cir. 2003), to support its argument that the end payers lack standing to proceed. But nothing in *Bourns* support this contention. Novartis's Br. at 21 n.22. *Bourns* stands for the unremarkable proposition that an antitrust plaintiff must show it is "more than a hopeful bystander"; it must show actual "antitrust injury." *Id.* Novartis also cites *In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522 (D.N.J. 2004). *Remeron* cites no controlling precedent, provides little justification for its conclusion, and fundamentally misunderstands the plaintiff's antitrust claim as a patent claim. *See Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.*, 402 F. Supp. 2d 276, 280 (D.D.C. 2005); *accord In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 316 (N.D. Cal. 2007).

The purchasers cannot challenge the legality of an agreement they know very little about. Novartis has hidden the terms of its settlements with Sun and other generic companies. Novartis would not provide the Sun agreement to the purchasers, and the district court would not compel its production. Therefore, the purchasers do not know whether, for example, the settlement included a large and unjustified reverse payment in exchange for the generic company's agreement to delay its launch. Novartis cannot manipulate the purchasers' unwillingness to challenge settlements they have not seen into an admission of their lawfulness. We cannot concede what we do not know.[107]

Novartis posits that this settlement was procompetitive because it allowed Sun to sell its generic formulation before the second Gleevec patent expired.[108] But the Supreme Court explicitly rejected this "scope of the patent" test in *Actavis*.[109] This Court has acknowledged and followed this ruling.[110]

---

[107] The purchasers do allege that, without the sham lawsuit, Novartis could not have settled with Sun. Horizontal agreements allocating market share (e.g., agreeing on when or at what price a competitor will sell its product) between competitors, outside of the settlement context, are *per se* unlawful. The agreement, including the agreed-upon launch date for Sun, therefore is a consequence of Novartis's sham counterclaim.

[108] Novartis's Br. at 4.

[109] 570 U.S. at 148.

[110] *See, e.g.*, *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 544 (1st Cir. 2016); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 16 (1st Cir. 2015).

**E.    The First Circuit's recent decision in *Puerto Rico Telephone* supports application of the *California Motor* standard to this case.**

The standard set forth in *California Motor Transport Co. v. Trucking Unlimited*[111] should apply to the purchasers' sham allegation.[112] First, Novartis argues that the Third Circuit's recent decision in *In re Wellbutrin XL Antitrust Litigation*[113] "explicitly rejected"[114] the application of *California Motor* in the Hatch-Waxman context.[115] But the *Wellbutrin XL* court rested its decision on the fact that the antitrust defendant there was only involved in "two proceedings – each against an independent defendant – [which] does not constitute a pattern" of serial petitioning.[116] Here, the purchasers allege *nine* acts of sham petitioning.

The First Circuit's recent decision in *Puerto Rico Telephone Company* shows that this Court agrees that the *California Motor* standard may be appropriate in serial sham petitioning cases. There, the Court did not apply *California*

---

[111] 404 U.S. 508 (1972).

[112] Novartis rightly points out that the end payers did not argue below that *California Motor* should apply. That should not preclude the direct purchasers from raising this possibility here, particularly in light of the First Circuit's recent suggestion that its test may be appropriate.

[113] 868 F.3d 132, 157 (3d Cir. 2017), *judgment entered sub nom. In re Wellbutrin XL Antitrust Litig.*, No. 15-2875, 2017 WL 3529114 (3d Cir. Aug. 9, 2017).

[114] Novartis's Br. at 60.

[115] The purchasers disagree with the analysis and conclusions presented in the *Wellbutrin XL* opinion. As it is of limited relevance here, we will not digress.

[116] *Wellbutrin XL*, 868 F.3d at 157.

*Motor*,[117] but as Judge Barron clarified in his concurrence (which Judge Torruella joined):

> [W]e do not hold that the "objectively baseless" requirement for triggering the sham exception set forth in the single-petition case of [*PRE*] necessarily applies to each and every case involving a pattern of petitioning. We instead rely on a more *record-based, case-specific* line of reasoning that, as I read our opinion, leaves open the possibility that, *PRE[]* notwithstanding, a monopolist might be liable under the antitrust laws for engaging in a pattern of petitioning, even though no single filing in that pattern is objectively baseless.[118]

As Judge Barron further noted:

> A decision to immunize monopolists from antitrust liability for their filings – by narrowly construing the exception's scope –surely protects the First Amendment right of petition. But, such a decision also may provide unnecessarily broad protection and thereby *unduly impede the 'free and unfettered competition'* that Congress wished to foster when it broadly empowered courts to hold monopolists accountable for their anti-competitive schemes.[119]

As a result, "it is important not to view the sham exception as a rigid rule."[120]

The purchasers urge this Court to follow Judge Barron's reasoning and apply the *California Motors* standard.

---

[117] 874 F.3d at 771-72.

[118] *Id.* at 773 (Barron & Torruella, JJ., concurring) (citation omitted).

[119] *Id.* at 774 (emphasis added) (quoting *N. Pac. Ry.*, 356 U.S. at 4).

[120] *Id.*

**F.** **The purchasers allege a viable *Walker Process* claim.**[121]

**1.** **The purchasers allege that Novartis made misrepresentations and omissions during prosecution of the second Gleevec patent.**

Under *Walker Process* case law, half-truths and incomplete statements,[122] omissions,[123] technically true but misleading statements,[124] selective and misleading "arguments" or "opinions,"[125] and misdirection[126] all constitute actionable misrepresentations. The purchasers allege that Novartis's misrepresentations included both *omissions* and *affirmative misstatements*.[127]

---

[121] Since *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011), the standards for alleging and proving inequitable conduct and *Walker Process* are virtually identical. *See Loestrin 24*, 261 F. Supp. 3d at 339 n.29 ("The Federal Circuit has . . . remarked that '[a]fter *Therasense*, the showing required for proving inequitable conduct and the showing required for proving the fraud component of *Walker Process* liability may be nearly identical.' It is plain, therefore, that after *Therasense*, inequitable conduct mandates something that approaches, or is identical to, the more exacting requirements of *Walker Process* fraud." (alteration in original) (citation omitted) (quoting *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1307 (Fed. Cir. 2016))). We cite both types of decisions here.

[122] *See Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1191-92 (Fed. Cir 1993).

[123] *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070 (Fed. Cir. 1998).

[124] *See Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007).

[125] *See Refac Int'l Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1583-85 (Fed. Cir. 1996); *Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp. 2d 522, 534 (D.N.J. 2000).

[126] *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1375-77 (Fed. Cir. 2000).

[127] JA-000097 (¶ 265).

First, the purchasers allege that Novartis misrepresented its manufacture of

the non-needle form of imatinib mesylate was "new" and "surprising"[128]:

> The invention relates to a *new* crystalline form of the
> methanesulfonic acid addition salt of [imatinib].[129]

> It has now been *surprisingly* found that a crystal form
> may under certain conditions be found in the
> methanesulfonate salt of this compound, . . . and . . . has
> very advantageous properties.[130]

This was not surprising: again, the needle form of imatinib mesylate either

naturally converts to the non-needle form or else the non-needle form was the

predictable product of routine lab procedures known to any bench chemist at the

time.[131] And again, Novartis first began manufacturing this non-needle form, with

its expected properties, in the early 1990s.[132]

---

[128] JA-000369, 372.

[129] JA-000080 (¶ 192) (emphasis added); JA-000369.

[130] JA-000081 (¶ 196) (emphasis added); JA-000372.

[131] JA-000098-99 (¶ 270). The purchasers also allege that Novartis explicitly acknowledged "the methane sulfonic acid addition salt [i.e., imatinib mesylate] is always taken to mean the β crystal form," JA-000081-82 (¶ 198), which suggests that the form of imatinib mesylate described in Novartis's earlier patent application and publications was in fact the β crystal form.

[132] JA-000069-70 (¶¶ 137-41); *see also Allergan, Inc. v. Teva Pharm. USA, Inc.*, No. 15-cv-1455, 2017 WL 4803941, at *39 (E.D. Tex. Oct. 16, 2017). In *Allergan*, Judge Bryson of the Federal Circuit, sitting by designation, invalidated six patents based on the patent holder's false claim to "surprising" results. The examiner relied on this claim of "surprising" results to issue the six patents. In invalidating the patents, the district court correctly noted that results – certain clinical trial data – were not surprising when Allergan applied for the patents because that data had been published 13 years prior.

Second, the purchasers allege that Novartis omitted key facts that were material to patentability: (1) imatinib mesylate converts to its non-needle form either on its own or else with routine lab procedures; and (2) the existence of the non-needle form, and its properties, were entirely predictable.

Third, and finally, Novartis misrepresented to the PTO that imatinib mesylate had never been "prepared" prior to the second patent application.[133] Novartis falsely claimed that prior publications "exemplified" imatinib mesylate "only in free form (not as a salt)."[134] But Gleevec's inventors had prepared imatinib mesylate and disclosed this compound in multiple articles in the 1990s.[135]

Novartis tries to cast the purchasers' *Walker Process* claim as primarily based on "five publications that were allegedly either 'belatedly' or never disclosed."[136] This misreads the complaints. As the purchasers explained,

---

[133] JA-000434, JA-000472-73; JA-000081 (¶¶ 194-97).

[134] JA-000081 (¶ 194); JA-000372.

[135] The 1996 Buchdunger article disclosed publicly that Zimmermann and others had used a "methane sulfonate salt" (i.e., *mesylate*) form of imatinib in all of the *in vivo* experiments described in the article. JA-000074-75 (¶¶ 159-64); JA-000527-31. The 1997 Zimmermann article disclosed the *mesylate* version of imatinib and suggested that the compound might be a development candidate for use in treatment of leukemia. JA-000077 (¶¶ 178-80); JA-000521-26 (including a diagram of imatinib mesylate). And the 1996 Druker Article described preclinical studies of imatinib *mesylate* and disclosed that imatinib *mesylate* selectively inhibits the proliferation of leukemia-causing cells. JA-000076 (¶ 172); JA-000673-78 (the compound in Figure 1 is imatinib mesylate). Novartis never provided the last article to the PTO.

[136] Novartis's Br. at 62.

Novartis's affirmative misrepresentation to the PTO that the non-needle form was surprising, and its failure to tell the PTO that this polymorphism occured either naturally or else was the product of routine laboratory techniques, constitutes fraud.[137] And Novartis's affirmative representation that imatinib mesylate was never previously prepared was false.[138]

## 2. The purchasers allege materiality under any standard.

Novartis argues that its misrepresentation regarding surprise was not material, under either a "but for" materiality standard or an "egregious misconduct" standard.[139] It is material under either standard.[140]

Patent examiners are not expected to know whether chemistry techniques are commonly used. The PTO relies on applicants to disclose information that affects patentability: patent applicants attest that all statements made to the PTO are true

---

[137] JA-000081 (¶¶ 196-97); JA-000098 (¶ 270).

[138] JA-00088 (¶ 222) (Novartis "disingenuously[] implied" that imatinib mesylate "was not actually included in Zimmermann" even though "Ciba-Geigy developed" it "back in 1992, Zimmermann was one of the scientists who developed it, and the '184 patent specification mentioned the mesylate salt. In its comments to the examiner, Novartis worded its argument very carefully to falsely suggest that the mesylate salt may not have actually been developed as of the time the Zimmermann patent issued."); JA-000097 (¶ 265) ("Novartis knowingly and willfully misrepresented facts to the PTO in order to obtain and maintain a patent monopoly," "includ[ing], but . . . not limited to, (i) misrepresenting that the mesylate salt of imatinib was not actually prepared in Zimmermann . . . .").

[139] Novartis's Br. at 66, 69-70.

[140] Courts "should apply the preponderance of the evidence standard" in assessing materiality. *Therasense*, 649 F.3d at 1291-92.

or believed to be true and are the product of reasonable inquiry.[141] Otherwise, "the

Patent Office and the public" are "the 'mute and helpless victims of deception and

fraud.'"[142] "A 'lapse on the part of the examiner does not excuse the applicant.'"[143]

The purchasers' complaints explain why the PTO would not have issued the

second Gleevec patent but for Novartis's claim to "surprise." Both the examiner

and the Board were looking for the precise information that Novartis withheld. The

examiner repeatedly focused on whether (i) the mesylate salt had been made or

disclosed earlier, and (ii) the non-needle form occurred through routine

conditions.[144] The Board focused on whether the examiner identified evidence that

a person skilled in the art would have known how to make the non-needle crystal

form.[145] Ultimately, the Board concluded that:

> [O]n this record, the examiner has not adequately
> explained how a person having ordinary skill would have
> been led from 'here to there,' i.e., from the
> methanesulfonic acid addition salt of imatinib to the non-

...

---

[141] 37 C.F.R. § 11.18(b)(1); *see also* 37 C.F.R. § 1.4(d)(4)(i); *Alcon Research, Ltd. v. Apotex, Inc.*, No. 09-cv-102, 2013 WL 2244338, at *5 (S.D. Ind. May 21, 2013).

[142] *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 818 (1945) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)).

[143] USPTO, *Manual of Patent Examining Procedure* § 2004 (8th ed. Rev. 8, Jan. 2018) (quoting *KangaROOS U.S.A., Inc. v Caldor, Inc.*, 778 F.2d 1571, 1576 (Fed. Cir. 1985)).

[144] JA-000090-91 (¶¶ 231, 238); JA-000423.

[145] JA-000092 (¶¶ 244-45); ADD-042.

> hygroscopic or β-crystalline form of that compound recited in the appealed claims.[146]

If Novartis had told the examiner the truth, the examiner could have filled in these gaps and the patent would not have issued. Novartis's failure to provide the desired information constitutes a violation of its duty of candor, good faith, and honesty.[147]

Novartis's citation to *LifeScan, Inc. v. Home Diagnostics, Inc.*[148] is not to the contrary. There, the defendant argued that a mis-description of a piece of prior art in an information disclosure statement constituted inequitable conduct. But the defendant's *own* "technical expert" confirmed that the patent holder's description of the prior art "was accurate."[149] And, in any event, the description could not have been material because the plaintiff *gave the examiner the prior art.*[150] Thus, the examiner could decide for herself what that prior art taught. Here, the problem is Novartis *did not provide* the examiner with the information about how easily it discovered or made the non-needle crystal form.

Novartis's claim to surprise also constitutes egregious misconduct. Novartis argues that there is a significant difference between false statements in a patent's

---

[146] JA-000092 (¶ 244) (emphasis added) (quoting the Board at ADD-045).

[147] 37 C.F.R. § 1.56(a) (explaining the duty of candor "includes a duty to disclose to the [PTO] all information known to [the applicant] to be material to patentability").

[148] 103 F. Supp. 2d 379 (D. Del. 2000), *aff'd*, 13 F. App'x 940 (Fed. Cir. 2001).

[149] *Id*. at 386.

[150] *Id.*

specification and false statements in a signed declaration.[151] Novartis would have this Court engage in superficial line-drawing, categorizing certain affirmative lies as worse than others. But false statements and omissions of all stripes are actionable under both the inequitable conduct and *Walker Process* standards.[152] Even attorney argument can amount to a material misrepresentation.[153]

Novartis relies on *Exergen Corp. v. Wal-Mart Stores, Inc.*[154] to argue that the purchasers have failed to list the specific claims to which its misrepresentations were material.[155] The purchasers do not list specific claims because Novartis's misrepresentations were material to *all claims*.[156] All eighteen claim the non-needle polymorphic form of imatinib mesylate. But for Novartis's misrepresentations, the PTO would not have issued *any* of the second patent's claims.[157]

---

[151] Novartis's Br. at 72.

[152] *See Paragon*, 984 F.2d at 1191-92; *Nobelpharma*, 141 F.3d at 1070; *Dippin' Dots*, 476 F.3d at 1347.

[153] *Refac Int'l*, 81 F.3d at 1583-85; *Bristol-Myers Squibb*, 90 F. Supp. 2d at 534 (rejecting "as a matter of law Bristol's protest that virtually any statement about a disclosed reference should be deemed 'mere advocacy' and irrelevant to the inequitable conduct inquiry").

[154] 575 F.3d 1312 (Fed. Cir. 2009).

[155] Novartis's Br. at 30.

[156] JA-000098-99 (¶¶ 270-77).

[157] *Id.*

### 3. The purchasers allege intent to deceive.

Intent is a highly fact-intensive inquiry usually resolved at trial.[158] To survive a motion to dismiss, the purchasers need only allege facts from which a jury could find *either* that Novartis intended to withhold or misrepresent material information[159] *or* that Novartis acted with reckless disregard as to the consequences of withholding/misrepresenting information.[160] Because wrongdoers rarely confess, "intent must be inferred from the facts and circumstances surrounding the applicant's conduct."[161] False statements made "in order to overcome a prior art reference raise[] a strong inference of intent to deceive."[162]

---

[158] *See, e.g., TransWeb*, 812 F.3d at 1312 (post-trial affirmance); *Unitherm Food Sys. Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1360 (Fed. Cir. 2004), *rev'd on other grounds*, 46 U.S. 394 (2006) (affirming as to intent); *Nobelpharma*, 141 F.3d at 1073 (post-trial affirmance).

[159] *Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1349 (Fed. Cir. 2007); *see also SanDisk Corp. v. STMicroelectronics, Inc.*, No. 04-cv-4379, 2008 WL 4615605, at *4-5 (N.D. Cal. Oct. 17, 2008).

[160] *Hydril*, 474 F.3d at 1349 (quoting *Unitherm*, 375 F.3d at 1358). Novartis cites *Argus Chem. Corp. v. Fibre Glass-Evercoat Co.*, 812 F.2d 1381, 1385 (Fed. Cir. 1987), for the proposition that something more than recklessness is required, Novartis's Br. at 74, but *Unitherm* and *Hydril* postdate *Argus*.

[161] *Unitherm*, 375 F.3d at 1360 (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180-81 (Fed. Cir. 1995)); *see also Dippin' Dots*, 476 F.3d at 1347 ("[I]ntent may be inferred from the facts and circumstances of a case . . . .").

[162] *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1345 (Fed. Cir. 2013).

In *In re Celebrex (Celecoxib) Antitrust Litigation*,[163] a similar antitrust action alleging *Walker Process* fraud, the plaintiffs alleged that Pfizer misrepresented facts to overcome rejections and obtain a follow-on patent.[164] In denying the motion to dismiss (in relevant part), the court recited *Unitherm*'s inquiry: whether "a jury reasonably could . . . conclude[] that a defendant intended to deceive the PTO" from evidence that "a representative of the defendant made a material statement to the PTO that he knew to be false."[165] The court concluded that *Celebrex* "present[ed] similar circumstances."[166] "[T]he fact that Pfizer made misleading statements, which it knew to be misleading," sufficiently raised an inference at the motion to dismiss stage "that Pfizer intended to deceive the PTO."[167]

This case is no different. Here, the purchasers allege that Novartis (through its inventors and prosecuting attorney) made false statements on purpose; it was not an accident that the words "new" and "surprisingly" appeared in the patent specification.[168] Novartis had actual knowledge that these statements were false: Novartis's inventors knew that they had made the mesylate salt years earlier and

---

[163] No. 14-cv-361, 2015 WL 13264206 (E.D. Va. Nov. 6, 2015).

[164] *Id.* at *2.

[165] *Id.* at *6 (citing *Unitherm*, 375 F.3d at 1360).

[166] *Id.* at *7

[167] *Id.*

[168] JA-000100 (¶ 282); JA-000369; JA-000372.

had already published articles about it.[169] Novartis's inventors – bench chemists –
also knew that either the β crystal form of the mesylate salt either spontaneously
occurred or else was the product of simple laboratory techniques.[170] Novartis's
attorney knew that these misrepresentations were material: the examiner explicitly
asked for information about how it made the non-needle form.[171] And yet Novartis
omitted key information that would have caused the PTO not to issue the patent, to
overcome the examiner's rejection.[172]

These actions alone are enough to allege intent. Novartis's decision to
withhold articles its own inventors authored about imatinib mesylate until *after*
Novartis received a notice of allowability only further evinces Novartis's deceptive
intent.[173] There is no plausible explanation for why the inventors' articles about
imatinib mesylate were not disclosed until the very last minute. Let alone an
explanation for why these articles were submitted with a *res judicata* argument that
discouraged the examiner from spending time actually considering the materials.
These allegations establish a pattern of deceit; the only plausible explanation for
Novartis's actions is that it intended to mislead the examiner.

---

[169] JA-000098-99 (¶¶ 270-72).

[170] JA-000070 (¶¶ 138-39); JA-000078 (¶ 181).

[171] JA-000087 (¶ 216); JA-000423.

[172] JA-000099-100 (¶¶ 278-82).

[173] JA-000100 (¶ 281).

### III. CONCLUSION

For the foregoing reasons, the purchasers respectfully request this Court reverse the district court's dismissal of this lawsuit.

Dated: February 16, 2017

Respectfully submitted,

/s/ Thomas M. Sobol
Thomas M. Sobol (BBO #471770)
Kristen A. Johnson (BBO #1153285)
Hannah W. Brennan (BBO #1181216)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel.: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
hannahb@hbsslaw.com

*Counsel for the End Payer Purchaser Appellants*

John D. Radice (BBO #1148856)
RADICE LAW FIRM, P.C.
34 Sunset Blvd
Long Beach, NJ 08008
Tel.: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com

Noah Rosmarin (BBO #630632)
ADKINS, KELSTON & ZAVEZ, P.C.
90 Canal Street, Suite 500
Boston, MA 02114
Tel.: (617) 367-1040
Fax: (617) 742-8280
nrosmarin@akzlaw.com

*Counsel for the Direct Purchaser Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the appellants certify that the foregoing consolidated brief is in 14-point Times New Roman proportional font and contains 9,631 words. It is thus in compliance with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) and the Order of this Court dated February 7, 2018.

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, the foregoing document was served by filing it on the court's CM/ECF system and additionally via electronic mail to all counsel of record.

Dated: February 16, 2017      /s/ Thomas M. Sobol
                   Thomas M. Sobol